**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MAURICIA VANMETER,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Case No. 1:18-CV-00476 (JMC)** |
| **v.** ) | |
| ) | |
| **UNITED STATES CAPITOL POLICE,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................... 1

II.  FACTS .............................................................................................................. 2

    A.  PHELPS ASSIGNED PLAINTIFF TO WORK WITH DOGS AT RISK OF FAILING AND UNDERMINED HER IN THE CONDITIONING EXERCISES ................................................ 2

    B.  PHELPS THREATENED TO REMOVE PLAINTIFF EARLY IN TRAINING DESPITE HER GOOD PERFORMANCE ....................................................................................... 5

    C.  PHELPS CONTINUED TO FABRICATE AND EXAGGERATED ALLEGED PROBLEMS WITH PLAINTIFF'S PERFORMANCE WHILE DOWNPLAYING OR CONCEALING THE MALE HANDLER'S DEFICIENCIES IN SEPTEMBER 2017 ............................................................. 7

    D.  DANTINNE'S DOG FAILS OUT AND DANTINNE IS TRANSFERRED TO PBIED .......... 16

    E.  PHELPS UNDERMINING CONDUCT TOWARD VANMETER CONTINUES IN LATE SEPTEMBER WHILE HE CONTINUED TO HIDE RILEY AND ZBORAI'S FAILINGS ......................... 18

    F.  RILEY' DOG FAILS OUT, AND RILEY IS TRANSFERRED TO PBIED ........................ 20

    G.  PHELPS UNDERMINING CONDUCT TOWARD VANMETER CONTINUES IN OCTOBER WHILE HE CONTINUED TO HIDE ZBORAI'S FAILINGS ................................................. 22

    H.  THE DEBACLE OF OCTOBER 11, 2017 .................................................... 27

    I.  DEFENDANT CONCEALED AND DESTROYED EVIDENCE ......................................... 30

    J.  VANMETER'S REMOVAL ON OCTOBER 18, 2017 ................................................. 31

    K.  DEFENDANT MANIPULATED THE FINAL CERTIFICATION TESTS TO ALLOW DANTINNE AND RILEY TO BE CERTIFIED ................................................................... 31

    L.  VANMETER'S COMPLAINT ABOUT DISCRIMINATION WAS SWEPT UNDER THE RUG 33

**III.  APPLICABLE LAW** ............................................................................... **33**

A.  SUMMARY JUDGMENT STANDARD ........................................................ 33

B.  STANDARD OF PROOF IN DISCRIMINATION AND RETALIATION CASES .................. 34

C.  BURDEN SHIFTING REGIME ............................................................. 36

   1.  *Prima Facie Case of Gender Discrimination* ................................... 36

   2.  *Prima Facie Case of Disability Discrimination* ............................... 37

   3.  *The Prima Facie Case for Retaliation* ......................................... 37

   4.  *Pretext* .................................................................... 38

   5.  *Cat's paw* .................................................................. 38

**IV.  ARGUMENT** ........................................................................... **39**

A.  PLAINTIFF CAN DEMONSTRATE THAT THE DEFENDANT'S ASSERTED REASONS FOR REMOVING HER WERE PRETEXT FOR DISCRIMINATION OR RETALIATION. ..................................... 39

B.  PLAINTIFF HAS PRESENTED PRIMA FACIE EVIDENCE OF GENDER AND DISABILITY DISCRIMINATION AS WELL AS RETALIATION. .......................................................... 49

   1.  *Prima Facie Evidence of Disability Discrimination* .......................... 49

   2.  *Plaintiff Asserts a Prima Facie Case of Gender Discrimination* .............. 51

      a.  Threatening VanMeter with Removal on August 22, 2017 ..................... 51

      b.  Assigning VanMeter to work with Jayden .................................. 55

   3.  *Plaintiff Asserts a Prima Facie Case of Retaliation* ....................... 56

**V.  CONCLUSION** ......................................................................... **58**

# TABLE OF AUTHORITIES

## CASES

*Ajisefinni v. KPMG LLP*, 17 F. Supp. 3d 28 (D.D.C. 2014) ........................................................ 33

*Akridge v. Gallaudet Univ.*, 729 F. Supp. 2d 172, 184 (D.D.C. 2010) ......................................... 48

*Brady v. Office of the Sergeant at Arms*, 520 F.3d 490 (D.C. Cir. 2008) .............................. 35, 48

*Christensen v. Titan Distribution*, 481 F.3d 1085 (8th Cir. 2007) ................................................ 47

*Chudson v. Watt*, 125 F. Supp. 3d 255 (D.D.C. 2015) ................................................................. 51

*Cones v. Shalala*, 199 F.3d 512 (D.C. Cir. 2000) ........................................................................ 54

*Fogleman v. Mercy Hosp.*, 283 F.3d 561 (3d Cir. 2002) ......................................................... 37, 56

*Frierson v. Ill. Cmty. Coll. Dist. 525*, 2000 U.S. Dist. LEXIS 3133 (N.D. Ill. Mar. 3, 2000) ..... 42

*Grosso v. City Univ.,* 2005 U.S. Dist. LEXIS 4089 (S.D.N.Y. Mar. 14, 2005) ........................... 57

*Hamilton v. Geithner*, 666 F.3d 1344 (D.C. Cir. 2012) ........................................................... 51, 58

*Ingram v. D.C. Child & Family Servs. Agency*, 394 F. Supp. 3d 119 (D.D.C. 2019) ................. 36

*Iyoha v. Architect of the Capitol*, 927 F.3d 561 (2019) ............................................................... 44

*Johnson v. Hartogensis,* 2023 U.S. Dist. LEXIS 179492 (D.D.C. Oct. 5, 2023). ................. 33, 36

*Johnson v. Napolitano*, 686 F. Supp. 2d 32 (D.D.C. 2010) .................................................... 37, 57

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). ......................................................... 35

*Moloney v. Home Depot U.S.A., Inc.,* 2012 U.S. Dist. LEXIS 75430 (E.D. Mich. May 31, 2012)

..................................................................................................................................................... 51

*Monroe v. Children's Home Ass'n of Illinois*, 128 F.3d 591 (7th Cir. 1997) ............................... 42

*Morris v. McCarthy*, 825 F.3d 658 (D.C. Cir. 2016) ................................................. 35, 36, 38, 49

*Murphy v. District of Columbia*, 390 F. Supp. 3d 59 (D.D.C. 2019) ...................................... 37, 56

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000). ............ 34, 38, 41, 47, 48, 50

*Staub v. Proctor Hosp.*, 562 U.S. 411 (2011) ............................................................................ 38

*Tolan v. Cotton*, 572 US. 650 (2014) ................................................................................. 34, 48

*United States EEOC v. Bojangles Rests., Inc.*, 284 F. Supp. 2d 320 (M.D.N.C. 2003) .............. 57

*VanMeter v. United States Capitol Police*, 2020 U.S. Dist. LEXIS 262231 (D.D.C. May 30, 2020) ............................................................................................................. 37, 56

*Walker v. Johnson*, 798 F.3d 1085 (D.C. Cir. 2015) ........................................... 36, 38, 39, 42, 47

*Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109 (D.C. Cir. 2016) ........................................ 42

**STATUTES**

2 U.S.C. § 1311 .................................................................................................................. 34

**RULES**

Fed. R. Civ. P. 56 .............................................................................................................. 33

**TABLE OF DOCUMENT EXHIBITS**

| | Description | Bates |
|---|---|---|
| 1 | Training Schedule | VM 17-26 |
| 2 | Phelps August 22, 2017 email to Cromwell and Erickson re training and canine assignments | USCP 4116 |
| 3 | Key to Handlers | N/A |
| 4 | First Hill Deposition | N/A |
| 5 | First Phelps Deposition | N/A |
| 6 | Meikrantz training records | Various |
| 7 | Deutsch Deposition | N/A |
| 8 | 30(b)(6) Notice | N/A |
| 9 | USCP Canine Handler Notebook | USCP 965-988 |
| 10 | Second Hill Deposition | N/A |
| 11 | Cullen Deposition | N/A |
| 12 | Heyen Report | N/A |
| 13 | Zborai Training Records | Various |
| 14 | VanMeter Training Records | USCP 23-100, 3129-3136 |
| 15 | Rogers October 3, 2017 Email Re Staying Longer in training | USCP 4124-25 |
| 16 | Riley Deposition | N/A |
| 17 | August 9 training record referencing returning Queen | USCP 335-336 |
| 18 | K9 Invoice | USCP 4079 |
| 19 | Riley Training Records | Various |
| 20 | Dantinne Training Records | Various |
| 21 | Second Phelps Deposition | N/A |
| 22 | VanMeter Deposition | N/A |
| 23 | VanMeter August 22, 2017 text to son | VM 621 |
| 24 | October 16, 2017 Removal Recommendation | USCP 12-17 |
| 25 | Dantinne Deposition | N/A |
| 26 | September 7, 2017 email from Phelps to Cromwell and Chain of Command | USCP 6-7 |

| 27 | September 12, 2017 email from Phelps to Chain of Command | USCP 4083 |
|---|---|---|
| 28 | Defendant's Fourth Response to 3d Interrogatories | N/A |
| 29 | VanMeter Declaration | N/A |
| 30 | Notes from September 28, 2017 | USCP 3082 |
| 31 | Notes from September 26, 2017 | USCP 3071 |
| 32 | Phelps email to chain of command on October 10, 2017 regarding removing VanMeter | USCP 4092 |
| 33 | Phelps email to chain of command on October 3, 2017, regarding transferring Riley to PBIED | USCP 4080-82 |
| 34 | Training notes from September 21, 2017 | USCP 3063-64 |
| 35 | October 3, 2017 Email Communications Regarding Billy L Health | USCP 4432, 4455 |
| 36 | Belknap Deposition | N/A |
| 37 | October 19, 2017 email from Rogers to VanMeter | USCP 10 |
| 38 | Rogers Deposition | N/A |
| 39 | Phelps' October 12, 2017 email to Cromwell requesting that Cromwell remove VanMeter | USCP 4099 |
| 40 | Second Cromwell Deposition | N/A |
| 41 | October 12, 2017 follow up email from Hill re documentation needed | USCP 4089 |
| 42 | October 16, 2017 email from Cromwell to Phelps asking for status of removal memorandum | USCP 4352 |
| 43 | Phelps November 1, 2017 memorandum summarizing removing VanMeter from Training, in anticipation of litigation | USCP 4090-91 |
| 44 | First Cromwell Deposition | N/A |
| 45 | 2016 training record referencing form 550 | USCP 2136 |
| 46 | Mid-Course Reviews for VanMeter, Dantinne and Riley | USCP 63, 2978, 472 |
| 47 | Presentation about Certification Requirements | USCP 1509-1514 |
| 48 | Zborai Environmental Test Result | USCP 898 |
| 49 | Dantinne, Riley, Meikrantz, Schmid, Zborai Odor Recognition Tests | USCP 267, 414, 611, 766, 897 |

| 50 | October 31, 2017 Training Record from Schmid Odor Recognition Test | USCP 2397-98 |
| 51 | October 26, 2017 email exchange between Cromwell and VanMeter regarding rumor | USCP 1963 |
| 52 | Course Overview | USCP 989-1005 |
| 53 | Handler Wish lists | Various |
| 54 | Erickson Deposition | N/A |
| 55 | VanMeter Pay Records from Training | N/A |
| 56 | August 21, 2017 Training Note | USCP 3024 |
| 57 | Sund Deposition | N/A |
| 58 | October 24, 2017 Memo Reassigning VanMeter after Removal | USCP 11 |
| 59 | October 23, 2017 email complaining about discriminatory treatment | USCP 103-105 |
| 60 | October 27, 2017 email from Sund to Braddock re conducting inquiry into VanMeter's allegations | USCP 118-120 |
| 61 | Braddock Deposition | N/A |
| 62 | Human Resources Inquiry | USCP 1856-58 |
| 63 | Defendant's Objection to 30(b)(6) deposition | N/A |

## I.     INTRODUCTION

Plaintiff Mauricia VanMeter (VanMeter), a 20-year career Officer in the U.S. Capitol Police, began the canine handler training program in August 2017, along with five male trainees. Sgt. Tony Phelps, who was in charge of the training program, undermined and sabotaged VanMeter throughout training. Among other things, he and the other trainers withheld key information from her (including the location of explosive hides), saddled her with a dog that was expected to fail out of the program, held her to a double standard, and gaslighted her to drive her to quit the class. All the while, Phelps concealed and minimized the male handler's serious performance deficiencies.

Compared to VanMeter, two of the men performed so badly in training that they ruined their initial canine partners, and a third handler (a veteran handler who was certifying with a new canine partner) proved himself to be unreliable because he regularly missed explosive targets due to his incomplete searches and was often fooled by his canine partner in situations when no explosive odor was present. None of the men were removed, or even threatened with removal.

Phelps threatened Plaintiff with removal several times throughout the course, beginning in the third week of training. Ultimately, on October 18, during in the eleventh week of what was supposed to be a fourteen-week training program, Phelps removed her. In so doing Phelps violated multiple important policies, designed to safeguard against discriminatory behavior.

A jury could conclude that the removal was due to discrimination based on gender, disability (VanMeter told Phelps she suffered from anxiety on September 6, 2017) or retaliation (Phelps believed VanMeter complained about discrimination during the week of September 11, 2017).

Phelps' discriminatory conduct had such wide range that if a jury were to credit any of Plaintiff's evidence, it would be justified in finding discrimination or retaliation here. For example,

1

even if a jury only believed the evidence that Phelps assigned VanMeter a dog he thought was going to fail out of the program (while giving the men their first choice of dogs), or only believed that Phelps withheld the location of hides during the imprinting phase from VanMeter, then that jury would be justified in concluding that all of Phelps subsequent actions against VanMeter were similarly imbued with the same unlawful animus.

## II.    FACTS

There were six handlers in VanMeter's training class, which commenced on August 7, 2017, and she was the only woman, including among the trainees and training staff. SUMF 114, 117-118.[1] The other handlers were Dmitri Dantinne (referred to as Handler 1[2]), Rob Meikrantz (Handler 2), Mike Riley (Handler 3), Jay Schmid (Handler 4) and Garrett Zborai (Handler 5). PMF 2. There were additionally five trainers for the class: Sgt. Phelps, who was in charge of the K9 training program at the time and the first line supervisor of all the handlers (SUMF 27, 31, PMF 16), Lead Trainer Charles "Kenny" Hill, and Trainers Tim Cullen, A.J. Turner, Jeff Core and Melvin Smalls (SUMF 34).

### a.    PHELPS ASSIGNED PLAINTIFF TO WORK WITH DOGS AT RISK OF FAILING AND UNDERMINED HER IN THE CONDITIONING EXERCISES

Phelps made sure things did not start well for VanMeter. During the first two weeks of the training program the handlers were supposed to work with all of the available dogs (there were originally 10). SUMF 128; Cullen Dep., Ex.11 at 92:17-93:6 (the trainers wanted the handlers to have experience with each dog in order to make good partner matches). One dog (Bliss) was sent

---

[1] Plaintiff's Statement of Material Facts Demonstrating a Genuine Dispute Necessitating Trial is abbreviated as PMF here. Defendant's Statement of (alleged) Undisputed Material Facts is abbreviated as SUMF (using Defendant's nomenclature), and Plaintiff's Response to the SUMF is referenced as the RUMF.  Exhibits referenced herein are to Plaintiff's Exhibits unless indicated.

[2] USCP redacted other handlers' names in training records produced to Plaintiff and used a key to cross-reference the names.

back to the supplier for medical reasons (SUMF 129), and Phelps specifically instructed VanMeter not to work with Pope and Billy (the Malinois), two dogs who were earmarked for male handlers who showed a preference for those dogs. SUMF 161. Phelps justified the restriction based on the size of the dogs, but that explanation did not hold up, because her assigned dog (Jayden) was bigger than Pope. RUMF 161.

Phelps initially encouraged VanMeter to work with Queen, but shortly afterwards, Queen was returned because she lacked a strong search drive from the outset. PMF 34-36, SUMF 130. Consequently, VanMeter's choice of dogs to work with were limited as compared with the men.

The first few weeks of training were devoted to familiarizing the handlers with how to work with a dog, and most importantly teaching the dogs to recognize various odors associated with explosives. PMF 19. This is initially done by exposing the dog to the odor (usually hidden inside one cinder block or other specially made target box among a row of similar empty blocks or boxes, that obscures the target from sight, but allows the odor to emanate) and – when the handler sees the dog catch a sniff of the target odor – commanding the dog to sit and rewarding the dog, usually with a toy, such as a tennis ball. PMF 19-20, SUMF 41-42, 52. This process, known as "imprinting," ultimately conditions the dog to sit as a final indication that it has gotten as close to the source odor as physically possible. SUMF 49, PMF 175, fn 23. Key to this process is that the handlers were quick to give the sit command so that the dog's recognition of the odor is paired with the immediate reaction to sit. PMF 21-22. Consequently, to make sure the handlers were ready and had quick timing on the "sit" command, the trainers always identified the cinder box or target box in which the hide was located. PMF 22, SUMF 52.

The trainers undermined VanMeter, however, by withholding that information from her. Video evidence shows the trainers advising the male handlers of the location of the target before

they begin the exercise, as they approach the line of blocks or boxes, then again as they approach the target box (typically yelling "this is the hot one!"). PMF 23-30, 33.  In contrast, one hears crickets on VanMeter's training videos. For the most part, the only time VanMeter was told where the hide was located was (on the rare occasion when she did not independently notice the dog's reaction) when she had already passed the target box. *Id.*

For the men, success came easy, or easier, because they were told and reminded where the hides were located. Not so for VanMeter, since she was not told where the target was located. PMF 24-25. That, in turn, gave Phelps the opportunity to decry her performance during those exercises when VanMeter was less sure in the exercise, and to document her with illegitimate criticism on the daily training forms that the trainers used to track the exercises performed each day. See, e.g., SUMF 172, 176. This, in turn, hurt VanMeter's confidence, which was important because – as Trainer Hill asserted in his post-discovery declaration, "signs a handler is progressing include confidence in reading the change of behavior in the dog." *See* Hill Decl. Def's Ex. 2, ¶ 27. Additionally, Phelps cited VanMeter's lack of "confidence" as justification for his decision to remove her in his post-discovery declaration. *See* Phelps Decl., Def's Ex. 3 at ¶ 81.

On August 22, 2017, the beginning of the third week of the program, each handler was asked to choose between either the "Static" search team or the Person Borne Improvised Device (PBIED) team . SUMF 15. The handlers also got to list their top three choices of canine partner. SUMF 15.  Each of the men got their first choice of dog; VanMeter did not. PMF 42.

On August 22, 2017, VanMeter was paired with Jayden, and Phelps told her that made the assignment because they both "had issues." PMF 45.  Jayden had been purchased as a PBIED dog, which meant that he was more expensive (SUMF 131, Ex. 18), and it was initially believed that he could work independently, without much need for direction from the handler, and had a strong

search drive. SUMF 133, RUMF 133. But the trainers quickly realized that Jayden was not the quality dog that they had purchased. Instead, according to Trainer Hill, he was a "just a dependent dog." PMF 44.  Jayden had other problems in the first several weeks: he would show no interest in searching for the explosive odors unless the trainers placed a tennis ball (a toy) in the search box. PMF 39-40, SUMF 155. If there was no tennis ball, Jayden showed no interest, which meant that he was confused and was slower to recognize the explosive odors. *Id.* Additionally, Jayden would not "sit."  PMF 38-39, 41, SUMF 155. That was a major problem because the dogs are taught to sit as the signal that they had found the explosive odor. SUMF 41. So, a dog that won't sit cannot show that final indication that it has found the source.

Due to these serious problems, the trainers doubted that Jayden would successfully pass the class. PMF 37-41, 44-46. In other words, Phelps saddled VanMeter with a dog was behind the other dogs in its progress through the imprinting process and – more importantly - that he thought would flunk out of the program, leaving VanMeter dogless. On the day she was assigned to work with Jayden, VanMeter texted her son saying: "I was just assigned my new partner Jayden. We are both having some problems and have been put on notice that we have to get it together in 3 weeks." PMF 45.

### b. PHELPS THREATENED TO REMOVE PLAINTIFF EARLY IN TRAINING DESPITE HER GOOD PERFORMANCE

During the first few weeks of training, each trainer expected that the new handlers would make frequent mistakes since they were all learning new skills and had never worked with a canine partner. Def P&A at 7, PMF 248, SUMF 227 (The K-9 trainers *begin to become concerned* about a handlers or teams lack of progression *after the fifth or sixth week of training*.") (emphasis added). No trainer would ever threaten a new handler with removal during this 5-6 week grace period,

simply for making mistakes in training. PMF 248, SUMF 227.  But that grace period did not apply to VanMeter.

Despite that grace period, on August 22, 2017 – the very day she was assigned to work with Jayden, Phelps threatened VanMeter with removal if she did not improve her performance. He approached her in the hallway and told her "I don't believe you are going to make it."  PMF 81.  The problem that Phelps cited in the record for that day was getting Jayden to sit. Out of numerous exercises, VanMeter failed to get Jayden to sit on *one occasion*. PMF 84.  The notion that the threat was due to some culmination of poor performance over the first two weeks is flatly contradicted by the note in VanMeter's training record from August 17 (only two training days earlier) that "Overall handler is progressing well." PMF 83. (emphasis added).

At the time, Jayden was having serious troubles (PMF 34-48), and the male candidates were demonstrating their own significant problems with mechanics of working a K9. PMF 38 (male handlers struggling to get Jayden to sit); PMF 50-85 (cataloging VanMeter's performance compared to the male handlers), PMF 203-212 (Dantinne's early struggles); PMF 231-239(f) (Riley's early struggles).  Indeed, the Defendant concedes that Riley and Dantinne struggled early in training. SUMF 228, 232, 233 (all relating to Dantinne's deficiencies); SUMF 238-239 (relating to Riley's deficiencies).

In particular, Phelps noted that Riley did not have a good work ethic and his pace was slow and he was not "fluid" when he searched.  PMF 233, 234, 237, 239, Deutsch Dep., Ex. 7 at 75:9-77:17 (Riley's pace was not "where it should be" and criticizing his  "pace and work ethic"). *See* also September 11, 2017 Mid-Course appraisal, listing "movement/pace, search fluency" as Riley's weaknesses, Ex. 46, USCP 472.  The problem with someone who was not "fluid" in the

search is that if the handler was stopping in the middle of a search, it confused the dog, especially early on in training. PMF 238.

To prepare his chain of command (Lt. Cromwell, Capt. Erickson, Inspector Belknap, and Deputy Chief Rogers) for VanMeter's ultimate removal, Phelps made sure that they knew about the August 22, 2017 threat to remove VanMeter. PMF 252.

### c.   PHELPS CONTINUED TO FABRICATE AND EXAGGERATED ALLEGED PROBLEMS WITH PLAINTIFF'S PERFORMANCE WHILE DOWNPLAYING OR CONCEALING THE MALE HANDLER'S DEFICIENCIES IN SEPTEMBER 2017

On September 6, 2017, VanMeter told Phelps that she suffered from anxiety and that the harsh way he gave her feedback was a problem for her.  PMF 300-310.  Phelps told trainers Cullen and Hill about VanMeter's anxiety, but they both denied knowing about it while VanMeter was in training. PMF 308-309.  That disclosure gave Phelps more fuel for his bias against VanMeter, and the next day, on September 7, 2017, he sent his chain of command another email warning about VanMeter's removal. PMF 253. As a result of VanMeter's complaint about his belittling treatment, Phelps asked Tim Cullen to participate in VanMeter's training (PMF 311), but Phelps denied that was the reason and claimed he just wanted another set of eyes. *Id.*

The September 7, 2017 email is particularly strong evidence of unlawful animus because of the abysmal performance of the male handlers, Mike Riley, and Dmitrius Dantinne in the preceding days.

On September 5, 2017[3] as he acknowledged in his deposition, Dantinne committed numerous serious errors. PMF 95.   He allowed his dog to pass by a training aid, despite knowing it was there. Then, while he was being lectured by Phelps, Dantinne lost sight and control over his dog who pulled the explosive target from where it was hidden, which could have been very

---

[3] Dantinne's consistently poor performance over the course of training is described in detail with references to videos, records, and depositions at PMF 50-122, 192-194, and 231-247.

dangerous for the dog and (in a real-life situation) led to an explosion (PMF 98). PMF 95(a)-(b). Dantinne's second exercise had to be aborted because his dog urinated in the search area (spoiling the area for future searches) because, as Dantinne admitted "I let the dog go kind of do free search on its own and just let it roam." PMF 95(c)-(d). On the fourth exercise, Dantinne "didn't condition him to sit when [the dog] came up to the aid." PMF 95(e). In other words, "That would be an error on [Dantinne's] part." *Id.* Had he been scored correctly, Dantinne would have been marked with three "Handler Errors" or "Handler Misses:" Hide 1 because Dantinne allowed the dog to walk the hide even though he knew the location; Hide 2 because the exercise had to be terminated because Dantinne allowed his dog to "roam" which led to the dog spoiling the search; and Hide 4 because Dantinne's dog located the odor, but Dantinne missed it and failed to condition the "sit." PMF 96. But Dantinne was not scored for any of those faults on his report. No Handler Misses or Handler errors were marked in Dantinne's training report. PMF 97.

Mike Riley performed badly on the day as well.[4] *See* PMF 99-102. Like Dantinne, he also committed a Handler Miss on the first exercise because he "failed to work the are to condition the sit." PMF 99. For the second hide, Riley "was slow to condition the sit" which, in Dantinne's report meant that the dog showed change of behavior but that the handler did not notice it. *Id.* and PMF 95(e). On the fourth hide, again the record states that Riley "was slow to condition the sit at training aid [and] had to be told to condition the sit at source." PMF 99. According to K9 Training Expert, Kyle Heyen, the report for Riley shows that he was clearly struggling with basic concepts of training and handling the dog. PMF 100. Riley, in particular, was repeatedly slow to condition the sit, which is one of the primary tasks the candidates have been working on to that point in

---

[4] Riley's consistently poor performance over the course of training is described in detail with references to videos, records, and depositions at PMF 50-121. 125-149. 163-64, 189-90, 231-247.

training. *Id.* Additionally, Riley's performance as described in the report could certainly lead to a K9 becoming confused and disinterested in the training, leading to a dog's removal from the program. *Id.*

Riley's performance was so concerning that his training report states that Sgt. Phelps and Tech Cullen (one of the trainers) singled him out for a private conversation, telling him "he needs to step up his performance. During these times when the training exercise are known to the handler is when the handler should notice the change of behavior from canine and condition the sit at the training aid." PMF 101. Significantly, however, and unlike VanMeter, Riley was not threatened with removal, and Cullen and Phelps could not even remember having that conversation with him. PMF 102. By comparison to Dantinne and Riley, VanMeter performed well. See PMF 103-104.

On August 5, 2017, Phelps raged at the entire class due to Dantinne and Riley's poor performance, declaring that the entire class had not progressed as it should, having entered the fifth week of training.  PMF 255. Dantinne acknowledged that his team was partially to blame for the lecture from Phelps, admitting: "I know Sergeant Phelps addressed the class after that day because my dog was one of the ones that had the issue that day." PMF 95.   Phelps was so upset that he also called lead trainer Hill on the carpet for a verbal drubbing. Phelps told Hill that there were *major issues* with the teams and that Hill needed to explain to the class how to do proper searches. PMF 94, 255.

While VanMeter had a good day on September 6, 2017, the same cannot be said for Dantinne and Riley. Riley repeatedly allowed his canine to ignore his commands and presentations (which he had been counseled about on August 31), which can lead to multiple problems including behavior issues and confusion for the dog about the search process – issues of the sort that can lead to a dog failing to progress through training. PMF 108(a) and (b). In another search, Riley failed

9

to have his K-9 check a car door seam, a problem with the "search pattern," even after the trainers reminded him to do so. PMF 108(c) ("that's the second time you missed that door seam."). Riley also repeatedly placed his dog at risk of injury by prompting the dog to jump on top of the vehicles he was searching *three different times*. This not only risked injury to the dog, but it could have also triggered an explosive device to detonate. 108(d). None of that poor performance was clearly logged in Riley's training report for the day. Ex. 19, USCP 477.

Dantinne's poor performance was noteworthy. He was criticized for not recognizing and understanding his canine's body language in the training report. PMF 109, referring to Ex. 20, USCP 2982). Videos show Dantinne too fast to give the "sit" command on some searches, but too fast on others. PMF 110(a). A video shows Dantinne getting tangled in the leash, losing sight of the dog, then again prompting the dog to sit too soon (prompting the trainer to direct Dantinne to "let him work a little bit more"). But then Dantinne waits too long, which prompts the trainers to (again) give the sit command in Dantinne's place.  PMF 110(b).  In another search the same day, Dantinne asked the trainers if the dog was on source twice (when it was not), and the trainers had to advise Dantinne to be ready to make a presentation (rather than stopping and staring). PMF 110(c). At the end of the search, Dantinne was again so slow in rewarding that the dog becomes frustrated and begins jumping on Dantinne to get the reward. 110(c). None of that additional negative performance was clearly captured in the report. Ex. 20, USCP 2982

Whereas Dantinne and Riley's training records obscured their clear deficiencies, the trainers took the opposite approach with Plaintiff. In VanMeter's training report for September 6, 2017, the trainers fabricated a performance deficiency. For the first search, the trainers wrote: "Handler initial failed to recognize COB to odor, presented high while canine started to whine; advised to allow more work before condition the verbal sit command." PMF 111. The video of the

search shows nothing of the sort; instead, it shows VanMeter performing a thorough multi-vehicle search, and finding the training aid with no assistance or guidance from the trainers at all. *Id.* Even according to the USCP's designated witness, Clifford Deutsch, "she did a good job" and followed the correct pattern for searching cars. *Id.* This was but one example of the training staff fabricating performance deficiencies in VanMeter's training records.

VanMeter received doubly harsh treatment from Phelps and Cullen on September 7, 2017. Video evidence reveals inexplicably harsh conduct on the part of the trainers, that Dantinne and Riley performed far worse than she did, while receiving more assistance, and that the trainers again fabricated or exaggerated VanMeter's alleged deficiencies in the training report.

In searches performed in club rooms at a local baseball stadium (PMF113(a)), VanMeter conducted an efficient search of the first room (in a 2-room search area), and she advised the training staff that the room was clear. But the trainers failed to respond to VanMeter for several seconds which confused her. PMF 29,113(c). While VanMeter was awaiting a response, Jayden began exploring a section of cabinets. *Id.* Rather than advise VanMeter that there was no target in the area, the trainer allowed VanMeter to give the "sit" command, and only stated "negative" after the command, which could have led to confusion in the dog at this early stage in training. *Id.* VanMeter's call was understandable given the trainer's silence and her K-9s interest in the area. *Id.* During the video, the trainer speaks to VanMeter in a condescending, sarcastic and unpleasant tone, despite her conducting appropriate searches and making appropriate observations. *Id.* Contrasting the trainers confusing and hostile treatment toward VanMeter, going to so far as to let her to give an incorrect "sit" command, their conduct toward the men (Dantinne and Riley) was much more helpful. On the same searches, the same trainers quickly informed Dantinne and Riley

11

when their K-9s were giving "false sits" and promptly responded to questions about whether their dogs were "on odor." PMF 30. PMF 113(h), (j)-(k).

When VanMeter moved on to the second room in the same search exercise, after a thorough search, her K-9 did not show any significant change of behavior, but VanMeter asked to run the search again (which was acceptable), and when she searched the room again, Officer VanMeter correctly noted her K-9's COB and she gave a correct sit command, indicating that the target had been found.  PMF 113(e)-(g). Despite allowing Riley to also take a "reset" that day (with no negative comment in the training report) (PMF   113(m)), Phelps criticized VanMeter on her training report: "Handler appeared to become frustrated and request to step out and then returned to re-search the room." PMF 113(f).  In the daily report, moreover, Phelps gave VanMeter a "Trainer Assist" rather than the "Find" that she deserved because she found the target independently, without assistance from the trainers. PMF 113(g).

In Riley's same two-room search, the trainers gave him immediate assistance when he needed, including stopping him from rewarding his dog on a false response. PMF 113(h). Riley made an additional error when he went back to the same location a second time, after being told that no trained odor was present, and he nearly rewarded the dog again, but for the trainer's quick response to stop him. *Id.* Riley moved on the second room in the exercise and found the hide. Unlike VanMeter, Riley was scored with a Find, but trainer Cullen testified that the exercise should have been scored as a "Handler Error," with a note in the comments section to explain Riley's mistakes, including his failure to read his dog correctly and bringing the dog back to the same unproductive spot. *Id.*

Dantinne's performance on this two-room search was just as bad as Riley's. The trainers criticized Dantinne's pace, and Dantinne had to ask the trainers if the dog was "on odor" (which

Dantinne should have been able to determine himself). PMF 113(j) and (k). After Dantinne exhibited a total lack of control over the dog, a trainer (Phelps) encourages Dantinne to control the search "you control him." When Dantinne's dog arrived at the target in the second room, he showed very clear (even to the untrained eye) alerting change of behavior, but Dantinne had to ask the trainers "is he working odor here" to which the trainers respond, without delay. PMF 113(j) Cullen described Dantinne's search as "not as fluid. He had difficulties getting the dog to focus on the search and have a fluent pattern around the room." PMF 113(j). Dantinne needed to "be ready for the next presentation and when the dog's ready to go to work, go to work" otherwise the dog could get frustrated and lose interest in the search. PMF 113(j). Dantinne should have been scored with a "TA" or Trainer Assist for this search because he only found the target with assistance from the trainers (PMF 113(k)), but Dantinne was scored with a Find, meaning he received a better score than VanMeter, even though she found the target independently and without guidance.

The next search (search 4) on September 7, 2107 was another multi-room search at the same location. After making several incorrect calls (directing his canine to "sit" or "stay" three times), erroneously telling the trainers that whenever his dog sits, it meant that his dog was on the source (the definition of a "false indication" SUMF 50) and failing to check the attached bathroom where the hide was located, Riley left the room in frustration and then came back saying "let's try this again." PMF 113(m). Unlike VanMeter, the trainers did not make any notation that Riley had left the room and re-searched the room in his training report, however. *Id.* Cullen testified that Riley believed that every time his dog sat, it was because the dog had found the odor, because Riley did not understand, even 5-weeks into training, that he had to also see an alerting change of behavior in order for the dog's "sit" to indicate the presence of explosive (see also SUMF 50). PMF 113(m). By one month into the training, generally, handlers had been taught to recognize

change of behavior, and were taught that just sitting (alone) is not change of behavior for a dog. *Id.* Yet the training report does not mention this serious deficiency in Riley's performance and understanding of the training concept. *Id.*

Even on the second time he searched the room, Riley failed to search the bathroom, which was just to the left of the entrance door. PMF 113(n).  After several minutes, and much confusion, the trainers finally prompted Riley to search the bathroom. *Id.* But when he did so, he failed to perform a thorough search because he did not get the dog to search the toilet, and he left the bathroom. Trainer Cullen then chided him, "and what happened when we searched that bathroom?" *Id.* Only then did Riley return and search the toilet, where he found the target. *Id.* Despite failing to search the bathroom, then missing the hide, and only getting the target because the trainers gave him specific instructions, Riley was scored with a clean "Find" for the exercise. *Id. and see* Ex. 19, USCP 475.

Cullen could not explain why there was no mention of Riley numerous deficiencies in the training record (PMF 113(o)), and according to both Cullen and Phelps, there was no good reason to make a negative comment in VanMeter's training report about her asking to restart her search (Search 3) but not to make a negative remark about Riley, when he did the same thing on Search 4. PMF 113(p). A jury could therefore conclude that decrying VanMeter for beginning the search again was a manufactured criticism designed to provide (false) ammunition to support removing her from training.

Dantinne's performance on search 4 rivalled Riley's in its awfulness. Like Riley, Dantinne failed to search the bathroom and had to be reminded later to search it. PMF 113(q). Similarly, Dantinne mistakenly believed that any time his dog sat it was because the dog was on odor, because Dantinne did not understand that the "sit" had to be accompanied by change of behavior (SUMF

50). *Id.* When he finally checked the bathroom (after being prompted to do so by the trainers), he failed to search the door seams before going in, another mistake because the explosive could have been right behind the door. *Id.* Cullen testified that Dantinne deserved a score of Handler Miss or Handler Error because he did not search the bathroom until the trainer told him to do so and for his failure to search the door before opening it. *Id*. And yet, Dantinne miraculously received a Find. Ex. 20, USCP 2780.

Contrary to both Riley and Dantinne, VanMeter performed her search in a left to right manner (as taught), which means that she checked the bathroom first (and independently). PMF 113(r). But that did not save her from Cullen's belittling scorn. After the search was completed and, in a tone dripping with disdain, Cullen told VanMeter he thought it was "odd" that she had searched the bathroom first. *Id*. Cullen's conduct was the epitome of gaslighting: "[to] manipulate (someone) using psychological methods into questioning their own sanity or powers of reasoning," Confronted with his own conduct at his deposition, Cullen could not explain. "I cannot recall why I made that statement." *Id.*

When VanMeter searched the bathroom the first time, Jayden showed some interest in the toilet area, but he backed off independently and moved away without VanMeter pulling away. PMF 113(s).  While Cullen agreed with that conclusion in his deposition, the truth did not stop him from tormenting VanMeter on the day of the search: he continued the gaslighting by falsely accusing her of having moved Jayden off the target the first time she searched. *Id.* When VanMeter searched the bathroom again, she correctly noted Jayden's change of behavior and the team found the target.  PMF 113(t). Even though both Riley and Dantinne received Finds for this search, VanMeter was given a "Trainer Assist." PMF 113(t).  While the trainers included critical notes about VanMeter's performance in the "comments" section of her training report (Ex. 14, USCP

60, beginning in first line "Hide#3-4"), there is no description at all in the "comments" section of either Dantinne or Riley's daily reports for either of the clubroom searches. The trainers conveniently skipped over those searches to obscure that aspect of the men's awful performance. Ex. 20, USCP 2980 (Dantinne); Ex. 19, USCP 475 (Riley).

The depth of description of the events of September 5, 6 and 7, 2017 is not necessary to repeat for most subsequent days. Plaintiff laid out that detail (and does so again only for certain future days, below) to provide specific examples of how Defendant has exaggerated or fabricated her performance deficiencies, while hiding the male handlers' faults. That discussion also shows that Phelps' discussion about removing VanMeter, in his September 7, 2017 email to Lt. Cromwell was the result of discrimination based on either gender or anxiety (or some combination thereof). Phelps did not mention his disappointment with Hill's training regimen, or Riley and Dantinne's horrid performance. Instead, he zeroed in on VanMeter, clear evidence that he was targeting her for removal because of discrimination:

> K-9 handler candidate VanMeter (Missy) is having issues with the mechanics of working a dog and at times reading/understanding the change of behavior of the canine when its odor verse just smelling … The training staff and I have talked to her in private. We have explained that she needs to start having more good days than bad days. … It's still early on making a recommendation on her, but wanted you to be aware as we reach the halfway point next week.

Ex. 26, USCP 7.

### d. DANTINNE'S DOG FAILS OUT AND DANTINNE IS TRANSFERRED TO PBIED

Due to Dantinne's consistently poor performance during training, including what the trainers called "nagging" behavior, his failing to give his dog direction, his confusing actions and commands, his poor rewarding habits and his failure to understand and respond to his dog's changing behavior during searches, Dantinne's dog, Billy M lost interest in searching and had to

be removed from training on September 12, 2017 – only a two training days (the static team trained Monday-Thursday) after Dantinne's very bad week, described above. *See* PMF 203-230.

After Billy M was removed, Phelps had the option of keeping Dantinne in the static training class and using Rocket, one of the unassigned reserve dogs, which had been training with the PBIED team for the past few days,[5] or switching Dantinne over to the PBIED side (despite having missed the first week of PBIED training) and allowing him to finish the course as a PBIED handler. PMF 124. But despite those options being discussed in two different emails one week apart, Phelps changed his tale at deposition: even though Rocket could have been used as a static dog, Phelps claimed that the only options available were to switch Dantinne to PBIED and let him work with Rocket, or to remove Dantinne from the program and make him wait to go through the static training the next time a class was offered. *Id.* Conveniently, Phelps claimed that the decision was out of his hands and that Cromwell gave him the order to switch Dantinne to PBIED from someone up the chain of command. 1st Phelps Dep., Ex. 5 at 193:2-9. But Cromwell contradicted that account, saying he never discussed Dantinne's options with Phelps. 1st Cromwell Dep., Ex. 44 at 116:9-12.

A jury could reasonably conclude that Dantinne's performance in static training was so bad that Phelps knew he would never be able to complete the training course. Rather than fail him out, Phelps decided to move Dantinne over to the PBIED side, so that he could work with one of the more independent PBIED dogs that would not require as much input or direction from the Dantinne. SUMF 133, RUMF 133. That showed bias in favor of the men because, at the same time, Phelps was threatening to remove VanMeter and preparing his chain of command for that

---

[5] On September 6, 2017, the handlers stopped training altogether as a class and began training only with their static or PBIED teammates (PMF 5).

result, he was arranging things so that Dantinne to stay in training, without ever discussing or considering his removal. PMF 288.

### e. PHELPS UNDERMINING CONDUCT TOWARD VANMETER CONTINUES IN LATE SEPTEMBER WHILE HE CONTINUED TO HIDE RILEY AND ZBORAI'S FAILINGS

Dantinne's departure from the static team left only VanMeter, Riley and Zborai working with Phelps, Hill, and Cullen as trainers for the next three weeks (through October 3, 2017 when Riley's dog was removed from the class and Riley was transferred to PBIED). During that period, Riley continued to show his incapacity to conduct effective searches with his partner. PMF 50-121, 125-149, 163-164, 189-90, 231-247; SUMF 238-39.

During this period, Phelps' discriminatory conduct toward VanMeter accelerated far beyond even what was seen in early September, *supra*.  On September 21, 2017, Riley's dog had to go to the veterinarian, and VanMeter and her dog Jayden were required to transport Riley to the clinic. PMF 31. On that day, while Zborai profited from a solo training day, the trainers introduced a new explosive scent, nitromethane, to Pope. PMF 31, 137. Pope, having encountered nitromethane, was now conditioned to recognize, and respond to, the odor in future days. But Riley and VanMeter's dogs were not, since they missed the imprinting exercise. SUMF 41-42, Deutsch Dep., Ex. 7 at 271:8-11 ("Q. Isn't every time you use a new odor, part of the process [is] imprinting that dog or the odor on that dog? A. You would imprint a dog on a new odor, yes.").

That brings us to September 26, 2017. On the first exercise of the day, there were two targets hidden in a large area that had seating, a bar area and cabinets on the exterior walls. Plaintiff began her search in the left-to-right pattern taught, and she noticed Jayden alert to some cabinets at the beginning of the search. Before she could call the location of the target, the trainers (Phelps, Hill, and Cullen) told her nothing was there, which was false. PMF 136. Van Meter continued her search, making sure to check the bar area and the cooler that was located there. Jayden showed no

interest in that area, however.  PMF 137. After performing a thorough and organized search, Jayden began to break pattern and explore different areas of the room, and VanMeter allowed that to try to find the targets. *Id.*  As the search extended beyond 20 minutes, the trainers would bark out how much time had passed at five or ten minute intervals. PMF 139. Ultimately, VanMeter found nothing and declared that the room was "clear." PMF 136-137

The whole exercise had been set up for VanMeter to fail. The first target was in the cabinets where VanMeter saw Jayden alert, but the trainers called her off of the area. PMF 136. Additionally, VanMeter was marked with a Handler Error for the second target (PMF 137), but that was also bogus.

The real reason VanMeter missed the second target was that the odor in question was nitromethane, on which Jayden had not been conditioned, so VanMeter had no chance whatsoever to score a Find for the exercise. PMF 137. By contrast, when Zborai searched for the target that day, his dog had already been conditioned, and Zborai scored a clean Find for the second target. PMF 137. Similarly, when Riley performed the same search on September 26, which was also the first day his dog encountered the new compound, true to the correct imprinting practice, the search was conducted as a "known location," just as was the case for Zborai on September 21. PMF 31, 138. So, Riley's dog was exposed to the new compound in a controlled training situation before Riley was ever graded on a search involving the compound.

Consequently, blaming VanMeter for a disorganized search pattern and allegedly misreading her dog's behavior for alerting behavior (on the first target) and marking VanMeter with a Handler Miss (on exercise 2) were all bogus and fabricated criticism, which Phelps then used to support her removal. PMF 137. Additionally, after a failed 47 minute search, and after having been unfairly humiliated by the trainers, VanMeter understandably had low energy on the

following search. The trainers took advantage by criticizing her for "lack of enthusiasm and weak verbal praise" on the ensuring search, which tarnished an excellent result ("Conducted a better search pattern and reacted very well to the canine's COB"). PMF 139.

After a day like Phelps engineered on September 26, it was no wonder that the next day VanMeter almost gave Phelps his golden ticket: She told him she was considering withdrawing from the program. While Hill claimed in his deposition that he told VanMeter to "just hang in there. Keep doing what you're doing," (1st Hill Dep., Ex. 4 at 13-19), VanMeter flatly refuted that tale. Instead, the trainers encouraged her to quit by telling her that it was "her decision" to make. VanMeter Dep., Ex. 22 at 281:2-7. The training record is consistent with VanMeter's account: After VanMeter told the trainers what she was considering, they harped on the areas she needed to improve on and said she needed to be "mentally focused during training" and "need[ed] to give 100% on every training exercise." Ex. 14, USCP 85.

### f. RILEY' DOG FAILS OUT, AND RILEY IS TRANSFERRED TO PBIED

As discussed above, Riley exhibited serious flaws nearly every day, which covered the entire gambit of what was covered in training, including basics of handling a dog, Riley's search pace and fluidity, making good presentations, leash work, rewarding, timing, understanding his dog's body language, and even caring for his dog and keeping him away from obvious danger. PMF 50-121, 125-149, 163-164, 189-90, 231-247; SUMF 238-39.

It should come as no great surprise that Riley's dog lost interest in searching. By the end of those nine weeks of working, the dog's head was spinning with confusion. As Phelps alluded to in his September 28 email to his chain of command (in which he wrote that Riley's "search speed is very slow, which is contributive to K-9 Billy's disinterest in searching, which is unacceptable" (PMF 243), and as K-9 training expert Heyen concluded, Riley's poor performance led to the dog's inability to proceed. PMF 244.

And yet, despite all of those obvious problems, Phelps never threatened Riley with possible removal. PMF 245. Instead, he told Riley that his performance was "spot on," and that his troubles in training were because of the dog.  That account is flatly rejected by all of the records discussed above, as well as in K-9 training expert Heyen's report. *Id*.

USCP argues that Billy the Lab had problems from the start, and those problems hampered Riley, but a jury could conclude that was not the case. Billy had a good search drive, and none of the trainers indicated otherwise. PMF 231. Even five weeks into class, on September 7, 2017 – when Sgt. Phelps was raising concerns to Lt. Cromwell about Dantinne's dog, Phelps made no mention of Riley's dog – a clear indication that there were no actual problems with him. Ex. 26.

It was Riley's performance that showed serious problems early on, as discussed above (*supra* at 5-6). On August 22, 2017, Sgt. Phelps remarked to his chain of command that Riley's "footwork with working the K-9s [was] very stiff." He was not "fluid and smooth." PMF 234. That was a serious problem that could harm the dog's progression. PMF 238.  On September 5, 2017 (a day discussed in detail above), although he was not warned or threatened with removal, the trainers told Riley he needed to "step up his performance." PMF 235. Phelps even wrote to his supervisors, on September 28, 2017, that Riley's slow search speed was ruining his dog's interest in searching. PMF 243. Riley's fluidity problem had not changed as of October 3, 2017, when Sgt. Phelps commented, to his chain of command "Is Riley smooth and fluid on his feet? Not really." PMF 237.

As was the case with Dantinne, Phelps had choices for how to handle Riley after Billy L "shut down" in the static training: (1) Move both Riley and Billy L to the PBIED team (since Billy L was purchased as a PBIED dog), (2) Move Riley to PBIED to work with Toby (a reserve dog that was training with the PBIED group), or (3) keep Riley in the static group and allow him to

work with Toby as a static team. *See* Ex. 33*, USCP 4082*. But in his deposition, Phelps testified

that the only choices were to either hold Riley over until the next static class opened or to transfer

him to the PBIED because Toby had to be used as a PBIED dog. PMF 261. That explanation did

not hold water. Deutsch (the witness designated to testify about K9 assignments), and Phelps' own

September 28 email confirm that Toby could have been used as a static dog. PMF 247.

### g. PHELPS UNDERMINING CONDUCT TOWARD VANMETER CONTINUES IN OCTOBER WHILE HE CONTINUED TO HIDE ZBORAI'S FAILINGS

On October 3, 2017, Riley followed in Dantinne's footsteps, another male candidate with

dubious skills was transferred to PBIED to work with an independent dog that could essentially

do the work without much input from the handler. PMF 265, SUMF 133. A jury comparing Phelps'

supportive attitude towards Riley could certainly conclude that his hostile approach to VanMeter

was driven by animosity based on either her sex or her disability.

Keeping in mind that Riley's dog was retired, and Riley had to be moved to the PBIED

team on October 3, 2017, underscores the discriminatory nature of Phelps' conduct two days later,

on October 5, 2017, when he again told *VanMeter* that she had to improve or would face removal.

*See* 184. That threat was emblematic of Phelps discriminatory animus toward VanMeter because

– her performance was clearly outshining her classmate, Garrett Zborai a 20+ year veteran of the

K9 unit, as discussed next.

Phelps listed VanMeter's performance on October 4 and October 5 as justification for her

removal. PMF 169.  As catalogued in Plaintiff's Statement of Material Fact (PMF 169-184),

Plaintiff's performance blew Zborai out of the water those days.  That is important – not because

they were being compared against each other – but only to show her level of accomplishment in

the training program.

First, Phelps characterized VanMeter's October 4 performance as "not bad," which begs the question why it was referenced in the removal memo in the first place. PMF 170. But even that "not bad" description was deceptive and illustrates Phelps' bias, because Van Meter performed very well in training that day. *Id.* Van Meter was complimented identifying Jayden's alerts and allowing "the canine the freedom to work the odor good." *Id*. She was also commended for having "conducted a very detailed search, completing 125% search of each, reassessing before returning to the K-9 vehicle," on a complicated 12-vehicle search that day.  *Id.* Consequently, referring to Van Meter's performance as "not bad" was an understatement that concealed her excellent performance and results that day.

Second, Zborai's training records for October 4, 2017 obscured his poor performance including his overly restrictive leash work, his failure to read his own dog's alerting behavior and body language. PMF 171. Zborai's training record is devoid of any such criticism, however, and makes it appear that his performance this day was good, when that is not the case. *Id.*

The real deviousness was Phelps' description of Plaintiff and Zborai's performance on October 5, where yet again Phelps exaggerated Van Meter's issues and completely ignores Zborai's serious deficiencies.  For the first search of the day, Van Meter and Zborai divided up the exterior of the baseball stadium, with Van Meter taking the portion where no hide was located at first. PMF 174. VanMeter performed a thorough search of the exterior and cleared her zone, but during that part of the search, she noticed that Jayden was distracted by other odors in the landscaping, and she pulled the dog off of an unproductive search, garnering a "good job" from one of the trainers. *Id.*

The next task was for Zborai and VanMeter to switch zones so that VanMeter could search the area where the hide was located. *Id.* When Jayden showed a desire to explore the grassy area

outside the stadium, VanMeter permitted it, as taught, but then Jayden began wandering. In order to keep Jayden from become distracted in the landscaping again, Van Meter pulled him back and continued to search the perimeter of the building. *Id.* When Jayden again showed interest in breaking that pattern, Van Meter permitted him to do so, performed a detailed search of equipment located there and found the hide. *Id.* Consequently, Van Meter did exactly what the trainers accused her of failing to do: she gave Jayden "the ability and freedom to work the odor more independently." *Id.*

In the daily report, however, the trainers claimed that Van Meter was slow to react after the dog began working the odor emanating from the source, but the video showed that criticism to be inaccurate. PMF 175. Before making his final indication (sitting), Jayden was briefly exploring the area of source on two occasions, quickly leaving both times on his own accord to explore adjacent areas. *Id.* Since the handler's job is to pinpoint the target as best as possible (*Id.* fn 23), VanMeter correctly waited for the dog to give a more precise indication, and on his third check, Jayden quickly sat – confidently indicating the location of the source. *Id.* Criticizing Van Meter for any delay in her calling the target on this search is exposed as biased upon review of Zborai's search, the same day. *Id.* At approximately 4:22 on the video, Pope performs a high search on a tall table with stacked chairs. With Zborai looking on, Pope sniffs the chairs for just over 10 seconds before Zborai gives the sit command. Yet there is no criticism of Zborai's delayed response in the training report. *Id.*

The second exercise on October 5, 2017 was an open field search, and Van Meter was marked with a "HM" in the scoring table, but the videos from the day show that neither VanMeter's or Zborai's dog made any alert to odor, and neither handler found the target. PMF 176. Yet,

miraculously, Zborai was scored with a Find on his report, while trainers logged a Handler Miss for Van Meter. *Id.*

For Hide #4, Van Meter was scored with a "Trainer Assist" for a search in the stadium seating, despite the fact that according to K-9 training expert, Kyle Heyen, she performed a thorough search, permitted Jayden to break pattern and explore his area of interest, and found the target without assistance from the trainers. PMF 178. Thus, the criticism of VanMeter's search, and scoring Van Meter with a Trainer Assist, instead of a successful "Find" is further evidence that Phelps was criticizing VanMeter for manufactured performance deficiencies. *Id.*

Zborai was also scored with a Trainer Assist for the general stadium seating search; but he deserved a Handler Miss because he repeatedly missed the target even after Pope brought him back to it on multiple occasions. PMF 179. After Zborai allowed the dog to leave the area twice without thoroughly searching the area, the trainer stepped in to tell Zborai to return and search the area again. Consequently, if Zborai was graded like the trainers graded VanMeter, he would have received a Handler Miss. No criticism of Zborai's search appears in the comments section of the report, however. PMF 179.

As bad as the stadium seating search was for Zborai, his performance on the next exercise, was even worse. The target was located in the outdoor patio seating associated with one of the club rooms at the baseball stadium. Zborai did a cursory check of the balcony/patio area and left it to go back inside, without examining where the hide was located. PMF 180.  Zborai then incorrectly declared that the target was in the trash can in the bathroom, where (likely because Zborai lingered in the area PMF 238), Pope gave a false sit. *Id.* Despite failing to thoroughly search the patio (resulting in a hander miss), and then incorrectly declaring the target to be located in the bathroom trash can, Zborai was graded with a Trainer Assist, rather than a Handler Error, as he deserved. To

make it worse, that was actually the *second* time Zborai had unsuccessfully checked the room in question. PMF 181. The first time he cleared the room (left it without finding the target) without even checking the patio. So, scored appropriately, Zborai actually committed two handler errors on the search, but none of that poor performance is captured in the training report. PMF 181.

Van Meter, on the other hand, did a thorough check of search 5, the club room and patio, and she found the target. PMF 182.

Videos from Zborai's sixth training exercise on October 5, reveal more instances when his poor performance goes undocumented. In one instance, Zborai was about to call source on an incorrect location, and Phelps cleverly dissuaded him from doing so. PMF 183. In the subsequent room, Zborai makes another incorrect call for the source, and Phelps told him he was wrong. But those incorrect calls, along with Zborai's failure to understand his dog's body language when on source are not mentioned in the daily report. *Id.*

Despite her superior performance compared Zborai, who was supposed to be judged more strictly because he was a veteran handler (Deutsch Dep., Ex. 7 at 247:9-15), Phelps again threatened VanMeter with removal, and notified his chain of command. PMF 184, 267.

Videos and records from October 10, October 11, October 16, and October 17 reveal that Zborai continued to fail when it came to performing thorough searches, which Phelps generally considered a "major problem" (1st Phelps Dep., Ex. 5 at 75:1-7). On October 10, Zborai failed to search two separate search areas thoroughly, resulting in Handler Misses. SUMF 241, PMF 186 By comparison, VanMeter's failure to search *one* of those areas was included in her removal recommendation. PMF 186. On October 11, 2017, Zborai and VanMeter were required to perform a search of several large flatbed trucks and buses. One hide was located on top of one of the flatbeds, nestled in some crane equipment. Zborai failed to search the entire area by failing to get

Pope to search the top of the truck, and the trainers ultimately told him where to search. Yet, the trainers obscured Zborai's failure by scoring him with a Trainer Assist and characterizing the exercise as just a "familiarization exercise." PMF 196-199. On October 16, 2017, Zborai failed to search the entire area thoroughly again, this time in a parking garage, where Zborai neglected to search an area in which several lawn mowers were stored (and where the hide was located). SUMF 241, RUMF 241(c). VanMeter, by contrast got the Find, and a compliment for her leash work and search pattern in a tight space, (Ex. 14 USCP 3131-32), but the decision to remove her had already been made and Phelps was already working on the termination recommendation memo. Ex. 24. Again, on October 17, 2017, Zborai showed his inability to perform thorough searches and find explosives. One of the explosives that day was located in the back of a pickup truck. VanMeter found the target in the course of performing a thorough search of the back of the pickup. RUMF 206(b). Zborai, on the other hand, failed to get Pope to perform high searches on the sides of the truck, and consequently, he failed to observe the device, which was hidden in plain sight. *Id*.

In light of Zborai's repeated failures to search the entire search area, a "major problem" exemplifying his poor search mechanics (Phelps Dep., Ex. 5 at 35:16-19 (Search mechanics includes thoroughly searching the entirety of the search area), Defendant's claim that VanMeter was removed, in part, for her search mechanics smacks of a double standard signifying pretext.

### h.   THE DEBACLE OF OCTOBER 11, 2017

In the annals of the 2017 K9 training class, October 11, 2017 could be recorded as among the worst for the men's performance and Phelps' exaggerations of VanMeter's (alleged) failings.

On the first hide, Phelps panned VanMeter for having allegedly giving Jayden a leash correction that pulled him off the source (a shoe) as the dog was giving its final sit indication. PMF 187-188. That was factually wrong: VanMeter presented the shoe in question, but Jayden did not immediately react. He then did a double take, which Van Meter observed, but since he did not give

a strong change of behavior, she moved on to present the next item. The video clearly shows that she did not pull Jayden off of the target and Jayden made no effort to return to the shoe. Nevertheless, the trainers marked Van Meter with a Handler Miss for that target. PMF 188.

As soon as Riley began this search, his dog urinated in the middle of the search area, which elicited a groan from the trainers and Riley declared that the dog had not been "emptied," which was the handlers had been taught was a basic part of preparing the dog for searching. PMF 189. Yet there is no negative mention of the failure to prepare the dog in the daily report. *Id.* Progressing to the actual search, Riley passed the shoe over three times without making sure his dog gave it a good sniff. PMF 190. Riley located the target on the fourth pass, but that was only after the trainers narrowed the search area for him several times *Id.* After all that, Riley was scored with a "Find" for the exercise. *Id.*

Meikrantz fared even worse: he had no search pattern at all, and he could not recognize when his dog was alerting to odor versus simply searching. Meikrantz' dog also urinated on a bag, an indication that Meikrantz also did not prepare his dog for the search. PMF 191. About 4 minutes into the search, one of the trainers asked, "Do you think he is on odor?" Meikrantz failed the quiz by responding in the affirmative, which drew the rebuke: "continue working - it's not that grouping. We have said that three times." *Id.* Shortly afterwards, a trainer stops Meikrantz from rewarding his dog after an incorrect sit. So even after two months of training, and feedback that day, Meikrantz remained confused as to how to interpret his dog's behavior. *Id.* After receiving numerous hints as to where he could find the target, and after Meikrantz passed over the shoe, the trainers tell him: "It's the shoe, present it again." *Id.* But, as Meikrantz was redirecting the dog toward the shoe, he dropped the leash which can be dangerous for the dog and third parties, and according to Hill reveals "reduced reliability" of the team. PMF 191. And yet, Meikrantz was

credited for a Find on the shoe, with no criticism of the numerous deficiencies he exhibited throughout his search. *Id.*

Dantinne similarly failed to find the shoe target on his own. Even though Rocket showed clear change of behavior toward the shoe (which Dantinne agreed should have prompted him to return to explore the shoe). The trainers then told Dantinne to go back to the shoe. And yet, despite that assistance, Dantinne was scored with the Find. PMF 192.

The second hide listed on the October 11 training forms was part of the same "scattered search" exercise, and the target was located inside a "gym bag" at the far end of the search area, near some stacked pallets and other items. PMF 193. The video of Dantinne's search reveals that (similar to his performance in early September (with Billy M), he remained incapable of independently determining when his dog was alerting and giving final indication on odor. Despite the assistance he received from the trainers. PMF 194. Dantinne was given a "Find." *Id.*

The truck and bus search (referenced above) came next, but only for VanMeter and Zborai, the static handlers.  Whereas VanMeter performed a good search, and quickly got Jayden on top of the flatbed truck where the target was hidden among crane equipment (PMF 200), Zborai had no such luck.  Zborai went on a lengthy, disorganized search because he never thought to get the dog to search the top of the flatbed. PMF 196.  The video of this search spans several different segments, because the trainers turned the video off when they were speaking to Zborai about the search.  PMF 197-198. Ultimately, the video makes it clear that one of the trainers told Zborai where to search, and he finally got his dog in the right area.  PMF 198. But – again to disguise Zborai's systemic failures, the trainers did not include any criticism of her performance and gave Zborai a "Trainer Assist" (rather than a Handler Miss) on the daily record and downplayed it even

more by labeling it a mere "Exposure exercise to evaluate the canine's confidence on the back of the truck." PMF 199.

The debacle that was October 11, 2017 underscores the unadulterated bias of what comes next: without mentioning any of the men's poor performance from the prior day, on October 12, 2017, Phelps recommended that Cromwell remove VanMeter, while he (Phelps) was out sick. *See* PMF 269. Phelps could not explain why there was any rush to remove VanMeter, and why it could not wait for his return to work (*Id.*), and so a jury could conclude that he was trying to take advantage of his own absence to have Cromwell do the deed for him and obscure his own responsibility. Cromwell's response indicates that this was not the first time Phelps had tried to remove VanMeter. Cromwell responded: "As I informed you earlier, you need to send up a memo to include all training documentation justifying her dismissal from the training program for the Deputy Chief's review. However, since the memo and documentation I requested has not been completed, she will remain in her current state until said documentation explaining her removal has been completed and forwarded." PMF 271.

### i.   DEFENDANT CONCEALED AND DESTROYED EVIDENCE

Defendant has attempted to conceal (and succeeded in some cases) evidence from this time period relevant to VanMeter's removal. [6] As Hill revealed in his supplemental deposition, in early October 2017, he and Phelps showed Lt. Cromwell a targeted number of videos of VanMeter's exercises from early October that they thought supported Plaintiff's removal. PMF 287. That video review session was not identified in discovery, and Hill was unable to identify the movies that they showed to Cromwell that exemplified VanMeter's alleged problems. *Id.* The undisclosed videos and documents were key pieces of evidence that VanMeter has been denied because Phelps got

---

[6] *See* generally, Plaintiff's pending motion for discovery sanctions and an adverse inference, ECF Documents 76 and 80.

Cromwell's approval to remove Van Meter *before he wrote the recommendation letter,* meaning those documents and videos were what Phelps used to convince Cromwell to greenlight the idea and set the removal process into motion. Cromwell Dep., Ex. 44 at 49:6-14.

### j. VANMETER'S REMOVAL ON OCTOBER 18, 2017

Phelps drafted the removal recommendation memo on October 16, 2017, and VanMeter was removed on October 18, 2017. PMF 280.

When Phelps told VanMeter that he was removing her from the program, he told her that even if she had passed all of the written tests and the final certification exams (the Odor Recognition and Environmental/Operational exams), he would not have signed her certification paperwork. PMF 346.

Before Plaintiff was removed from training, she was entitled to "counseling, remediation, retesting, [and] reevaluation. PMF 981. That remedial training meant more training hours in addition to what was offered during a normal training day. *Id.* But it is undisputed that VanMeter did not receive any additional training before she was removed. PMF 282.

### k. DEFENDANT MANIPULATED THE FINAL CERTIFICATION TESTS TO ALLOW DANTINNE AND RILEY TO BE CERTIFIED

After VanMeter was removed from training, the trainers' favorable treatment of the male handlers came to full bloom, particularly with regard to Dantinne and Zborai.

There were two end of program certification exams that the handlers had to pass in order to be certified. The first one was an odor recognition test, in which the teams were required to locate a certain number of trained odors, and they had to pass with a 100% score. PMF 314-315. But Dantinne's dog (Rocket) got confused when he began the test (which was originally organized inside various items scattered throughout a furniture warehouse PMF 319) refused to search and showed no response to the trained odors. PMF 316-17. But rather than sticking to the rules and

failing Dantinne (PMF 315, 317), the trainers gave Rocket some on the spot training and modified the test to run it in a way that the dog was more comfortable with (outside in rows of luggage) PMF 318.  The records further reflect that Dantinne got additional assistance or leniency in the modified test and that the trainers did not require Rocket to actually show clear indications that he had found the targets for the test. PMF 320. According to the records, Dantinne's October 31, 2017 odor recognition test was videotaped, but those tapes were never produced in discovery. PMF 322. A jury could conclude that the videos were destroyed because they would have showed that the trainers flaunted the certification rules when they allowed Dantinne and Rocket to pass the Odor Recognition Test.

A similar thing happened with Zborai, whose Odor Recognition Test was run in the same manner as Dantinne's (outside in luggage) rather than in the warehouse. PMF 321. Videos of only two out of either six or ten different targets (PMF 315) in Zborai's Odor Recognition Test were produced in discovery.  PMF 322-323. Consequently, a jury could conclude that the remaining videos of Zborai running his searches were destroyed because the evidence would have revealed that (scored properly) he should have failed the test.

The record additionally demonstrates that Zborai should have failed his Operational or Environmental test. According to the rules for the certification, the team was only allowed to make one error during the Operational/Environmental Test and still be permitted to certify. PMF 326. If the team made two or more errors, they were not to be given an immediate second chance, and instead they had to go through a period of retraining, which would last several days, before they could try again. PMF 327-28. Flaunting those rules, the Trainers allowed Zborai and Pope to make at least three errors, and stopped him from making even more, yet still passed him. PMF 329-335. Then, to cover for Zborai's failures during the search, the trainers falsified the records to make it

appear as if the trainers had made an error that confused Pope, when no such thing happened. PMF 336-339. Instead, any confusion on the dog's part was caused by Zborai's repeated failure to heed the trainer's instructions during the search. *Id.*

    **l.** **VANMETER'S COMPLAINT ABOUT DISCRIMINATION WAS SWEPT UNDER THE RUG**

    After she was removed, VanMeter complained to Assistant Chief Sund (among others) that her removal had been because of discrimination (RUMF 274), Chief Sund violated policy by forwarding the issue to Richard Braddock (the Chief Administrative Officer) to have Human Resource conduct an inquiry, instead of the Office of Professional Responsibility or Inspector General, as policy required. RUMF 275. The K9 training staff either fooled the investigator into believing that a male candidate had been removed from the same class as VanMeter (as if that somehow proved that VanMeter's removal was not discriminatory), or the report was fallaciously written that way in order to obscure the discriminatory conduct. Ex. 62, USCP 1857 ("There were two candidates who did not successfully complete the program, one male candidate … and a female candidate [VanMeter]"); Braddock Dep., Ex. 61 at 99:14-20 (Braddock agreed the report was written so that it appears the male candidate was removed at the same time). Rather than conduct an actual investigation, the Human Resources officer simply rubberstamped Phelps' justification for removing VanMeter, with no analysis whatsoever. RUMF 276-277.

**III.** **APPLICABLE LAW**

    **a.** **SUMMARY JUDGMENT STANDARD**

    "A court may grant summary judgment when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. A 'material' fact is one capable of affecting the substantive outcome of the litigation. A dispute is 'genuine' if there is enough evidence for a reasonable jury to return a verdict for the non-movant.

… In considering a motion for summary judgment, a court must 'eschew making credibility determinations or weighing the evidence[,]' and all underlying facts and inferences must be analyzed in the light most favorable to the non-movant." *Ajisefinni v. KPMG LLP*, 17 F. Supp. 3d 28, 38 (D.D.C. 2014) (citing Fed. R. Civ. P. 56(a) and controlling Supreme Court precedent).

A party that moves for summary judgment must support its factual positions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

If the moving party meets its burden, "it falls to the nonmoving party to establish that a genuine dispute exists regarding a material fact. To do so, the nonmoving party must demonstrate that there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict for that party." *Johnson v. Hartogensis*, 2023 U.S. Dist. LEXIS 179492, at *8 (D.D.C. Oct. 5, 2023) (citations omitted and cleaned up).

 "Courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 US. 650, 656 (2014). "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 651. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 150–51 (2000). Courts "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 151.

### b.   STANDARD OF PROOF IN DISCRIMINATION AND RETALIATION CASES

The trial court must determine if – based on a preponderance of the evidence – Officer VanMeter's removal from K9 Training was "free from any discrimination," as reflected in the text

of the Congressional Accountability Act itself. 2 U.S.C. § 1311 (a)(1) ("All personnel actions affecting covered employees shall be made free from any discrimination based on … race").

In *Babb v. Wilkie*, 140 S. Ct. 1168 (2020), the Supreme Court interpreted the same statutory phrase, "free from discrimination" in the federal sector provision of the Age Discrimination in Employment Act, 29 U.S.C. § 633a (a)) ("All personnel actions … shall be made *free from any discrimination based on age*") (emphasis added)). The Court held that the phrase "free from any discrimination" means something different from "but for" causation, the standard typically used in Title VII cases. The import of that ruling is that if "discrimination plays *any part* in the way a decision is made, then the decision is not made in a way that is untainted by such discrimination. *Id*. at 1171.

The same meaning must be given to the "free from any discrimination" phrase used in the Congressional Accountability Act, because it uses the exact same language. *Compare* 29 U.S.C. § 633a(a) and 2 U.S.C. § 1311(a)(1). Thus, according to the plain language of the CAA, Officer VanMeter should prevail in this case if she proves that sex discrimination played *any part* in the USCP's decision to remove him. *Babb, supra.*

Retaliation claims under the CAA also require something less than traditional "but for" causation. *Britton v. Architect of the Capitol*, 02-AC-20 (May 23, 2005) ("We consider it inappropriate to adopt a … "but for " framework for Section 207 retaliation claims."). Under the Congressional Accountability Act, the Board has "decline[d] to adopt a narrow definition of adverse action for Section 207 retaliation cases, and instead [has adopted] the EEOC's definition of adverse action as 'any adverse treatment that *is based on a retaliatory motive* and is reasonably likely to deter a charging party or others from engaging in protected activity.'" *Id.* (emphasis added).

Even despite the more flexible standard applicable to CAA cases, due to the strong evidence presented here, even if the Court were to use a "but for" standard for liability, Officer VanMeter should prevail on both the discrimination and retaliation claims. *Morris v. McCarthy*, 825 F.3d 658, 668 (D.C. Cir. 2016).

### c.   BURDEN SHIFTING REGIME

A plaintiff can prove disparate treatment discrimination either by direct evidence or by using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). That said, the D.C. Circuit has held that "[i]n a Title VII disparate-treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not -- and should not -- decide whether the plaintiff actually made out a *prima facie* case under *McDonnell Douglas*." *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). Instead, the "the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Ibid. and see Johnson v. Hartogensis,* 2023 U.S. Dist. LEXIS 179492, at *10 (D.D.C. Oct. 5, 2023).

Because the Court is to consider the Claimant's *prima* facie evidence, pretext evidence and any other probative evidence of discrimination and retaliation presented at trial (*Morris v. McCarthy*, 825 F.3d 658, 668 (D.C. Cir. 2016)), we summarize the *prima facie* burden-shifting regime below.

### 1.   *Prima Facie Case of Gender Discrimination*

"To state a prima facie case of discrimination, a plaintiff must allege she is part of a protected class under Title VII of the Civil Rights Act of 1964, she suffered a cognizable adverse

employment action, and the action gives rise to an inference of discrimination." *Walker v. Johnson*, 798 F.3d 1085, 1089 (D.C. Cir. 2015).

### 2. *Prima Facie Case of Disability Discrimination*

For a disability discrimination claim, "all a plaintiff must show is that she was disabled within the meaning of the ADA, she was qualified for the position at issue with or without a reasonable accommodation, and she suffered an adverse employment action because of her disability." *Ingram v. D.C. Child & Family Servs. Agency*, 394 F. Supp. 3d 119, 127 (D.D.C. 2019).

### 3. *The Prima Facie Case for Retaliation*

In the typical retaliation claim, "the plaintiff must allege that she engaged in activity protected by Title VII, the employer took adverse action against her, and the employer took that action because of the employee's protected conduct." *Ibid.* This case proceeds on a theory that Sgt. Phelps believed or perceived VanMeter to have engaged in protected activity, a theory Judge (now Justice) Ketanji Jackson permitted to proceed when she was assigned to this case as a District Court Judge. *VanMeter v. United States Capitol Police*, 2020 U.S. Dist. LEXIS 262231, at *2 (D.D.C. May 30, 2020) ("Assuming *arguendo* that the so-called perception theory of retaliation is a viable basis for claiming unlawful retaliation under the CAA, this Court finds that the allegations of fact in VanMeter's complaint are sufficient to support a plausible claim for retaliation in violation of the CAA."). Other Courts have recognized the perception theory of retaliation. *See Murphy v. District of Columbia*, 390 F. Supp. 3d 59, 71 (D.D.C. 2019) ("what matters for purposes of a retaliation claim is whether the employer punishes the employee based on its belief that the employee is engaging in protected activity. For these and other reasons, most courts to reach the question have permitted Title VII retaliation claims under a perception theory, and this Court will

37

as well.") (citing cases from various circuits and district courts). *And see Johnson v. Napolitano*, 686 F. Supp. 2d 32, 36 (D.D.C. 2010) (permitting a perception cases to proceed and explaining that "A perception theory of retaliation does not rest on whether the employee actually asserts participation in a protected activity; rather, the theory applies so long as the employer believed that the employee was engaged in protected activity.")(*Fogleman v. Mercy Hosp*., 283 F.3d 561, 571 (3d Cir. 2002)).

### *4.  Pretext*

Once Plaintiff makes out a *prima facie*, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for its action, which the Plaintiff can defeat by showing that the employer's proffered explanation is unworthy of credence.

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the *prima facie* case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination.

> Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt." Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

*Reeves*, 530 U.S. at 147-148 (2000) (citing cases).

### *5.  Cat's paw*

"Under a cat's-paw theory, a formal decision maker may be an unwitting conduit of another actor's illicit motives." *Walker v. Johnson*, 798 F.3d 1085, 1095 (D.C. Cir. 2015). *See also Staub v. Proctor Hosp.*, 562 U.S. 411, 421, (2011) ("[A] supervisor's biased report may remain a causal factor if the [ultimate decision maker's] independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified."). To prevail on a cat's paw theory, the employee must show that the 'formal decision maker [was] an unwitting conduit of another actor's illicit motives,' or, in other words, her 'cat's paw.' To do so, the plaintiff must show that (1) the person with bias performed an act motivated by discriminatory or retaliatory animus; (2) the person with bias intended to cause an adverse employment action; and (3) the discriminatory or retaliatory act is the proximate cause of the ultimate employment action. *Walker,* 798 F.3d at 1095, *Staub*, 562 U.S. at 421, and *Morris v. McCarthy*, 825 F.3d 658, 668 (D.C. Cir. 2016).

## IV.   ARGUMENT

Plaintiff addresses the Defendant's arguments in the order they are presented.

### a.   PLAINTIFF CAN DEMONSTRATE THAT THE DEFENDANT'S ASSERTED REASONS FOR REMOVING HER WERE PRETEXT FOR DISCRIMINATION OR RETALIATION.

Defendant correctly states that indirect of evidence can include evidence that the employer treated employees outside of Plaintiff's protected class more favorably in the same factual circumstances, that the employer gave dishonest or inconsistent excuses, or deviated from established procedure. Def's P&A at 18-19 (citing *Vinh,* 299 F. Supp. 3d at 78-79 *(*relying on *Walker v. Johnson,* 798 F.3d 1085, 1092 (D.C. Cir. 2015)). VanMeter has evidence that fits into each of those categories.

As discussed in the fact section, above, from the outset, and then throughout training, the men were given assistance during search exercises that was withheld from VanMeter. During the

imprinting phase, this meant telling the male handlers where hides were located and then withholding that same information from VanMeter. *Supra* at 3-4, *and see* RUMF 206 and 206(c). As class progressed, that assistance included giving Zborai an addition training day while depriving of VanMeter of the same on September 21 (*supra* at 18); letting male handlers know whether their dog was on source, without making the men make the decision themselves (PMF 28-29, 113, 133, 159, 160, 162, 194, 329); stopping the men from making incorrect calls throughout the latter part of training (PMF 113(h), 131, 161, 162, 164, 179, 183, 190, 191, 192, 329, 330, 332) when they did not do so for VanMeter; and reminding the men where to search in order to find targets when they failed to search those areas independently (PMF 113(n) and (q), 127(c), 190, 192, 196-199).

Phelps also gave VanMeter inconsistent instructions (RUMF 66) and sabotaged her in many ways, including: by encouraging her to work with Queen, who quickly failed out for lack of search drive (*supra* at 3), restricting her from working with two of the remaining dogs (*id.*), and then assigning her to work with Jayden, who the trainers believed would fail out of the program due to his many performance deficiencies at that time (*supra* at 5); and, on October 26, failing to credit her for a find in the cabinets (making her think she had erred) and using an odor that her dog had never been trained on. *Supra* at 18-19.

Additionally, the trainers allowed Jayden to bite and paw at the objects in which target odors were hidden (such as luggage), which was unwanted behavior that the trainers should have eliminated. PMF 151-158. Thus, for Jayden, biting and pawing became a conditioned response to show that he had located trained odor. *Id.* Yet the trainers later repeatedly criticized VanMeter, in training records and the termination memo, for (correctly) believing that biting and pawing indicated that Jayden was on odor. PMF 150-151, 166.

The trainers regularly omitted or downplayed their criticisms in the men's daily training records, while never missing an opportunity to fabricate or exaggerate alleged problems with VanMeter's performance. PMF 50-202, RUMF 167-207, Heyen's expert report Ex. 12. Relatedly, while Lead Trainer Hill testified that they would not memorialize issues on the training reports if they were addressed verbally during the training, that was not the case with VanMeter. PMF 132.

Phelps' behavior toward VanMeter also showed his bias. On September 22, Phelps told VanMeter that he was pairing her with Jayden because they both had "issues." *Supra* at 5. That same day, Phelps threatened VanMeter with removal, and told her "I don't think you're going to make it" for failing to get Jayden to sit *once* that day, even though it was in the grace period when no handler would be threatened with removal, for a problem that was inherent in Jayden, and which all the male handlers had struggled with when they worked with the dog. *Supra* at 6-7.

Phelps told Cromwell he was considering removing VanMeter on September 7, and did not raise any concerns with the male handlers at that time. *Supra* 7-16. Subsequently, on October 5, Phelps again threatened VanMeter with removal, even though Zborai's performance had been far worse in recent days, including October 4 and 5, and he was regularly making incorrect calls when no source was present and missing targets because of his consistent failure to perform thorough searches of the defined areas. *Supra* at 22-23.

Phelps' hostile treatment of VanMeter was out front and obvious. In addition to telling her that he was assigning her to Jayden because they both had "issues" and that he did not think she was going to "make it" in week three of training, near the end of her time in training, he told VanMeter that she could not get advice or assistance from other K-9 handlers (RUMF 256-57). Around the same time, when VanMeter asked Phelps for additional assistance to address his alleged criticism, he told her "besides me taking the lead and making decisions for you, there's

41

nothing else I can do for you." RUMF 215. Then, when he removed Plaintiff from the program, Phelps rubbed salt in the wound by telling her that, even if she had passed all the written tests and practical certification exams, he would not have signed her certification paperwork. PMF 346.

Despite all of Dantinne, Zborai and Riley's performance deficiencies, they were never threatened with removal. Riley was never even counseled about his poor performance (regardless of what was written in the September 5 record), and instead was told that his performance was spot on. PMF 245. Similarly, Zborai was never counseled about his consistently sloppy performance and failure to understand his dog. PMF 297.

The evidence that Phelps and the training staff gave greater guidance and assisted to the male candidates and tolerated Dantinne, Riley and Zborai's poor performance, and even attempted to minimize it in daily training reports, while recommending VanMeter's removal for less severe alleged deficiencies certainly exposes the reasons for removing VanMeter as "unworthy of credence." *Reeves*, 530 U.S. at 147-148 (2000). "Showing that others outside the plaintiff's class have been more favorably treated is 'especially relevant' to a demonstration of pretext. *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1115 (D.C. Cir. 2016). *See also Walker v. Johnson*, 798 F.3d 1085, 1092 (2015)("A plaintiff may support an inference that the employer's stated reasons were pretextual, and the real reasons were prohibited discrimination or retaliation, by citing the employer's better treatment of similarly situated employees outside the plaintiff's protected group."); *Frierson v. Ill. Cmty. Coll. Dist. 525*, 2000 U.S. Dist. LEXIS 3133, at *15 (N.D. Ill. Mar. 3, 2000) ("Evidence that an employee is let go for transgressions that are generally tolerated casts doubt on the honesty of the proffered reason.") (relying on *Monroe v. Children's Home Ass'n of Illinois*, 128 F.3d 591, 593 (7th Cir. 1997)).

All of the handlers were similarly situated before they were divided into the static and PBIED teams because they were all in the same course, were all considered "trainees," had the same supervisors, were subjected to the same standards, and were given the same performance goals. *See* PMF 4-5; SUMF 16-26, 29-31, 39-74 (and corresponding RUMF paragraphs); *see also* Phelps Dep., Ex. 6 at 227:7-12 (Prior to splitting the handlers into the PBIED or Static disciplines, which occurred on September 6, 2017 (PMF 5) all of the teams trained together each day). Subsequently, VanMeter, Dantinne and Riley were all "similarly situated," at least for as long as Dantinne and Riley were in the static training program.

For a plaintiff to prove that she is similarly situated to another employee, she must demonstrate "that all of the relevant aspects of [her] employment situation were nearly identical to those of the other employee." *Wheeler*, 812 F.3d at 1115-16. "Factors that bear on whether someone is an appropriate comparator include the similarity of the plaintiff's and the putative comparator's job and job duties, [and] whether … the same supervisor [was involved]. *Id.* at 1116. Thus, Plaintiff can show she was similarly situated to her suggested comparators, Dantinne, Riley and Zborai, and Meikrantz (for the time training was together).

Additionally, even after the split, for example on October 11, the PBIED and Static teams trained together in a scattered search in the parking lot of the K9 facility. That exercise was meant to simulate the aftermath of an explosion in which it would be a situation where all teams were expected to be able to search for and locate additional explosive devices that may be hidden in the ensuing wreckage from an initial explosion. Deutsch Dep. Ex. 6 at 525:10-526:10; Cullen Dep., Ex. 12 at 129:3-20 (agreeing that "it was important that both, regardless of your discipline, PBIED or static, that all teams be able to conduct an effective search under those conditions").

Phelps and his chain of command also violated USCP policy and practices in nearly all their interactions with VanMeter. Among these violations: The K-9 training policy requires that there be specific achievement measurements that are "graded to monitor handlers' progression," PMF 11. That never happened for VanMeter, at least. *Id.* Phelps threatened VanMeter with removal at the beginning of week 3, despite their being a 5-6 week grace period in which no trainer would threaten a handler candidate while they were learning the new K-9 handling skills. RUMF 167; PMF 17-18, 248. Subsequently, Phelps failed to ensure that VanMeter was afforded the additional training required by the training policy before she was removed. PMF 281-282. Additionally, Phelps removed VanMeter from the program before he was authorized to do so, creating a *fait accompli* that destroyed VanMeter's spirit and would have been hard for to reverse. PMF 298-99. *And see* Sund Dep., Ex. 57 at 91:16-92:20 (had the chief disapproved the removal, VanMeter would have been returned to training, where she would have had to pick up after days or weeks of absence). Additionally, Plaintiff was entitled to a receive a Form 550, which provides formal notice of her performance deficiencies and an opportunity to improve them. PMF 283. Phelps did not provide one, and he could not explain the reason why. *Id.* All of these breaches of policy constitute evidence of pretext because "when an employer seeks to rely on a 'fairly administered' process to justify an employment action, the process must in fact be fair." *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 570 (2019) *and see id.* at 571 ("unexplained deviations from established procedure can permit a jury to infer that a purportedly fair selection process was in fact a pretext for discrimination").

USCP attempted to conceal evidence, and in fact destroyed key evidence in this case. Defendant's attempt to conceal crucial evidence has been briefed already in this case, but a quick summary is that weeks after depositions ended and discovery was closed, USCP produced over

150 additional pages of documents that were clearly responsive to Plaintiff's discovery requests and addressed key points in the case, including communications about VanMeter's removal as well as other handlers' poor performance (primarily Riley). Additionally, as discussed at length in Plaintiffs pending motion for sanctions (ECF Documents 76 and 80, incorporated by reference here), Defendants failed to identify and explain numerous communications relevant to VanMeter's removal from training, and the loss of that information is prejudicial to the Plaintiff.

Chief among the communications that USCP failed to identify in response to Interrogatory 7 were:

(1) The "earlier" communication about removing VanMeter between Cromwell and Phelps, referenced in their email exchange on October 12, 2017. PMF 271-272

(2) A meeting in which Phelps and Hill showed Cromwell some training videos showing VanMeter's performance in early October 2017. Hill could not remember which videos were viewed and the witnesses' testimony conflicts, with Hill testifying that the meeting occurred and Phelps and Cromwell denying any recollection of the meeting or viewing videos. PMF 287.

(3) An October 11, 2017 meeting among Cromwell, Belknap, and Phelps, at which Cromwell and Belknap met with Phelps to discuss his desire to remove VanMeter from the program. No reliable testimony was provided about the Phelps specific reasons or documents that Phelps presented for removing VanMeter or any discussion that ensued.

(4) Lastly, on October 12, 2017, Hill and Cromwell were in communication about what documents Cromwell wanted to review in support of removing VanMeter, with discussion about comparing VanMeter's performance to an experienced-certified

team. See Ex. 41, USCP 4089. As of the time of his deposition Cromwell could not explain why he had wanted to compare VanMeter's performance to a certified team that was then-currently operational or why such a review would be fair to her (since she had only completed approximately 10 out of the 14-week course at that point). 2d Cromwell Dep., Ex. 44 at 57:21-60:6.

Additionally, as discussed above, important records have been destroyed, including Riley's training report and all videos from September 27, 2017, the day that VanMeter felt so beaten down that she told the trainers she was considering quitting the program. PMF 140-141. Based on Zborai's existing training records for the day, and the destruction (or failure to produce) Riley's record, the videos would have shown Zborai's and Riley's poor performance this day. PMF 142. Additionally, videos from the handlers' Odor Recognition Tests were also destroyed, which could cause the jury to conclude that the handlers (particularly Zborai and Dantinne, for whom the test was modified) performed poorly and were given assistance to pass. PMF 312-323.

In light of the prejudice to the Plaintiff, and for the reasons cited in Plaintiff's pending motion, Plaintiff seeks an adverse inference that:

> The records and justifications that Sgt. Anthony Phelps and Lead Trainer, Kenneth Hill presented to Inspector Belknap and Lieutenant Cromwell to get their approval to move forward with Plaintiff's removal from the K9 training program reflect information, including details of VanMeter's performance that would have been favorable to her, because they would have shown her performance to be consistently equal or superior to the performance of her male counterparts in the training program. Defendant withheld records and other information in order to conceal evidence that could have been helped Plaintiff prove her claims of discrimination and retaliation.

> Lastly, Phelps took several deliberate actions so that he could deny his own involvement in VanMeter's removal.

VanMeter told Phelps about her anxiety and complained about his belittling conduct on September 6, 2017, PMF 300-307, 310. Cullen claimed that Phelps asked him to accompany VanMeter on subsequent training exercises because of VanMeter's complaint (PMF 311), an account that Phelps denied (*Id*). Based on Cullen's inexplicably hostile conduct toward VanMeter on September 7, 2017 (PMF 113(r)), a jury could conclude that Phelps asked Cullen to be his proxy in the campaign to ensure VanMeter would not succeed in the class so that his involvement was not as obvious.

Second, Phelps claimed that Cullen and Hill had been the ones to recommend VanMeter's removal to him (rather than the other way around). PMF 347. ("I believe it was Mr. Hill. It was Mr. Hill and – and Cullen because he was part of the class as well, saying it's time for her to be removed."). But Cullen disputed that account, saying it was Phelps who raised the idea of removing VanMeter (PMF 348), and Hill's recollection was that it was either Phelps or Cullen (Phelps' proxy, *supra*) who first raised the idea of VanMeter's removal. *Id.*

Third, Phelps attempted to have Lt. Cromwell be the one to remove VanMeter, on October 12, 2017, while Phelps was out sick. PMF 269. Had Cromwell agreed to do so, then it would have obscured Phelps' direct involvement. Phelps attempts to point the finger at other trainers and Lt. Cromwell for VanMeter's removal constitutes evidence of pretext. If there was nothing unlawful about removing VanMeter, then there would have been no reason for Phelps to attempt to avoid responsibility. *Reeves*, 530 U.S. at 147-148 (2000); *See*, e.g., *Christensen v. Titan Distribution*, 481 F.3d 1085, 1095 (8th Cir. 2007) (attempt to conceal identity of decisionmaker evidence of pretext).

Viewing all of that evidence, a jury could disbelieve the Defendant's explanation and conclude that VanMeter's removal was the result of unlawful discrimination. *Walker v. Johnson,* 798 F.3d 1085, 1092 (D.C. Cir. 2015).

Defendant asserts that Plaintiff cannot show pretext because she attempted to shift the blame for her performance to Jayden. P&A at 19. But that is simply not the case. Plaintiff has asserted, and correctly so, that Jayden struggled in the beginning of training, during the imprinting phase which was why Phelps paired her with Jayden. But there is no dispute that – after VanMeter was paired with Jayden, he began to excel, such that by September 27, that Jayden "continues to excel and is very independent alerting and responding to the trained odors." Ex. 14, USCP 81. This phenomenon that Jayden excelled under VanMeter underscores the quality of her performance as a handler, because – as Deutsch agreed, "a bad handler can mess up a good dog." Deutsch Dep. Ex. 7 at 189:7-11.

It should go without saying that any one of the above categories of evidence would suffice to survive summary judgment. For instance, if a jury believed that Phelps sabotaged VanMeter by assigning her a dog he thought was going to fail out of the program (while giving the men their first choice of dogs), or by not telling her the location of hides during the imprinting phase (when all the men received that information), then that jury would be justified in concluding that all of Phelps subsequent actions against VanMeter were similarly imbued with discriminatory animus and concluding that Phelps continued to sabotage VanMeter throughout the course and that he failed her – all because of discrimination. This is because Plaintiff is entitled to the reasonable inferences of the evidence, in her favor, and a jury that believes Phelps discriminated against VanMeter early in training continued to discriminate against her throughout training, and it could disregard Phelps' subsequent criticisms on that basis. *Tolan v. Cotton*, 572 US. 650, 651 (2014)

("[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000) (Courts "must disregard all evidence favorable to the moving party that the jury is not required to believe.")*.*

### b. PLAINTIFF HAS PRESENTED PRIMA FACIE EVIDENCE OF GENDER AND DISABILITY DISCRIMINATION AS WELL AS RETALIATION.

Defendant claims that the failure to establish a *prima facie* case is grounds for granting summary judgment. Def. P&A at 19 (referring to *Akridge v. Gallaudet Univ.*, 729 F. Supp. 2d 172, 184 (D.D.C. 2010)). That argument is inapplicable here, because Plaintiff easily states *prima facie* claims of disability and gender discrimination, as well as for retaliation. But for the sake of clarity, Plaintiff notes that Defendant is wrong. As the D.C. Circuit established in *Brady*, at the summary judgment phase, as long as the Defendant has asserted an alleged legitimate explanation for its actions, "the district court need not -- *and should not* -- decide whether the plaintiff actually made out a *prima facie* case under *McDonnell Douglas*." 520 F.3d at 494 (emphasis added). Furthermore, the District Court did not grant summary judgment in *Akridge* because of any failure to make out a *prima facie* case. Instead, summary judgment issued because the plaintiff failed to come forward with any pretext evidence. 729 F. Supp. 2d at 184.

Plaintiff discusses her *prima facie* evidence here because it should be considered alongside all of her additional evidence when determining if she has presented sufficient evidence to survive summary judgment. *Morris v. McCarthy*, 177, 825 F.3d 658, 668 (D.C. Cir. 2016).

### 1. *Prima Facie Evidence of Disability Discrimination*

With respect to disability discrimination, the Defendant only challenges whether VanMeter could perform the essential functions of her position, either with or without an accommodation. Def. P&A at 21-22. But the Defendant relies on perfectly circular logic for its position. Defendant

claims that Plaintiff could not perform the duties of the job of K9 Handler because she failed out of the K9 training program. *Id.* at 22. Under that theory, an employer could prevent all disabled employees who were removed from a training program or a job merely by removing them from the course or the position. The act of having been removed from the program or position would be a disqualifying event under the very law that was designed to protect disabled individuals. The argument that employers have a "get out of jail free" card by simply removing the disabled employee, is silly and of course the Congressional Accountability does not work that way.

Plaintiff was not prevented from performing the essential functions of the K9 Technician position because of her anxiety. She was prevented from performing those functions because the Defendant removed her from the training course for unlawful reasons, including disability discrimination. *Supra.*

But even aside from the fact that Defendant has asserted an absurd and circular argument, Defendant's own statement eviscerates the argument that VanMeter could not perform the essential functions of K9 training or K9 handling because of her anxiety. Defendant freely admitted in its own Memorandum that "Phelps did not perceive Plaintiff as being incapable of being a K-9 Technician. His assessment was that Plaintiff 'had some short-comings that needed to be addressed and corrected through the training program.'" Def. P&A at 29. Thus, Defendant has acknowledged VanMeter's ability to perform as a K9 Handler. *See also* PMF 91 and PMF 128 (noting the training weeks between August 25 and September 4 and September 18-September 21 when even Phelps agreed VanMeter's performance did not warrant mentioning in the termination memo); SUMF 176 (referring to Plaintiff's good performance between August 24-31, 2017), SUMF 189 (referring to Plaintiff's good performance on October 4, 2017). The fact that the Defendant claims to have noticed performance deficiencies, all of which have been disputed in Plaintiff's statement of

material fact and response to Defendant's statement of material fact, does not nullify her disability claim.

Additionally, on the point of her disability claim, Defendant latches onto Plaintiff's testimony that she took her anti-anxiety medication while she was in training, which Defendant asserts "calls into question Plaintiff's ability to perform hundreds if not thousands of sweeps weekly." Def. P&A at 24. Again, that argument is specious and relies on an inaccurate reading of Plaintiff's deposition: Plaintiff testified that she started taking additional medication to manage her anxiety because of the hostile treatment she was receiving from Phelps, not in order to be able to perform the job. RUMF 242.

Lastly regarding her claim for disability discrimination, it is important to recall that although Phelps admitted he knew about VanMeter's anxiety, and that he told Cullen and Hill about it while VanMeter was still in the training program, on September 6, 2017 (PMF 300-309), the USCP claimed that none of the supervisors or trainers knew about it, and both Hill and Cullen denied any knowledge. *Id.* That creates a genuine issue of material fact and could lead a jury to conclude that the USCP, at large, and Hill and Cullen, were both lying about their knowledge of VanMeter's disability to conceal their own discriminatory animus toward her. *Reeves, supra. And see, e.g., Moloney v. Home Depot U.S.A., Inc.,* 2012 U.S. Dist. LEXIS 75430, at \*24 (E.D. Mich. May 31, 2012) (summary judgment denied when evidence could show employer was dishonest when it denied knowledge of plaintiff's disability).

### 2. *Plaintiff Asserts a Prima Facie Case of Gender Discrimination*

#### a.   Threatening VanMeter with Removal on August 22, 2017

Defendant first claims that Plaintiff cannot assert a *prima facie* claim of discrimination because Phelps' threat to remove her on August 22, 2017 does not raise an inference of

discrimination due to her poor performance prior to that date. Def. P&A at 25-26. This argument falls flat because Plaintiff has already demonstrated that Phelps' performance-based criticisms were pretextual because the men in class were exhibiting either the same or more serious performance problems. PMF 50-85 (analyzing the handlers' performance between the beginning of training and August 22), and see generally, Heyen Report.

Addressing the additional deficiencies raised in the brief, Plaintiff notes that they were not included in the daily training record itself, which could convince a jury that the Defendant is attempting to fabricate after-the-fact justifications. *See Hamilton v. Geithner*, 666 F.3d 1344, 1356 (D.C. Cir. 2012) (absence of contemporaneous documentation could lead a reasonable jury to doubt the explanation); *Chudson v. Watt*, 125 F. Supp. 3d 255, 269 (D.D.C. 2015) (Employer is required to explain its actual as opposed to hypothetical reasoning and "the relevant question is whether the employer's actual reason was legitimate and non-discriminatory—not whether the employer can articulate a "post-hoc rationale" that would have been legitimate and non-discriminatory.")

Additionally (in the alternative) regarding the additional deficiencies that Defendant raises in its brief, prior to August 22, 2017:

1. Exhibiting "Human Behavior," (for which VanMeter was criticized on August 9) meaning leaning over the dog's back or staring in the dog's eyes, was frequently observed in videos of the men, but never mentioned in training reports. PMF 50-54.

2. Leading with the hand and leash control was a problem for all of the handlers. Heyen Report, Ex. 12 at 5 ("In nearly, if not every, video provided for review, almost every, if not every handler has poor leash control and leaves their arm/hand extended during most, of not the entire search."); PMF 77 (notes from August 21 reveal that Riley, not

VanMeter was leading with the hand). PMF 78 (video shows Dantinne requiring an explanation of the hand presentations on August 21). In one video, from August 24, 2017, Riley can be seen waving the odor into his dog's nose, the penultimate "leading with the hand." Although the trainers saw him do it and said "don't" during the exercise, no notation was made in his training report. Pl. Video Ex. 186 at USCP 2681, Ex. 488-89. *See also, e.g.,* PMF 55, 56, 60, 80 (leash work a problem for Meikrantz, Dantinne and Riley on August 10, August 15, 2017, and August 21 (for Meikrantz)). Additionally, the Defendant's own citation includes references to Plaintiff's improved leash work, on August 16.

3. The criticism that VanMeter was slow to condition that dogs to sit at known sources is related to the fact that Phelps and the trainers failed to tell VanMeter where the hides were located (*supra*). But the men received numerous negative notations about this problem – even with the additional help they received. PMF 209 and 212, 239 (c), (d), (e), (f) (Riley counseled on the timing of his sit conditioning on August 16, August 17, August 21, and August 22), PMF 64, 65, 67 (Videos from August 15, show Riley and Meikrantz failing to timely condition the sit), PMF 68 (Riley, Meikrantz and Dantinne all criticized for being slow to condition the sit on August 16), PMF 72 (Riley and Meikrantz received identical criticism about being late giving sit commands on August 17), PMF 80 (Meikrantz slow to condition the sit on August 21). PMF 85 (Riley and Dantinne both criticized for their odor recognition sit conditioning on August 22). Additionally, on August 17 (one of the days for which VanMeter was allegedly slow to condition the "sit" she was working Jayden, who had not yet learned the sit command. PMF 73.

4. The notion that VanMeter was the only candidate who was repeatedly reminded about performance issues prior to September 22, 2017 is flatly contradicted by the citations to the record immediately above. Moreover, on August 16, 2017 Dantinne, Meikrantz and Riley's training records all contain the notation "At times, the handler is slow to condition the canine at source, allowing the canine to come out and start to leave the source before the handler verbally conditions the sit. Timing is imperative for the classical conditioning process of pairing the odor with the reward and any delay can-will disrupt and impede the learning." *See* Ex. 20, USCP 178-179 (Dantinne); Ex. 19, USCP 498 (Riley); and Ex. 6, USCP 327-328 (Meikrantz), so the notion that only VanMeter was warned about impeding the dogs' progress is inaccurate.

In addition to the foregoing, Phelps was sabotaging Plaintiff during this early period by not telling her where the hides were located, whereas the training staff made sure to tell (and remind) the male handlers during their exercises. Moreover, the threat came at the beginning of week 3, which was during the 5-6 week grace period when no trainer would threaten a handler with removal, as they were learning the basics of K9 handling. Lastly, the threat to remove VanMeter on August 22 was premised on her inability to get Jayden to sit on one occasion that day, and that was a problem that all of the men had experienced with Jayden, who had not yet learned the "sit" command. Phelps preferential treatment of the men, and his violation of the "grace period" by threatening VanMeter with termination not only supports a *prima facie* case of gender discrimination, but it also constitutes strong evidence of pretext.

Although it is true that Phelps did not use sexist language when he threatened to remove VanMeter from the training program, that is not necessary. Direct evidence of discrimination is not required, and Plaintiff can prove her case with circumstantial evidence, such as the evidence

that she was the only candidate to be threatened with removal despite the male candidates' similar or worse performance. *Cones v. Shalala*, 199 F.3d 512, 516 (D.C. Cir. 2000).

Lastly, Defendant claims that Phelps' August 22, 2017 threat to remove VanMeter cannot support her discrimination claim because "Phelps also issued similar warnings to the entire class and a male handler in the class two weeks later." Def. P&A at 29. That claim creates a genuine issue of dispute over a material fact that a jury must resolve. Contrary to Defendant's claim, the male candidates were _never_ threatened with removal. PMF 288, RUMF 239(a). Zborai was never even counseled about his troubles in the program (PMF 296-297). Worse, Riley claims he was never warned that his performance needed to improve; instead, he claimed that Phelps told him that his performance was "spot on." PMF 245.

### b.   Assigning VanMeter to work with Jayden

Plaintiff does not argue that assigning her to the static discipline constituted discrimination.[7] That is a red herring that deserves no space in this brief. On the contrary, assigning her to Jayden was an act of discrimination based on her gender.[8]

Defendant claims that "not one K9 trainer indicated that they had any doubts about Jayden's ability to be successful in training." That claim is disputed and creates another genuine issue of material fact that a jury must resolve.  Hill testified that Jayden's performance diminished over the first few weeks, before he was assigned to VanMeter: "the more we ran the exercise[s], the more [Jayden] became dependent on the handler. So as the duration of the exercise continued, he needed more from the handler as opposed to the other ones, which was the complete opposite."

---

[7] Similarly, Plaintiff is not relying on any statistical evidence on the disparities between the number of men and women in K9 to prove her case. So that section of Defendant's Memorandum (P&A at 31-32) is also off-point.

[8] Plaintiff had not yet advised Phelps of her anxiety on August 22, 2017.

*See* PMF 44. Phelps told VanMeter that he was assigning Jayden to her because both Jayden and Van Meter had problems and "maybe they could help each other out." PMF 45. Consistent with her account of Phelps' statement to her, Plaintiff messaged her son on August 22, 2017 (the day she was paired with Jayden), saying "I was just assigned my new partner Jayden. We are both having some problems and have been put on notice that we have to get it together in 3 weeks." *Id.*

Additionally, multiple handlers had difficulty getting Jayden to sit prior to the time he was assigned to VanMeter because he had not learned to sit on command. PMF 38-40, 41, 44, 46. These videos additionally show the trainers having to use a pain grip and even then, struggling to get Jayden into a sit. PMF 38. Additionally, early on, the trainers could not get Jayden to show any interest in searching for explosives unless they added a tennis ball to the target box. PMF 40. In light of all that, a jury could easily credit Riley's testimony that the trainers commented to him that Jayden might not make it through the training program. PMF 46.

The fact of the matter is that Phelps' effort to sabotage VanMeter by assigning her to Jayden did not work, and a jury could conclude that Jayden's success in the program is attributable in part to VanMeter's consistent good performance and progression in the training course. Deutsch Dep. Ex. 7 at 189:7-11 ("a bad handler can mess up a good dog.").

### 3. *Plaintiff Asserts a Prima Facie Case of Retaliation*

The Defendant attacks Plaintiff's claim of retaliation on the grounds that she never engaged in protected activity. Def. P&A at 33. That argument is wide of the mark because Courts recognize a perception of retaliation theory.

This case proceeds on a theory that Sgt. Phelps believed or perceived VanMeter to have engaged in protected activity, a theory Judge (now Justice) Ketanji Jackson permitted to proceed when she was assigned to this case as a District Court Judge. *VanMeter v. United States Capitol*

*Police*, 2020 U.S. Dist. LEXIS 262231, at *2 (D.D.C. May 30, 2020) ("Assuming *arguendo* that the so-called perception theory of retaliation is a viable basis for claiming unlawful retaliation under the CAA, this Court finds that the allegations of fact in VanMeter's complaint are sufficient to support a plausible claim for retaliation in violation of the CAA."). Other Courts have recognized the perception theory of retaliation. *See Murphy v. District of Columbia*, 390 F. Supp. 3d 59, 71 (D.D.C. 2019) (relying on *Fogleman v. Mercy Hosp*., 283 F.3d 561, 571 (3d Cir. 2002)) ("what matters for purposes of a retaliation claim is whether the employer punishes the employee based on its belief that the employee is engaging in protected activity. For these and other reasons, most courts to reach the question have permitted Title VII retaliation claims under a perception theory, and this Court will as well.") (citing cases from various circuits and district courts). *And see Johnson v. Napolitano*, 686 F. Supp. 2d 32, 36 (D.D.C. 2010) (permitting a perception cases to proceed and explaining that "A perception theory of retaliation does not rest on whether the employee actually asserts participation in a protected activity; rather, the theory applies so long as the employer believed that the employee was engaged in protected activity."); *see also Grosso v. City Univ.,* 2005 U.S. Dist. LEXIS 4089, at *9 (S.D.N.Y. Mar. 14, 2005)*,* ("plaintiff states a valid claim for retaliatory discrimination based on culpable behavior by defendants before plaintiff engaged in protected activity to the extent that the behavior was motivated by their belief that plaintiff had already done so."); *United States EEOC v. Bojangles Rests., Inc*., 284 F. Supp. 2d 320, 328 (M.D.N.C. 2003) ("an employer's perception or even misperception can lead to potential liability.").

In Plaintiff's case, a jury could conclude that Phelps believed that VanMeter had complained about his discriminatory treatment of her up the chain of command in week 6 of the training class, meaning the week beginning September 12, 2017. During week 6 of training, Phelps

confronted VanMeter and demanded to know "who the hell [she had] talked to on up on the Hill because there's a rumor going on the Hill that Missy is going to fail out of K-9." PMF 340-50. Phelps blamed Van Meter and told Cromwell that another Sergeant must have overheard Plaintiff complaining to a K9 handler, Matt Broehl, because Phelps saw Plaintiff speaking to Broehl around that time.

The timing of that incident is significant because a jury could conclude that Phelps ratcheted up the pressure campaign against VanMeter even more afterwards, driving her to consider quitting from the training program on September 27, 2017 (PMF 140), and he again threatened her with removal again only two weeks later, on October 5, 2017, despite her solid performance, which outshined the veteran handler, Zborai in the timeframe. PMF 169-184.

The gap between the date on which Phelps came to believe that VanMeter had engaged in protected activity by getting word to his chain of command that she was being unfairly targeted for removal, and Phelps' threat to remove her, therefore was only 20 days (measured from September 15, the last day of training in week 6). That close temporal proximity certainly gives rise to an inference of retaliation. *Hamilton v. Geithner*, 666 F.3d 1344, 1358 (D.C. Cir. 2012) (two-month delay was sufficient to raise inference of discrimination for *prima facie* case).

## V.   CONCLUSION

For all of the reasons explained above, Defendant's motion for summary judgment should be denied in its entirety. Plaintiff has established that a jury could conclude that her removal from K9 training was due to Phelps' animus against her based on her gender, disability and retaliation, or some combination of those factors. Additionally, there are too many genuine issues of material facts on all of her claims for summary judgment to be appropriate.

Respectfully Submitted,
ALDERMAN, DEVORSETZ & HORA, PLLC

Leslie D. Alderman III (D.C. # 477750)
1025 Connecticut Ave., NW
Suite 615
Washington, DC 20036
Tel: 202-969-8220
Direct: 202-652-2451
lalderman@adhlawfirm.com

Counsel for Plaintiff