1    IN THE UNITED STATES DISTRICT COURT

2       FOR THE DISTRICT OF COLUMBIA

3 -------------------------- x

4 MAURICIA VAN METER,       :

5         Plaintiff,   :    Case No.

6     v.             :1:18-cv-00476-KBJ

7 UNITED STATES CAPITOL POLICE,:

8         Defendant.   :

9 -------------------------- x

10

11      Deposition of TONY EDWARD PHELPS

12    1025 Connecticut Avenue, NW, Suite 615

13        Washington, DC 20036

14      Tuesday, December 13, 2022

15          10:15 a.m.

16

17

18 Job No.: 472175

19 Pages: 1-348

20 Transcribed By: Cynthia Bauerle

21

22

1        Deposition of TONY EDWARD PHELPS

2

3        Pursuant to Notice of Deposition of

4    Tony Edward Phelps, before Chris Melton,

5    Court Reporter, who officiated in

6    administering the oath to the witness.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

```
1    A  P  P  E  A  R  A  N  C  E  S

2

3    ON BEHALF OF PLAINTIFF, MAURICIA VAN METER:

4           LESLIE D. ALDERMAN III, ESQUIRE

5           ALDERMAN, DEVORSETZ & HORA PLLC

6           1025 Connecticut Avenue, Northwest

7           Suite 615

8           Washington, D.C. 20036

9           (202) 969-8220

10

11   ON BEHALF OF DEFENDANT, UNITED STATES CAPITOL

12   POLICE:

13          KELLY M. SCINDIAN, ESQUIRE

14          OFFICE OF THE GENERAL COUNSEL

15          Employment Law Division

16          499 South Capitol Street, Southwest

17          Suite 820

18          Washington, D.C. 20003

19          (202) 593-3619

20

21   ALSO PRESENT:

22          SHEILA BERRY, Paralegal
```

```
1                C O N T E N T S

2   EXAMINATION OF TONY EDWARD PHELPS      PAGE

3   By Mr. Alderman                        7

4   By Ms. Scindian                        340

5   By Mr. Alderman                        343

6   By Ms. Scindian                        346

7

8                E X H I B I T S

9            (Retained by counsel)

10  PLAINTIFF DEPOSITION EXHIBIT           PAGE

11  Exhibit 1 Document Bate-stamped

12          USCP 000012 to 000017          37

13  Exhibit 2 E-mail Bate-stamped

14          USCP6 to USCP7                 61

15  Exhibit 3 Document Bate-stamped

16          USCP814 to 815                 99

17  Exhibit 4 Document Bate-stamped

18          USCP1696 and 1697 to

19          USCP1800 to USCP1805           168

20  Exhibit 5 Document Bate-stamped

21          USCP2135 to 2136               206

22
```

| | CONTINUED | PAGE |
|---|---|---|
| 1 | | |
| 2 | Exhibit 6 Document Bate-stamped | |
| 3 | USCP41 to USCP42 | 223 |
| 4 | Exhibit 7 Schedule | 225 |
| 5 | Exhibit 8 EOD K-9 training form | 227 |
| 6 | Exhibit 9  EOD K-9 training form | 231 |
| 7 | Exhibit 10 Document Bate-stamped | |
| 8 | USCP68 and USCP69 | 284 |
| 9 | Exhibit 11 Document Bate-stamped | |
| 10 | USCP464 and USCP465 | 284 |
| 11 | Exhibit 12 Document Bate-stamped | |
| 12 | USPC848 and USPC849 | 284 |
| 13 | Exhibit 13 Document Bate-stamped | |
| 14 | USCP838 to USCP839 | 289 |
| 15 | Exhibit 14 Document Bate-stamped | |
| 16 | USCP3082 to USCP3083 | 290 |
| 17 | Exhibit 15 Document Bate-stamped | |
| 18 | USCP84 to USCP85 | 291 |
| 19 | Exhibit 16 Document Bate-stamped | |
| 20 | USCP1818 to USCP1819 | 299 |
| 21 | Exhibit 17 Document Bate-stamped | |
| 22 | USCP1481 to USCP 1508 | 324 |

1   Exhibit 18 Document Bate-stamped

2            USCP276 to USCP           324

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

1               P R O C E E D I N G S

2    Whereupon,

3               THE REPORTER:  Mr. Phelps, will

4    you raise your right hand?  Do you solemnly

5    swear or affirm under the penalties of perjury

6    that the testimony you shall give will be the

7    truth, the whole truth, and nothing but the

8    truth?

9               THE WITNESS:  I do.

10               TONY EDWARD PHELPS,

11   being first duly sworn to testify to the

12   truth, the whole truth, and nothing but the

13   truth, was examined and testified as follows:

14          EXAMINATION BY COUNSEL FOR

15          PLAINTIFF, MAURICIA VAN METER

16   BY MR. ALDERMAN:

17        Q.     Good morning, Mr. Phelps.

18        A.     Good morning.

19        Q.     My name is Les Alderman.  I

20   represent Mauricia Van Meter in a lawsuit that

21   she's brought against Capital Police.

22        A.     Okay.

1      Q.      Thanks for coming today and
2  appearing as a witness.
3      A.      Okay.
4      Q.      For the record, can you give us
5  your full name?
6      A.      Tony Edward Phelps.
7      Q.      And your home address?
8      A.      1329 Duchess Lane, Huntingtown,
9  Maryland 20639.
10      Q.      Any plan to move in the
11  foreseeable future?
12      A.      It's in the talks.
13      Q.      Okay.  And where are you guys
14  talking about moving?
15      A.      Multiple states.  Florida,
16  Texas.  We're still in preliminary
17  discussions.
18      Q.      Okay.  Okay.  Will you keep
19  Counsel for Capital Police advised of your
20  address if you move?
21      A.      I will.
22      Q.      Super.  Thank you very much.

1   Have you ever had your deposition taken

2   before?

3        A.     No.

4        Q.     Okay.  So I'm going to just lay

5   some ground rules down that hopefully make

6   everything easier.  I'm going to have a bunch

7   of questions for you today.  Hopefully, you'll

8   have a bunch of answers for me, but if at any

9   point in time you don't understand my

10   question, let me know.  I'll rephrase it.

11   I'll repeat it.  I'll come from a different

12   angle.  I'll do everything that I can do to

13   make sure that you understand what I'm asking,

14   but you have to let me know if there's any

15   confusion for me to do any of that.  Does that

16   make sense?

17        A.     Will do.

18        Q.     Okay.  Miss Scindian and me

19   object from time to time today.  Most of those

20   objections are for the record, so she's just

21   putting an objection down for the record.  If

22   she tells you, however, not to answer a

1    question, then stop.  Don't answer the

2    question because it may involve some kind of

3    privileged question.  Otherwise, you can go

4    ahead and answer the question if you

5    understand it and you can provide an answer.

6    Does that make sense?

7         A.     Yes.

8         Q.     Okay.  Because we're developing

9    a transcript, you know, it'll be a written

10   transcript of today's proceedings, it's really

11   important that we follow a couple rules.

12   First, even if you know exactly what question

13   I'm going to ask you, let me ask it so that

14   it's clear for the record and, likewise, I'll

15   let you finish your answer before I jump in

16   with another question.  The other thing is, it

17   sounds like we're not going to have a problem

18   with this, is if you're going to answer my

19   question either in the affirmative or in the

20   negative, it's always better to say yes or no

21   instead of using body language or saying

22   something like uh-huh or uh-hum because you

1    can't --

2              A.      I understand.

3              Q.      -- read those things.  You can't

4    figure out if that was a yes or no.

5              A.      Understand.

6              Q.      Today's going to be probably a

7    long day.  So if you need to take breaks to be

8    comfortable, take breaks to be comfortable.

9    It doesn't matter.  The deposition's going to

10   last as long as it lasts.

11             A.      Okay.

12             Q.      Okay, so stretch your legs, do

13   whatever you need to do to be comfortable.  If

14   I'm in the middle of, like, a line of

15   questions, I may ask you to hold off for a

16   minute so that I can finish up that, you know,

17   the questions on that point, and if I've asked

18   you a question, then I'll definitely need an

19   answer before we take a break, but otherwise,

20   the goal is to be comfortable and get through

21   the day.  All right?

22             A.      Sounds good.

1        Q.      You realize you're under oath,

2    so everything that you say is sworn testimony,

3    right?

4        A.      Correct.

5        Q.      Okay, but we're all human,

6    right, and you may remember something, like,

7    midway through the deposition or at the end of

8    the deposition that pertains to something that

9    you said in the beginning of the deposition,

10   and if that happens, just say, you know, Les,

11   I'd like to go back to something that I said

12   earlier and then add whatever you want to add.

13   That at least let's me know to ask follow-up

14   questions about the new information.  Okay?

15       A.      Yes.

16       Q.      The best time to do that if you

17   realize that you want to add something or that

18   you forgot something is while we're in the

19   deposition so that I can ask you follow-up

20   questions.  Makes sense?

21       A.      Yes.

22       Q.      Let's see.  The best

1   information, you know, the most valuable

2   information for me is always information that

3   you have based on your firsthand knowledge.

4   You saw it, you did it, you were there when it

5   happened, you know, that kind of thing.  So if

6   you were testifying based on information that

7   you received from someone else second or third

8   hand, would you please let me know that the

9   information is coming from someplace else and

10  not based on your firsthand knowledge?

11          A.     Yes.

12          Q.     Okay.  Also, if you're taking a

13  guess at something because this is how it

14  always happened, let me know you're taking a

15  guess and you're not talking about something

16  that you specifically remember.  Good?

17          A.     I understand.

18          Q.     Okay.  I'm sure I'm forgetting

19  something, but we'll hit it as we go.

20          A.     I'm sure we will.

21          Q.     Okay.  Are you currently

22  employed?

1          A.      No.

2          Q.      Okay.  And you were formally an

3    employee of the Capital Police?  U.S. Capital

4    Police?

5          A.      Yes.

6          Q.      What were the years of your

7    employment?

8          A.      I started May 3rd of 1989 until

9    end of January 30, 31.  I can't remember the

10   -- until 2018.

11         Q.      2018.  Okay.  And when you

12   retired -- you retired --

13         A.      Correct.

14         Q.      -- right?  Okay.  At the time

15   you retired, was there any pending discipline

16   against you?

17         A.      No.

18         Q.      Okay.  Was there any pending

19   investigations against you?

20         A.      No.

21         Q.      Okay.  Any open OPR

22   investigations?

1          A.      No.

2          Q.      Okay.  And at the time you

3   retired, were you a sergeant?

4          A.      Yes.

5          Q.      Okay.  How long had you been a

6   sergeant?

7          A.      Approximately ten years.

8          Q.      So about 2008-ish.  Something

9   like that?

10         A.      Correct.  Somewhere in there.

11         Q.      Okay.  And how long had you been

12  in K-9?  When did you start in K-9?

13         A.      May of 1991.

14         Q.      Okay.  And when you started,

15  that would mean that you were a K-9

16  technician, right?

17         A.      Correct.

18         Q.      Okay.  K-9 technician from about

19  '91 to about 2008?

20         A.      It could've been earlier, 2006.

21  I think during election time of President

22  Bush.  No, it was Obama running.  So it's

1    during that time.

2          Q.    Okay.  Okay.  And from 1991

3    forward to your retirement, were you always in

4    K-9?

5          A.    No.

6          Q.    Okay.  At what point in time

7    were you not in K-9?

8          A.    When I was promoted to the rank

9    of sergeant, I was transferred to the Senate

10   division section-3.

11         Q.    And how long were you there?

12         A.    Approximately a year and a half.

13         Q.    Okay.  Nothing to do with K-9?

14         A.    No.

15         Q.    Okay.  Let me step back for a

16   second.  Can you tell me what you did to

17   prepare for your deposition today?

18         A.    Can you clarify?

19         Q.    Did you do anything to get ready

20   for today's deposition?

21         A.    Clarify even more.  I'm not

22   understanding your question by "get ready."

1          Q.      To refresh your recollection of

2     event?

3          A.      Yes.

4          Q.      Okay.  And what did you do?

5          A.      Met with the USCP's attorneys.

6          Q.      Okay.  Miss Scindian is here.

7     Does she represent you?

8          A.      She represents the department,

9     as well as me.

10         Q.      Okay.  And when did you meet

11    with Miss Scindian?  I don't want to know what

12    you talked about.  When did you meet with her?

13         A.      Tuesday and Wednesday of last

14    week.

15         Q.      Okay.  Did you review any

16    documents in order to refresh your

17    recollection of events from Van Meter's

18    training session?

19         A.      Yes.

20         Q.      Okay.  What documents did you

21    review?

22         A.      Review her training.  Her daily

1    training forms.

2           Q.      Okay.

3           A.      And I believe some -- some

4    videos.

5           Q.      Did you watch videos of anyone

6    besides Van Meter?

7           A.      Yes.

8           Q.      Okay.  Whose videos did you

9    watch?

10          A.      I watched Dantinne.

11          Q.      Okay.

12          A.      Watched Riley.  I watched

13   Mikrantz.  I watched Zborai.

14          Q.      Do you remember the days of the

15   videos that you watched?  It's going to be

16   pretty tough, right?

17          A.      What do you mean?  Clarify what

18   do you mean by "days"?

19          Q.      So do you remember what dates

20   the videos that you watched were dated?

21          A.      No.

22          Q.      Okay.  Do you remember the

1    exercises that you reviewed?

2         A.    They were explosive training

3    exercises.

4         Q.    Okay.  Do you remember the

5    context of the settings of those training

6    exercises that you watched?

7         A.    I think the majority of them

8    were conducted at our training facility.

9         Q.    Okay.  Do you remember the

10   period of time of the training?  In other

11   words, was it -- did you watch videos from

12   before dogs were assigned to the handlers?

13        A.    Yes.

14        Q.    Okay.  Did you watch videos from

15   after that point in time?

16        A.    Yes.

17        Q.    Did you watch videos from when

18   Riley was still assigned to the static side?

19        A.    Yes.

20        Q.    And did you watch videos from

21   after that point in time, after Riley had been

22   transferred to PBIED?

```
 1          A.      I believe so.  I'm not 100
 2  percent sure.
 3          Q.      Okay.  So you reviewed videos
 4  from the -- from the entire training course,
 5  right?
 6          A.      Correct.
 7          Q.      Okay.  And did you review
 8  training forms?
 9          A.      Yes.
10          Q.      From other handlers?
11          A.      I believe so.
12          Q.      Okay.  Let's get some vocabulary
13  down for a sec because I've been referring to
14  all of the handlers in that class or all the
15  students in that class as handlers.  If I do
16  that, does that make sense to you?
17          A.      Yes, it makes sense.  I would
18  probably refer to them as trainees.
19          Q.      Trainees.  Okay.  If I said
20  trainee, would it include Zborai?
21          A.      Yes.
22          Q.      Okay.  And it would include
```

1    Schmid?

2          A.     Correct.

3          Q.     Okay.  They were all considered

4    trainees, right?

5          A.     Correct.

6          Q.     They all had to go through the

7    program?

8          A.     Correct.

9          Q.     They all had to pass the tests?

10         A.     Correct.

11         Q.     And they all had to meet your

12   standards for getting -- moving on to the

13   certification phase?

14         A.     They didn't have to meet my

15   standards.

16         Q.     Okay.  Tell me what you mean by

17   that.

18         A.     They had to meet the department

19   standards that have been set forth.

20         Q.     And where are those department's

21   standards set forth?

22         A.     It's within our K-9 training

1    manual.

2            Q.      Who was the judge of whether the

3    trainees met the department standards as set

4    forth in the training manual?

5            A.      Clarify "judge."

6            Q.      Who decided whether the trainees

7    met the standards or not?

8            A.      It was a collaboration effort.

9            Q.      All right.  Between who?

10           A.      The lead instructors and then

11   myself, which would be the supervisor at the

12   time.

13           Q.      And who were the lead

14   instructors?

15           A.      For which?

16           Q.      Okay.  Static?

17           A.      Static.

18           Q.      Static.

19           A.      Static would be Mr. Hill as the

20   lead, myself as a secondary.

21           Q.      All right.  And then for PBIED?

22           A.      PBIED would be Core for the lead

1    and Turner as secondary.

2            Q.      You were the -- you were the

3    supervisor of K-9 training at the time,

4    correct?

5            A.      Yes.

6            Q.      Meaning, what is that -- tell me

7    what your duties then as supervisor over K-9

8    training were in the -- in the 2017 time

9    period, specifically?

10           A.      Clarify your question more

11   because that's a broad question because I had

12   many responsibilities.

13           Q.      Okay.  And what I want to -- I

14   want to know about your many responsibilities.

15           A.      One -- I'm sorry.

16           Q.      Go ahead.

17           A.      No.  No.

18           Q.      What I was going to say is I

19   want to know about your many responsibilities

20   as supervisor over K-9 training.

21           A.      Okay.  As supervisor K-9

22   training, you're responsible for the

1    retraining of the current teams that are out

2    there.  Make sure they have their monthly

3    retraining and then when we have a new class

4    come aboard for training, we ensure that the

5    trainees meet the standards that have been set

6    forth to successfully be deployed in an

7    operational environment.

8          Q.    As supervisor, were you also --

9    were you the first line supervisors for all of

10   the trainers in the program?

11         A.    Yes.

12         Q.    Okay.  Did it matter if they

13   were civilians or sworn officers?

14         A.    No.

15         Q.    Okay.  You supervised everybody?

16         A.    Correct.

17         Q.    And as their supervisor, that

18   means you issued their performance

19   evaluations?

20         A.    Correct.

21         Q.    You approve their schedule and

22   leave?

1        A.      Yes.

2        Q.      If there was any discipline, you

3   would be the first line of supervisory --

4   supervisor to do that?

5        A.      Correct?

6        Q.      Okay.  What other kind of

7   supervisory controls did you have over the

8   training staff?  Did you assign who is going

9   to be lead trainer?

10       A.      Yes.

11       Q.      Okay.  And who is going to be

12  assistant trainer?

13       A.      Yes.

14       Q.      Or I'm sorry.  Is it assistant

15  trainer or is it -- or is it another title?

16       A.      It's semantics on words.

17  Assistant -- our policy is that two trainers

18  have to be accompanied with a training device.

19  So the policy is two trainers have to be

20  present at all time.

21       Q.      And a training device, is that

22  an explosive or an explosive compound?

1          A.      A training device, yes, would be

2     some type of explosive device.

3          Q.      Okay.

4          A.      Or materials.

5          Q.      Yeah.  And so you got a lead

6     trainer and then a secondary trainer?

7          A.      Correct.

8          Q.      Okay.  I've heard testimony that

9     there's a -- there's a title called like

10    instructor, and then maybe there's another one

11    called assistant instructor, which is a

12    different -- a different level it sounded

13    like.

14         A.      It's semantics.

15         Q.      Okay.  What role -- in this 2017

16    training class, what role did Tim Cullen have?

17         A.      He was a trainer that floated

18    around initially.

19         Q.      Okay.

20         A.      Then eventually came onboard for

21    the static side to assist.

22         Q.      And why did that happen?

1          A.      Just another set of eyes.

2    Different point of view, different opinion,

3    suggestion.

4          Q.      Did you ask Cullen to

5    participate in the static training because of

6    concerns that Van Meter raised?

7          A.      No.

8          Q.      Did you ask Cullen to

9    participate in the static training because Van

10   Meter had accused you of belittling behavior

11   towards her?

12         A.      No, and I wanted to ask you to

13   clarify the be -- you said belittling?

14         Q.      Yeah.

15         A.      Clarify that.  I'm not sure

16   exactly your meaning behind that.

17         Q.      Okay.  Harsh, I think.

18   Sarcastic, mean, unkind?

19         A.      No.

20         Q.      Okay.  Did you ask Mr. Cullen to

21   assist with the static side for anything

22   related to Van Meter?

1        A.      To assist with Van Meter as

2   another set of eyes to help her through the

3   program.

4        Q.      Okay.  Was he also there to

5   assist Zborai?

6        A.      Yes.

7        Q.      Okay.  In the same way?

8        A.      Correct.

9        Q.      All right.  Now, you said a

10  moment ago that Kenny Hill, that's Charles K.

11  Hill, right?  Charles K.  The initial K Hill.

12       A.      Correct.

13       Q.      Okay.  You said he was the lead

14  instructor for the status side?

15       A.      Yes.

16       Q.      And then you were the secondary

17  instructor?

18       A.      Correct.

19       Q.      Or something of that nature?

20  Semantics.  So what was the interplay between

21  -- between you and Hill?  Was there some

22  hierarchy in terms of who had the authority

1  to, you know, define what searches were going

2  to happen or who did what during a search,

3  paperwork, you know, things of that nature?

4        A.    Can you clarify your question?

5        Q.    Who was actually in charge of

6  the training exercises?

7        A.    Mr. Hill.

8        Q.    Okay.  What was your role when

9  it came to training?

10        A.    As a supervisor.

11        Q.    And can you explain that?

12        A.    I'm not sure I understand what

13  you mean by explain that.

14        Q.    So you said your role for

15  training was to be a supervisor?

16        A.    Correct.

17        Q.    Can you explain how you were a

18  supervisor in the training context?

19        A.    In the sense that the training

20  exercise, the instructions that were given to

21  the trainee were clear and as well as my

22  experience as to provide an instruction, as

1    well.

2         Q.    Okay.  So you also provided

3    hands-on instruction during the training

4    exercises --

5         A.    Yes.

6         Q.    -- right?  Did you complete the

7    training records, the daily training record

8    forms?

9         A.    I completed some.

10        Q.    Okay.  How was it -- how it is

11   -- how was it decided who would complete the

12   training forms at least on the static side?

13        A.    The lead instructors set up the

14   training venues and also completed the daily

15   training forms.

16        Q.    But I think you said that you

17   sometimes filled out those forms?

18        A.    Correct.

19        Q.    So under what circumstances

20   would you fill out the form?

21        A.    When Mr. Hill would be on leave

22   for that day, then I would fill out the form.

1          Q.      Any other occasions when you

2    would fill out the form?

3          A.      I do not recall.

4          Q.      So as the -- as the secondary

5    instructor for static, but also the supervisor

6    over K-9 training, did you have the authority

7    to propose Van Meter's removal?

8          A.      I made the recommendation put

9    forward, yes.

10         Q.      Okay.  Did anyone suggest to you

11   or ask you to put forward that recommendation?

12         A.      I had a staff meeting --

13         Q.      Okay.

14         A.      -- with Mr. Hill, technician

15   Cullen, as well as civilian Turner and

16   civilian Small.  We met.  We discussed, and

17   ultimately the decision to recommend --

18   recommendation from my staff was she needed to

19   be recommend for removal.  Therefore, I put

20   forth the memo for the recommendation.

21         Q.      Did you call the meeting?  You

22   said you had a staff meeting with those

1    individuals.

2           A.      Yes.

3           Q.      Did you call the meeting

4    specifically to discuss what to do with Van

5    Meter?

6           A.      Yes.

7           Q.      Okay.  And you're the one that

8    called the meeting?

9           A.      Yes.

10          Q.      All right.  So did you call the

11   meeting to discuss whether or not to remove

12   Van Meter?

13          A.      To discuss whether the

14   recommendation should be put forward for her

15   removal.

16          Q.      Okay.  Did anyone -- did anyone

17   disagree with putting forward the

18   recommendation to remove?

19          A.      No.

20          Q.      Did anyone argue to give her

21   more time?

22          A.      No.

1          Q.      And what were the issues that

2    led you to call that meeting?  What were the

3    -- what were the problems or the alleged

4    problems that Van Meter was having?

5          A.      As it was noted in her daily

6    training forms up to the point where she was

7    officially removed, it was her inconsistency

8    conducting a search pattern or inconsistent to

9    work the mechanics of a dog or the

10   inconsistency of reading a change of behavior

11   in a canine.

12         Q.      Okay.  And can you tell me what

13   you mean by inconsistency with search

14   patterns?

15         A.      She would not conduct a search

16   pattern as it was taught, as well as

17   demonstrated.

18         Q.      And was there particular

19   contexts or settings in which she struggled

20   with her search pattern?  And what I mean by

21   that is rooms versus vehicles, versus buses,

22   versus luggage sweeps.

1          A.      Clarify your question.  Are you

2    asking me did she struggle with one more than

3    others?

4          Q.      Yes.

5          A.      No.  All were equal.

6          Q.      Okay.  She struggled equally in

7    all of the search contexts?

8          A.      Correct.

9          Q.      Okay.  And you said the

10   mechanics.  What did you mean by that?

11         A.      Being able to manipulate the

12   leash, the training leash, being able to

13   maintain a proper pace.  Again, maintain

14   searching the odor release points and being

15   able to read the change of behavior in a

16   canine when it's on odor versus just regular

17   smelling investigating.

18         Q.      Okay.  Now that reading a change

19   of behavior, is that a part of mechanics or

20   was that a separate category?

21         A.      It's all compassed together.

22         Q.      Okay.  So the mechanics of the

1    search, and when you use that term, you're

2    also referring to monitoring the dog for

3    change of behavior and recognizing change of

4    behavior?

5          A.     Correct.

6          Q.     Okay.  So it's leash work, it's

7    pace, and then it's monitoring for change of

8    behavior?

9          A.     And conducting effective search.

10         Q.     Conducting an effective search

11   encompasses everything under the sun, right?

12   That's search patterns, mechanics and reading

13   change of behavior, right?  You need all those

14   things to conduct an effective search?

15         A.     Correct.

16         Q.     Okay.  Search mechanics.  Does

17   that include thoroughly searching the entirety

18   of the search area?

19         A.     Yes.

20         Q.     Okay.  Does that include

21   following instructions from the training

22   staff?

1          A.     No.  There's two separate

2     issues.

3          Q.     Okay.  Following instructions is

4     not part of search mechanics?

5          A.     Correct.

6          Q.     Okay, but what if your

7     supervisor says, you know, Van Meter, I need

8     you to search bus 467 and you check bus 469.

9     Following the mechan -- following the

10    instructions is going to be a big part of

11    effect -- doing an effective search, right?

12         A.     Correct.  However, she did not

13    search what she was directed to search.

14         Q.     Okay.  And that's what I mean.

15    So failing to follow instructions when it

16    comes to what you're supposed to search and

17    what you're not supposed to search was also

18    part of what Van Meter struggled with?

19              MS. SCINDIAN:  Objection.

20    Mischaracterizes the testimony.

21         A.     I don't recall that being the

22    issue.

1          Q.      Okay.

2          A.      It's possible, but I do not

3   recall.

4          Q.      All right.  Now, at the time you

5   called this meeting, do you remember -- do you

6   remember what date that was?

7          A.      No.

8          Q.      Or about what date that was.

9   (Exhibit 1, document Bate-stamped USCP 000012

10  to 000017 marked for identification.)

11         Q.      Okay.  Sergeant Phelps, you've

12  been given what's been marked Phelps

13  Exhibit 1.  It's a stapled packet.  On the

14  bottom right corner of each page you will

15  notice what we call a Bates number.  The first

16  page is USCP 000012, and it goes all the way

17  to 000017.  Do you see that?

18         A.      I do.

19         Q.      I'll refer to those Bates

20  numbers when we -- when we look at different

21  exhibits, but I will start dropping the zeros.

22  So I'll just say it's USCP12.

1          A.      Okay.

2          Q.      Do you recognize the document

3     that's been marked Exhibit 1?

4          A.      I do.

5          Q.      Is this the memorandum that you

6     put forward recommending Officer Van Meter's

7     removal from the K-9 training?

8          A.      It does.

9          Q.      Okay.  And did anyone help you

10    write it?

11         A.      No.

12         Q.      Did anyone ask you to write it?

13         A.      No.

14         Q.      Does this document help you

15    determine what date that meeting was that you

16    called with the training staff to discuss

17    whether to recommend Van Meter's removal?

18         A.      No.

19         Q.      The last entry in your memo is

20    dated -- so in other words, yeah.  If you take

21    a look at USCP17, paragraph X, the last

22    paragraph refers to events that occurred on

1    October 11th, 2017.

2              A.      Okay.

3              Q.      Do you recognize that?

4              A.      I don't recall, but okay.  I rec --

5              Q.      That's what it says, right?

6              A.      Correct.

7              Q.      Okay.  Does that -- does that

8    help you place that meeting?  Did it happen

9    before the 11th or after the 11th?

10             A.      I'm not sure.  Don't recall.

11             Q.      So it could have been before the

12   11th that you had the meeting?

13             A.      Yes.

14             Q.      Okay.  Now, by that time, had

15   you decided that you thought removal was the

16   best option?

17             A.      I didn't have an opinion.

18             Q.      You didn't have an opinion?

19             A.      Correct.

20             Q.      Okay.  So you didn't say to the

21   training staff, I think we should remove Van

22   Meter, what do you think or anything like

1    that?

2           A.      No.  Not that I recall.

3           Q.      If you take a look at your -- at

4    your memo, you'll see that it was -- looking

5    at the second page of the document, which is

6    USCP13, the date at the top of the page is

7    October 16th.

8           A.      Okay.

9           Q.      Do you think that's the day that

10   you forwarded the recommendation memo up the

11   chain of command?

12          A.      I don't -- don't recall.

13          Q.      Okay.  At what -- and so take a

14   look at the first page of the document USCP12.

15   There's a bunch of signatures on this page,

16   right?

17          A.      Correct.

18          Q.      And these are signatures of your

19   chain of command?

20          A.      Yes.

21          Q.      And is it the case that before

22   you removed Van Meter from K-9 training, you

1    had to get all of these signatures, including

2    the signature of Chief Verderosa?

3           A.      I did not remove Van Meter from

4    the training.  I put forth a recommendation.

5           Q.      Okay.  She was removed, correct?

6           A.      Correct.

7           Q.      Okay.  And what was the event

8    that effectuated her removal then?  Did you

9    not tell her Officer Van Meter, you're being

10   removed?

11          A.      I was -- received a phone call

12   after this letter was -- this memo was

13   submitted to the chain.  I received a phone

14   call from Lieutenant Cromwell.

15          Q.      Okay.

16          A.      And was instructed to remove her

17   from the training program.

18          Q.      Okay.  And was that after

19   Verderosa signed?

20          A.      I don't recall.

21          Q.      Okay.

22          A.      I don't recall the timeline.

1          Q.      At the time that Cromwell called

2     you to say, go ahead and remove her, did you

3     -- did you have the memo back?

4          A.      No.

5          Q.      Okay.  Okay.  You can put that

6     down for now.  We'll probably look at it.

7          When did -- when did you first have

8     doubts about whether Officer Van Meter would

9     make it through training?

10         A.      I don't recall when I first had

11    doubts.

12         Q.      Okay.  I don't mean just like,

13    you know, Officer Van Meter has problems like

14    everybody else, you know, every -- the first

15    few weeks of training, I'm guessing the new

16    handlers are all pretty much useless and, you

17    know, learning the -- learning the skills, but

18    -- and everybody's probably equally bad,

19    right, or within -- within a close distance to

20    each other.  Is that about right?

21         A.      No.

22              MS. SCINDIAN:  Objection.  Vague

1    and ambiguous.

2            Q.      Okay.  So in this particular

3    class, were there -- were there handlers who

4    were immediately kind of heads above the other

5    handlers?

6                    MS. SCINDIAN:  Objection.  Vague

7    and ambiguous.

8            A.      There was some that seemed to

9    handle their canine better than others.

10           Q.      And who are those?  Do you

11   remember?

12           A.      Obviously, well, the seniors

13   Zborai, Schmid, Mikrantz handle the dogs

14   better and I'll, yeah, say those three.

15           Q.      Okay, then I'll go back to my

16   question.  I mean, I think you answered it

17   just to see if it -- if you refresh at all.

18   At what point in time did you have significant

19   doubts that Van Meter would not make it

20   through class?

21                   MS. SCINDIAN:  Objection.  Vague

22   and ambiguous.

1          A.       It was in the latter part of

2     training.  Probably week 10 to 11.

3          Q.       Week 10 or 11.  Was that around

4     the time that you had the meeting with the

5     training staff that you referred to earlier?

6          A.       I don't recall.

7          Q.       Okay.  Did you ever -- did you

8     ever threaten to remove Officer Van Meter

9     prior to week 10?

10              MS. SCINDIAN:  Objection.  Vague

11     and ambiguous.

12          A.       No.

13          Q.       Okay.  Did you ever tell her

14     that if she didn't improve some aspect of her

15     performance that you would put a

16     recommendation to remove her?

17          A.       I did.

18          Q.       Okay.  And what prompted you to

19     do that?

20          A.       We were entering -- just

21     completed, I believe, week three, entering

22     week four.  So we completed a quarter of the

1  training.  Unfortunately, Van Meter struggled

2  more than the other two candidates, which was

3  noted on her daily training forms of her

4  deficiencies.

5       Q.     And what specifically do you

6  remember her struggling with more so than the

7  other candidates?

8       A.     Being able to control the dogs,

9  conduct a proper search, her leading with her

10 right hand, bending over the dog during the

11 search.

12      Q.     When you say being able to

13 control the dog, do you mean -- are you

14 referring to a specific dog?

15      A.     She did struggle with certain

16 dogs more than others.

17      Q.     And did she struggle with

18 Jayden?

19      A.     No.

20      Q.     Did she struggle to get him in a

21 sit?

22      A.     Yes.

1          Q.      Okay.  And was that part of why

2     you thought she was struggling more than other

3     handlers?

4          A.      No.

5          Q.      And why do you say that?

6          A.      Because other handlers also

7     struggled to place Jayden in a sit, which

8     isn't unusual in the first three weeks of

9     training.

10          Q.      All right.  You said being able

11     to control the dog.  What did -- what did you

12     mean by that?

13          A.      Being able to control the dog in

14     a safe manner for her and other handlers,

15     trainees and canine, as well as to effectively

16     conduct the exercise that was being presented

17     at the time.

18          Q.      Now at the time -- so week

19     three, were you guys still in the imprinting

20     process?

21          A.      Yes.

22          Q.      Okay.  And so she was not

1  effectively performing the imprinting

2  exercises?

3          A.      Correct.

4          Q.      Okay, but did she need to work

5  on the timing of her -- of her sit command?

6          A.      Correct.

7          Q.      And how was her leash work?  Did

8  she need to work on her leash work?

9          A.      Yes.

10         Q.      Okay.  And those things were

11 significant enough that you put them or made

12 sure that they were in her training report?

13         A.      Yes.

14         Q.      Okay.  And what kind of things

15 did -- when you were writing the training

16 reports, did you put every little thing in the

17 training report or did you focus on the

18 important things?

19         A.      I don't recall.

20         Q.      But you only wrote the reports

21 when Hill was not available when he was on

22 leave?

1          A.      Correct.

2          Q.      Okay.  Did Van Meter have any

3   trouble controlling Jayden physically?

4          A.      No.

5          Q.      Okay.  And what did you say --

6   you said something about leading with her

7   right hand?

8          A.      Correct.

9          Q.      What was that about?  What was

10  the issue that she was experiencing?

11         A.      She would present with her right

12  hand and I -- of the search exercise.  She

13  would present with the right hand and leave it

14  out in front of her as if guiding the dog to

15  the imprinting box.

16         Q.      Anything else when it comes to

17  her leading with her right hand?  Any other

18  problems?

19         A.      Based off of your question, you

20  mentioned the right hand, the hand.  Talking

21  about the hand.  Leading with the hand.

22         Q.      Okay.  Just leading with the

1  hand.

2          A.      Correct, based off the question.

3          Q.      I don't -- I'm sorry.  I'm not

4  understanding you.

5          A.      Repeat your question to me.

6          Q.      You said one of the issues that

7  Van Meter was struggling with that led you to

8  tell her that if she didn't improve was

9  leading with her hand and you mentioned her

10  right hand.

11          A.      Correct.

12          Q.      I'm just asking you, have you

13  described that issue fully, or is there

14  anything else that you remember that you want

15  to -- that you can tell me about?

16          A.      That's correct, what I recall.

17          Q.      Okay.  And then you said bending

18  over the dog?

19          A.      Yes.

20          Q.      And what is that?  What do you

21  mean by that?

22          A.      She would lean over -- over the

1    dog during a search exercise during the

2    training exercise.

3        Q.    Okay.  Meaning, like, she would

4    be over the dog's back while walking?

5        A.    While conducting -- conducting

6    the exercise.

7        Q.    Was she the only one that did

8    that in the first two or three weeks?

9        A.    I don't recall 100 percent.

10       Q.    Yeah.  Okay.  During that

11   imprinting phase that you were talking about,

12   was it important to make sure that the

13   handlers knew where the explosive hide was so

14   that they could quickly react and condition

15   the dog to sit?

16       A.    Yes.

17       Q.    Okay.  And so as a result, did

18   the training staff make sure that the handlers

19   knew where the hide was during the imprinting

20   process?

21       A.    Yes.

22       Q.    And you guys would -- you guys

1    would tell the handlers before they started

2    and then even in the middle of the search

3    where the hide was, right?

4         A.    Correct.

5         Q.    To keep them cued?

6         A.    Correct.

7         Q.    To keep the handler cued to

8    where the explosive odor was located?

9         A.    Correct.

10        Q.    Okay.  Did that with everybody?

11        A.    Yes.

12        Q.    Did that with all the handlers.

13   Did you ever have any doubts about any other

14   trainees making it through the program?

15        A.    No.

16        Q.    Did you ever tell Cromwell that

17   you had doubts about anyone else?

18        A.    Not that I recall.

19        Q.    Did you ever tell Cromwell

20   anyone else was struggling?

21        A.    I do not recall.

22        Q.    When you told Officer Van Meter

1    that she needed to improve, this is -- this

2    week three communication that you had with

3    her, do you remember what you said?

4          A.     No.

5          Q.     Do you remember if you pointed

6    out any particular deficiencies that she

7    needed to work on?

8          A.     I'm sure I did.

9          Q.     But can you remember any that

10   you mentioned?

11         A.     No, but I also shared with Van

12   Meter I was sympathetic towards her struggles

13   because I to struggled during the K-9 -- my

14   first K-9 training process.  So I was very

15   sympathetic to her and her struggles.

16         Q.     You told her that in the same

17   discussion that you had when you told her that

18   if she didn't improve, that you'd have to

19   recommend her out of the program?

20         A.     Correct.

21         Q.     You remember specifically

22   telling any other handler that they needed to

1   improve if they wanted to remain in the

2   program?

3          A.      I do not recall.

4          Q.      Remember telling Mike Riley that

5   he needed to improve if he wanted to stay in

6   the program?

7          A.      It's possible, but I do not

8   recall.

9          Q.      Remember telling Dantinne that

10  he needed to improve if he wanted to stay in

11  the program?

12         A.      No.

13         Q.      So when I asked you about Riley,

14  you said it was possible.  When I asked you

15  about Dantinne, you said no.

16         A.      Correct.

17         Q.      Why the difference there?

18         A.      When looking at Dantinne -- I'm

19  sorry.  Looking at Riley didn't quite

20  understand the struggles until later into the

21  program.  The dog revealed itself as being

22  more of an issue than actually Riley was the

1    issue.

2           Q.     Okay.  Parse that out for me.

3    At some point in time, did you think that

4    Riley was a problem or was having problems?

5           A.     Initially.

6           Q.     Okay.  And then -- and then

7    later on you decided that it was -- that the

8    dog was a problem, not Riley?

9           A.     Correct.

10          Q.     Did you tell Riley at some point

11   in time that he was doing everything right,

12   that it was the dog's problem and that you

13   were working on retiring the dog or removing

14   the dog from the program?

15          A.     You need to clarify your

16   question because I didn't tell anybody that

17   did everything right.

18          Q.     Okay.  Did you tell Riley that

19   his performance was not a concern, that the

20   dog was a problem and that you were working to

21   remove the dog from the program?

22          A.     No.  I do not recall.

1      Q.      Okay.  What were the issues that

2  you initially attributed to Riley?  What were

3  the struggles that you thought Riley was

4  having?

5      A.      I don't recall.  I don't recall

6  right here without looking at the training

7  sheets to refresh my memory.  I do not recall.

8      Q.      You need to see all the Riley

9  training sheets to refresh your recollection

10  on that?

11      A.      Possibly.

12      Q.      Didn't you -- didn't you review

13  those training sheets when you were preparing

14  for your deposition today?

15      A.      I reviewed some of them.

16      Q.      What issues -- even if you can't

17  tell me all of them, what issues did you think

18  Riley was struggling with?

19              MS. SCINDIAN:  Objection.  Asked

20  and answered.

21      A.      Riley struggled with being

22  fluid, smooth with his search.

1       Q.      What does that mean, being
2   fluid?  I've seen -- I've seen search fluency
3   and now you've said fluid search.  Do those
4   two things mean the same thing?
5       A.      Yes.
6       Q.      Okay.  And can you describe what
7   those terms mean?
8       A.      The meaning I -- I have for it
9   is fluid is the search is smooth.  There's --
10  the team goes in, does a left to right search
11  pattern, hits the -- all the odor release
12  points, and the end of the training exercise
13  hopefully the dog gets to the training aid,
14  responds appropriately and handler's condition
15  it.
16      Q.      And part of having a fluid
17  search is that the trainer -- while the dog is
18  working, the trainer has an idea of where he's
19  going to get the dog to search next, right?
20  So the trainers not just or the handler, I'm
21  sorry.  The handler is not just staying put
22  watching the dog work.

1          A.      Correct.

2          Q.      Right?  The handler is getting

3    ready for the next thing?

4          A.      Correct.

5          Q.      While keeping an eye on the dog,

6    right?

7          A.      Correct.

8          Q.      So in peripheral vision, you're

9    looking for the next spot that might be an

10   odor release point or a spot that you want the

11   dog to check out, but you're always keeping

12   yourself and the dog moving?

13         A.      Correct.

14         Q.      Right.  And that's a fluid

15   search?

16         A.      Correct.

17         Q.      Instead of just going to the

18   middle of the room and holding the leash and

19   watching the dog, right?

20         A.      No.

21         Q.      No what?

22         A.      No.  That's not a search.

1          Q.     Okay.  That's not a search,

2    right?

3          A.     Correct.

4          Q.     Okay.  Not only is not fluid,

5    it's not a search?

6          A.     Correct.

7          Q.     Okay.  Anything else that you

8    thought that Riley was having -- struggling --

9    was struggling with besides search fluidity?

10         A.     Not that I recall in five years.

11         Q.     Yeah.  Do you remember that he

12   struggled reading his dog's body language?

13         A.     I do not.

14         Q.     How about his search patterns?

15   Do you remember him struggling maintaining an

16   effective search pattern when he was on the

17   static side?

18         A.     I do not.

19         Q.     Okay.  Now, at what point in

20   time did you realize or did you come to the

21   conclusion that it wasn't Riley having those

22   issues, it was the dog?

1          A.     I do not recall.

2          Q.     And what was the dog doing to

3   cause Riley to have difficulties?

4          A.     Very disinterested.  Very

5   disinterested in the search, the exercise that

6   was present.

7          Q.     And that's something that arose

8   later on in the -- in the training program?

9                 MS. SCINDIAN:  Objection.

10         Q.     You didn't notice that in the

11  first couple of weeks of training, did you?

12                MS. SCINDIAN:  Objection.  Vague

13  and ambiguous.  Calls for speculation.

14         A.     That's -- I don't recall, but I

15  think that it was displayed, but I do -- the

16  behavior for the canine was displayed, but I'm

17  not -- I don't recall 100 percent.

18         Q.     At some point in time, you come

19  to the conclusion that this is the dog, not

20  Riley, right?

21         A.     As a staff and myself came to

22  the conclusion.

1          Q.      And who do you remember, you

2     know, collaborating with on that conclusion?

3     You said as a staff.  Who are you referring

4     to?

5          A.      The lead instructor for the

6     PBIED, as well as the lead instructor for

7     static.  That would be Mr. Hill, Mr. Core,

8     Turner, as well Smalls, as well as Cullen.

9          Q.      Now, was this -- was this a

10    realization you came to after Riley had

11    transitioned over to the PBIED side?

12         A.      I'm not sure I understand your

13    question.

14         Q.      You said at some point in time

15    you realized that it was the dog causing the

16    struggle for Riley, right?

17         A.      Correct.

18         Q.      Did you come to that realization

19    before Riley transitioned over to the PBIED

20    side of the training program?

21         A.      Yes.

22         Q.      Okay.  So you came to that

1    conclusion while the dog -- while Billy was

2    still -- while Riley was still working with

3    Billy the Lab on the static side?

4          A.    Correct.

5          Q.    Okay.  Do you remember how long

6    after you came to that realization that Riley

7    was removed from the program?

8          A.    No.

9          Q.    Billy the Lab was removed from

10   the program?

11         A.    No.

12         Q.    Okay.  Do you remember in early

13   September notifying Lieutenant Cromwell that

14   you had concerns about Officer Van Meter?

15         A.    I do not recall.

16   (Exhibit 2, e-mail Bate-stamped USCP6 to

17   USCP7, marked for identification.)

18         Q.    Mr. Phelps, you've been given

19   Exhibit 2.  This one goes from USCP6 to USCP7

20   and if you take a look at the very bottom of

21   the first page, you'll see that there is a

22   forward of an e-mail from Cromwell to maybe

1    Eric Belknap, and what he's forwarding is an

2    e-mail that is received from you?

3            A.      Correct.

4            Q.      From September 7th, 2017?

5            A.      Correct.

6            Q.      Okay.  Have you seen this

7    document since you left the department?

8            A.      Yes.

9            Q.      Okay.  Did you see it when you

10   were preparing for your deposition?

11           A.      Yes.

12           Q.      Okay.  Do you remember -- so

13   directing your attention down to the bottom

14   paragraph of the document and read it again if

15   you need to, you were -- what was the point in

16   providing the information in that paragraph to

17   Cromwell?

18           A.      To keep my chain of command

19   posted on the progress of each candidate in

20   the class, as well as the class overall.

21           Q.      Why did you single out Van Meter

22   in that paragraph?  Like, in the -- in the

1    whole e-mail, you're referring to Billy the

2    Mal and Van Meter, right?

3           A.     In the whole paragraph?

4           Q.     No, in the whole e-mail.

5           A.     In the whole --

6           Q.     You don't -- you don't refer to

7    each of the trainees, do you?

8           A.     I don't understand your

9    question.

10          Q.     You said that you wrote this

11   e-mail to keep Cromwell up to date on the

12   progress of the class?

13          A.     Correct.

14          Q.     Aside from Van Meter, which

15   trainees do you refer to in this e-mail?

16          A.     There were no trainees.  The

17   e-mail was highlighting deficiencies.  That's

18   -- the first paragraph states canine Billy.

19   Second paragraph canine Billy the Mal, and

20   then the last paragraph is Van Meter.

21          Q.     Okay.  So the purpose of your

22   writing the e-mail to Cromwell was to notify

1   him of issues, right?

2          A.      Correct.

3          Q.      Problems?

4          A.      Correct.

5          Q.      Okay.  And what specifically

6   about Van Meter's performance led you to write

7   this to include her in this e-mail to

8   Cromwell?

9          A.      As it states, addressing the

10  mechanics of a working dog as we discussed

11  earlier.  Being able to recognize a change of

12  behavior in a canine versus odor recognition

13  versus just smelling.

14         Q.      Okay.  And can you explain to us

15  laypeople what that change of behavior of the

16  canine when it's -- I guess it's on odor

17  versus just smelling?

18         A.      There's -- when the dog is

19  investigating is more of smelling, but when

20  the dog is on odor, their breathing becomes

21  heavier.  You can hear it.

22         Q.      Okay.  Just the breathing?

1        A.      Breathing.  Body language of the

2   canine changes.  They become more excited.

3   The tail starts to wag, then they -- if

4   they're at this stage, they'll back out and

5   sit.

6        Q.      Okay.  Now, at this time

7   September 7th, what's that?  About a month

8   into the class?  It started at August 7th.

9        A.      I believe that's correct.

10        Q.      Exhibit 1, if you take a look at

11   the second page in the document, it refers to

12   an August 7th start date.

13        A.      Okay.

14        Q.      Any reason to think that's

15   inaccurate?

16        A.      No.

17        Q.      Okay.  So September 7th is a

18   month in the training, and you said at this

19   time the dog will show that change of behavior

20   that you're referring to, the breathing, the

21   more excited movements, the tail wagging, and

22   then it'll sit as well, right?

1          A.      If it's at that particular stage

2    of a finished position.

3          Q.      Meaning, if the -- if the team

4    has advanced to the point where the dog is

5    sitting independently on final odor?

6          A.      Correct.

7          Q.      Okay, but there are some -- is

8    it accurate to say that there are some dogs

9    that may just sit without showing that change

10   of behavior?  They'll sit during a search?

11         A.      If they're giving a false

12   indication, if that's what your question is.

13         Q.      And one of the things that you

14   guys work with the trainees on is deciphering

15   or distinguishing between a false sit and a

16   sit because the dog is on odor, right?

17         A.      Correct.

18         Q.      Okay.  And what's the big

19   difference between those two different

20   indications?

21         A.      The body language of the canine

22   when it's on a training odor versus smelling,

1  investigating something and just sit.

2      Q.      Okay.  And then that's what you

3  want the handlers, the trainees to be able to

4  distinguish?

5      A.      Correct.

6      Q.      Okay.  And you're saying that

7  that's one of the issues that Van Meter was

8  having, which prompted you to write this

9  e-mail to Cromwell?

10     A.      One issue.

11     Q.      Recognizing the change of

12 behavior?

13     A.      Yes.

14     Q.      Okay, because what you say is

15 reading and understanding the change of

16 behavior of the canine when it's odor versus

17 just smelling.  So is that that she wasn't

18 recognizing when the dog was initially

19 alerting to the presence of the odor, or was

20 it that she wasn't recognizing the change of

21 behavior when the dog was actually, you know,

22 at source and ready for that final response?

1          A.      Clarify your question.

2          Q.      I'm trying to understand what

3     you mean in the language that you use in your

4     letter to Cromwell.  In your e-mail to

5     Cromwell, what did you mean by she's having

6     issues at times reading and understanding the

7     change of behavior of the canine when it's

8     odor versus just smelling?

9          A.      Correct.  We discussed this

10    earlier just a few minutes ago.  She had issue

11    recognizing a change of behavior in the dog

12    when the dog was on odor, the train odor

13    versus investigating something and smelling

14    it.  She could not separate the two.

15         Q.      Are you referring to that she

16    was having an issue recognizing the difference

17    between searching behavior and alerting

18    behavior when the dog alerts to the initial

19    presence of the order?

20         A.      That's another way of saying it.

21    Yes.

22         Q.      Okay.  Okay.  Were you referring

1    to anything else there with regard to this

2    change of behavior?

3           A.      Not that I recall.

4           Q.      Okay.  And then the mechanics of

5    working a dog, mechanics can mean a bunch of

6    things, right?  Can you explain to me what you

7    were specifically referring to when you

8    referred to having issues with the mechanics

9    of working a dog?

10          A.      As I said earlier, the mechanics

11   of being able to control the dog with proper

12   leash control, being able to effectively

13   conduct a -- conduct a search and maintaining

14   proper search integrity and keeping up with

15   proper pace.

16          Q.      Okay.  What do you mean by

17   search integrity?

18          A.      Conducting a search, an

19   effective search as she was trained.

20          Q.      Following the rules and

21   procedures that you guys teach them?

22          A.      Correct, for that particular

1    exercise.

2         Q.    Right.  So if it's a door, then

3    it's doing the order of procedures for

4    checking a door?

5         A.    Correct.

6         Q.    If it's a car, then it's doing

7    the order of procedures when checking a car?

8         A.    Correct.

9         Q.    And you're saying she was

10   struggling with that?

11        A.    Correct.

12        Q.    Do you remember anyone else

13   struggling with that?

14        A.    No.

15        Q.    And then search pace, that's

16   what you referred to earlier with making

17   presentations and keeping the team moving?

18        A.    Correct.

19        Q.    Okay.  Do you remember what

20   Cromwell said in response to your e-mail?

21   What he either said or wrote or how did he

22   respond after you sent him that e-mail on

1    September 7th, Exhibit 2?

2          A.     It's dated here on number six.

3    Copy.  Keep us posted.

4          Q.     Anything else?  Did he check

5    back?  So that -- sorry.  Copy.  Keep us

6    posted.  That's Cromwell's message back to

7    you?

8          A.     Correct.

9          Q.     Okay.  Do you remember having

10   any other communications with Cromwell about

11   Van Meter around that time?

12         A.     No.

13         Q.     Okay.  When do you -- when do

14   you think your next communication with

15   Cromwell to discuss Van Meter was?

16         A.     I don't recall.

17         Q.     Was it -- was it when you were

18   in the process of recommending her termination

19   you think?

20         A.     I don't recall.

21         Q.     Don't know.  Okay.  Did you --

22   do you think you had weekly communications

1   with Cromwell about Van Meter?

2       A.    I do not recall.  I don't think

3   so, but I do not recall.

4       Q.    Okay.  You think you talked to

5   him every other week about Van Meter?

6       A.    No.

7       Q.    Okay.  How many times total do

8   you think you communicated with Cromwell about

9   Van Meter?

10      A.    I do not recall.

11      Q.    More than five?

12      A.    For the whole training period?

13      Q.    Whole training.  Yeah.  Where

14  you express not -- I'm not saying it was Van

15  Meter's birthday today.  I mean, you know,

16  where you are expressing concerns?

17      A.    It could be five.  It could be

18  less than five.  It could be more than five.

19  I do not recall.

20      Q.    You don't know.  Okay.  On

21  October 4th and 5th, at least according to the

22  Exhibit 1, if you take a look at the entries

1   for the 4th and 5th, which is -- so that's

2   Exhibit 1 and it's -- if you jump to USCP16

3   and take a look at paragraph V it says -- I'm

4   just reading the first sentence, on October

5   4th and 5th, trainers Turner and Smalls

6   assisted trainer Hill and Sergeant Phelps by

7   being neutral observers of Officer Van Meter's

8   performance.  Did you ask them to do that?

9          A.     Yes.

10         Q.     Okay.  And why did you ask them

11  to do that?

12         A.     Because to provide more help and

13  assistance to Van Meter that they may see that

14  we were not seeing.

15         Q.     Okay, but on October 4th or 5th,

16  what were the issues that you thought Van

17  Meter was having that led you to ask for

18  Smalls and Turner to be observers?

19         A.     Would have to review her daily

20  work -- her daily training sheets up to that

21  point to give you a better answer.  As I

22  talked about earlier, her deficiency consists

1   of not being able to read the change of

2   behavior in a dog.  Not being prepared for the

3   search.  When she was given a search exercise,

4   she would not assess her search area,

5   formulate a plan, and then execute the -- her

6   plan.

7        Q.     Is that she wasn't -- she wasn't

8   making an assessment of how she was going to

9   conduct the search and then performing, like,

10  a clear as you go search?

11           MS. SCINDIAN:  Objection.  Vague

12  and ambiguous.

13       A.     Depends.  Depends on the

14  exercise.  It could be an open field search

15  where the plan execution is different than

16  conducting a room search or conducting a

17  vehicle search.

18       Q.     But what you said she was unable

19  to assess and formulate a plan for searches.

20  What kinds of searches were you referring to?

21  Any and all?

22       A.     Yes.

1          Q.      All right.  And so as a result,

2    was she -- was she failing to search the

3    entire search area?

4          A.      She did on some exercises, yes.

5          Q.      And that's a -- is that a major

6    problem?

7          A.      Yes.

8          Q.      Okay.  When you said -- you said

9    something about her preparing for searches.

10   What did you mean by that?  Is that like

11   getting the dog exercised and making sure the

12   dog relieves itself?

13         A.      That's part of it.

14         Q.      Okay.  What else goes into that?

15         A.      Preparing for the exercise.

16   Once you're given instructions by your

17   instructors of what the exercise is, it's

18   preparing for it.  How do you go about to

19   search a -- what are the exercises?  Open

20   space, car, room.  How do you go about

21   clearing the room that you've been tasked with

22   or search item you've been tasked with.

1        Q.      Okay, but when you say that she

2   wasn't preparing for the search, that's the

3   activities that she did before she started the

4   search, right?  Activities to get ready for

5   the search.

6        A.      It's everything.  As far as

7   emptying out the dog.  Make sure dog's empty

8   prior to the search, and then as well as

9   you're given the information, instruction from

10  your instructors, executing what's been laid

11  out in front of you.

12       Q.      Then it goes into assessing your

13  search area development plan?

14       A.      Correct.

15       Q.      Okay.  Part of being prepared

16  for the search, does that mean that your --

17  that your dog has all the equipment that it

18  needs?  Like, for example, if your dog needs a

19  slip chain, slip -- slip collar, is that what

20  it's called?  Used to be called a choke chain.

21       A.      As far as I know it's still

22  called a choke collar.

1        Q.     Okay.

2        A.     Unless --

3        Q.     So if your dog needs a choke

4   collar, then making sure the choke collar is

5   on there, or if it's a prong collar, make sure

6   the prong collar is on there?

7        A.     We don't use prong collars.

8        Q.     In 2017 did you use prong

9   collars?

10       A.     Not that I'm aware of.  We used

11  a choke collar.  Not a prong collar.

12       Q.     Whatever collar the dog was

13  supposed to have, whether it be a regular old,

14  you know, nylon or leather collar or a slip

15  collar or a prong collar.  If they were

16  deployed at that time, it's preparing your dog

17  for the search.  Making sure that you have the

18  equipment that you're supposed to have?

19       A.     Correct.

20       Q.     Okay.  So you asked Smalls and

21  Turner to observe Van Meter.  Did you also ask

22  them to observe Zborai?

1          A.      No.

2          Q.      Why not?

3          A.      Zborai wasn't having the issues

4    that Van Meter displayed during her training.

5          Q.      And what was the feedback you

6    got, if any, from Smalls and Turner?  Do you

7    remember?

8          A.      Not --

9          Q.      Sorry.  If you don't mind, if

10   you -- if you need to look at a document,

11   that's fine, but right now I want to ask if

12   you remember it without looking at a document?

13         A.      No, I do not recall.

14         Q.      Okay.  If it would help you to

15   look at the document, then please look at the

16   document if it's useful.

17         A.      Okay.

18         Q.      And do you remember what the

19   feedback was?

20         A.      Clarify.

21         Q.      From Turner and Smalls.  You

22   said you asked Turner and Smalls to observe so

1    that you have another set of eyes or couple

2    sets of eyes --

3            A.      Yes.

4            Q.      -- to maybe some things that you

5    weren't seeing.  And did they report back to

6    you anything that they saw?

7            A.      They -- we had a meeting.

8            Q.      Okay.

9            A.      We had a meeting with Van Meter.

10   They discussed what's here with Van Meter in

11   my office.

12           Q.      Okay.  In addition to any

13   meeting at which Van Meter was present, did

14   Turner and Smalls talk to you separately to

15   tell you what they had observed?

16           A.      No.

17           Q.      Okay.

18           A.      And I will clarify that more by

19   saying I was present.  So I saw what they saw,

20   but I just wanted another set of eyes to

21   confirm what I was seeing and to provide any

22   additional assistance from their experience

1    that could help Van Meter.

2          Q.     Okay.  And did they recommend

3    any additional assistance or training for Van

4    Meter?

5          A.     I don't recall.

6          Q.     Do you remember Officer Van

7    Meter receiving any additional training?

8          A.     She did receive additional

9    instruction.

10          Q.     What do you mean by that?

11          A.     She could -- she was given a

12    visual instruction by Mr. Hill taking Jayden,

13    showing Van Meter how the exercise search

14    should be conducted.  Van Meter was also

15    presented videos of her training performance

16    that day.  We went over them, the good and the

17    bad where she needs to improve on.  Van Meter

18    was also afforded the opportunity to come in

19    and watch other trainers, other trainees,

20    conduct their exercise so she could learn, as

21    well doing the process.

22          Q.     Okay.  All those things that you

1    mentioned, having a trainer give a visual

2    demonstration, all of the handlers got that,

3    right?

4          A.      Initially.

5          Q.      All the trainees got that?

6          A.      Initially, but what we're

7    talking about this particular.

8          Q.      Around October 4th or 5th --

9          A.      Correct.

10         Q.      You're saying that Hill gave her

11   demonstrations?

12         A.      She was given demonstration

13   through her entire program.  Her entire weekly

14   program she was given instructions.

15         Q.      And wasn't that the same for all

16   of the trainees?

17         A.      No.

18         Q.      Okay.  So Hill didn't give

19   Dantinne -- he didn't demonstrate techniques

20   to Dantinne?

21         A.      I'm sure he did.

22         Q.      Okay.  Who else did Hill give

1      those demonstrations to?

2              A.      I'm sure he gave some additional

3      instructions to Riley.

4              Q.      Okay.  So Dantinne and Riley got

5      additional demonstrations?

6              A.      Correct.  However, that was

7      earlier on in the training.  This here is a

8      month and a half, six weeks.  What did I

9      write?  Week 10.  This is week 10.  So they --

10     all trainees were given the same instruction,

11     but now we're in week 10.

12             Q.      So when was the last time that

13     Dantinne got an extra demonstration from Hill?

14             A.      Well, Dantinne was reassigned to

15     PBIED.

16             Q.      Still, when was the last time he

17     got an extra demonstration?

18             A.      I don't recall.

19             Q.      What about in PBIED?  When was

20     the last time he got an extra demonstration in

21     PBIED?

22             A.      I don't recall.

1        Q.      Do you know?

2        A.      No.

3        Q.      Okay.  How about Riley?  When

4   was the last time he got an extra

5   demonstration?

6        A.      I don't recall.

7        Q.      Do you know?

8        A.      No.

9        Q.      Okay.  The video reviews.  All

10  of the trainees got to see their videos,

11  right?

12       A.      Correct.

13       Q.      In the beginning, let's say

14  while Dantinne and Riley were both still part

15  static, were you performing daily video

16  reviews?

17       A.      Not daily.  Whenever the

18  instructor had the video camera charged and it

19  was prepared to use it.

20       Q.      Okay.  So thanks for the

21  clarification.  On days when videos were taken

22  of training exercises, would you regularly

1   watch those videos with the static trainings?

2          A.     Correct.

3          Q.     Okay.  Did you, in that process,

4   in that video review process, did you focus

5   more on Van Meter videos than any other

6   handlers?

7          A.     No.

8          Q.     Okay.  Would you say all of the

9   handlers got to see their videos roughly

10  equally?

11         A.     Yes.

12         Q.     I'm sure there's no mathematical

13  perfect, but roughly equally?

14         A.     Yes.

15         Q.     Okay.  Did any handler tell you

16  that they would like to see more of their

17  videos?

18         A.     I don't recall.

19         Q.     Do you remember when watching

20  those videos on the static side, would Van

21  Meter ask questions about the feedback that

22  she was getting during the videos?

1          A.      I believe so.

2                  MS. SCINDIAN:  Objection.  Vague

3     and ambiguous.

4          Q.      And do you remember -- did that

5     take time?  I mean, was it distracting her

6     questions?

7          A.      No.

8          Q.      Okay.  Were those questions and

9     answer sessions useful for everyone in the

10    class?

11         A.      Yes.

12         Q.      Okay.  And did Van Meter ever

13    indicate that she was receiving inconsistent

14    instructions during those video reviews?

15         A.      Not that I'm aware, but it's

16    possible because we're all human.

17         Q.      Okay.  Did she ever indicate

18    that she thought that the -- that the men in

19    class or that the other handlers in class, who

20    were all men, were doing things that she was

21    being called out for?  In other words, they

22    would perform a search in the same manner that

1    she had performed the search, but that she

2    would be criticized for it while the men were

3    not?

4           A.     No.

5           Q.     Okay.  You don't remember that?

6           A.     No.

7           Q.     Okay.  Did you ever -- did Van

8    Meter ever specifically ask you for additional

9    training or help?

10          A.     No.  She has her lead

11   instructor.  She needs to go to the lead

12   instructor, and then from there, if she needed

13   more than what the lead instructor was giving

14   her, then come -- they would direct her to

15   come see me.

16          Q.     And did she do that?

17          A.     Not that I recall.

18          Q.     Do you remember telling Officer

19   Van Meter that aside from taking the leash

20   from her and doing the search for her, there

21   was nothing additional that you could do or

22   anything like that?

1          A.      No.

2          Q.      If she says that you told her

3    that, would you dispute it?

4          A.      Yes.

5          Q.      Okay.  So it's not just that you

6    don't have a recollection of it, you don't

7    think it happened?  You're saying it didn't

8    happen?

9          A.      I'm almost 100 percent that it

10   didn't happen.

11         Q.      Okay.  Did you ever tell her

12   that even if she had passed all of the written

13   exams and the final certification exams that

14   you wouldn't -- you would have still failed

15   her?  You would not have certified her?

16         A.      No.

17         Q.      Did you say anything like that?

18         A.      No.

19         Q.      Okay.  Was it -- was it

20   available to students, to trainees to get

21   extra hours of training if they needed it?  If

22   they were failing some exercises or struggling

1    with some problem, you know, in class, could

2    they come in early or stay late and get extra

3    hours of training?

4            A.      Based on the department's policy

5    with overtime, that part was not available.

6    However, instruction was given during her 10

7    hour workday, and if she needed additional, it

8    will be done during her tour of duty.

9            Q.      So she could've gotten more

10   hours of training fit within her 10 hours --

11   more hours of training than another handler

12   got in that day fit within her 10 hour days?

13           A.      Correct.

14           Q.      Okay.  All right.  And why did

15   the overtime rules prevent you from giving any

16   additional training outside of the 10 hour

17   workday?

18           A.      My understanding, the department

19   policy is no overtime is granted for training.

20           Q.      And is there a -- is there a

21   written policy?  Where did you get that from?

22           A.      That's my understanding.

1          Q.     And, again, where does that

2     understanding come from?

3          A.     From my experience.

4          Q.     Have you ever had overtime, a

5     request for overtime, rejected for training?

6          A.     No, because I never submitted

7     overtime for training.

8          Q.     Have you ever seen a written

9     policy that says that you can't get overtime

10    for training?

11         A.     I do not recall.

12                MS. SCINDIAN:  We've been going

13    for more than an hour.

14                MR. ALDERMAN:  Yeah.  Yeah.

15                MS. SCINDIAN:  Twenty minutes.

16                MR. ALDERMAN:  Take a break.

17    (Short recess.)

18         Q.     All right.  Mr. Phelps,

19    referring you back to the Exhibit 2, the

20    e-mail to Lieutenant Cromwell.  If you take a

21    look at the second page, it says the e-mail

22    was sent at 1:24 p.m.  Would that be after the

1   training exercises were done for that day?

2          A.      That's possible.

3          Q.      Training exercise was typically

4   done in the morning, right?

5          A.      No.

6          Q.      Okay.  Tell me -- tell me about

7   the training day then.

8          A.      The training we work from five

9   to three.

10         Q.      Okay.

11         A.      Ten hour days, four days a week.

12         Q.      Okay.

13         A.      So the first part of the

14  mornings are generally that time of year the

15  sun is coming up later.  So the first part of

16  the day is classroom work.

17         Q.      All right.

18         A.      And then from there if we're

19  staying on site is classroom -- classroom --

20  classroom work and then field work.

21         Q.      And what was that time slot that

22  the fieldwork typically was done?

1          A.      It could be -- it could be the

2    morning.  It could be after midmorning,

3    afternoon.  It could be all the way up until,

4    I would say, almost two o'clock because ended

5    at three.  The last hour is generally -- is

6    putting our training aids away, securing them,

7    and then have a time to fill out the daily

8    training reports for the trainees and have

9    time to review them and discuss any issues

10   that he or she may have.

11         Q.      Okay.  So if on September 7th,

12   2017 you wrote the e-mail at 1:24, do you

13   think that was after the training exercises

14   out in the field were completed?

15         A.      It very well could be, yes.

16         Q.      Okay.  How would you -- how

17   would you figure that out?  How can we go from

18   very well could be, to a yes or a no on that?

19         A.      As I just explained our training

20   day, and we generally finish up about two as

21   far as training, so we have time to do the

22   administrative stuff.  Considering the time it

1    was sent, it was the later part of the day.

2    So it's possible that the training was

3    complete.

4            Q.      Is it more likely than not that

5    the training was complete for that day when

6    you wrote the e-mail?

7            A.      Yes.

8                    MS. SCINDIAN:  Objection.  Asked

9    and answered.

10           Q.      Okay.  Again, kinda getting back

11   to the division of responsibility between you

12   and the other instructors.  At least for the

13   static side trainees, you guys had -- they had

14   written tests during the training program,

15   right?

16           A.      All trainees had written tests.

17           Q.      Okay.  Who graded the training

18   tests?

19           A.      I believe it was a mixture of

20   Kenny Hill and myself.

21           Q.      Okay.  And were you using a

22   score sheet or a score key, an answer key?

1          A.      I believe so.

2          Q.      Okay.  Do you know when was the

3   last time you saw that answer key?

4          A.      Shortly after the test was

5   administered.

6          Q.      Okay.  Were those answer keys

7   kept on the computer or were they printouts?

8          A.      I don't recall.

9          Q.      Did you ever intentionally let

10  someone get by with an incorrect answer?

11         A.      Not that I'm aware.

12                 MS. SCINDIAN:  Objection.  Vague

13  and ambiguous.  Calls for speculation.

14         A.      Not that I'm aware of.

15         Q.      Okay.  When you graded those

16  tests, did you refer to the answer key?

17         A.      Yes.

18         Q.      Okay, but there were some

19  midcourse evaluations issued to the trainees,

20  at least on the static side.  What was your

21  involvement in those midcourse evaluations?

22         A.      I sat in on the meetings.

1          Q.     Did you -- you're aware that

2    there were written evaluations given to the

3    students that listed their strengths and

4    weaknesses?

5          A.     Yes.

6          Q.     And did you contribute to

7    drafting those documents?

8          A.     No.

9          Q.     And who drafted those documents?

10         A.     I believe Kenny Hill.

11         Q.     Okay.  Did you approve them

12   before they were issued to the students or to

13   the trainees?

14         A.     Yes.

15         Q.     So you at least reviewed them?

16         A.     Correct.

17         Q.     Okay.  Did you make any changes?

18         A.     No.

19         Q.     Okay, but Hill was the one that

20   drafted them?

21         A.     Correct.

22         Q.     Okay.  How about at the end of

1   the training program there were two big

2   practical tests.  I'm saying practical tests.

3   In my mind they're, you know, the exercise

4   test.  There was the Odor Recognition Test,

5   right, and then the environmental test.  Is

6   that accurate?

7          A.     Believe so, yes.

8          Q.     And who was in charge of

9   overseeing those tests to ensure that they

10  were administrated properly for that 2017

11  class?

12         A.     I don't recall.

13         Q.     Who was capable of overseeing

14  that?  Who had the authority to oversee it?

15               MS. SCINDIAN:  Objection.  Vague

16  and ambiguous.

17         A.     Myself.

18         Q.     Okay.  Anyone else?

19         A.     Myself and the other trainers.

20         Q.     Okay.  So any of the trainers

21  could have overseen -- let's break it down to

22  the Odor Recognition Test.  Could any of the

1    trainers, including yourself, have overseen

2    the ORT?

3          A.     Yes.

4          Q.     Was there some -- was there some

5    rule about certif -- like you had to have a

6    particular certification in order to oversee

7    an ORT?

8          A.     Not that I'm aware of.

9          Q.     Okay.  And do you remember if

10   you oversaw the ORT, the Odor Recognition

11   Tests, for that class?

12         A.     I don't recall.

13         Q.     Okay.  How about the

14   environmental test?  Do you remember if you

15   oversaw the environmental test?

16         A.     For the static?

17         Q.     Let's start with static.  Yeah.

18         A.     I believe so.

19         Q.     Okay.  Can you just briefly

20   describe what the environmental test is all

21   about?

22         A.     You have to do -- conduct an

1    open field search.  You have to conduct a room

2    search, three rooms, then you have to search

3    stadium seating, then you have to search

4    vehicles, and I believe a mass transit such as

5    a bus or a tractor-trailer.

6         Q.    So when you -- sorry.  I didn't

7    mean to interrupt.  When you said vehicles,

8    that's cars and trucks?

9         A.    Correct.

10        Q.    Okay.  And then mass transit is

11   either buses or trains?

12        A.    Buses or a semitruck.

13        Q.    Okay.  And do you know how many

14   -- how many mistakes are allowed for a team to

15   still pass the environmental test?

16             MS. SCINDIAN:  Objection.  Vague

17   and ambiguous.

18        A.    I believe you're allowed to miss

19   two.

20        Q.    And when you say miss, what does

21   that mean, miss two?

22        A.    The team did not successfully

1    find the training aid that was placed in the

2    environment.

3          Q.     Okay.  Are there a certain

4    number of NPR's beyond which is unacceptable

5    for that test?

6          A.     NPR's clarify them.

7          Q.     It's a phrase in a -- that I've

8    seen in the training records.  I believe it's

9    a Nonproductive Response.  I believe that's

10   what it's defined as.

11         A.     Okay.

12         Q.     Do you recognize that term?

13         A.     When you say it like that, but

14   not the NPR, but with the Nonproductive

15   Response.

16         Q.     Okay.  Can you tell me what a

17   Nonproductive Response is just to make sure

18   we're talking about the same thing.

19         A.     I'm not sure what content that

20   it's used in, so I can't explain it because I

21   didn't -- I didn't use it in any form that I

22   wrote.

1        Q.      If a dog sat, gave a final

2   response, so either sitting or laying down for

3   the dog when it was not actually on odor, what

4   do you -- what would you call that?

5        A.      I need more information.

6        Q.      What information do you need?

7        A.      Of the exercise.  Just for a dog

8   to sit or lay down doesn't classify it one way

9   or the other.

10        Q.      Okay.  Let's say a dog gave some

11   indication that it was on odor, some change of

12   behavior and then gave the final response and

13   yet there was nothing there, what is -- what

14   is that?  Does that have a phrase or a term?

15        A.      I'm not sure.

16        Q.      Do you remember keeping track of

17   NPR's for each dog in the class?

18        A.      I don't remember NPR's being

19   used.

20   (Exhibit 3, document Bate-stamped USCP814 to

21   815, marked for identification.)

22        Q.      Mr. Phelps, I've given you

1    what's been marked Phelps Exhibit 3.  This one

2    goes from USCP814 to 815.  You see that it's

3    an October 16th, 2017 dated document, and the

4    title at the top of it is EOD K-9 Training

5    Form.  You'll see at the top right it says

6    handler five.  That's a key for Garrett

7    Zborai.

8         A.    Okay.

9         Q.    Okay.  So whenever you see

10   handler five, it means Zborai.

11        A.    Okay.

12        Q.    With the dog Pope.  Can you tell

13   me, generally speaking, what is the document

14   that we're looking at?  What is this form used

15   for?

16        A.    This is our daily training

17   activity form for the class that we give to

18   these -- the handlers of the new trainees.

19        Q.    And do you on the static side at

20   least, is this the form that you use to denote

21   the significant events of the day?

22             MS. SCINDIAN:  Objection.  Vague

1    and ambiguous.

2          A.     It appears to be.

3          Q.     Okay.  On the second pa --  have

4    you ever completed forms like this when you

5    were employed at the Capital Police?

6          A.     I believe I have.

7          Q.     Okay.  And if you take a look,

8    you were asking what an NPR means, and so I'm

9    just going to show you it's used in the form

10   and then ask you right back what it means.

11   Okay.  If you take a look at the second page,

12   which is USCP815, and you go down to the

13   bottom of the comments section, it says -- the

14   last sentence reads, quote, canine gave two

15   NPR's on blank bags.  Handler waited canine

16   out and continued searching.  Do you know what

17   an NPR means as using that context?

18         A.     No, I don't recall what it

19   means.

20         Q.     Can you tell me what a

21   Nonproductive Response is?  You seem to have

22   recognized that term earlier in your

1    deposition.

2           A.      My understanding is a false

3    response.

4           Q.      Meaning, what kind of false

5    response?

6           A.      The dog sat.

7           Q.      Okay.

8           A.      On a negative blank -- on this

9    bag.  A blank bag.

10          Q.      Okay, but it wouldn't matter if

11   it was a car, door scene or, you know, a desk

12   drawer.  If the dog sat and there was nothing

13   there, then that would be a Nonproductive

14   Response?  Is that what you're saying?

15          A.      Could be.

16          Q.      Okay.  Now, for you, does a

17   Nonproductive -- is the Nonproductive Response

18   just to sit, or is there also a change of

19   behavior that accompanies the sit for it to

20   count as an NPR or Nonproductive Response?

21          A.      I would have to look at the

22   exercise.  Visually see the exercise in order

1     to comment on whether it was an NPR.

2           Q.      But what I'm asking is, what is

3     your definition of a Nonproductive Response?

4     Is it just sitting in the middle of a search,

5     or is it showing a change of behavior and

6     sitting?

7           A.      It's a negative response to

8     nothing.  Negative response to a no training

9     aid.

10          Q.      Right.  Well, what's the

11    negative response?

12          A.      It could be a finished position,

13    which is what we teach is a sit.

14          Q.      Okay.

15          A.      We concentrate on the finished

16    position, which is a sit.  So that would be

17    for me an NPR.

18          Q.      Okay.  During a search, does

19    every time a dog sits when there's no scent,

20    when there's no odor present, would that be

21    considered an NPR or a Nonproductive Response?

22          A.      We would have to look at the

1    training -- the exercise at hand.

2          Q.      Yeah.

3          A.      I can't say in general what it

4    would be.  It's for a certain exercise.

5          Q.      What I'm trying to figure out is

6    what distinguishes just a random sit in the

7    middle of a search from a sit that you would

8    consider a Nonproductive Response?

9          A.      Again, I can't answer that

10   without seeing the exercise that was provided,

11   as well as the instructions that were given.

12   I can't say what something is if I don't see

13   it.

14         Q.      Now, I'm just trying to figure

15   out when you use the term NPR, is it for any

16   sit that occurs during a search when there's

17   -- when the dog is actually not on odor, or is

18   it sit accompanied by some other behavior?

19         A.      I'm not sure how it was used

20   here.

21         Q.      Okay.

22         A.      Because I didn't write it.  So I

1    can't testify to that.

2         Q.    And you're saying you never used

3    the term NPR in one of the training forms that

4    you completed?

5         A.    Not that I'm aware of.

6         Q.    Okay.  While we have this

7    document, go ahead and use it as a tool.

8         Referring your attention to the second

9    page of the document and the table that's

10   being used there at the top.  We've, -Miss

11   Cindy and I have kinda got an arrangement

12   where we actually don't refer to the

13   explosives by name.

14        A.    Okay.

15        Q.    Okay.  So I'm going to avoid

16   doing that where I can.  I might if I need to

17   refer to it, which I don't think so, I'll say

18   the explosive referred to in row four.

19        A.    Okay.

20        Q.    Okay.

21        A.    By number.

22        Q.    Yeah, but I don't think I'm

1    going to need to, just so that you understand.

2    So in this table, have you ever completed a

3    table like this?

4            A.      I believe so.

5            Q.      Okay.  And are these tables used

6    to record basic information about each of the

7    searches performed?

8            A.      Correct.

9            Q.      Okay.  And so, for example, in

10   this case, so search one would involve the

11   explosive listed in the first column, one

12   pound of it, right?

13           A.      Okay.

14           Q.      The third column would indicate

15   where that hide was placed in the search area?

16           A.      Correct.

17           Q.      And then the next three columns,

18   that's for whether it's a low hide, medium

19   level hide, or a high level hide; is that

20   correct?

21           A.      Correct.

22           Q.      And then you've got a score

1    column?

2            A.      Correct.

3            Q.      And there are some -- there are

4    some initials in the score column.  The first

5    if you take -- just take a look at the first

6    row, there's HM.  And do you know what those

7    initials refer to?

8            A.      Be a handler miss.

9            Q.      And now when you -- well, let me

10   say this.  Even if you didn't write the

11   report, you reviewed the reports --

12           A.      Correct.

13           Q.      -- before they were issued,

14   right?

15           A.      Correct.

16           Q.      And so can you testify as to

17   whether or not all the training staff had used

18   a similar methodology when it came to issuing

19   the scores for the searches?

20                   MS. SCINDIAN:  Objection.  Vague

21   and ambiguous.

22           A.      Clarify.

1          Q.      Like, did a handler miss for

2    Sergeant Phelps mean the same thing as a

3    handler miss for Hill?

4                  MS. SCINDIAN:  Objection.

5    Speculative.

6          A.      I don't know.

7          Q.      Okay.  What did a handler miss

8    mean for Sergeant Phelps?

9          A.      For this exercise?

10         Q.      For any.  If you were going to

11   write HM on one of these reports.

12         A.      Okay.

13         Q.      What would that mean?

14         A.      The handler failed to get the

15   dog to the training aid where it was placed.

16   So the handler failed.

17         Q.      Okay.  What about when is an F

18   used?

19         A.      Appears to be when it's a find.

20         Q.      And what for Sergeant Phelps,

21   for you, what would have to happen for you to

22   mark somebody with a find?

1          A.      When the team successfully found

2     the training aid.

3          Q.      Is that successfully found the

4     training aid without assistance from the

5     trainers?  Like, they independently found the

6     training aid?

7                  MS. SCINDIAN:  Objection.  Vague

8     and ambiguous.

9          A.      It can vary.  This is subjective

10    from the trainer, what he or she sees during

11    an exercise.

12         Q.      But if it was you grading and

13    you were grading a find, would that have to be

14    that the team found the hide independently?

15         A.      I can't answer that.

16         Q.      Sometimes, yes.  Sometimes, no

17    depending on the facts?

18         A.      I have to be in the circum --

19    that situation to say whether or not I would

20    do it.  A hypothetical I can't.

21         Q.      So you didn't have, like, a rule

22    that you went by for when you issued a find?

1          A.      Clarify by rule.

2          Q.      A principal.

3          A.      You have -- if the dog finds it,

4     it's a find.

5          Q.      What if the trainer says, hey,

6     look underneath the desk.  Is that a find?

7          A.      It shouldn't be a find.

8          Q.      Okay.  So if the trainer

9     identifies the location of the hide for the

10    team, that shouldn't be a find?

11         A.      Again, if it goes with the

12    exercise.  What is the instructions given at

13    the exercise and what has happened prior as

14    well.

15         Q.      Meaning, how are the other teams

16    graded?

17         A.      How the other dogs performed.

18         Q.      Okay.  Okay.  So on a given

19    exercise, let's say, you know, you got three

20    people going through.  The hide is under the

21    table.

22         A.      Okay.

1          Q.     The first two dogs walk the

2     exercise, walk the hide.  Meaning, they don't

3     even -- they don't know alert.  They don't do

4     anything to the hide, but the trainer might

5     say, okay, take a look.  It's up under there.

6     Under the -- under the desk, and then the dog

7     puts its nose on it and as soon as it gets

8     that close, then the dog makes some kind of

9     indication.  Would you call that a trainer

10    assist or a find?

11               MS. SCINDIAN:  Objection.  Calls

12    for speculation.

13          A.     Based on how you described it?

14          Q.     Yeah.

15          A.     It could -- it could be marked

16    as a trainer assist.

17          Q.     Okay.  Now, that the third dog

18    that comes through after you've seen two dogs

19    already, you know, somehow miss it, would you

20    adjust the hide to make sure that the, you

21    know, that the odor was being released?  Was

22    that -- is that a -- is that something that

1    you've done?

2          A.    Not that I'm aware of.

3                MS. SCINDIAN:  Objection.  Calls

4    for speculation.

5          Q.    Okay.  With that third dog, have

6    you ever just pointed out to the team where it

7    is so that they, you know, you avoid confusion

8    and allow them to do the exercise more

9    quickly?

10               MS. SCINDIAN:  Objection.  Calls

11   for speculation.

12         A.    I don't recall that being done.

13         Q.    Okay.  The next initials that I

14   wanted to ask you about are TA, which if you

15   look at -- it's actually not listed in the key

16   that appears below the table.  Is TA trainer

17   assist?

18         A.    I believe so.

19         Q.    And under what circumstances

20   would you, if you were scoring this, give a

21   TA?

22         A.    If the -- if the dog showed

1    interest, he was working, but the handler and

2    the dog could not pinpoint where it is.

3            Q.      Okay.

4            A.      I may say, may step in to assist

5    to have a productive exercise.

6            Q.      To avoid frustration in the dog

7    or to avoid the dog picking up a bad lesson?

8            A.      To avoid the dog from falsely

9    sitting out of frustration.

10           Q.      Okay.  Now, if you were marking

11   a TA, is there any negative or positive

12   connotation?  Negative, neutral, or positive

13   connotation to that?

14           A.      No.

15           Q.      Okay.  Well, if you're reviewing

16   one of these forms and you see a TA, do you

17   think that the -- that the handler failed to

18   do something correctly?

19           A.      No.

20           Q.      Okay.  Do you think that the dog

21   failed to do something correctly?

22           A.      Did the dog do something

1    correctly?

2         Q.    Incorrectly.  I'm sorry.

3         A.    No.  No.

4         Q.    Okay.  It's just whatever

5    happened, the trainer needed to give some

6    assistance.  No one was doing anything wrong?

7         A.    Correct.

8         Q.    Right.  And then you got KL,

9    which is Known Location.

10        A.    Okay.

11        Q.    Under what circumstances would

12   you do a Known Location hide?  This is -- this

13   is October 2017.

14        A.    When we're introducing --

15   introducing a new training aid.  So we want to

16   make sure the dog smells it so that the

17   handler can condition the dog at source.

18        Q.    And when it's a Known Location,

19   do you typically tell the handler where the

20   source is?

21        A.    Correct.

22        Q.    Okay.  Now, if you were going to

1    -- if it was you filling out the training

2    form, the EOD K-9 training form, there's some

3    -- there's some checkboxes on the form for

4    both the handler and the dog's performance.

5    Do you see that?

6            A.      Yes.

7            Q.      Section A is for the handler's

8    performance.  Section B is for the dog's

9    performance.

10           A.      Okay.

11           Q.      Did you regularly use the

12   checkboxes when you completed these forms?

13           A.      I don't recall.

14           Q.      Okay.  Do you remember -- here's

15   my question.  Are you saying I don't recall if

16   I did, or are you saying I don't recall ever

17   doing that?

18           A.      I don't recall if I did.

19           Q.      Okay.  So you may have.  You may

20   not have?

21           A.      Correct.

22           Q.      Do you know if you were

1    consistent either way?  Like, if you did use

2    the checkboxes, did you consistently use the

3    checkboxes?

4          A.     I believe I did.

5          Q.     Okay.  And under what

6    circumstances would you use the checkboxes?

7          A.     Clarify your question.

8          Q.     If you use the checkboxes, under

9    what circumstances would you -- the

10   checkboxes, correct me if I'm wrong, they list

11   typical errors that either dogs or handlers

12   make, right?

13         A.     Correct.

14         Q.     The most common mistakes?

15         A.     Correct.

16         Q.     All right.  So would you use the

17   checkboxes in your own personal practice?

18   Would you use the checkbox anytime any of

19   those problems existed in training?

20              MS. SCINDIAN:  Objection.  Vague

21   and ambiguous.

22         A.     It's probable, possible.

1          Q.      Okay.  Thanks.  I think you can

2    put that away.  We may need to look at it for

3    some other reason later.  Like for now, like

4    right now, actually.  So take a look at

5    Exhibit 3 again.  You'll see that there is a

6    -- under the -- on the second page of the

7    document and right now I'm not -- I'm using

8    this document as an example.  I'm not focusing

9    your attention on this particular training day

10   or this particular document or these

11   particular signatures.

12         A.      I understand.

13         Q.      Okay.  On the second page under

14   the comment section, there's a signature block

15   for the two instructors.  On this particular

16   example, it's Kenny Hill and Tim Cullen,

17   right?

18         A.      Correct.

19         Q.      On other forms there's -- it's

20   you and Kenney Hill?

21         A.      Correct.

22         Q.      All right.  If you were

1    completing the form, would you put your name

2    first to the left under the instructor

3    signature line?

4           A.      No.

5           Q.      Would you put it to the right?

6    Did you have a practice of where you put your

7    name?

8           A.      No.

9           Q.      Okay.  So if you were completing

10   a form, your signature could be on either the

11   left hand side or the right hand side?

12          A.      Correct.

13          Q.      And why was that the case?

14          A.      Just how it worked out,

15   especially with me the forms I recall with my

16   name, my name was first, then Mr. Hill.

17          Q.      Okay.  The ones you recall

18   completing, you recall your name being first?

19               MS. SCINDIAN:  Objection.

20   Mischaracterizes the testimony.

21          A.      The ones I completed, I put

22   first.

1          Q.      Yeah.

2          A.      The ones I completed.

3          Q.      Your name came first?

4          A.      Correct.

5          Q.      Okay.  And when we say first, we

6     mean on the left hand side, right?  Reading

7     left to right?

8          A.      Correct.

9          Q.      Okay.  Now, you would also sign

10    below under the supervisor's signature, right?

11         A.      That is correct.

12         Q.      So why -- what did the

13    supervisor's signature connote or denote that

14    your signature above didn't and why sign

15    twice?

16         A.      To make this an official

17    training document.

18         Q.      Okay.  To make it an official

19    document it had to be signed by the

20    supervisor?

21         A.      Correct.

22         Q.      Okay.  So by signing it, you're

1    making it an official document?

2            A.      Correct.

3            Q.      Now, there's a space for handler

4    signature on the second page.  The signatures

5    are redacted.

6            A.      Okay.

7            Q.      But I'm assuming that there's a

8    signature there.  Do you know what that

9    signature meant?

10                   MS. SCINDIAN:  Objection.  Vague

11   and ambiguous.

12           A.      Acknowledgment of what was

13   discussed at the end of the day and if they --

14   if the trainee has any feedback from what he

15   or she may have signed.

16           Q.      Where would that feedback go?

17           A.      They have the option of writing

18   it or verbalizing it in our discussion.

19           Q.      Okay.  There's no place for

20   trainee feedback on the form, is there?

21           A.      That is correct.

22           Q.      Okay.  So if they wanted to

1    write it, where would they write it?

2          A.      They have a back.

3          Q.      On the back of the form?

4          A.      Correct.

5          Q.      And did trainees do that?  Did

6    they write in Missy's class?  Did trainees

7    write on the back of the form?

8          A.      I do not recall.

9          Q.      Are you -- I want to make sure I

10   understand your testimony.  You said they're

11   -- by signing they are acknowledging what?

12   They're acknowledging that they received the

13   form, or are they acknowledging that

14   everything in the form is accurate?

15         A.      They're acknowledging that what

16   has been brought to their attention and

17   reviewed with them from the instructors and if

18   they had any feedback from the signature is

19   basic acknowledging this form.

20         Q.      The signature is acknowledging

21   that the person has read the form and any

22   instruction and feedback given in the form the

1    handler is saying, I've received that?

2          A.    Correct.

3          Q.    Okay.  They're not saying and I

4    agree with everything that you said, are they?

5          A.    I'm not sure what they're

6    saying.

7          Q.    Okay.

8          A.    I can't speak for them.

9          Q.    But you didn't tell the

10   handlers, don't sign this unless you agree

11   with every word in it?

12         A.    No.

13         Q.    Okay.  Talking about the -- we

14   were talking about the video reviews earlier

15   today.  If videos were taken in a given day,

16   then typically there was an opportunity or

17   there was time at the end of the day to review

18   videos, right?

19         A.    Correct.

20         Q.    Generally speaking.  I'm not

21   saying every single day that's what happened,

22   but generally --

1          A.      Correct.

2          Q.      -- that's what happened, right?

3    And if multiple videos were going to be viewed

4    in a given day, who would decide which video

5    to put up first?

6          A.      It would be the person

7    presenting.  So if the lead instructor is

8    presenting the video, they would be in

9    numerical order based on the date and time

10   when they were recorded.

11         Q.      Okay.  So the -- when you say

12   numerical order based on the date and time, so

13   the name assigned to each video did they like?

14         A.      There's an imprint on the video.

15         Q.      Okay.  The name would indicate

16   -- if it was MV0001, that would indicate it

17   was the first video taken that day?

18         A.      I believe so.

19         Q.      Okay.  Number -- if it was

20   MV0002, that would be the second?

21         A.      Correct, provided that the

22   memory card wasn't erased to reset -- reset it

1   for the day.

2          Q.     Okay.  And so we can assume that

3   if there's one that says MV363, that one comes

4   before MV364?

5                 MS. SCINDIAN:  Objection.  Calls

6   for speculation.

7          Q.     Right?

8          A.     Could.

9          Q.     I mean, that's what you would

10  assume, right?

11                MS. SCINDIAN:  Objection.  Calls

12  for speculation.

13         A.     Could.

14         Q.     You said the numeric order

15  typically indicated the timing of the videos,

16  right?

17         A.     I believe so.  I'm not a digital

18  expert, computer expert, so.

19         Q.     But that's how that's --

20         A.     My understanding.

21         Q.     And that's how you would decide

22  which to play first.  Just the number on the

1    video?

2            A.      Which one ever populated first

3    on down --

4            Q.      Okay.

5            A.      -- would be played.

6            Q.      All right.  So it wasn't a

7    choice, like, I want to play this one from

8    Mikrantz or this one from Dantinne first.  It

9    would just be whatever the number was?

10           A.      Correct.

11           Q.      Okay.  Okay.  Let's have lunch.

12    (Luncheon recess taken.

13           Q.      Okay.  Mr. Phelps, we've just

14    come back from lunch.  You remember you're

15    still under oath.  All the same rules and

16    instructions apply, right?

17           A.      Yes.

18           Q.      Perfect.  I want to ask you a

19    couple more questions about that e-mail that

20    you wrote to Cromwell on September 7th, which

21    we identified as Exhibit 2 USCP6 and seven.

22    Did you consult with Kenney Hill on sending

1    that e-mail out to Cromwell?

2           A.    I don't recall.

3           Q.    Did you -- did you ask him if he

4    thought it was a good idea to send the e-mail

5    out or if he agreed to sending it?

6           A.    I don't recall.  I don't recall.

7           Q.    Okay.  Did you let him know that

8    you were sending it?

9           A.    I don't recall.

10          Q.    Did you ever tell him that you

11   sent it after the fact?

12          A.    I don't recall.

13          Q.    Okay.  I want to just get this

14   over with.  Do you know why you were removed

15   or yeah.  Why were you reassigned out of K-9?

16          A.    Because I filled out a bulletin

17   notice for sergeant voluntary -- sergeants and

18   lieutenant voluntary reassignment.  I called

19   my lieutenant and asked, is this mandatory or

20   voluntary?  I was instructed it was mandatory,

21   and I said, okay.  He said, I'm going to

22   contact Aviews because we have to reset our

1   password, and he was going to do his today.

2   So I went to Aview, filled out my reassignment

3   wish list.  K-9 was the fourth option.  Wasn't

4   my -- couldn't have been, wasn't my first and

5   so I hit submit.

6          Q.      Were you not allowed to have K-9

7   as your first option?

8          A.      Under the program, no.

9          Q.      So K-9 was blocked out for you,

10  essentially?

11         A.      I believe for me it was.

12         Q.      Do you know why that was the

13  case?

14         A.      I think it's because K-9 is

15  considered a specialty unit.

16         Q.      Okay.

17         A.      That's the last option because

18  they're looking at your first three options,

19  which could be the Senate Capital House or LLC

20  Library of Congress at that time.  So you

21  filled out your first three wish list, and

22  then you picked your fourth option, which K-9

1    was on I think our dignitary protection unit

2    and others.

3              Q.      Now, was that the first time you

4    ever had to fill out one of those reassignment

5    forms?

6              A.      Correct.

7              Q.      It was?

8              A.      To my knowledge.

9              Q.      Okay.

10             A.      Yes.

11             Q.      So you -- something in the Aview

12   system stopped you from listing K-9 as your

13   first, second or third option?

14             A.      Correct.

15             Q.      Okay.  And did anyone explain to

16   you why that was the case?

17             A.      No.

18             Q.      Okay.  Did anyone ever tell you

19   that it was because of the Van Meter your --

20   because you removed Van Meter from K-9

21   training?

22             A.      No.

1        Q.      Did you ever tell anyone that

2   you thought that you were removed from K-9

3   because of the decision to remove Van Meter?

4        A.      I do not recall.

5        Q.      You don't recall or do you think

6   that that happened?

7        A.      No, I -- I don't, but I don't

8   want to box myself in and say, yeah, you did.

9   No, I do not recall, but I believe I did not.

10       Q.      Okay.  Okay.  Did Officer Van

11  Meter ever tell you that she suffered from

12  anxiety?

13       A.      She did.

14       Q.      Okay.  And when did she do that?

15       A.      We were at a training location,

16  Coparts, and she -- we were -- it's in

17  Brandywine.  I'm standing 2 -- 200 yards away

18  from the training exercise just observing it

19  from afar.  She walks up to me and says, I

20  don't know if you're aware, but I suffer from

21  anxiety and short-term memory loss.  I said,

22  no, I'm not aware.  Said, however -- because

1    she said, I may have to ask you to repeat

2    things multiple times.  I said, that's fine,

3    Missy.  We will repeat as many times necessary

4    for you to completely understand the exercise

5    so you're successful.

6         Q.     Did you tell any of the other

7    trainers about Van Meter's anxiety?

8         A.     I told Hill as well as Cullen

9    what she brought to me, and I said we will as

10   a staff repeat these instructions as many

11   times as necessary for her to be successful.

12        Q.     Did you tell Hill and Cullen

13   that Van Meter told you about anxiety, as

14   well?

15        A.     Yes.

16        Q.     Okay.  And did you tell him on

17   or about the same date that Van Meter brought

18   those issues to your attention?

19        A.     Yes.

20        Q.     Now, you said you were at -- can

21   you remember where the training occurred that

22   day?

1          A.      It's at Coparts in Brandywine.

2          Q.      But is it Co-parts?

3          A.      No, it's one word.

4    C-O-P-A-R-T-S Coparts.

5          Q.      Okay.

6          A.      It's an impound lot where they

7    take damaged vehicles in an accident there for

8    insurance companies.

9          Q.      Okay.  It's the car lot.  I've

10   seen the video of the car lot.  Okay.  And

11   that's in Brandywine, Maryland?

12         A.      Well, it's in White Plains.  I'm

13   sorry.  It's in White Plains, Maryland.

14         Q.      Is that close to Brandywine?

15         A.      A couple -- a couple miles

16   farther south.

17         Q.      All right.  Do you remember if

18   it was the first time you guys were at that

19   facility in that training class?

20         A.      No, it was further.  Further

21   into training she mentioned it to me.

22         Q.      Okay.  Estimate.  Can you give

1  an estimate about which week she told you?

2          A.      I don't recall.

3          Q.      Do you think it was -- it must

4  have been after dogs were assigned?

5          A.      Correct.

6          Q.      All right.  Do you think it was

7  after Dantinne had been switched to PBIED?

8          A.      It's possible it was done before

9  Dantinne and Riley was switched to PBIED, I

10 believe, because, again, I'm standing off in a

11 distance looking from, again, a good distance

12 away.  She had already completed her exercise.

13         Q.      Okay.

14         A.      They came up to me and stood to

15 my left and we had a conversation, and that's

16 when she informed me.

17         Q.      Did she say anything to you

18 about the way that you gave her feedback?

19                 MS. SCINDIAN:  Objection.  Vague

20 and ambiguous.

21         A.      At that -- at that time?

22         Q.      At any time during the training,

1    did she ever tell you that there was something

2    about the way you gave her feedback that she

3    didn't like or appreciate or that didn't work

4    for her?

5         A.    She had mentioned that I was

6    unapproachable.

7         Q.    Okay.  Was that about the same

8    time that she told you about the anxiety?

9         A.    No.

10        Q.    Okay.

11        A.    I'm not sure.  Again, I'm not

12   sure of the timeline there because she

13   mentioned that I was unapproachable during the

14   midterm report.

15        Q.    Okay.

16        A.    And me, I was kinda shocked

17   because I never had anybody say that.  Nobody

18   has ever said, you're unapproachable.  So we

19   discussed this why she felt that way.

20        Q.    You and Van Meter discussed it?

21        A.    Yes.

22        Q.    Around the date of the midterm?

1    A.    Correct.

2    Q.    Okay.  And what did she say?

3    A.    I don't recall.  She just felt

4    that I was unapproachable.  I don't recall the

5    exact language she used, but I do remember she

6    said I was unapproachable.

7    Q.    Unapproachable?

8    A.    Yeah.

9    Q.    Okay.

10    A.    Then we talked about it.

11    Q.    All right.

12    A.    And then the following day she

13    asked to speak to me in private.

14    Q.    Okay.

15    A.    So I stepped -- because she

16    approached me in my office because I shared an

17    office with a clerical person in there.  So we

18    stepped over into the copy room and she

19    apologized for what she said.  I told her I

20    said, no need to apologize.  Water under the

21    bridge.  We're here to help you.

22    Q.    What was she apologizing for?

1          A.      For what she said about me.  I

2     can only imagine she's saying I was

3     unapproachable.

4          Q.      You think she apologized for

5     saying that you were unapproachable?

6          A.      No, I don't think.  She said I

7     apologize for what I said yesterday.

8          Q.      Did she say I apologize for

9     saying that you were unapproachable or did she

10    say I apologize for what I said yesterday?

11         A.      Correct.  That second part.

12         Q.      Okay.  So then you don't know

13    exactly what she was apologizing -- what part

14    of the things that she said the day before

15    that she was apologizing for?

16         A.      I know the context of the

17    conversation, how it was implied, and my

18    response to her was it's water under the

19    bridge.  We're here to make -- we're here to

20    see you succeed.

21         Q.      Okay.  Did you ever tease her

22    after that about the way that she perceived

1   your feedback?

2        A.      No.  Not that --

3              MS. SCINDIAN:  Objection.  Vague

4   and ambiguous.

5        A.      No.

6        Q.      Did you ever make any sarcastic

7   responses or remarks, like, I know you don't

8   like the way I give you feedback, but.

9   Anything like that?

10       A.      No.

11       Q.      Okay.  And you never told

12  anyone, any of the other training staff that

13  you thought that you had been removed from K-9

14  because of the decision to remove Van Meter?

15       A.      I don't recall saying anything

16  like that.

17       Q.      Okay.  Did any -- did any of

18  your supervisors ever tell you that's why you

19  hadn't been permitted to put K-9 in one of

20  your top three choices?

21       A.      No, because the day I was

22  transferred, you'll probably get to this, but

1    I'll cut the head off right now.

2           Q.      Go ahead.

3           A.      The day I was transferred, I

4    came back to work.  I sent an e-mail to the

5    chief because he ultimately has final say.  He

6    kicked back saying to go through my chain of

7    command.

8           Q.      Okay.

9           A.      I said, thanks for replying.

10   Have a good day or something along those

11   lines.

12          Q.      Did you do that?  Did you then

13   ask the chain of command?

14          A.      I had the next day off.

15          Q.      Okay.

16          A.      Well, once he kicked my e-mail

17   back, I submitted my retirement paper.

18          Q.      Okay.

19          A.      The next day had off.  I called

20   and spoke with Inspector Belknap.

21          Q.      All right.

22          A.      And I asked him, does this have

1    anything to do with the Missy -- the Van Meter

2    case?  This has nothing to do with Van Meter

3    case.  You serve at the pleasure of the Chief.

4    All our officials do.

5          Q.     Okay.  So Belknap told you it

6    had nothing to do with Van Meter?

7          A.     Correct.

8          Q.     All right.  Let's see.  Did you

9    ever make any notes or records that Van Meter

10   had told you about the anxiety and short-term

11   memory?

12         A.     No.

13         Q.     Did you make records of either

14   of those comments, either anxiety or

15   short-term memory?

16         A.     No.  That's an HR issue.  It's

17   not my issue.  She informed me of her

18   situation and I informed my staff going

19   forward if she needs additional assistance,

20   being told again on the instruction.  Being --

21   so she has a clear understanding, make sure we

22   give it to her.

1          Q.      Okay.  Did you say the

2    short-term memory was related to the anxiety?

3          A.      I don't --

4          Q.      Did she say something like I

5    suffer from anxiety and sometimes it can

6    affect my short-term memory?  Something like

7    that?

8          A.      Her comments were I suffer from

9    anxiety and short-term memory loss.

10         Q.      Okay.  Let's see.  I asked you

11   earlier about midcourse reviews that were

12   given to the static side.

13         A.      Okay.

14         Q.      Do you know if the PBIED

15   handlers also received midcourse reviews?

16         A.      I do not recall.

17         Q.      Did any other handlers or

18   trainees ever complain about your demeanor?

19              MS. SCINDIAN:  Objection.  Vague

20   and ambiguous.

21         A.      Not that I'm aware of.

22         Q.      Okay.  No one ever came to you

1    with a concern about your demeanor?

2           A.    No.

3           Q.    Okay.  How many -- for how many

4    training sessions were you the K-9 training

5    supervisor?  Can you ballpark that?

6           A.    Can you clarify your question?

7           Q.    Yeah.  Like, so I'm referring to

8    the 2017 training program that Missy was a

9    part of.

10          A.    Okay.

11          Q.    As one training session.

12          A.    Okay.

13          Q.    All right.  Sorry if that was

14   confusing.

15          A.    Okay.

16          Q.    How many training classes --

17          A.    Okay.

18          Q.    -- have you supervised?

19          A.    Three in total.

20          Q.    Okay.  Do you remember what

21   years those were?

22          A.    2016.  Part of the later part of

1    2016 and then '17.

2            Q.      So two in '16 and one in '17?

3            A.      I believe.

4            Q.      Okay.

5            A.      It's either two in '16 or two in

6    '17.  Not sure.

7            Q.      All right.  Three total classes,

8    and in those classes, how many female

9    trainees?

10           A.      There's a total of three.  One

11   in each.

12           Q.      Okay.  Who was the -- who was

13   the female trainee in the first of those three

14   classes?

15           A.      I'm sorry.  Clarify.  The first

16   one did not have females.  The second one had

17   two.

18           Q.      Okay.

19           A.      Then the last one Missy was the

20   only one in there.

21           Q.      Second one had two and who where

22   they?

1          A.      Michelle Gonzales is one and I'm

2    blanking out on the one because she's assigned

3    to PBIED.

4          Q.      If you remember her name during

5    the deposition.

6          A.      Yeah.  I don't think I will

7    because her last name is unique.  I just don't

8    remember.

9          Q.      Okay.  Did you ever tell

10   Michelle Gonzalez that if she didn't improve

11   some aspect of her performance, you would

12   recommend her removal?

13         A.      No.  What I did say she needs to

14   improve her performance.

15         Q.      And what aspect of her

16   performance?

17         A.      It was Michelle's situation.

18   Unfortunately for her, she was -- had a dog

19   initially, then it got dropped from the

20   program.  The vendor had to replace it because

21   of a medical issue.  So she was already two

22   weeks behind, if I recall, two weeks behind

1    her classmates going forward in the static,

2    and so she worked hard to get back on par with

3    the other members in her class and she

4    struggled.  The dog was difficult and in

5    hindsight, the dog was her issue, not

6    necessarily the handler, because the dog

7    eventually had to be dropped from the program

8    once it was deployed out on the operational

9    side.

10          Q.     And how was she assigned to that

11   dog?  Who assigned that dog to her?

12          A.     That was the only dog available

13   because the vendor had to replace a dog.

14          Q.     Okay.

15          A.     And that -- from what I recall

16   is that all the other handlers were assigned a

17   dog and she had what was left.

18          Q.     That was the only reserve dog?

19          A.     I believe so.  I'm not 100

20   percent sure.

21          Q.     All right.  Who assigned her the

22   first dog that had to be returned to the

1    vendor.

2          A.      It would be with our training

3    staff.  We met as a group.

4          Q.      Okay.

5          A.      Decided which dogs would be best

6    partnered with the handler for their certain

7    assignment.

8          Q.      And were you a part of that

9    decision making?

10          A.      I believe so.

11          Q.      Okay.  And did any other dogs

12    get retired in that training session?

13          A.      Retired?

14          Q.      Return.  I'm sorry.  Either fail

15    the program or get returned to the vendor?

16          A.      Not that I recall.

17          Q.      Okay.  Now, you said you told

18    her that she needed to improve?

19          A.      Correct.

20          Q.      Okay.  Did you say that there

21    would be consequences if she didn't improve?

22          A.      I don't recall.

1          Q.      Okay.  And do you remember at

2     what point in time in training you told her

3     that she needed to improve?

4          A.      No.

5          Q.      And do you remember what aspects

6     of training she needed to improve or you told

7     her that she needed to improve?

8          A.      I don't recall.

9          Q.      Okay.  How about the other

10    female trainee in that class?  Did you tell

11    her that she needed to improve her

12    performance?

13         A.      No.  Her situation is completely

14    different.  She -- when she went through the

15    initial imprinting stage, then she was

16    assigned to PBIED.  She did not have an issue,

17    nor did her assigned partner have an issue.

18         Q.      Okay.  And you were not involved

19    in the day-to-day PBIED training, right?

20              MS. SCINDIAN:  Objection.  Lack

21    of foundation.

22         A.      Not during that part of the

1    training.

2         Q.    Okay.  You were involved -- you

3    would be involved in the imprinting the early

4    couple weeks, right?

5         A.    Correct.

6         Q.    Okay, but not the bulk of the

7    PBIED training?

8         A.    Once the classes are split.

9         Q.    Yeah.  Okay, but Michele

10   Gonzalez was static?

11        A.    Correct.

12        Q.    Okay.  I want to talk about the

13   assignments of both handlers and dogs to

14   either PBIED or static.  PBIED, just for the

15   record, is P all caps P-B-I-E-D and it stands

16   for Person Borne --

17        A.    Improvised Explosive Device, I

18   believe.

19        Q.    Okay.  Can you tell me what the

20   considerations are for you when you -- well,

21   let me back up first.

22        As the head of K-9 training, when you

1    were the head of K-9 training, were you

2    involved in the decision to assign some

3    handlers to PBIED and some handlers to static?

4         A.    Yes.

5         Q.    Okay.  Now, for the 2017 class,

6    were there -- were there specified numbers of

7    either PBIED handlers or static handlers that

8    you needed?

9         A.    I believe we were given an

10   instruction -- I was given instruction from

11   the lieutenant that a certain number had to be

12   PBIED and a certain number had to be static.

13        Q.    And that would be Lieutenant

14   Cromwell?

15        A.    Correct.

16        Q.    Do you remember how many had to

17   be PBIED and how many had to be static?

18        A.    I do not.

19        Q.    Do you remember when you

20   received that instruction?

21        A.    I do not.

22        Q.    Was it before the dogs were

1    assigned and the handlers were allocated to

2    either PBIED or static?

3          A.    It could've been before the dogs

4    were purchased.

5          Q.    Okay.  So was it before the

6    handlers were actually assigned to either

7    discipline?

8          A.    Correct.

9          Q.    Okay.  Now, so what did you --

10   what were the factors that you thought about

11   or considered when making the assignment

12   between PBIED and static for the handler?

13         A.    Their decision making, their

14   fluidness and how quick were they with the

15   reading of the body language from the canine,

16   the change of behavior.  So it's their leash

17   manipulation, how fluid they are, how quick

18   their decision making is.

19         Q.    When you say how quick their

20   decision making is, what do you mean by that?

21         A.    Clarify.

22         Q.    Well, what kind of decision

1    making?  You said one of the factors you

2    consider is how quickly they make their

3    decision making.  What decision making?

4            A.      Correct, because when your --

5    when the handler, the new handler is given a

6    exercise, let's say we have four blocks.

7            Q.      Okay.

8            A.      The training aid is in block

9    number three.  Missy our just trainer,

10   trainee.  Trainee it's in block number three.

11           Q.      Okay.

12           A.      When the dog gets there and

13   smells it, as he's starting to back out finish

14   the response, which is our finished position

15   is a sit.

16           Q.      So it's how fast their reaction

17   to condition to sit?

18           A.      Correct, because we do not want

19   to encourage a negative behavior of the dog

20   walking past the training aid then coming back

21   and we're teaching the dog a secondary

22   response.

1        Q.      And so handlers that are faster

2   in their reaction time would be more inclined

3   to go towards static or PBIED?

4        A.      Not necessarily.

5        Q.      So what I'm asking you is, what

6   are the factors that when you're making the

7   decision help you determine whether you're

8   going to assign someone to PBIED or static?

9        A.      The totality of the picture I

10  painted for you.  How confident are they, the

11  trainee is in making the simple imprint, just

12  the little simple imprinting, as we progress

13  is which ones would work better.

14       Q.      For what?

15       A.      The PBIED.

16       Q.      Okay.

17       A.      Or static and which dog would be

18  best for that trainee because the dogs are --

19  the dogs are already going to be predetermined

20  where they're going, then it's up to the

21  training staff to mirror up the dog and the

22  trainee for them to be successful.

1      Q.      Okay.  So I'm trying to figure

2 out -- well, tell me this.  What would make

3 you think someone would be good at PBIED

4 rather than static?

5      A.      How smooth they are with their

6 feet.

7      Q.      So the more smooth they are, the

8 more you would be inclined to put them in

9 PBIED?

10      A.      It's a possibility.

11      Q.      I'm just trying to figure out

12 your -- your decision making, so.

13      A.      Well, it's not just my decision

14 making.  It's the entire group.  We discuss

15 this together.  What is best for handler A and

16 canine A.

17      Q.      Right, but you are part of that

18 decision making, right?

19      A.      Correct.

20      Q.      And you have opinions about what

21 handler would be good at what discipline,

22 right?

1          A.      Correct.

2          Q.      And for you personally, for

3    Sergeant Phelps, is someone who's more fluid

4    in their searches more inclined for PBIED or

5    is that person more inclined for static?

6          A.      It depends on the training.

7    What we see over a three week period, maybe

8    four before the dogs are assigned.

9          Q.      So for you, what sets a good

10   PBIED candidate apart from a good static

11   candidate?

12         A.      Their leash manipulation.

13         Q.      It has to be better for PBIED or

14   better for static?

15         A.      In my opinion?

16         Q.      Yeah.

17         A.      It's PBIED has to be a little

18   better.

19         Q.      Okay.  PBIED has to have better

20   leash manipulation.

21         A.      In my opinion.

22         Q.      Yeah.  How about their reaction

1   time?

2          A.     They have to be able to -- be

3   able to read a canine's behavior.

4          Q.     Faster?

5          A.     Correct.

6          Q.     Okay.  So better leash

7   manipulation.  Better faster reads on canine

8   behavior?

9          A.     Correct.

10         Q.     Okay.  And then I guess would

11  you say you referred to decision making

12  earlier, is that faster ability to assess a

13  search area and develop a pattern?

14         A.     Correct.

15         Q.     Okay.  How about -- how about

16  their athleticism?  The handler's athleticism.

17  More athletic PBIED?  Does it matter?

18         A.     No.

19         Q.     Okay.  What are the attributes

20  in your mind that make for a good static

21  candidate?

22         A.     Not sure I can answer that.

1          Q.      Okay.  In your view, are the

2     PBIED handlers sort of a cut above the static

3     handlers?

4          A.      I wouldn't say the handlers.

5     The PBIED job itself is harder than a static.

6          Q.      Okay.  Why do you say that?

7          A.      Because with PBIED, you have to

8     use wind flow, air direction and be able to

9     put your dog in the best position to detect

10    odor versus a static you're controlling the

11    search.  It's up to you, the handler, to

12    conduct a systematic search as you were

13    trained and to clear whatever it is, a room, a

14    vehicle, et cetera.

15         Q.      Okay.  So you don't have this

16    variable of the wind flow and the wind

17    direction?

18         A.      That comes into play, but with

19    static you're controlling the search.  You're

20    controlling it if you want -- if your outside

21    wind direction does play a part in it.  So if

22    you want to start, suggest that you start

1  downhill, downwind and work your way into it.

2  Same as for PBIED.

3      Q.    Okay.  So it's -- so then why is

4  PBIED more challenging?  You referred to wind

5  flow?

6      A.    Correct.

7      Q.    But now you're saying that both

8  sides have to deal with wind flow.

9      A.    Because the PBIED, they have to

10 be able to read the change of behavior quicker

11 because of the wind flow because you're

12 dealing generally with crowds.

13     Q.    Okay.  Okay.  So you look for

14 trainees who show early on the ability to

15 quickly and confidently read the dog?

16     A.    Correct.

17     Q.    Okay.  Okay.  Before the dogs

18 were actually assigned to the handlers, were

19 dogs either formally or informally sort of

20 reserved or earmarked for certain handlers?

21     A.    No.

22     Q.    Okay.  Did handlers -- were

1    handlers told that if they -- if they wanted

2    to be assigned to a dog, then gravitate

3    towards those dogs in the first couple of

4    weeks of training?

5           A.     No.

6           Q.     Show the trainers that you're

7    working well with those dogs?

8           A.     No.

9           Q.     Okay.  Before you assigned the

10   dogs in that 2017 class for Van Meter's class,

11   did you know any handlers had any preference

12   for any of the specific dogs?

13          A.     Before --

14          Q.     Before you made the assign?

15          A.     -- the class?

16          Q.     No.  No.  For Van Meter's class?

17          A.     Okay.  Before Van Meter.

18          Q.     But before you made the

19   assignment, did you know that any handlers had

20   preferences for specific dogs?

21          A.     I do not recall.

22          Q.     Okay.  Do you remember that the

1    handlers were asked to complete wish lists for

2    both what assignment they wanted, PBIED versus

3    static --

4            A.      Yes.

5            Q.      And what dog they wanted?

6            A.      Correct.

7            Q.      Do you know why some of the

8    handlers submitted two forms?

9            A.      I think the forms were filled

10   out incorrectly as far as their dog wish list.

11           Q.      So some handlers put the -- what

12   static dogs in the PBIED section or PBIED dogs

13   in the static section?

14           A.      Correct.

15           Q.      Okay.  Now, how are they

16   supposed to -- how are the handlers to know

17   which dogs were PBIED dogs and which dogs were

18   static dogs at the time they made their

19   selection?

20           A.      I believe it was listed up on a

21   whiteboard and broken into categories.

22           Q.      Were there some dogs that could

1    have gone either PBIED or static or were dogs

2    in specific categories?  These are the PBIED

3    dogs.  These are the static dogs.

4           A.     There was one dog in question.

5    We didn't -- we didn't know which way to go

6    with it.

7           Q.     And which dog was that?

8           A.     It was Jayden.

9           Q.     And why didn't you know which

10   way to go with it?

11          A.     Because Jayden was a very good

12   dog and could do the PBIED work, but we

13   decided that Jayden would be a good fit for

14   static.

15          Q.     And why did you ultimately make

16   that determination?

17          A.     Assessing the dogs over a three

18   week period along with the handlers, it was

19   determined.

20          Q.     On the day, was there -- was

21   there anything in particular that made you

22   conclude, ah, let's keep it in static?

```
 1          A.     No.

 2          Q.     On the day that the trainees

 3   made their dog choices, was there a question

 4   mark by Jayden's name?

 5          A.     I don't recall.

 6          Q.     If there was a question mark, do

 7   you know what it denoted?

 8                 MS. SCINDIAN:  Objection.  Lack

 9   of foundation.

10          A.     If there was a question mark, it

11   would be which PBIED or static?

12          Q.     Okay.  Do you remember that

13   before dog assignments were made, Jayden

14   struggled with certain parts of the training?

15          A.     No.

16          Q.     Do you remember that Jayden

17   struggled with the sit?

18          A.     That's not uncommon.

19          Q.     Whether it's common or not, do

20   you remember that Jayden struggled with it?

21          A.     I remember Jayden struggling to

22   finish in a finished position, which is a sit.
```

1    Q.    Do you remember that trainers

2  and handlers had to physically place Jayden in

3  the sit?

4    A.    I remember they had them to

5  place -- physically place Jayden in the sit.

6    Q.    And what did they have to do to

7  get Jayden to sit?  Do you remember?

8    A.    They would lift up on either the

9  leash or if they're really close, they can

10  lift up on right up underneath of the jaw and

11  as they're lifting, pushing down the back side

12  of the dog, the rear end, and kind of pushing

13  the dog into a sit.

14    Q.    Was there a --

15    A.    With a verbal command sit.

16    Q.    Was there a grip that they would

17  use, sort of they would put their hands in a C

18  shaped and apply, you know, pinching to the

19  dog, the back of the dog's spine?

20        MS. SCINDIAN:  Objection.  Vague

21  and ambiguous.

22    A.    No force was used that would

1    injure the dog to have the dog sit.

2          Q.     What about pain or discomfort?

3    Was it applied to make the dog sit?

4          A.     No.

5          Q.     Now, Jayden would also -- do you

6    remember that Jayden would not show interest

7    in the hide boxes unless the tennis ball was

8    also present?

9          A.     I do not recall.

10         Q.     Did any of the handlers

11   specifically tell you they did not want to be

12   assigned Jayden?

13         A.     No.

14         Q.     Were some dogs restricted in how

15   they could be used?  Like, where there -- were

16   there some dogs that had to be used as PBIED

17   dogs?

18         A.     I believe the -- Pope, who's a

19   Dutch Shepard, was strictly for static.

20         Q.     Oh, that's pointy ear dogs

21   tended to be static dogs, right?

22         A.     Correct.

1          Q.      Okay.  So Billy the Lab then

2     also would have been designated as a static

3     dog?

4          A.      Billy the Lab?

5          Q.      Billy the Mal?

6          A.      Could have been, but not

7     necessarily --

8          Q.      Okay.

9          A.      -- have to be.

10          Q.      All right, but Pope had to be

11     static?

12          A.      Based off of information that we

13     gathered, pointing dogs, people more

14     intimidated by them.

15          Q.      Okay.

16          A.      Versus -- so if you put them in

17     a PBIED, PBIED works in close proximity of

18     people.

19          Q.      Yeah.

20          A.      And so you don't want a Shepard,

21     so to speak, to be intimidating for presence.

22          Q.      Okay.  And that was the only dog

1    where there was a distinction between, like a

2    predetermination between which discipline he

3    would go into?

4          A.     I believe so.

5          Q.     Okay.  Do you know where all of

6    the -- all of the dogs in that class were

7    male, right?

8          A.     I believe so.

9          Q.     Ultimately.  There was a dog

10   named Queen in the very beginning who got

11   either returned to the vendor.  Something

12   happened to Queen.

13         A.     Okay.

14         Q.     Do you remember what happened?

15         A.     I remember the dog being

16   returned to the vendor.  I don't recall the

17   dog's name.

18         Q.     Okay, but otherwise all the dogs

19   in the class were male, right?

20         A.     Correct.

21         Q.     Can you name them?  I'd come

22   pretty close.  I think I can get them all, but

1    you tell me if you can do it.

2          A.     I think we have Pope, Billy the

3    Mal, Billy the Lab, Jayden, Reno, Toby,

4    Cooper, and I'm not sure if I'm missing any.

5          Q.     Rocket.

6          A.     Rocket.

7          Q.     Pope, Billy the Mal, Billy the

8    Lab, Jayden, Cooper, Toby, Rocket and Reno.

9    Okay.  Were any of those dogs -- I'm not sure

10   if this is the right term or not, but were any

11   of those dogs neutered?

12         A.     I do not think so.

13         Q.     Okay.  Before the dog choices

14   were made, was Van Meter told that any of the

15   dogs -- that she should not work with any of

16   the dogs or that she should not request any of

17   the dogs?

18         A.     She was advised by me not to

19   work two dogs.

20         Q.     And which dogs were those?

21         A.     Pope and Billy the Mal.

22         Q.     And why not?

1        A.      Because she couldn't physically

2   handle the dog safely, which pose a safety

3   issue for the other canines as well as the

4   other handlers have the dog -- should the dog

5   happen to break free from Missy.

6        Q.      And why do you say she couldn't

7   control the dogs?  Is there a weight

8   limitation or a observation?

9        A.      An observation.

10        Q.      Were both of those -- were Pope

11   and Billy the Mal both energetic hard pullers?

12        A.      They were strong.  They were 80

13   plus pound dogs.

14        Q.      But you said it wasn't the

15   weight that made the fact that -- the

16   determination, right?

17        A.      It played into the decision.  It

18   wasn't a determined factor.  It played into

19   the ultimate decision.

20        Q.      Okay.  So Pope and Billy the Mal

21   were off limits for Van Meter to choose?

22        A.      For safety reasons.

1        Q.      For safety reasons.  So even if

2   she had put one of those dogs as her favorite

3   dog, you wouldn't have granted her that

4   request?

5                MS. SCINDIAN:  Objection.  Calls

6   for speculation.

7        A.      It's possible.  It's possible

8   that she wouldn't get getting -- get her

9   request because of safety.  If there's a

10  safety issue in the training that we

11  recognize, we address it.

12       Q.      Okay.  Were any dogs off limits

13  to any other handlers?

14       A.      No.

15       Q.      And who made the decision to

16  assign -- yeah.  Who made the dog assignment

17  decisions for that class?

18       A.      It was the training staff and

19  myself.

20       Q.      Can you tell me who on the

21  training staff participated in that decision

22  making?

1      A.      It would be Kenny Hill, Jeff

2  Core, AJ Turner.  I believe Tim Cullen was in

3  there and myself.

4      Q.      And you all discussed it and

5  came to a consensus; is that right?

6      A.      We discussed which would be best

7  for the handler as far as the assignment, and

8  then which canine would be best suited for

9  them for the team to be successful in the

10  program.

11      Q.      Okay.  And did you take the

12  handler's preference into consideration?

13      A.      Yes.

14      Q.      Okay, but was the handler's

15  preference determinative?

16      A.      No.

17      Q.      Okay.  Do you remember why

18  specifically Van Meter was assigned to Steph?

19      A.      I do not.

20      Q.      Do you remember why specifically

21  she was assigned to Jayden?

22      A.      I remember it being the best fit

1    for her.

2          Q.    Do you remember that all of the

3    male handlers got their first pick at dogs?

4          A.    I do not recall.

5          Q.    Did you guys ever discuss that

6    fact that all -- all the men got first pick?

7          A.    No.

8    (Exhibit 4, document Bate-stamped USCP1696 and

9    1697 to USCP1800 to USCP1805, marked for

10   identification.)

11         Q.    Okay.  Mr. Phelps, you've been

12   given Phelps Exhibit 4.  This is a stapled

13   packet, I believe, of eight pages.  The first

14   two pages are USCP1696 and 1697, then after

15   that it goes from USCP1800 to USCP1805.  Do

16   you have that?

17         A.    I do.

18         Q.    Okay.  Do you recognize what

19   these documents are?

20         A.    Yes.

21         Q.    Can you tell me what they are?

22         A.    They appear to be the wish list

1    for the assignments of the handlers, as well

2    as their canines.

3         Q.    Okay.  Now, taking a look at the

4    first two, which correspond to Officer Van

5    Meter, can you tell which of these -- so

6    first, you indicated earlier that some of the

7    forms had to be redone because there were

8    errors on the dog -- the dog assignments PBIED

9    versus static, right?

10        A.    Correct.

11        Q.    So what I'm trying to figure out

12   is which of these two forms was the effective

13   one for Van Meter?  Which one is like the

14   replacement form?  Can you tell?

15        A.    Replacement, yes.

16        Q.    Which one?

17        A.    It would be 96.

18        Q.    Okay.  And how do you know that?

19        A.    Because Billy the Lab and Billy

20   the Mal are on the static side.  Cooper, Toby

21   and Rocket are the PBIED.

22        Q.    Okay.  Whereas, on 1697 you see

1    Cooper as a static dog?

2          A.    And I also see Toby, Jayden and

3    Billy the Lab as PBIED.

4          Q.    Which of those dogs was not

5    supposed to be PBIED or couldn't be chosen as

6    a PBIED dog?

7          A.    Billy the Lab and Jayden that

8    are not supposed to be PBIED.  That's your

9    question, correct?

10         Q.    Yeah.

11         A.    Correct.

12         Q.    Okay.  Okay.  So for then

13   skipping to handler two, that's Mikrantz under

14   the -- under the key that we have.  So that's

15   1800 and 1801, and can you tell which of these

16   forms is the effective one?

17         A.    The 1800.

18         Q.    Okay.  And how can you tell

19   that?

20         A.    Because on 1801 Mikrantz has

21   Cooper listed as static.

22         Q.    Okay.  Now, taking a look at

1    1801 specifically.  At the top Mikrantz has

2    circled N to indicate that he is not

3    interested in working PBIED, right?

4           A.     Correct.

5           Q.     He circled Y indicating that he

6    is interested in working static.

7           A.     Correct.

8           Q.     And N that he's not interested

9    in working either assignment.  So Mikrantz

10   indicated to you that he wanted to work static

11   on this form, right?

12          A.     Correct.

13          Q.     Okay.  And under static he

14   wanted to work with Cooper as his dog, right?

15          A.     Correct.

16          Q.     Why wasn't he allowed to work

17   Cooper in static?

18          A.     The department has the right to

19   assign.  So I was given a mandate of X number

20   of PBIEDs, X number of static and consultation

21   with my training staff.  It was decided that

22   Mikrantz would be better suited for the

1    department's needs as a PBIED handler.

2            Q.    So then was Cooper sort of

3    redesignated as a PBIED dog so that Mikrantz

4    could work with Cooper in PBIED?

5            A.    No.  Cooper -- again, it was

6    filled out.  Let's see.  Cooper.  Error on my

7    -- error on me.  The 1801 is actually the

8    incorrect one because Cooper is listed as a

9    static.  He should have been PBIED.

10           Q.    Okay.  I may have misunderstood

11   you earlier.  I understood you to say that

12   1800 was the correct one --

13           A.    Correct.

14           Q.    -- or the replacement one.  I

15   may --

16           A.    Okay.  I'm looking at 1801.

17           Q.    Okay.

18           A.    Because you were talking about --

19           Q.    Right.

20           A.    The top part.

21           Q.    Right.  1801, I think, was his

22   initial one in which he indicated his

1    preference and a desire to work with Cooper in

2    static?

3            A.    Correct, and on 1801.

4            Q.    And then he was -- everybody was

5    asked to redo the forms because Cooper was not

6    a static dog?

7            A.    Correct.

8            Q.    Cooper was PBIED?

9            A.    Correct.

10           Q.    My question is, was Cooper made

11   PBIED in order so that he could be assigned to

12   work with Mikrantz in the PBIED --

13           A.    No.

14           Q.    -- discipline?

15           A.    No.

16           Q.    Okay.  So there was something

17   written somewhere that indicated that Cooper

18   was PBIED from the start?

19           A.    My understanding, yes.

20           Q.    And then all these handlers made

21   a mistake and didn't abide by whatever that

22   listing was.  Is that your understanding?

1          A.       It appears that way.

2          Q.       Okay.  Okay.  How about 1802 and

3    1803?  That's for handler one, which is

4    Demetrius Dantinne.

5          A.       Okay.

6          Q.       And can you tell which of these

7    was the first form and which one was the

8    replacement form?

9          A.       The form in error is 1803 and

10   the correct form is 1802.

11         Q.       And, again, you're saying that

12   because in 1803 Dantinne has Cooper listed as

13   a static dog?

14         A.       Correct.

15         Q.       So if you take a look at 1697,

16   1801, in other words, if you take a look at

17   the first version of the form that each of

18   these handlers filled out, at least each of

19   the first three handlers that we looked at,

20   Van Meter, Mikrantz and Dantinne so far, each

21   one of them thought that Cooper was a static

22   dog?

1         A.      It appears, yes.

2         Q.      Are you sure that they were

3  informed that Cooper was a static dog from the

4  beginning?

5              MS. SCINDIAN:  Objection.  He

6  answered the question.

7         A.      It appears I don't know what

8  they thought.

9         Q.      Okay.  Take a look at 1805

10  handler three, which is Riley also thought

11  Cooper was static.

12         A.      Okay.

13         Q.      Listed Cooper as static on the

14  first ballot.

15         A.      Okay.

16         Q.      Does that refresh your

17  recollection about events at all?

18         A.      No.

19         Q.      Okay.  So focusing again, where

20  were we?  On 1802 versus 1803.  You said 1803

21  was the -- was the first form that Dantinne

22  submitted?

1          A.      Yes.  It appears.

2          Q.      And 1802 was the replacement

3   form?

4          A.      Correct.

5          Q.      Okay.  And then 1804 and 1805,

6   those pertain to Mike Riley.  And let's see.

7   On 18, can you tell which one is the old form

8   and which one was the replacement form?

9          A.      For?

10         Q.      For Riley.

11         A.      For handler three?

12         Q.      Between 1804 and 1805?

13         A.      Well, the 1805 is a error and

14  1804 is the correct form.

15         Q.      Okay.  Now on 1805 you see some

16  handwriting there.  It says, at the end of the

17  day, I prefer PBIED, but understand the

18  staff's expertise may dictate otherwise.

19         A.      Okay.

20         Q.      Did you see that notation at the

21  time you were making the dog assignments?

22         A.      I do not recall because we

1   didn't use this form.  We used 1804 as means

2   to assigning dogs and assigning the handlers

3   to their assignment.

4           Q.      Did you know that Mike Riley

5   wanted to work PBIED?

6           A.      I don't recall.

7           Q.      Can you explain why you and the

8   training team decided to assign him to static?

9           A.      I only had a certain number of

10  spots for PBIED.  Certain number of spots for

11  static.  At the end of the day, the best

12  candidate at the time during the initial three

13  weeks of training was assigned to the PBIED

14  side.

15          Q.      Okay.  You knew Schmid was going

16  to go to PBIED, right, because he had already

17  gone through PBIED training once before?

18          A.      Yes.  That's his assignment.

19          Q.      Yeah.  Okay.  So there was no

20  question that Schmid was going to be PBIED,

21  and then you thought the next best handler was

22  other than Zborai who you knew was going to go

1   to static -- strike everything I just said.

2   Let me start again.

3          You knew Schmid was going to go to

4   PBIED because that was his assignment, right?

5          A.     Correct.

6          Q.     So there was no question in

7   anybody's mind Schmidt was going to PBIED?

8          A.     Correct.

9          Q.     All right.  You knew Zborai was

10  going to static because that was his

11  assignment, right?

12         A.     Correct.

13         Q.     So no question in anybody's mind

14  Zborai was going right to static?

15         A.     Correct.

16         Q.     Okay.  And then you had one more

17  PBIED slot at the time that you were going to

18  fill, right?

19         A.     I believe so.

20         Q.     And that went to Mikrantz?

21         A.     Correct.

22         Q.     And it was -- that's because the

1    trainers' consensus is that Mikrantz would've

2    been the best person to fit the remaining

3    PBIED slot?

4          A.    Correct.

5          Q.    All right.  So there was an

6    assessment that he was -- he fit those factors

7    that you mentioned earlier better than either

8    Riley, Dantinne or Van Meter at the time?

9          A.    Initially, yes.

10         Q.    Did that change?

11         A.    No.

12         Q.    Okay.  Was there anything in

13   particular about Riley that made you conclude

14   that he would not be a good fit for PBIED

15   initially?

16         A.    Not initially.

17         Q.    At any time?

18         A.    No.

19         Q.    How about Dantinne?  Was there

20   anything that made you conclude that he would

21   not be a good fit for PBIED initially?

22         A.    No.

1          Q.      How about at any time?

2          A.      No.  Not that I recall.

3          Q.      Okay.  How about Van Meter?  Was

4     there anything that led you to believe that

5     she would not be a good candidate for PBIED?

6          A.      There was.

7          Q.      And what was that?

8          A.      Based off her initial training

9     sheets before the assignment of the dogs, it

10    had been noted of her leaning over, as we

11    talked about earlier, leading with the hand,

12    for foot work, her pace was slow.

13         Q.      As indicated in the training

14    sheets?

15         A.      Correct.

16         Q.      Okay.  Let's see.  Before we

17    move away from Exhibit 4, you indicated that

18    USCP1696, the first page of the document, is

19    the effective or, yeah, the effective form for

20    Van Meter, right?

21         A.      Correct.

22         Q.      And you see on her wish list

1    under static Jayden was listed as her second

2    choice, right?

3           A.     Correct.

4           Q.     Billy the Lab was listed as her

5    first choice?

6           A.     Correct.

7           Q.     Can you tell me why she wasn't

8    assigned to Billy the Lab?

9           A.     Jayden was a better fit for Van

10   Meter.

11          Q.     And why?

12          A.     The dog was more of an

13   independent searcher worker, and we felt as a

14   staff that Jayden would be best suited for Van

15   Meter.

16          Q.     Why did you think that Van Meter

17   needed to be assigned to a dog that was more

18   independent?

19          A.     There wasn't.  It was just they

20   paired up watching the evaluation process of

21   the first three weeks.  Those two compared to

22   Billy the Lab, those two mesh better.

1      Q.      They had good chemistry?

2      A.      Correct.

3      Q.      Okay.  Flipping to --

4      A.      And also say for the record,

5   Billy the Lab, Billy the Mal would drop from

6   the program.  So in the end Missy got the

7   better dog of the two.

8      Q.      Did you ever have any concerns

9   that it was with -- in the case of Billy the

10  Lab, the way that Mike Riley was handling

11  Billy the Lab, that led to the problems that

12  Billy the Lab experienced?

13     A.      No.

14     Q.      How about with Billy the Mal?

15  Did you ever come to the opinion that it was

16  how Dantinne was handling Billy the Mal that

17  led Billy the Mal to suffer the issues that

18  led to his removal?

19     A.      No.

20     Q.      Never a doubt in your mind?

21     A.      No.

22     Q.      Never a discussion among the

1    trainers about that?

2                   MS. SCINDIAN:  Objection.  Asked

3    and answered.

4         A.    Not that I recall, no.

5         Q.    Okay.  Let's see.  180 -- 1800

6    was the effective form for Mikrantz handler

7    two, right?

8         A.    Okay.

9         Q.    Agree with that?

10        A.    Yes.

11        Q.    Okay.  And his first choice

12   under PBIED was Cooper, right?

13        A.    Correct.

14        Q.    And he got assigned Cooper,

15   correct?

16        A.    I don't recall.

17        Q.    Mikrantz?

18        A.    Correct.  I don't recall.

19        Q.    Okay.  Do you remember who ended

20   up working with Rocket?

21        A.    No, I do not.

22        Q.    How about Toby?

1        A.      No.

2        Q.      Okay.  Flip to 1802 then.  And

3   can you confirm that -- so this is the form

4   for Dantinne and I believe it's the effective

5   form for Dantinne, but please confirm that.

6        A.      It appears to be, yes.

7        Q.      All right.  And he was initially

8   assigned to static, correct?

9        A.      Dantinne, yes.

10       Q.      And he was initially assigned to

11  work with Billy the Mal, right?

12       A.      Correct.

13       Q.      And Billy the Mal was his first

14  choice, right?

15       A.      Correct.

16       Q.      Then flip to 1804 and do you

17  agree that that's the effective form for Mike

18  Riley?

19       A.      Yes.

20       Q.      And Mike Riley was initially

21  assigned to static, right?

22       A.      Correct.

1          Q.      And Billy the Lab was his first
2     choice, correct?
3          A.      Correct.
4          Q.      And he was assigned to Billy the
5     Lab, right?
6          A.      Correct.
7          Q.      Do you remember the -- do you
8     remember anything about the order in which the
9     handlers were told about their dog
10    assignments?
11         A.      No.
12         Q.      Remember who went first, who
13    went last?
14         A.      No.
15         Q.      Okay.  Do you remember that Van
16    Meter went last?
17         A.      I do not.
18         Q.      Okay.  Do you remember anything
19    that you said to her during the dog assignment
20    meeting?
21         A.      No.
22         Q.      Okay.  Do you remember who was

1    present during the dog assignment meeting?

2            A.      I believe it was Mr. Hill, Core,

3    Turner and Cullen and myself.

4            Q.      Okay.  What happened?  You

5    called -- you called each handler into an

6    office and then told the handler --

7            A.      Into the classroom.

8            Q.      Told the handler which dog they

9    were going to get?

10           A.      As well as their assignment.

11           Q.      Okay.  And do you remember

12   anyone being upset about which dog they were

13   being assigned?

14           A.      I do not.

15           Q.      Okay.  Do you remember telling

16   Officer Van Meter that you thought that both

17   she and Jayden had problems and maybe they

18   could help each other out?

19           A.      No.

20           Q.      Did you say anything like that?

21           A.      No.

22           Q.      Do you remember any other member

1   of the training staff stating that they

2   thought that Jayden -- it was doubtful that

3   Jayden would make it through training?

4        A.    No.

5        Q.    Do you remember any other member

6   of the training staff talking about problems

7   that Jayden was having in the first few weeks

8   of training before the dog assignments?

9        A.    I do not recall.

10             MS. SCINDIAN:  Objection.  Vague

11  and ambiguous.

12       Q.    Did any other trainer tell Van

13  Meter that she was given Jayden because she

14  and Jayden both had problems and maybe they

15  could help each other out?

16       A.    I do not recall.

17       Q.    Now Riley -- let's focus in on

18  Riley real quick.  Riley was ultimately

19  assigned to PBIED, right?

20       A.    Correct.

21       Q.    Why did that happen?

22       A.    I had -- I believe I had two

1    extra PBIED dogs available.  So I submitted an

2    e-mail through the chain asking I have two

3    PBIED dogs available.  I can either assign

4    Riley to one of them and they be transferred

5    over to the PBIED side, or he would have to

6    wait until the next class of static become

7    available.

8           Q.     And who did you inform of that?

9           A.     My chain of command.

10          Q.     Cromwell?

11          A.     Correct.

12          Q.     Okay.  And you did that by

13   e-mail?

14          A.     I believe so.

15          Q.     Okay.  So you had two choices,

16   one either assign Riley to a PBIED dog.

17          A.     Correct.

18          Q.     Or make Riley wait until the

19   next class?

20          A.     Correct.

21          Q.     Okay.  And did then Cromwell

22   tell you to put Riley in the PBIED class?

1          A.      I believe so.

2          Q.      Okay.  Did you inform or advise

3    Cromwell what you thought about whether Riley

4    would be good and effective in PBIED?

5          A.      When it came to deciding, Riley

6    was initially, from what I recall, assigned a

7    static because he his footwork wasn't smooth.

8          Q.      Okay.

9          A.      Not to make light of this, he

10   reminds me of Charlie Chan.  So and I kinda

11   wrote that in my e-mail; however, he was

12   assigned to PBIED and excelled in it.

13         Q.      When you say Riley walked like

14   Charlie Chan, do you mean Charlie Chapman?

15         A.      Probably.

16         Q.      Like the old vaudeville actor?

17   Funny mustache and wears his top hat?

18         A.      It's Chapman.

19         Q.      Chapman.

20         A.      Chapman.

21         Q.      Okay.

22         A.      Learn something from you.

1          Q.      Oh, my God.   Thanks, Chris.

2     It's Charlie Chaplin.

3          A.      Chaplin.

4          Q.      All right.   It was all me.   I

5     don't want to throw the --

6          A.      All right.

7          Q.      -- Charlie Chapman.   Who the

8     hell is Charlie Chapman?

9                  MS. SCINDIAN:   I know who it is.

10         Q.      I remember Charlie Chapman.

11    Always wore that Bowler hat.   Okay.   Sorry.

12    Back on the record.   Okay.

13         Okay.   Now, you said that Riley then

14    excelled in PBIED.   Is that what the PBIED

15    handlers or trainers told you?

16         A.      He successfully completed the

17    program, so he excelled.

18         Q.      He passed the program?

19         A.      Correct.

20         Q.      Did you ever -- did you see him

21    on training exercises in PBIED?

22         A.      I didn't go out as much with the

1   PBIED because I was assigned to the static

2   side.

3        Q.    Okay.  Did anyone tell you that

4   Riley was excelling on the PBIED side of

5   things?

6        A.    I read the training sheets I

7   believe and I formed my own opinion based off

8   of what I read, I believe.

9        Q.    What you read in the training

10  sheets?

11       A.    Correct.

12       Q.    Okay.  Now, how about Dantinne?

13  Ultimately Dantinne had to be switched over to

14  PBIED as well, right?

15       A.    Correct.

16       Q.    And why was he switched over to

17  PBIED?

18       A.    Because of his canine failing

19  the program.

20       Q.    So we should go back.  Riley,

21  this whole -- the question of whether what to

22  do with Reilly PBIED or wait until the next

1    static class, that was caused by the fact that

2    Riley's dog was removed from the training

3    program, correct?

4            A.     Correct.

5            Q.     Billy the Lab?

6            A.     Correct.

7            Q.     Okay.  Billy the Mal was also

8    removed.  That was Dantinne's dog, right?

9            A.     Correct.

10           Q.     And then that -- so then that

11   created the question what to do with

12   Dantinne --

13           A.     Correct.

14           Q.     -- either.  So what was the

15   decision making there?

16           A.     Just the same as Riley.  I had

17   an extra PBIED dog.

18           Q.     Okay.

19           A.     A vacant spot.  Dantinne had the

20   -- the department had a choice either to put

21   the two together, Dantinne and the PBIED dog.

22   So you have an extra PBIED team or wait until

1    the next static class became available.

2         Q.     And Cromwell made the election

3    to put Dantinne in the PBIED class?

4         A.     I'm not sure who --

5              MS. SCINDIAN:  Objection.  Vague

6    and ambiguous.

7         A.     I'm not sure who ultimately made

8    the final decision.  I was instructed by

9    Lieutenant Cromwell.

10        Q.     Okay.  Okay.  We've looked at

11   the -- at least we've talked about a warning,

12   a caution that you gave to Van Meter in about

13   week three of class that she needed to improve

14   if she wanted to remain in the program.  You

15   remember that?

16        A.     I believe -- I may the --

17   something similar to that.  Yes.

18        Q.     Okay.  Do you remember doing

19   that on any other occasions with Van Meter?

20   Telling her that she needed to improve if she

21   wanted to remain in the program or if she

22   wanted to avoid being removed?

1          A.     I don't recall.

2          Q.     You don't remember doing it

3     after that August 22nd instance?

4          A.     No.

5          Q.     Do you believe you did or do you

6     -- are you saying I don't remember either way,

7     or are you saying --

8          A.     I don't recall.

9          Q.     Okay.  So I don't remember

10    either way?

11         A.     I don't recall, other than the

12    first time letting her know that her

13    performance needed to improve or a

14    recommendation would be put forth for her

15    removal.

16         Q.     Okay.  If Van Meter said that

17    you gave her similar warnings on a regular

18    basis every other week in class, would you

19    dispute her account?

20         A.     I would contest it, yes.

21         Q.     Okay.  You disagree that you

22    gave her more than -- more than just the one

1   warning?

2        A.     Correct.

3        Q.     Okay.  Did you ever talk to

4   anyone in human resources about how to deal

5   with the information that Van Meter gave you

6   about her anxiety and short-term memory loss?

7        A.     No.

8        Q.     Did you ever talk to your super

9   -- anyone in your supervisory chain of command

10  about how to deal with that?

11       A.     No.  That's an HR issue.  That's

12  something for them to handle.  They would give

13  me guidance on how to handle it if I was to be

14  aware of it.

15       Q.     Did Cromwell or anyone else in

16  your chain of command counsel you or talk to

17  you about how you were dealing with Van Meter?

18       A.     No.

19       Q.     Did you ever tell Van Meter that

20  you had either had a meeting or received an

21  e-mail from Cromwell, which prompted you to

22  ask Van Meter who she had been talking to

1    about her treatment in training -- in canine

2    training?

3                    MS. SCINDIAN:  Objection.  Lacks

4    foundation.

5           A.     No.  Not the way you

6    characterize the question, no.

7           Q.     Tell me what it reminds you of.

8    Tell me what happened.

9           A.     We were at a training facility.

10   Laurel Racetrack.

11          Q.     Okay.

12          A.     We conducted a training

13   exercise.  We come back.  Van Meter is talking

14   to P3 handler.  We get back.  P3 is an evening

15   shift canine handler.

16          Q.     Okay.

17          A.     Talking to him.  The next day I

18   get a phone call from Lieutenant Cromwell

19   asking me if I'm talking about Van Meter's

20   performance in class and I said, lieutenant,

21   what are you talking about?  We're not talking

22   about anything.  A 311 sergeant went to

1    lieutenant -- Lieutenant Cromwell's office

2    because Matt Broehl came up and was talking

3    about Missy's -- Van Meter's performance that

4    day, which Van Meter said to Broehl, said to

5    the P3 officer, who then went back and shared

6    her performance amongst the other handlers,

7    and that that evening shift sergeant went to

8    the lieutenant and said something.

9         Q.    Okay.  Let's break all this

10   down, if you don't mind.  So on the day that

11   you guys were at the Laurel Racetrack.

12        A.    Okay.

13        Q.    Do you remember if it was the

14   first time you guys went to the Laurel track

15   for exercises?

16        A.    No.

17        Q.    You don't remember either way or

18   you --

19        A.    No, it wasn't the first time.

20        Q.    It was not the first time.

21   Okay.  All right.  You see -- so when you come

22   back to K-9 training that day, you see Van

1  Meter speaking to Broehl?

2          A.      Correct.

3          Q.      And that was the P3 handler?

4          A.      Correct.

5          Q.      Okay.  How do we spell Broehl?

6  Is it B-R-O-H-L or something like that?

7          A.      B-R-O-E-H-L.  I think there's an

8  E in there.

9          Q.      Okay.  What's his first name?

10         A.      Matt.

11         Q.      Okay.  And then did you hear

12 what Van Meter was talking to Matt Broehl

13 about?

14         A.      No.

15         Q.      Okay.  So then the next thing

16 that you know, the next thing that happens, at

17 least that you're involved with, is that you

18 get a call from Cromwell.

19         A.      The next day.

20         Q.      The next day and Cromwell tells

21 you what?

22         A.      Are you guys talking about Van

1    Meter's performance?  I said, no.  What are

2    you talking about?  I'm confused, then at that

3    time when he started explaining, I explained

4    to Lieutenant Cromwell that Technician Broehl

5    was outside of the K-9 training building

6    talking to Van Meter when we pulled up, which

7    led me to believe that he's the one that went

8    back to the hill and shared our conversation.

9         Q.     Now, what did Cromwell explain?

10   You said Cromwell explained what happened.

11   What did he say happened?

12        A.     I explained to -- Lieutenant

13   Cromwell said to me --

14        Q.     Yeah.

15        A.     -- I thought, are you guys

16   talking about Van Meter's performance to other

17   handlers?  I said, what are you talking about

18   because I'm confused.  And that's when he

19   started explaining what had transpired and

20   that's when I said, lieutenant, this is what I

21   saw.  It has to be coming from Broehl because

22   we're not saying anything.

1          Q.      What did Cromwell explain had

2    happened?  So he said, are you guys talking

3    about Van Meter's performance?  You said, I'm

4    confused, then he explained further what he

5    had heard.  So what had he heard?

6          A.      I don't know.

7          Q.      What did he tell you he heard?

8          A.      I don't recall what he told me.

9    It was talking about her performance.

10         Q.      You said sergeant was involved?

11         A.      It was an evening shift sergeant

12   that was around the evening shift rollcall

13   overheard the conversation that Matt Broehl

14   was having with other handlers.

15         Q.      Was it a K-9 sergeant?

16         A.      I do not -- I do not know.

17         Q.      So the evening shift sergeant

18   heard Matt Broehl talking to other people

19   about what allegations of unfair treatment--

20                 MS. SCINDIAN:  Objection.

21         Q.      -- that Van Meter made?

22                 MS. SCINDIAN:  Objection.

1    Mischaracterizes testimony.  Lack of

2    foundation.

3          A.     I'm not sure.

4          Q.     Something about Van Meter's

5    experience in K-9 training.

6          A.     It's about Van Meter's

7    performance.

8          Q.     Okay.  And Cromwell called you

9    to talk to you about that?

10         A.     The next morning.

11         Q.     Okay.  Was there any e-mail

12   traffic on that?

13         A.     None that I'm aware of.

14         Q.     Was it your understanding from

15   Cromwell that Van Meter was talking about how

16   wonderful her performance was?  Like, was she

17   recounting positive things about K-9 training?

18         A.     I don't know.

19         Q.     Okay.  Did Cromwell tell you to

20   do anything, instruct you to do anything?

21         A.     Clarify.

22         Q.     You then told -- you told

1    Cromwell that you saw Van Meter talking to

2    Broehl, right?

3          A.    Correct.

4          Q.    Was that the end of the

5    conversation, or did Cromwell say, okay, well

6    look, I need you to do this or that or not do

7    this or that?

8          A.    That's the end of the

9    conversation.

10         Q.    Okay.  So as soon as you told

11   him that Van Meter was talking to Broehl, that

12   was the end of the conversation with Cromwell?

13         A.    Correct, as far as I can recall.

14         Q.    Do you remember Van Meter ever

15   trying to get assistance from other K-9

16   handlers?

17         A.    Yes.

18         Q.    And what do you remember about

19   that?

20         A.    The same days were speaking of

21   after Lieutenant Cromwell called me.

22         Q.    Okay.

1          A.      Van Meter comes in and runs a

2    exercise, I asked Van Meter if she's talking

3    to other handlers about assistance.  She had

4    informed me, no, she wasn't.  However, other

5    handlers -- experience handlers has told me

6    otherwise, which she was seeking assistance

7    from them, and as I as myself and Kenny Hill,

8    Cullen said, well, I said, they were present,

9    that we know your dog and we're your best

10   resource for you to become successful.  They

11   don't understand what we suggest for you is

12   going to be different from what we would

13   suggest for another team because the

14   situations are different.

15          Q.      So you told her not to get help

16   outside the K-9 training staff?

17          A.      Correct.  They don't understand

18   what deficiency you or the dog may be

19   experiencing.

20          Q.      How did you know that Van Meter

21   was getting help from others?

22          A.      Had other handlers come up,

1    approach me saying so.

2        Q.    Who told you?

3        A.    I don't recall.  They're -- I

4    don't recall who it was.  I know that I was

5    told.

6        Q.    And you're saying Van Meter told

7    you that she hadn't asked anyone else for

8    help?

9        A.    Correct.

10            MS. SCINDIAN:  Can we take a

11   break?  It's been like an hour and 20 minutes.

12            MR. ALDERMAN:  Yes.

13   (Short recess.)

14        Q.    Mr. Phelps, you indicated that

15   you had participated or were the head of K-9

16   training for three different classes, right?

17        A.    Correct.

18        Q.    Other than Van Meter, did you

19   ever have to remove another student?

20        A.    I did.

21        Q.    How many?

22        A.    One.

1          Q.      Okay.  And who was that?

2          A.      I think his name is Mark Schwam.

3          Q.      Schwam.  Okay.  And before you

4    removed Mr. Schwam, did you issue him a form

5    550?

6          A.      I do not recall.

7          Q.      Do you know what a form 550 is?

8          A.      Yes.

9          Q.      Can you tell me what it is?

10          A.      It's a personnel performance

11    note.

12          Q.      And what are they used to

13    document?

14          A.      They could be used for --

15    document positive behaviors.  Interactions

16    that you may have received from the public

17    within the department.  They can also be used

18    for a corrective behavior, such as if you're

19    late for work or it can be used for something

20    along those lines.

21          Q.      Is it the -- is it a form used

22    to place an employee on official notice that

1    corrective action can be taken?

2                    MS. SCINDIAN:  Objection.  Vague

3    and ambiguous.

4          A.     No, not in that way.

5          Q.     What do you mean, not in that

6    way?

7          A.     Your question.  Not in the way

8    you worded your question, as putting somebody

9    on notice.

10   (Exhibit 5 document Bate-stamped USCP2135 to

11   2136, marked for identification.)

12         Q.     Okay.  Mr. Phelps, I've given

13   you what's been marked Exhibit 5.

14         A.     Okay.

15         Q.     This one goes from USCP2135 to

16   2136.  Do you have both those pages?

17         A.     I do.

18         Q.     And it is August 12th, 2016, EOD

19   K-9 training form for handler six, which is

20   Mr. Schwam -- Officer Schwam.

21         A.     Okay.

22         Q.     And if you take a look down in

1    the supervisor's comments on the second page.

2          A.    Yes.

3          Q.    Did you write that language?

4          A.    I did.

5          Q.    And it says, the officer -- the

6    officer's name is redacted, but, quote,

7    redacted name was given an informational 550,

8    putting him on notice regarding his

9    performance, end quote, for the first sentence

10   there.  Does that refresh your recollection as

11   to whether a 550 was issued to Schwam before

12   he was removed from the class?

13         A.    No.

14         Q.    What do you mean that it doesn't

15   refresh?

16         A.    It doesn't refresh me that I did

17   it.

18         Q.    Does this form reflect that you

19   gave him a 550?

20         A.    I'm not sure.  I'm not sure if I

21   did it or didn't do it.  I don't recall if I

22   did.

1           Q.      You wrote that you gave him a

2    550, correct?

3           A.      In here on this training form,

4    yes.

5           Q.      On Exhibit 5 you wrote that you

6    had given Schwam a form 550, correct?

7           A.      Correct.

8           Q.      Do you have any reason to doubt

9    the veracity of what you wrote on the form?

10          A.      No.  I just do not recall.

11          Q.      Okay.  Do you know why you would

12   give Schwam a 550 and not Van Meter?

13          A.      This was a new assignment for

14   me.  I'm transitioning from an operational

15   side into a training environment.  Coming from

16   that background of operational side, sergeants

17   issue 550s, whether negative or positive.  I

18   just used the same practice here with Schwam.

19          Q.      Did someone tell you that you

20   didn't need to do that?

21          A.      No.

22          Q.      Okay.  So no one ever corrected

1    you and said you don't need to give a 550

2    before you -- before you remove someone from

3    class?

4           A.     I do not recall.

5           Q.     Okay.  You can turn that aside.

6    Do you remember if any additional assistance

7    was given to Schwam before he was removed from

8    class?

9           A.     I don't -- I don't recall.

10          Q.     Do you remember if any -- he was

11   given any additional scheduled hours of

12   training before he was removed?

13          A.     I do not recall.

14          Q.     You were the K -- yeah.  You

15   were the K-9 supervisor for Schwam's class,

16   right?

17          A.     For the overall class of K-9

18   training, yes.  I was not actively involved in

19   his class.

20          Q.     You were not an instructor in

21   his class?

22          A.     Correct.

1        Q.      Okay.  Who was it that proposed

2   or came up -- who had the idea to remove

3   Schwam?  Do you remember?

4        A.      According to this sheet

5   technician at the time, Technician Turner and

6   Cullen were his lead instructor.  As far as

7   who suggested it, I do not recall.

8        Q.      But it was one of the trainers

9   that suggested it to you, right?

10       A.      We -- I believe we had a

11  discussion about it.

12       Q.      And someone suggested to you

13  that they thought he should be removed?

14       A.      I believe so.  I'm not 100

15  percent sure.

16       Q.      Let's see.  During Van Meter's

17  class, the 2017 class, did you guys use

18  distractor bags?

19       A.      Clarify.

20       Q.      I mean, I've seen in the daily

21  reports a reference to distractor bags.  Did

22  you use distractors?

1          A.      Yes.

2          Q.      Okay.  Can you tell me about

3     that?

4          A.      They could be -- when you say a

5     bag, it could be placed in luggage.

6          Q.      Okay.

7          A.      They could be food, anything.

8     It could be articles of clothing.  The

9     distractors could be unlimited what it could

10    be.  What the canine and team may experience

11    in a work environment.

12         Q.      Okay.

13         A.      Where it's not sterile in a

14    training environment.  We want to give a

15    realistic environment training as possible

16    being in a controlled environment.

17         Q.      Could be a Big Mac or two around

18    in a real search, right?

19         A.      Possible.

20         Q.      Okay.  Do you remember in 2017

21    if you used tennis balls as distractors?

22         A.      I do not recall.

1          Q.      Okay.  When you were using a

2    distractor in the 2017 class at least, would

3    you tell the handlers that there's a

4    distractor bag out there or which one was the

5    distractor bag?

6          A.      Not in the early phase.  We

7    would not use a distractor in the early phase

8    of training.

9          Q.      Okay.

10          A.      The distractors would not become

11    in play until the team had advanced further

12    along into the training.

13          Q.      Okay.  And so when distractor

14    bags were used would you tell the handlers

15    where they were?

16          A.      No.

17          Q.      Okay.  Would that sort of defeat

18    the purpose of having a distractor bag?

19                  MS. SCINDIAN:  Objection.  Calls

20    for speculation.

21          A.      It's possible.

22          Q.      In what way?

1          A.      Can you repeat your question

2    again?  I want to make sure.

3          Q.      Why wouldn't you tell the

4    handlers where the distractor bag was?

5          A.      You wouldn't want to tell them

6    where it is -- I don't know how to say this.

7          Q.      Was it that you wanted to see

8    how the team handled the challenge of the

9    distractor bag?

10          A.      We wanted to see if the handler

11    could separate the behavior change in the dog,

12    whether the handler could determine if it was

13    a dog smelling based off of curiosity,

14    investigating versus smelling the trained

15    odor.

16          Q.      Okay.  Random question about the

17    termination memo or the recommendation to

18    remove Officer Van Meter memo that you wrote.

19    So it's exhibit -- exhibit something.

20    Exhibit 1 there it is.  Did you get Cromwell's

21    permission to remove Van Meter before you

22    wrote the memo or after you wrote the memo?

1        A.      I was notified after the memo

2    was written once it worked its way up through

3    the chain, and I'm assuming Lieutenant

4    Cromwell was notified to have me remove Van

5    Meter from the class.

6        Q.      Okay.  So let me just make sure

7    that I get an answer on this specific

8    question.  Did Cromwell give you approval to

9    remove Van Meter before you wrote the memo or

10   after you wrote the memo?

11       A.      After.

12       Q.      Did Cromwell give you approval

13   to write the memo before you wrote it?

14       A.      No.

15       Q.      In your mind you were just

16   talking about the teams get to a point where

17   you're using distractor bags on them, right?

18   They're at the level where you're using

19   distractor bags on them.

20       A.      Okay.

21       Q.      Okay.  For static teams.  At

22   that point in time, what can you -- can you

1    give us a general estimate of what week that

2    normally would be?

3            A.      I cannot.

4            Q.      Okay.  Might change from class

5    to class?

6            A.      It could.

7            Q.      Okay.  Would it be typically

8    after the halfway mark?

9            A.      Again, I can't -- I can't answer

10   that.

11           Q.      Okay.  At that point in time,

12   whatever point in time that is that you're

13   comfortable with using things like distractor

14   bags on the team, can you tell what sort of

15   the worst mistakes a team can make at that

16   point?

17           A.      Clarify.

18           Q.      I mean, I'm assuming that there

19   are a million ways to mess up as a -- as a

20   team in training, right?

21           A.      Again, you have to clarify what

22   is mess up?

1          Q.      Errors, mistakes, things you

2    should not do.

3          A.      Clarify even more.  Things you

4    shouldn't do?

5          Q.      As a trainee.

6          A.      Okay.

7          Q.      Working a dog in a static

8    discipline.

9          A.      Okay.

10          Q.      I'm just trying to figure out is

11    there, like, a hierarchy of mistakes that are

12    more serious than other mistakes that training

13    teams can make in your mind?

14          A.      Understand, but, again, I need

15    you to clarify what you mean by mistakes.

16          Q.      Okay.  So mistakes that I've

17    seen in records and things would be failing to

18    search all the entire search area, right?

19    Missing a trash can.  It would be not seeing

20    that your dog is giving you a final response

21    and pulling your dog away with the leash, you

22    know, making the dog walk.  The odor would be

1    another example.  Another one would be giving

2    your dog a leash correction when your dog is

3    doing something it's supposed to be doing.

4    When it's doing a productive search and you

5    give the dog a leash correction of some kind.

6    These are, as a layperson, mistakes that I

7    feel like I've seen in the videos and in the

8    reports.  Not emptying your dog so that it

9    urinates over a hide.

10          A.     Okay.

11          Q.     Okay.  So are there certain

12   mistakes that are more serious, more

13   problematic in your mind than others?

14          A.     I can't answer that without

15   seeing the exercise.  Without seeing an

16   exercise, I cannot comment on what a handler

17   mistake was.

18          Q.     No, I understand that.  I mean,

19   understand you need to assess, but I'm talking

20   about these categories of mistakes.  Are there

21   any that are, in your mind, more serious than

22   others?

1          A.      I would say multiple handler

2    miss would be detrimental to the team.

3          Q.      And the handler miss is where --

4    that's where the dog essentially did

5    everything the dog was supposed to do, gave a

6    good indication, and the handler did not see

7    it and pull the dog off.

8          A.      It could be.

9          Q.      Okay.  That kind of thing.

10         A.      Could be.

11         Q.      Or the dog gives a strong change

12   of behavior, doesn't give a final response

13   like a sit or a lay down.  It gives a strong

14   change of behavior and instead of letting the

15   dog investigate and get the source, the

16   handler moves on.  That would be a handler

17   miss, too, right?

18         A.      Not sure.  Again, I could -- I

19   can't answer that without seeing the exercise

20   because it could be, but there could be other

21   extenuating circumstances where it's not.

22         Q.      In the event there's no

1    extenuating circumstances, it's a black and

2    white situation like I've described it.  A dog

3    gives a strong change of behavior, handler

4    doesn't notice and continues to walk.

5                    MS. SCINDIAN:  Objection.  Calls

6    for speculation.

7          A.     That could be detrimental to the

8    training process of the team.

9          Q.     And if you see -- and that's a

10   handler miss of the type that if you see

11   multiple of them, it's a problem, right?

12         A.     Yes.

13         Q.     And since that's the one that

14   you mentioned, I'm assuming that that's, in

15   your mind, among the most serious errors that

16   a trainee can make, right?

17         A.     Correct.  In the later part of

18   the training, yes.

19         Q.     Okay.  If you would, take a look

20   at Exhibit 1 and flipping to the -- yeah, to

21   the memo part of it, which is the second page

22   to the end.  You know, from what I see,

1    there's, like, paragraph C is August 9th.  The

2    next one is the 10th and 15, 16, 17, 21, 22,

3    24.  So in your memo it seems like you're

4    highlighting a string of days in which, in

5    your view, Officer Van Meter had bad days,

6    right?

7            A.      My memo is highlighting notes

8    from her daily training sheets of her

9    deficiencies.

10           Q.      And but what I'm -- so what I'm

11   drawn to is, like, between J and K between

12   August 24th and September 5th there's about

13   nine days where you've not made any

14   indication.  You haven't included any notes

15   from any training days during that nine day

16   period of time.  Was that because there wasn't

17   anything significant enough in the training

18   records to include as a justification for

19   removing her?

20               MS. SCINDIAN:  Objection.  Lacks

21   foundation.  Calls for speculation.

22           A.      This is documenting her

1   deficiency through the program.

2          Q.     And so if you -- if you haven't

3   listed a day in the memo, was it that there

4   wasn't a deficiency significant enough to

5   justify or build the case for removal?

6                 MS. SCINDIAN:  Objection.

7   Mischaracterizes the testimony.  Calls for

8   speculation.  Lack of foundation.

9          A.     If it wasn't listed, then the

10  deficiency weren't sufficient enough to be

11  listed.

12         Q.     Okay.  Okay.  So, in other

13  words, between August 25th and September 4th,

14  her -- Van Meter's performance was

15  satisfactory overall?

16                MS. SCINDIAN:  Objection.

17  Mischaracterizes the testimony.  Lacks

18  foundation.  Calls for speculation.

19         A.     Van Meter had good days and bad

20  days.

21         Q.     Okay.

22         A.     In this, list the bad days for

1    reason.  She had more bad days that she did

2    good days, which outweighed her overall

3    performance.

4         Q.    You listed the bad days on the

5    memo, right?

6              MS. SCINDIAN:  Objection.

7    Mischaracterizes the testimony.  Calls for

8    speculation.  Lack of foundation.

9         A.    It was part of the process of

10   writing the memo.

11        Q.    Was to include the bad days in

12   the memo?

13        A.    Correct.

14             MS. SCINDIAN:  Objection.

15   Mischaracterizes the testimony.  Lack of

16   foundation.  Calls for speculation.

17        A.    But also in the memo it states

18   where Van Meter also performed well.

19        Q.    Okay.  August 22nd, 2017 was the

20   day that the dogs were assigned.  Does that

21   sound familiar, or would you like to see a

22   document to confirm that?

1           A.      I'll say okay.

2     (Exhibit 6, document Bate-stamped USCP41 to

3     USCP42, marked for identification.)

4           Q.      All right.  Mr. Phelps, you've

5     been given Exhibit 6.  This one goes from

6     USCP41 to 42.  It's dated August 22nd, 2017,

7     and this is a EOD K-9 training form for

8     Officer Van Meter.  And do you see under the

9     comment section all handlers were assigned a

10    canine today?

11          A.      Yes.

12          Q.      Okay.

13          A.      It's hard to make out for the

14    record.

15          Q.      Yeah.  The quality of the

16    documents produced is not great sometimes,

17    then down below there it says, handler.  This

18    is in the bottom section under that comments.

19    It reads, quote, handler was advised of her

20    performance with the mechanics of working a

21    canine and she needs to improve.  If she

22    doesn't, this will hinder the K-9 team from

1    progressing, then a recommendation will be put

2    forward through the chain of command to remove

3    her from the training program.  Did you write

4    that language?

5            A.     I do not recall if I wrote that

6    language.

7            Q.     Okay.  So you may have?

8            A.     I don't recall.

9            Q.     You don't recall either way?

10           A.     Correct.

11           Q.     Okay.  Okay, but does this

12    confirm for you that dogs were assigned on the

13    22nd of August?

14           A.     Yes.

15           Q.     Okay.  And did the team split up

16    on that same day?

17           A.     I do not recall.

18           Q.     Do you think that the teams

19    continued to train altogether after the dog

20    assignment?

21           A.     I believe so because imprinting

22    was still ongoing.  Was this week three?  Week

1    three or week four.  So imprinting was still

2    ongoing.

3          Q.     Okay.  So all the teams would be

4    together until the imprinting was over?

5          A.     Correct.

6          Q.     PBIED and static?

7          A.     Correct.

8          Q.     Okay.  How long does the

9    imprinting process last?

10         A.     I'm not 100 percent sure.

11   Probably five, six weeks tops.  Depends on the

12   progress of the team.  The progress of the

13   class.

14   (Exhibit 7, schedule, marked for

15   identification.)

16         Q.     Mr. Phelps, you've now been

17   given Exhibit 7.  This one goes from Van Meter

18   17 to 26.  Do you recognize this as the

19   schedule that was issued to the trainees in

20   Van Meter's class?  There's some handwritten

21   notes on there that are Van Meter's, but aside

22   from those handwritten notes, do you recognize

1    this as the schedule?

2         A.     It appears to be a schedule.

3         Q.     Does this schedule help you or

4    using this schedule, can you tell us when the

5    teams were split into the PBIED versus static?

6    I don't mean to cheat here, but if you look at

7    Van Meter 21 on 9/6.

8         A.     Again, I do not recall.

9         Q.     Do you see that on September

10   6th, 2017 --

11        A.     Yes.

12        Q.     -- at noon it says, PBIED K-9

13   detection course?

14        A.     Yes.

15        Q.     Is that an indication that's

16   when the PBIED course started or was scheduled

17   to start at least?

18        A.     It's an approximate date.

19        Q.     Okay.

20        A.     When it could begin because this

21   is merely a guide.

22        Q.     Yeah.  So it may have changed --

1  it may have changed as the course got

2  underway?

3          A.      Correct.

4          Q.      But at the beginning of the

5  course, that was the plan?

6          A.      Correct.

7          Q.      All right.  And so all of the

8  teams, regardless of whether they were

9  ultimately assigned PBIED or static, would

10  have been working together up until the time

11  the PBIED class actually started?

12          A.      Correct.

13          Q.      All right.  I want to direct

14  your attention to September 5th, 2017.  Before

15  I show you any documents, can you remember the

16  training day of September 5th, 2017?

17          A.      No.

18  (Exhibit 8, EOD K-9 training form, marked for

19  identification.)

20          Q.      Okay.  Okay.  Mr. Phelps, I've

21  given you now what's been marked Exhibit 8.

22  This one goes from USCP2983 to 2984 and it is

1    September 5, 2017, EOD K-9 training form for

2    handler one, which is Dantinne.  Would you

3    review the document and then I'll ask you what

4    you remember about the day after you refresh

5    your recollection with the document?

6          A.    Okay.

7          Q.    Okay.  Just let me know when

8    you're finished.

9          A.    Okay.

10         Q.    Okay.  Now, without actually

11   looking at the document, and you can even flip

12   it over to prove it, do you remember this day?

13         A.    No.

14         Q.    All right.  Take a look at the

15   second page of the document.  Your signature

16   on the instructor signature line --

17         A.    Yes.

18         Q.    -- comes first.

19         A.    Yes.

20         Q.    Is that an indication that you

21   wrote the report?

22         A.    Yes.

1        Q.      Okay.  And down under

2    supervisor's comments, did you write that

3    language?

4        A.      I belive so.

5        Q.      Okay.  Would anyone else have

6    written in the supervisor's comments block

7    besides you?

8        A.      No.

9        Q.      Okay.  You say in that

10   supervisor's comment section, meet with the

11   class after watching five of the six handlers

12   conduct searches on hide number one and two.

13   I let it be known to each class member that

14   their performance today after two training

15   hides was unacceptable.  The thing that tech

16   Cullen and I are seeing are unacceptable for a

17   class starting week five.  I told the handlers

18   that I needed 100 percent -- 110 percent and

19   I'm not getting it after a four day weekend.

20   If there's a handler that can't give me 110

21   percent and don't want to be here, then I'll

22   write him or her out of the program.  I ask

1    the class, was there any questions regarding

2    what is expected of them?  There were no

3    questions.  You don't remember giving that

4    talk to the class?

5            A.      No.

6            Q.      Do you remember who the five out

7    of the six handlers that conducted the first

8    two hides that prompted you to have that

9    discussion with the class?

10           A.      No.

11           Q.      If you take a look at the front

12   page and look at the description of Dantinne's

13   performance on those two hides, does that

14   refresh your recollection?

15           A.      No.

16           Q.      Do you remember on this day

17   pulling Mike Riley aside and telling him in

18   particular that his performance was

19   unacceptable?

20           A.      No.

21           Q.      Do you remember ever doing that

22   with Riley during this class?  During the 2017

1    class?

2           A.     No.

3           Q.     Do you remember having a talking

4    to with Kenny Hill the following day about

5    where this class was in its progression?

6           A.     No.

7    (Exhibit 9, EOD K-9 training form, marked for

8    identification.)

9           Q.     Okay.  This is nine.  Okay.  Mr.

10   Phelps, you've now been given Exhibit 9.  This

11   one goes from USCP478 to 479 and it's dated

12   September 5th, 2017.  It's EOD K-9 training

13   form for handler three, which is Mike Riley.

14          A.     Okay.

15          Q.     Based on what you see in the

16   form, are you the one that drafted it?

17          A.     Yes.

18          Q.     Okay.  And that's because your

19   signature comes first under the instructor

20   signature line?

21          A.     That is correct.

22          Q.     Okay.  And if you take a look on

1    the first page, three lines up from the top or

2    from the bottom.  I'm sorry.  In the comment

3    section it says, quote, Tech Cullen and

4    Sergeant Phelps met with Officer Riley

5    explaining he needs to step up his performance

6    during these times when the training exercise

7    are known to the handler is when the handler

8    should notice the change of behavior from the

9    canine and condition the sit at the training

10   aid.  Officer Riley acknowledged his

11   performance this morning wasn't where it

12   needed to be.  Does that refresh your

13   recollection of the events of that day?

14        A.     No.

15        Q.     And do you remember having that

16   conversation with Riley at all?

17        A.     No.

18        Q.     Taking a look at the description

19   of the first two hides on that page, USCP478,

20   does that refresh your recollection as to any

21   of the handlers?  The five of six handlers

22   that perform searches on hides one and two,

1    which then led you to have that stern talking

2    to the class?

3          A.     No.

4          Q.     Okay.  If the training day on

5    the fifth was as bad as described in the

6    training form dated the fifth, can you explain

7    why you didn't mention it in your September

8    7th e-mail to Cromwell that the entire team

9    had performed badly on September 5th?

10         A.     I'm not sure I understand your

11   question.

12         Q.     I'll repeat it.

13         A.     Okay, because I think it was

14   clear.  If the whole class had performed as

15   badly as the records that we just read

16   indicate, the records that you drafted

17   indicate from September 5.

18         Q.     Okay.  Can you explain why in

19   your September 7 e-mail to Cromwell, you did

20   not mention the overall classes on acceptable

21   performance?

22         A.     I do not recall why I didn't.

1          Q.     Can you explain why if you

2    indeed had the talk, specific talk to Officer

3    Riley --

4          A.     Okay.

5          Q.     -- on the 5th of September, can

6    you explain why you did not mention that to

7    Cromwell in your September 7th e-mail?

8          A.     I do not recall.

9          Q.     All right.  Give me one sec to

10   get the video screen operational.  Anybody

11   need to take a break?  Might as well.

12              MS. SCINDIAN:  I suppose this is

13   a good time.

14              MR. ALDERMAN:  Yeah, good time.

15   (Short recess.)

16          Q.     I should've asked earlier, do

17   you prefer sergeant or Mr. when I address you?

18          A.     Doesn't matter.

19          Q.     Okay.  I think I'll keep using

20   Mr.  Just for consistency sake, I'm going to

21   continue with that.

22              I'm going to show you a video from

1   September 7th, 2017.  You'll see at the top

2   it's USCP2475.  That's the Bates number that's

3   been assigned to the video.  Okay?

4         A.    Okay.

5         Q.    I'm assuming that you don't

6   remember the specific training exercises from

7   September 7th, 2017?

8         A.    Safe to say, yes.

9         Q.    I have that about right.  Okay.

10   So let you watch the video, and then I'll ask

11   you questions after.

12         A.    Okay.

13         Q.    Okay.

14   (Video started.)

15            SPEAKER:  Were prepared for the

16   next (inaudible) Arizona (inaudible) property.

17            THE WITNESS:  No.  No.

18            SPEAKER:  All right.  He's going

19   over here.  Keeps sitting over here.

20            SPEAKER:  Okay.

21            SPEAKER:  Something in this room

22   that --

1                    SPEAKER:  Okay.  Where haven't

2    you searched?

3                    SPEAKER:  If there was anywhere

4    in this room being a small room (inaudible)

5    travel because you can literally pretty much

6    reach across the room with your arm out and

7    the leash extended.  However, there's a

8    portion of this room that you have not

9    searched.

10                   SPEAKER:  No.  It'd be closer

11   towards me.

12                   SPEAKER:  It's called a

13   bathroom.

14   (Video was stopped.)

15        Q.    Okay.  Mr. Phelps, can you tell

16   us where that exercise occurred?

17        A.    It appears to be the Blue Crabs

18   Stadium.

19        Q.    Okay.  And can you tell what the

20   exercise was supposed to be?

21        A.    No.

22        Q.    At one point in time you say,

1   we're having you search today.  I'm sorry.  Do

2   I have it right that we heard your voice in

3   that training exercise?

4           A.      I believe so.

5           Q.      Okay.  You and Tim Cullen,

6   right?

7           A.      Correct.

8           Q.      Okay.  Now, at some point in

9   time, one of the trainers says, we are having

10  you search, right, to Dantinne?

11          A.      I did not hear that.

12          Q.      Playing back at two minutes 27

13  seconds.

14  (Video started.)

15              SPEAKER:  However, there's a

16  portion of this room that you have not

17  searched.

18  (Video stopped.)

19              MR. ALDERMAN:  Have to go

20  backwards.  One minute.  Starting at two

21  minutes.  He's going over.  Keeps sitting over

22  here.

1     (Video played.)

2                    SPEAKER:  Okay.  Something in

3     this room that --

4                    SPEAKER:  Okay.  Okay.  Where

5     haven't you searched?

6     (Video stopped.)

7          Q.     Okay.  Was that you that said,

8     where haven't you searched?

9          A.     Yes.

10         Q.     So was Dantinne's job to then

11    independently either clear the room or specify

12    where the hide was?

13         A.     No.

14         Q.     Okay.  What was -- what was his

15    task?

16         A.     His task was from what I see

17    from the video.

18         Q.     Yeah.

19         A.     My comment was to search the

20    room.  He searched the room, but he did not

21    search a room.

22         Q.     The bathroom?

1          A.     Correct.

2          Q.     Okay.  And he didn't search the

3     bathroom until the trainers pointed that out

4     to him, correct?

5          A.     I believe so.

6          Q.     Okay.  And so if you were

7     scoring or if you were writing this up on a

8     daily training form of the type that we've

9     seen today, the EOD K-9 training forms, how

10    would you list that search for Dantinne?

11         A.     I'd have to see the entire

12    search be completed before I can give them a

13    fair grading.

14         Q.     Well, if that search -- if that

15    room was one of the listed searches, how would

16    you grade that, the search of that room?

17         A.     I would have to see the entire

18    exercise complete before I can make an opinion

19    on that on his performance.

20         Q.     Why would you have to see more

21    than the performance of his search of that

22    room?

1     A.     Because I don't know what the

2  exercise was.  I need to see the entire

3  exercise in order to come to a conclusion.

4     Q.     Well, you can come to the

5  conclusion that he failed to search the

6  bathroom, right?

7     A.     It appears that he failed.  It

8  appears he failed to search the bathroom.

9     Q.     Okay.  And is that a handler

10 mistake?  If the handler fails to search a

11 part of the search area, is that typically a

12 handler mistake?

13          MS. SCINDIAN:  Objection.  Vague

14 and ambiguous.

15     A.     Not really.

16     Q.     Why not?

17     A.     Because he's reading the dog

18 conditioning as a sit.  Like, if the dog is on

19 odor.  We don't know if the dog's on odor.

20 The dog could be absolutely correct because

21 the odor could travel from the bathroom wall

22 into the cabinet and pull, which is then being

1    released at the bottom in the seams of the

2    cabinet doors.  I don't know if the dog's

3    correct.  The dog could be 100 percent

4    correct.  I don't know that until I watch him

5    search the bathroom and then the others that

6    came before him or after him.

7            Q.     Okay.  What you know is that

8    Dantinne did not search the bathroom, right?

9            A.     Correct.

10           Q.     Okay.  Is failing to search the

11   bathroom in this particular search a mistake?

12           A.     If he leaves the room, yes.

13           Q.     Okay.  Now, you guys stopped him

14   from leaving the room and informed him that he

15   hadn't searched the entire search area, right?

16           A.     No.

17                  MS. SCINDIAN:  Objection.

18           Q.     Before he could do anything,

19   whether it's to leave the room or search for

20   five more minutes, the trainers told him that

21   he failed to search the bathroom, right?

22           A.     The trainers advised him that

1    there's one part of the room he has not

2    searched.

3          Q.      And then one of the trainers

4    said, I really have to go to the bathroom.

5          A.      Okay.

6          Q.      Or I really have to pee and then

7    so did they -- did the trainers, you and

8    Cullen, indicate where he had failed to

9    search?

10          A.      I don't know what Cullen meant

11    by that.  Just based off what I see, he did

12    not search the bathroom.

13          Q.      Okay.  And the handlers are

14    taught when they enter a room to search

15    clockwise from left to right, right?

16          A.      Correct.

17          Q.      And so the first thing he

18    should've searched was the bathroom?

19                MS. SCINDIAN:  Objection.  Lack

20    of foundation.

21          Q.      Right?

22          A.      No.

1          Q.      Well, the bathroom was

2    immediately to his left upon entering the

3    room, right?

4          A.      Correct.

5          Q.      Okay.  So it's among the first

6    things that he should have first searched,

7    right?

8                  MS. SCINDIAN:  Objection.  Lack

9    of foundation.

10         A.      Correct.  I mean, negative.  No.

11         Q.      Why no?

12         A.      Because the bathroom door was

13   closed.  It's closed off from that room.  It's

14   a part of it, but it's closed off from the

15   room.  He searched the room.

16         Q.      Okay.

17         A.      The bathroom door was closed, so

18   that's a separate room at that point.  He

19   searched the room.  The dog gave an indication

20   of sit.  Is the dog right?  Is the dog wrong?

21   We don't know yet because we talk -- I just

22   explained odor travel.

1          Q.      Yeah.   So if someone else made

2     the same mistake, if Van Meter -- if she was

3     confused by her dog sitting in the same

4     location, you would say that's a -- that's a

5     reasonable mistake, right?

6                     MS. SCINDIAN:   Objection.  Vague

7     and ambiguous.  Calls for speculation.

8          A.      No, because we have to look at

9     the entire training exercise.  If three dogs

10    come in here and sat right in that spot, it's

11    very unlikely three dogs are wrong.  It's

12    indicated to me odor is traveling from the

13    bathroom through the walls into the corner

14    into the cabinet and fallen.

15         Q.      Okay.  Very unlikely that three

16    dogs would be wrong, right?

17         A.      It's highly unusual.

18         Q.      Okay.

19         A.      But could happen.

20         Q.      Okay.  And so Dantinne -- let's

21    assume the three dogs sat right there in front

22    of the cabinets, then it's reasonable for

1    Dantinne to conclude that his dog is actually

2    sitting on odor, right, on the source?

3                    MS. SCINDIAN:  Objection.  Calls

4    for speculation.  Lack of foundation.

5          A.    I don't know.  I don't know what

6    Dantinne's thinking.

7          Q.    You're the trainer?

8          A.    Correct.

9          Q.    You're the one that gets to

10   decide if it's a good job or a bad job?

11         A.    Correct.

12         Q.    So in your mind as the trainer

13   and the head of K-9 training, is it reasonable

14   for Dantinne -- assuming that three dogs sit

15   in the same place, is it reasonable for

16   Dantinne to conclude that his dog is sitting

17   on source?

18                    MS. SCINDIAN:  Same objection.

19         A.    I don't know if it's source.  It

20   could be odor because I know based off where

21   the hide is actually placed, so I know where

22   the hide is.  So as the dogs are coming in

1    they're sitting.  Why?  Because could be

2    airflow.  Could be odors traveling, pulling in

3    that area.

4            Q.      My question is, is it reasonable

5    for Dantinne to believe that his dog is

6    sitting on source?  He doesn't know where the

7    hide is, right?

8            A.      That's correct.

9            Q.      But his dog is showing a strong

10   indication right there in front of the

11   cabinets, right?

12           A.      I wouldn't say it's strong.

13           Q.      Okay.  Was there change of

14   behavior there or not?

15           A.      Very weak.  Very minimal change

16   of behavior.

17           Q.      Okay.  So what does that mean

18   for Dantinne's performance?  He's taught to

19   look for good recognizable change of behavior,

20   right?

21           A.      Correct.

22           Q.      Okay.  And then you said this

1  was weak change of behavior?

2          A.      For me the dog gave a weak

3  change of behavior.  Dantinne did well to

4  recognize the weak change of behavior.

5          Q.      Okay.  So Dantinne did well to

6  recognize the week change of behavior and

7  questioned whether the source was at the

8  cabinets?

9          A.      Correct.

10         Q.      Okay.  Now, was his search

11  pattern -- so searching the main part of the

12  room before searching the bathroom, was that

13  also how they're -- how the trainees are

14  taught to conduct this search, given that the

15  bathroom door was closed?

16         A.      Yes.

17         Q.      Okay.  So they're not taught to

18  open the bathroom door and search from left to

19  right into the bathroom and they come back out

20  continuing the left to right pattern?

21         A.      They are taught that, as well.

22  However, the handler has to assess what he

1    has, formulate his plan, and then execute it.

2    He walked in.  The bathroom door was closed.

3          Q.     Did he search the seams of the

4    door before moving on?

5          A.     I don't think so.

6          Q.     Okay.

7          A.     Because I think we're taught to

8    -- we teach them to -- before you make entry

9    into that room, you search the door.  Door

10   seams.

11         Q.     Well, if the door is closed,

12   then should he have just skipped over it and

13   not searched the door at all?  Just like, you

14   know, jumped over the door and continued

15   searching the club room?

16              MS. SCINDIAN:  Objection.

17   Mischaracterizes testimony.

18         Q.     Or should he have searched the

19   door as he's -- as he's continuing his left to

20   right pattern?

21         A.     The way he conducted his search

22   is how we teach it is the room, the bathroom

1   is a separate room at this point because the

2   door is closed.  It's not -- in technical

3   forms it is part of the room, but it's a

4   closed off room.  So he searched the open area

5   within that room, the main room, then from

6   there he can move into the next room.

7           Q.      So when a handler is searching a

8   hallway that has a locked door, is the handler

9   supposed to search the door as the handler

10  walks down the hallway?

11          A.      If he's clear in the hallway,

12  yes.

13          Q.      Okay.  And so what would that

14  door search look like?

15          A.      He would present the seams.

16          Q.      The seams of the door,

17  underneath the door, the door handle, and then

18  the door seams, right?

19          A.      He would present the door seams.

20  Those are the odor release point.  Not

21  necessarily the handle.

22          Q.      Okay.  What are the -- what are

1  the door seams then?

2          A.      The hinge side, the left side,

3  the lower part and the right side.

4          Q.      But you're saying he shouldn't

5  have done that in this particular search?

6                  MS. SCINDIAN:  Objection.

7  Mischaracterizes the testimony.

8          Q.      That's not what he would be

9  taught to do?  Assuming that he's not going to

10  open the bathroom and do that as part of his

11  initial search, should he have searched the

12  door in the manner that you just described?

13          A.      It's subjective.  It's his

14  search.  He's given the tools.  How he gets

15  there will be critiqued.

16          Q.      And that's what I'm asking you

17  to critique.  Should he have searched the door

18  as he passed it?

19          A.      Not necessarily.

20          Q.      Okay.  Now, when he did open the

21  door, I believe it was you that said that he

22  forgot to search the door?

1          A.      Correct.

2          Q.      What was that?  What was that?

3     What did he miss?  What did he fail to do?

4          A.      As we discussed earlier, he

5     failed to present odor release points on the

6     door.  The hinge side seam, the lower part of

7     the door and the right side seam.

8          Q.      Okay.  Does that go to -- does

9     that go to search mechanics?

10         A.      It goes to search techniques.

11         Q.      Techniques.  Okay.  Now, someone

12     also made a comment when the dog was sniffing

13     the high table to let the dog do the work.

14     Something of that nature.  You remember that?

15         A.      No.

16         Q.      All right.  Starting again at 51

17     seconds.

18     (Video played.)

19              SPEAKER:  This way.  He's

20     working on being prepared for the next.

21     (Video stopped.)

22         Q.      Okay.  I believe that was

1    Cullen.  He said he's working something.

2    Being prepared for the next.  What's that a

3    reflection of?

4            A.      I don't underst -- clarify.

5            Q.      Why did Cullen say he's working

6    something.  Be prepared for the next?

7                    MS. SCINDIAN:  Objection.  Calls

8    for speculation.

9            A.      He's working something.  Could

10   be odor.  Be prepared for your next item to

11   search.

12           Q.      The dog was working something,

13   right, and Dantinne was trying to get the dog

14   to do something else, correct?

15           A.      I don't know if the dog was

16   working.  The dog looked very disinterested

17   and just walking and smelling.

18           Q.      Okay.  Well, one of the trainers

19   Cullen said he's working, right?

20           A.      Okay.

21           Q.      Did you hear that?

22           A.      I heard that.

1          Q.      Okay.  And at the time that the

2    dog was doing what Cullen described as

3    working, Dantinne was trying to redirect the

4    dog's attention to another part of the room,

5    right?

6          A.      I'm not sure that I saw that.

7    It's about -- it's semantics because what

8    Timmy is seeing is not what I'm seeing.

9          Q.      Okay.  So you disagree with the

10   instruction that Tim gave to Dantinne?

11         A.      I don't want to disagree because

12   that's how he observed it.  I'm observing it

13   something different.

14         Q.      What are you observing?

15         A.      I'm seeing the dog is smelling.

16   Not necessarily working, as we talked about

17   earlier, investigate versus a change of

18   behavior when he's actually on odor.

19         Q.      And so what did you see

20   investigating?

21         A.      I saw him smelling,

22   investigating.

1          Q.      Okay, but when a dog is

2    investigating, should you let the dog

3    investigate?

4          A.      Yes.

5          Q.      Okay.  Was there a point in time

6    in this training class that Dantinne wasn't

7    allowed to reward his own dog?  That the

8    reward had to come from a third person?

9          A.      I think there was an issue with

10   the dog coming out of the finished position to

11   sit because the dog is looking at the handler

12   for the reward.  So they're to get the dog to

13   stop concentrating on Dantinne.  The reward

14   was coming from somewhere else.

15         Q.      And was the dog focusing on

16   Dantinne because Dantinne was slow to get the

17   reward out?

18         A.      No.

19         Q.      Dantinne wasn't doing anything

20   wrong?

21         A.      You said Dantinne slow to get

22   the reward out.

1       Q.      Was the dog focused on Dantinne,

2    and as a result, another person had to give

3    the reward because of something Dantinne was

4    either doing or failing to do?

5       A.      No.

6       Q.      Okay.  So, again, Dantinne was

7    doing everything right in the rewarding

8    process?

9       A.      I didn't -- I didn't see that,

10   nor did I -- I didn't say that, nor did I see

11   that.

12      Q.      Was there any issue, any problem

13   that Dantinne had in the rewarding process

14   that led to someone else having to give his

15   dog the reward?

16      A.      I do not recall.

17      Q.      Okay.  So if you were writing

18   this report, if you were writing a daily

19   report for Dantinne on the search that we just

20   saw in USCP2475, would you have made any kind

21   of remark about his failing to search the

22   bathroom in the report?

1              MS. SCINDIAN:  Objection.  Calls

2  for speculation.

3         A.     I don't recall.

4         Q.     No.  No.  Would it have been

5  your practice to make a notation that Dantinne

6  didn't search the bathroom?

7              MS. SCINDIAN:  Objection.  Calls

8  for speculation.  Vague and ambiguous.

9         A.     It's possible.

10        Q.     Okay.  All right.  I'm showing

11 you now 2477.  USCP2477.

12        A.     Mr. Alderman, was the other one

13 2476?

14        Q.     Seventy-five.

15        A.     Seventy-five.  Okay.

16        Q.     And playing now.

17 (Video played.)

18              SPEAKER:  Search.  Stay.  No.

19 Search.  Stay in there.  Don't look at him.

20 Walk away.  Give him the command again.

21 Search.  Search.  Search.

22              SPEAKER:  Why you doing that?

1    What change of behavior did he show?

2                    SPEAKER:  When he was right

3    there?

4                    SPEAKER:  Yeah.

5                    SPEAKER:  He sat.

6                    SPEAKER:  Oh, he sat there.  Sat

7    there.

8                    SPEAKER:  I mean, the work.

9    We're looking for the work.  There was no work

10   from him.

11                   SPEAKER:  Change of behavior.

12                   SPEAKER:  Let's try this again.

13   (Video stopped.)

14        Q.    Okay.  Now, I'm stopping the

15   video at one minute 36 seconds.  What are you

16   seeing?  Riley seems confused about something

17   in that first part of the video.  And can you

18   tell me what he is misunderstanding?

19        A.    I can't tell you what he's

20   misunderstanding.

21        Q.    What are you counseling him

22   about, you and Cullen?

1          A.      I don't recall what we were

2    counseling him about.  I can only tell you

3    what I see today on that video.

4          Q.      Okay.  What do you see today on

5    the video?

6          A.      Based off the previous video I

7    was shown, now this -- there's clear to me

8    that there's odor release coming from that

9    corner because there's two dogs that come in

10   and sat as they were trained -- as they are

11   trained to do.  Now, the dog is confused

12   because we're telling him, no, keep searching.

13   Now, the dog is, I've already smelled it.  I'm

14   conditioned to sit and I'm not getting my

15   reward.  So he's confused.

16         Q.      Okay.  So is this then a -- if

17   Riley is the second team to come through and

18   just going to -- you see this number MVI_0072?

19         A.      Okay.

20         Q.      For Riley's video, which is

21   247-- USCP 2477.  Now, here's Dantinne's video

22   2475 and it has the MVI number MVI_0068.

1          A.      Okay.

2          Q.      Does that tell you that

3   Dantinne's search occurred before Riley's

4   search?

5               MS. SCINDIAN:  Objection.  Calls

6   for speculation.

7          A.      I don't know.  Based on numbers?

8          Q.      Yes.

9          A.      Probable.

10         Q.      Okay.  Based on what you were

11  testifying earlier with the -- with the

12  numbers generated for each video, this is what

13  you went on when you decided which video was

14  the first in a day, right?

15         A.      Correct, but also said I'm not a

16  data expert either.

17         Q.      Right.  That's fine.  What you

18  believe indicates the order of the videos?

19         A.      Correct.

20         Q.      Okay.  And so based on what

21  you're seeing right now, is it your

22  understanding that Riley came second?

1          A.      It appears.

2                  MS. SCINDIAN:  Objection.  Calls

3     for speculation.

4          Q.      All right.  And I'm going to

5     just show you 2420 real quick, which I'll

6     represent to you is Van Meter's search of the

7     same room and it bears the MVI number 77.

8          A.      Okay.

9          Q.      So you have Dantinne with

10    MVI_68.

11         A.      Okay.

12         Q.      Riley with MVI_72 and Van Meter

13    with 77.

14         A.      Okay.

15         Q.      Is it your understanding, based

16    on what your testimony was earlier, that Van

17    Meter would've been -- would have come after

18    both Dantinne and Riley on this search?

19                 MS. SCINDIAN:  Objection.  Calls

20    for speculation.

21         A.      Based off the number category

22    and order sequence order, yes.

1        Q.      Okay.  And you guys use that

2    sequence order during the training class,

3    right, to determine which videos to show

4    first?

5        A.      It depends on how it's populated

6    on the -- it's downloaded from the camera onto

7    the system.

8        Q.      But these are -- this MVI number

9    is the number that you were referring to

10   earlier when we talked about which videos you

11   would show first, correct?

12             MS. SCINDIAN:  Objection.

13   Mischaracterizes testimony.

14       A.      If they're in numerical order,

15   then yes.

16       Q.      Okay.  So I think I get back to

17   Riley's search.  Okay.  Based on what you've

18   seen so far in these two searches, the

19   Dantinne search and then the Riley search,

20   what you see today is that you think that the

21   odor was coming from the bathroom and out the

22   cabinets, right?

1          A.      Correct.

2          Q.      Okay, but Riley also didn't

3    search the bathroom first, right?  He searched

4    the main room without searching the bathroom?

5          A.      That's correct.

6          Q.      So far.

7          A.      Based off of what our earlier

8    discussion was about searching and the room

9    versus being broken off.

10          Q.      Okay.  Now, Riley has now left

11    the room, right, and he said something like,

12    let's do this again.  Was that okay?

13          A.      Yes.

14          Q.      To have a reset and, you know,

15    get your composure and then start the -- start

16    the search again?

17          A.      Yes.

18          Q.      Okay.  So if Van Meter had done

19    the same thing, would you have made a negative

20    comment about it in the daily report?

21                  MS. SCINDIAN:  Objection.  Vague

22    and ambiguous.  Calls for speculation.

1          A.      Clarify negative.

2          Q.      Would you have made a notation

3    about it and restarted search?

4          A.      It's probable.

5          Q.      If Riley did it and Van Meter

6    did it, would you have made a notation for

7    both of them?

8               MS. SCINDIAN:  Objection.  Calls

9    for speculation.

10         A.      It's possible.

11         Q.      Is there any reason why you

12   wouldn't notate Riley's, but you would notate

13   Van Meters?

14              MS. SCINDIAN:  Objection.  Calls

15   for speculation.

16         A.      No.

17         Q.      Okay.  Starting again at 136.

18   Sound will come, I think.  Starting at 121.

19   Now, hopefully the sound will catch up with

20   us.

21   (Video played.)

22              SPEAKER:  The work.  We're

1    looking for the work.  There was no work from

2    him.

3                    SPEAKER:  Change of behavior?

4                    SPEAKER:  Sat there.

5    (Video stopped.)

6         Q.     Pausing it again at one minute

7    and 32 seconds.  Both you and Mr. Cullen have

8    told Riley in this clip of the video that his

9    dog did not show any change of behavior,

10   correct?

11        A.     I don't know if I said changed

12   behavior.  I said work.

13        Q.     You said there was no work?

14        A.     Correct.

15        Q.     Right.  And do you mean -- what

16   do you mean by work?

17        A.     The dog is -- the dog appeared

18   to smell.  The dog appeared to smell and

19   investigating versus aggressively searching on

20   his own or being when the handler was

21   presenting to search an area.

22        Q.     So he didn't show a change of

1    behavior that showed that he was working the

2    odor, right?

3           A.      Not necessarily the way you

4    characterize your question.

5           Q.      Okay.  What's the connection

6    between work and change behavior?

7           A.      The dog, as I said earlier,

8    aggressively searching.  If you could play the

9    video again, it will show the dog was more

10   walking around being, if I recall correctly,

11   guided by Riley.

12          Q.      Okay.  And not showing the kind

13   of change of behavior that you would associate

14   with the dog being either on odor or close to

15   odor?

16          A.      Correct.  Knowing that the aid

17   was placed in the bathroom.

18          Q.      Okay.  Okay.  Playing again from

19   one minute 32 seconds?

20   (Video played.)

21                  SPEAKER:  No.  There ain't

22   nothing in the cabinets.  It would have been

1   odor travel.

2                   SPEAKER:  Search.  Search.

3   Search.

4                   SPEAKER:  Now, he may be on

5   odor, but there's one area you have not even

6   entered.

7                   SPEAKER:  When we searched in

8   the bathroom.

9   (Video stopped.)

10          Q.     Okay.  Is it the case that Riley

11  also didn't check the bathroom until he was

12  told by the trainers to do so?

13          A.     Yes.

14          Q.     Okay.  Now, when he checked the

15  bathroom, he failed to correctly check the

16  door, right?

17          A.     Yes.  However, on earlier search

18  he did present low on the door when he went

19  through the second time.

20          Q.     Okay.  Someone made a comment.

21  It helps if you check the door.

22          A.     I did not hear that.  It wasn't

1   me.

2          Q.     Okay.  Now, then Riley enters

3   the bathroom does a search and then leaves the

4   bathroom, right?

5          A.     Appears.

6          Q.     And only goes back to the

7   bathroom and finds the hide when the trainer

8   prompts him to do so, correct?

9          A.     It appears so.

10         Q.     Okay.  So how would you grade

11  that exercise for Riley?  Fine, trainer

12  assist, hit or miss?

13                MS. SCINDIAN:  Objection.  Calls

14  for speculation.

15         A.     Based on what I see there, it

16  could go as a trainer assist.

17         Q.     Okay.  What else could it be?

18         A.     I would go with trainer assist.

19         Q.     Trainer assist.  Now, when the

20  team searched the cloakrooms in the -- at this

21  ballpark, was there a rule that they were not

22  supposed to check high up on the walls?  You

1   remember that?

2          A.      I don't recall.

3          Q.      Okay.  Based on what you saw in

4   that video, would you say that Riley was

5   failing to correctly read his dog's behavior?

6          A.      No.

7          Q.      How about when he sat at the

8   ledge far away from the -- from the cabinets

9   and Riley went to reward him?

10         A.      No.

11         Q.      Not a misread?

12         A.      No.  The dog's confused.

13         Q.      Okay.  Agree that confusion

14  could have been avoided if Reilly had searched

15  the bathroom first?

16                 MS. SCINDIAN:  Objection.  Calls

17  for speculation.

18         A.      No, I don't agree.

19         Q.      If Riley had searched the

20  bathroom first in the left right pattern and

21  if he had searched it effectively, then he

22  would have found the hide behind the toilet,

1   right?

2                  MS. SCINDIAN:  Objection.  Calls

3   for speculation.

4        A.     If he would have gotten -- if he

5   would have searched the bathroom, searched the

6   commode --

7        Q.     Yeah.

8        A.     -- and the dog responded, could

9   have.

10       Q.     Okay.  I'm going to show you a

11  search from this one from September 12th,

12  2017, and I believe you'll see this is at the

13  Laurel Racetrack.  This is 2804.  USCP 2804.

14  I'm assuming you don't remember this, so I'm

15  going to show it to you.

16       A.     Okay.

17       Q.     Unless you say, oh, no, I

18  remember everything about it.  Okay.

19  (Video played.)

20                  SPEAKER:  Walk in.  Sit first.

21  In and outs.  (Inaudible.)

22                  SPEAKER:  I didn't see any.

1    (Video stopped.)

2         Q.    Stopping the video at three

3    minutes and four seconds.  And just to

4    describe it for the -- for the record, let's

5    see.  Riley's dog has gone into one of these

6    bathroom stalls in the men's bathroom.  Are

7    you present for this search?  Are you

8    observing?

9         A.    I think I'm observing from the

10   outside.  I saw my -- saw myself.

11        Q.    In the video, right?

12        A.    Correct.

13        Q.    Okay.  So -- and it was you and

14   Kenny Hill, correct?

15        A.    That I saw, not counting the

16   camera operator.

17        Q.    Do you know who was the camera

18   operator?

19        A.    No.

20        Q.    Okay.  And -- okay.  The dog did

21   -- went into the stall and as Riley was moving

22   towards the next stall, the dog sat, right?

1          A.      Okay.

2          Q.      You agree with my

3    characterization?  You don't have to.  I mean,

4    there's a correction.

5          A.      The dog did sit.

6          Q.      Okay.  And then Mike Riley

7    started to reach to reward the dog, right?

8          A.      It appears.

9          Q.      And the trainer called him off?

10         A.      It appears.

11         Q.      And then Riley said, I didn't

12   see any change of behavior and then Kenny Hill

13   says, what.  Then what'd you reach in your --

14   what'd you reach into pocket for, right?

15         A.      Okay.

16         Q.      Did you hear that and see all

17   that?

18         A.      I think so.

19         Q.      Okay.  Do you think Mr. Riley

20   was not being truthful about what he saw or

21   didn't see?

22         A.      I can't comment on what he saw.

1          Q.      I'm asking you about your

2    perception.  Did you think that Riley was not

3    being truthful?

4          A.      Again, I cannot comment on what

5    Riley saw, perceived or anything.

6          Q.      Did you ever doubt Riley's

7    truthfulness when speaking to the trainers?

8          A.      I had no reason not to.

9          Q.      You had no reason to doubt him?

10         A.      No, to not doubt him.  To trust

11   him.

12         Q.      Say it one more time so there's

13   no confusion.

14         A.      I have no reason not to doubt

15   whether he was truthful based off your

16   question.

17         Q.      Let me just characterize it for

18   the record.  You had no reason to doubt that

19   he was being truthful?

20         A.      Correct.

21         Q.      Okay.  You did not doubt his

22   honesty?

1          A.      Correct.

2          Q.      Okay.  Did you ever doubt his

3    honesty during the training class?

4          A.      No.

5          Q.      Did you ever doubt any of the

6    handler's honesty in the training class?

7          A.      Not that I'm aware of.

8          Q.      Ever think anyone told you a

9    half truth just to, you know, avoid getting a

10   lecture or to avoid being called out for a

11   mistake?

12              MS. SCINDIAN:  Objection.  Calls

13   for speculation.

14         A.      It can be -- depends on the

15   exercise.  What we see and what they're trying

16   to sell us.

17         Q.      I mean, did you ever suspect

18   anyone of trying to pull one over on you

19   during the training in this class?

20              MS. SCINDIAN:  Objection.  Vague

21   and ambiguous.  Calls for speculation.

22         A.      It's hard to -- it's hard to say

1    without seeing more of this video to say

2    whether that occurred.

3         Q.    Okay, but so far what we've seen

4    in this video up until three minutes and four

5    seconds of video 2804, you're not doubting

6    what Riley is saying in the video that he

7    didn't -- he claimed not to see a change of

8    behavior and yet went to award his dog anyway.

9         A.    Correct, but what I will say

10   before you start the video.  What I do see is

11   a disinterested dog, which is making it harder

12   on Riley to conduct a search.

13        Q.    You see a disinterested dog

14   here?

15        A.    Yes.

16        Q.    Okay.  Starting again at three

17   minutes and -- well, tell me what about the

18   dog makes you think he's disinterested?

19        A.    He's not aggressively searching.

20   He's just going out for a walk to me the way

21   I'm interpreting it.  It's -- the dog is going

22   through the motion.  Riley's having to lead

1    the dog versus the dog aggressively searching,

2    being independent becoming more dependent on

3    Riley.

4         Q.    Would it change your mind if you

5    knew that the dog had just done a lengthy

6    search of the restaurant bar area that lasted

7    several minutes?

8              MS. SCINDIAN:  Objection.  Lacks

9    foundation.  Calls for speculation.

10        A.    I can't -- I can't answer that.

11   I don't know.  I don't recall that happening.

12        Q.    Okay.  I'll show you that one in

13   a minute.  Starting again at three minutes and

14   four seconds.

15   (Video played.)

16             SPEAKER:  No.  There's the

17   difference.

18   (Video stopped.)

19        Q.    Okay.  And stopping the video at

20   four minutes and two seconds.  Based on what

21   you saw on the video, was Riley watching his

22   dog when his dog showed change of behavior and

1    sat?

2            A.      I'm not sure.  You have to

3    replay the video.

4            Q.      Okay.  Replaying at 335.

5    (Video played.)

6    (Video stopped.)

7            Q.      And pausing at 345.  Was Riley

8    watching his dog?

9            A.      It doesn't appear that he had

10   full eye contact on his dog.

11           Q.      Okay.  And so when the trainer

12   asked, did you see the difference and Riley

13   responded, I heard the difference.  Do you

14   think Riley was telling the truth?

15           A.      I believe so.  Seeing and

16   hearing two different things.  We use our

17   senses, as well.  I've talked about earlier

18   listening to the change in breathing, as well

19   as watching.

20           Q.      So you think Riley knew that his

21   dog had sat?  I mean --

22           A.      I don't know what Riley thought.

1          Q.      But you don't think Riley was

2     lying to you?

3          A.      I don't think so.

4          Q.      Okay.  Now, I'm showing you the

5     earlier search.  This is 2803.  The search we

6     just watched 2804 has the MVI number 50 0536.

7     Let me pull that back up so you can see it.

8     2804 is the video of the bathroom that we just

9     watched with MVI number 0536.  And I'm showing

10    you now 2803 with MVI number 535, and you'll

11    see on the counter at least it's a seven

12    minute and 56 second search.  Do you remember

13    this search that Riley did of the restaurant

14    area at the Laurel Racetrack?

15         A.      No.

16         Q.      Okay.  I'm going to play it

17    then.

18    (Video played.)

19              SPEAKER:  Give you a more

20    (inaudible.)

21    (Video stopped.)

22         Q.      I'm pausing in a 1:44.  Did you

1    just hear one of the trainers say something

2    about your taking your eyes off the dog?

3            A.      I did not hear that.

4            Q.      Okay.  I am going to put it back

5    to one minute 21 seconds.

6            A.      Okay.

7            Q.      Did you hear it?

8            A.      I'm not sure exactly what he

9    said.  It could -- it could be that.  I'm not

10   sure.

11           Q.      Do you remember Riley repeatedly

12   taking his eyes off the dog?  Failing to look

13   at his dog?

14           A.      I don't recall.

15           Q.      Do you remember that was one of

16   the problems that Riley had?

17           A.      I don't recall.

18           Q.      Okay.  I'm going to fast forward

19   this search a little bit to ask you a question

20   about the later part of it.

21           A.      Okay.

22           Q.      Okay.  Fast forwarding to about

1    four minutes 41 seconds.

2    (Video played.)

3            SPEAKER:  (Inaudible) take a

4    look and see what I'm asking.

5    (Video stopped.)

6        Q.    Stopping at five minutes 52

7    seconds.  Did you hear one of the trainers say

8    you're wandering?

9        A.    I'm not sure.  I heard

10   something.  I'm not sure what was actually

11   said.

12       Q.    What does it -- what does it

13   mean for a trainer to say you're wandering to

14   a handler?

15       A.    I don't know.  I can tell you

16   what it means to me.

17       Q.    Yeah.

18       A.    But for other trainers, I can't.

19       Q.    Okay.  What does it mean to you?

20       A.    He's not sticking to a search

21   pattern.

22       Q.    And is that accurate based on

1   what you've seen on the video so far?

2          A.     From what I've seen, that is

3   correct.

4          Q.     Okay.  How would you describe

5   his pace during that search?

6          A.     Well, I see a dog that's very

7   disinterested, so it's slowing down his pace.

8          Q.     Well, is Riley trying to pick up

9   the pace and get the dog excited and

10  motivated?

11         A.     Is the handler's responsibility

12  to ensure that the item that he's searching,

13  wants the canine to search, is being searched.

14  So if the canine is not picking up his or her

15  speed, it's going to slow down the team.  I

16  see, again, there's a canine issue more than a

17  handler issue.

18         Q.     Okay.  Starting at 552 again.

19  (Video played.)

20                SPEAKER:  What are you doing?

21  Are you ready to tell (inaudible) clear?  You

22  got to make a call.

1    (Video stopped.)

2         Q.    And pausing again in six minutes

3    19 seconds.  One of the trainers, I believe

4    it's Hill, is saying, you have to make the

5    call.  Are you ready to tell everybody this is

6    clear.  Based on what you're hearing and what

7    you're seeing, what was the exercise that

8    Riley was supposed to do?  Service thing and

9    then make a declaration of whether it was

10   clear there was no device or whether there was

11   source somewhere?

12        A.    I don't -- I don't recall.

13              MS. SCINDIAN:  Objection.  Calls

14   for speculation.

15        Q.    Okay.  Based on what you hear,

16   what do you believe the exercise was?

17        A.    I can't answer that because I

18   don't know what the exercise was to give you a

19   full honest answer.

20        Q.    Based on what trainer Hill just

21   said, you can't figure out what the exercise

22   was?

1          A.      No, because I don't know what

2    the exercise was.

3          Q.      Well, trainer Hill is expecting

4    Riley to make a call on whether the room is

5    clear, right?

6          A.      It sounds as if that's the case.

7          Q.      Okay.  Do you have any reason to

8    believe that trainer Hill made up rules for

9    this exercise on the go?

10              MS. SCINDIAN:  Objection.  Calls

11   for speculation.

12         A.      I don't -- I don't know what the

13   instructions were at the beginning of the

14   exercise.  So, again, I can't answer to what

15   trainer Hill is speaking.

16         Q.      Do you have any reason to

17   believe that trainer Hill would make up rules

18   for this exercise midway through?

19              MS. SCINDIAN:  Objection.  Calls

20   for speculation.  Lack of foundation.

21         A.      No, I do not.

22         Q.      All right.  Starting at 619.

1    (Video played.)

2                    SPEAKER:  You ready for the

3    (inaudible.)

4                    SPEAKER:  You're not going to be

5    ready to for all clear, but I'm sure

6    (inaudible.)

7                    SPEAKER:  Don't doubt yourself.

8                    SPEAKER:  Okay.  Right now I'm

9    (inaudible.)

10   (Video stopped.)

11       Q.    Stopping the video at seven

12   minutes 55 seconds.  Riley called the room

13   clear, right?

14       A.    I believe so, yes.

15       Q.    But then said that there were

16   some things that he didn't check in the room,

17   correct?

18       A.    I'm not 100 percent sure because

19   I don't know what area he was given to search.

20       Q.    Well, he said I didn't search

21   that trash can.

22       A.    Okay.  If that's what -- I

1    didn't hear that, but if that's what you're

2    saying, I did not hear it.

3            Q.     Okay.  If Riley says he didn't

4    search the trash can, is that a mistake that

5    Riley made?

6            A.     Yes.  I would say that would be

7    a handler error.

8            Q.     Okay, because you have to check

9    everything in your search area before calling

10   it, right?  Before clearing the room?

11           A.     Correct.

12           Q.     Okay.  Okay.  Everybody doing

13   okay?

14           MS. SCINDIAN:  Do you know what?

15   Actually, I need to stand up.

16   (Exhibit 10, document Bate-stamped USCP68 and

17   USCP69, marked for identification.)

18   (Exhibit 11, document Bate-stamped USCP464 and

19   USCP465 marked for identification.)

20   (Exhibit 12, document Bate-stamped USPC848 and

21   USPC849 marked for identification.)

22           Q.     All right.  Okay, Mr. Phelps,

1    I'm going to give you three documents that

2    we're going to mark Exhibit 10, 11 and 12.

3    The first document is our Exhibit 10.  Has the

4    Bates numbers 68 and 69.

5                    MS. SCINDIAN:  Oh, I'm sorry.  I

6    marked the first one you gave me as 10.

7                    MR. ALDERMAN:  It's a set of

8    three that I gave you like this.  I was trying

9    to be helpful.

10                    MS. SCINDIAN:  All right.

11                    MR. ALDERMAN:  My helpfulness

12    confuse you, Cindy.  Come on.  Cindy Scindian.

13                    MS. SCINDIAN:  So it's 68 and

14    then 464 and then 848 is the order.

15                    MR. ALDERMAN:  Yup.  Yup.

16                    MS. SCINDIAN:  Okay.  That's

17    right.  One set.

18                    MR. ALDERMAN:  You need another

19    one?

20                    MS. SCINDIAN:  Yes.

21                    MR. ALDERMAN:  Okay.

22          Q.     Mr. Phelps?

1          A.      Yes.

2          Q.      Again, you've been given exhibit

3    10, 11 and 12.  Exhibit 10 is 68, USCP68 and

4    69.

5          A.      Okay.

6          Q.      Exhibit 11 is USCP464 and 465,

7    and Exhibit 12 is USCP848 and 849.

8          A.      Okay.

9          Q.      Exhibit 10 is -- all three

10   exhibits 10, 11 and 12 are from September

11   14th, 2017.  Do you see that?

12         A.      Yes.

13         Q.      Okay.  Exhibit 10 is the EOD K-9

14   training form for Van Meter.  Exhibit 11 is

15   the one for handler three, which is Mike

16   Riley, and Exhibit 12 is handler five Garrett

17   Zborai.

18         A.      Okay.

19         Q.      All right.  Now, if you flip to

20   the second page of each of those three

21   documents, you'll see that your signature

22   comes first under the instructors line.

```
 1              A.      Correct.

 2              Q.      And so does that indicate that

 3    you're the one that drafted the report?

 4              A.      No.

 5              Q.      Say again?

 6              A.      I did not draft this report.

 7              Q.      Did you provide the information

 8    that appears in the report?

 9              A.      No.

10              Q.      How do you know that?

11              A.      Because technician -- not

12    technician.  Kenney Hill is a lead instructor

13    for this class.  He's the one that generates

14    this report.  As my earlier testimony states,

15    when Mr. Hill is not present, I generate which

16    would leave me my name being first.

17              Q.      So you're saying if Kenny Hill

18    was present, then he completed the form?

19              A.      Correct.

20              Q.      Even if your signature comes

21    first.

22              A.      Correct.
```

1          Q.     All right.  Is it accurate that

2    you were present for the training this day?

3          A.     Correct.

4          Q.     Okay, because your name appears

5    as one of the instructors?

6          A.     Correct.

7          Q.     All right.  So what I'm trying

8    to figure out and I'm hoping you can tell me,

9    is for Exhibit 10 and 11, so that's Van Meter

10   and Riley's forms.  They both get a handler

11   miss because they didn't check the trash can

12   in the center of the locker room.

13         A.     Okay.

14         Q.     Apparently it's where the hide

15   was.  If you look at hide number three in the

16   table, do you see that?

17         A.     Yes.

18         Q.     Okay.  Now, Zborai, however, for

19   the same hide, hide number three, the trash

20   can in center of the lock room, his is a known

21   location.  Do you know why that is the case?

22         A.     I do not.

1          Q.      Do you know why it was run as a

2    known location for Zborai and not for Van

3    Meter and Riley?

4          A.      I do not.

5          Q.      Okay.  You can put those aside.

6    If it -- if it was run as a known location for

7    Zborai, that means that Zborai was told where

8    the hide was, right?

9          A.      Generally speaking, yes.  A

10   known location is the handler knows where the

11   hide is.

12   (Exhibit 13, document Bate-stamped USCP838 to

13   USCP839 marked for identification.)

14         Q.      Okay.  Mr. Phelps, I've given

15   you Exhibit 13.  This one goes from 838 to 839

16   and it says September 25th, 2017, EOD K-9

17   training form for handler five, which is

18   Garrett Zborai.  Take a look at the document.

19   My question for you is -- I guess first, were

20   you present for the training this day?

21         A.      I believe so, yes.

22         Q.      Okay.  And can you remember for

1    hide number one in the comment section it

2    reads, quote, trainer assisted team for final

3    response.  Do you remember anything about

4    that?

5            A.      No.

6            Q.      Do you remember the assistance

7    given to Zborai for the final response?

8            A.      No.

9    (Exhibit 14, document Bate-stamped USCP3082 to

10   USCP3083 marked for identification.)

11           Q.      Okay.  Set that aside.  Thanks.

12   Mr. Phelps, you've been given Phelps 14.  This

13   is -- this bears the page numbers USCP3082 and

14   3083.  These are some handwritten notes on an

15   explosive detector dog training a placement

16   form dated September 28th, 2017.  And do you

17   know whose handwriting appears on this form?

18           A.      3082?

19           Q.      Yes, sir.  On page 3082?

20           A.      It appears to be Mr. Hills.

21           Q.      Throughout the form?  Throughout

22   the page?

1          A.      3082?

2          Q.      Yes, sir.

3          A.      Yes.

4          Q.      Okay.  And what about on the

5    second page 3083?

6          A.      That would be mine.

7    (Exhibit 15, document Bate-stamped USCP84 to

8    USCP85, marked for identification.)

9          Q.      Okay.  All right.  Thank you.

10   Mr. Phelps, you've now been given Exhibit 5.

11   This one goes from -- yes, 15.  Exhibit 15.

12   This one goes from USCP84 to 85.  It is dated

13   September 27th, 2017 and it's a EOD K-9

14   training form for Officer Van Meter.  In the

15   -- let's see.  There's some handwritten notes

16   in the supervisor's comments section on the

17   second page.  Can you tell me whose notes

18   those are?

19         A.      Those would be mine.

20         Q.      Okay.  And taking a look at the

21   comment section above that again on USCP85,

22   but in the instructor's comments down on the

1    second row towards the end of that row it

2    reads, quote, searches were videotaped, which

3    reviewed for constructive criticism.  Period.

4    Do you have any reason to doubt the statement

5    that those searches were videotaped today?

6            A.    No.

7            Q.    And do you know what happened to

8    the videos from that day?

9            A.    I do not.

10           Q.    Are you aware of any videos that

11   were deleted for that training class?

12           A.    No, I'm not.  Are you suggesting

13   that videos were deleted?

14           Q.    I'm suggesting that we haven't

15   received videos from this day.

16           A.    Okay.

17           Q.    September 27th, 2017.

18           A.    I'm not aware of any videos

19   being deleted.

20           Q.    Okay.  How about videos being

21   lost?  Anything of that nature?

22           A.    No.

1          Q.      Okay.  You're not aware of any

2     videos being deleted for any day of training

3     in that 2017 class, right?

4          A.      That is correct.

5          Q.      Okay.  I'm going to show you a

6     video from October 11th, 2017.  So I'm going

7     to show you the video, but I'll describe it

8     for you and see if you remember the exercise

9     before I show it to you.

10         A.      Okay.

11         Q.      The hide was on top of a -- of

12    an open truck with some kind of a crane on it.

13    Boom crane on it.  That truck was located

14    adjacent to some buses as well and Van Meter

15    and Zborai were the only ones searching that

16    area that day.

17         A.      Okay.

18         Q.      Do you remember that?

19         A.      No.

20         Q.      Okay.  This is hide 2929.  Video

21    2929 again from October 11th, 2017.

22         A.      Okay.

1        Q.      Okay.  It's long, unfortunately.

2    Okay.  Now, just for background, we're going

3    to watch the first couple minutes of it, and

4    then when he starts searching buses and other

5    things, I'm going to fast forward it, but I'm

6    going to fast forward it really fast.  If you

7    want me to slow it down at all, I will do so,

8    but I'll tell you my questions aren't about

9    the bus searches.

10        A.      Okay.

11        Q.      Okay.  All right.  So the video

12    is up.  It's 2929.  USCP2929.  Can you

13    recognize who you see in the video there?

14        A.      As far as the handler team?

15        Q.      Yes, sir.

16        A.      The technician is Zborai.  Looks

17    like canine Pope.

18        Q.      And can you recognize where you

19    are?

20        A.      No.

21        Q.      Where this search takes place?

22    Okay.  All right.  Pressing play.

1    (Video played.)

2    (Video stopped.)

3         Q.     Okay.  I'm pausing the video at

4    one minute 36 seconds and I'll tell you for

5    the record that the hide was on that first

6    truck with the crane that Zborai and Pope

7    circled and searched.  Do you remember that

8    hide?

9         A.     No.

10        Q.     Okay.  And what you saw in the

11   first minute 35 seconds of that video, was

12   there any reason, any impediment, to Zborai

13   putting or encouraging the dog to climb up on

14   the platform area of the truck?

15        A.     Clarify "platform."

16        Q.     The top of the truck where the

17   crane is actually located.

18        A.     Your question is asking me if

19   there's any reason why Zborai didn't get the

20   dog on top of the flatbed area?

21        Q.     Yes.

22        A.     It's a safety issue.

1          Q.      Okay.   The hide was on top of

2   the flatbed area of the truck.

3          A.      Okay.

4          Q.      Was there -- in your mind,

5   looking at seeing what you're seeing, was

6   there an impediment to getting the dog to

7   climb the stairs to go up to the platform

8   truck area?

9          A.      I didn't see stairs.

10         Q.      Okay.   Let me -- let me put it

11  back.  Do you see this triangular area here

12  forward of the tires?

13         A.      I see that.

14         Q.      Okay.   Those are stairs that go

15  up to the top of the platform area of truck.

16         A.      Okay.

17         Q.      Flat area.

18         A.      Okay.   They don't look like

19  stairs.

20         Q.      From our perspective.

21         A.      Okay.

22         Q.      If you keep watching videos,

1    you'll see dogs go up those stairs.

2          A.      Fair enough.

3          Q.      Okay.  So in what you just saw

4    the first minute 35, was there any reason for

5    Zborai not to allow his dog to go up the

6    stairs and do a search of the platform?

7          A.      I'm not sure what type of search

8    Zborai is doing.  Without knowing the exercise

9    that was laid out to Zborai, I don't know what

10   search technique he used to conduct that hide.

11         Q.      Okay.  So if the hide was on top

12   of the platform truck area, the platform area

13   of the truck.

14         A.      Okay.

15         Q.      Should Zborai have gotten his

16   dog on top of the platform area of the truck?

17         A.      It depends on the search

18   techniques that he's using.  Is he using a

19   scan where he's allowing the dog freedom to

20   search on his own before he goes into a

21   systematic search to clear as you go.

22         Q.      Okay.  All right.  So assuming

1    that the dog is in the scan side of things,

2    assuming that this -- what we just saw the

3    minute 35 is a scan, would Zborai be making

4    presentations to the dog?

5          A.      He can.  If he's noticing a

6    change of behavior, we encourage him to work

7    that area if the dog is showing change of

8    behavior.

9          Q.      Did you see the dog showing

10   interest?

11         A.      The dog to me is what I

12   described to you earlier in a previous video.

13   That dog is aggressively searching on his own

14   where I talked about Billy the Lab being very

15   disinterested in the handler's guide.  Zborai

16   is having to keep up with canine Pope.

17         Q.      Okay.  Was canine Pope showing

18   interest on the left hand side of that truck?

19         A.      I do not recall seeing it.

20         Q.      Okay.  I am going to press.  I'm

21   going to get it back to a minute 35 seconds.

22   How about that and then I'm going to fast

1    forward.  Okay?

2            A.      Okay.

3            Q.      And now he's close to that

4    platform truck again, so I'm going to slow it

5    down.

6            A.      Fair enough.

7            Q.      Okay.  I'm going to speed it up

8    again.  At four minutes eight seconds speeding

9    up.  Okay.  Let's see if I can get it to go

10   even faster.  I'm not sure if it'll do ten.

11   Okay.  I'm just going to back it up.  I think

12   -- I think the dog gets a fine on the back of

13   the bus here.  Just make sure there's no

14   confusion.  Playing it about 21 second -- 21

15   minutes 50 seconds.

16   (Video played.)

17   (Video stopped.)

18           Q.      Okay.  Did you just recognize

19   your voice on the video?  Is that you saying,

20   okay?

21           A.      I'm not sure.

22   (Exhibit 16, document Bate-stamped USCP1818 to

1    USCP1819, marked for identification.)

2          Q.     Okay.  So let's -- if this

3    helps.  You've been given Exhibit 16.  This

4    one goes from USCP1818 to 1819, and it's

5    October 11th, 2017.  EOD K-9 training form for

6    handler five Garrett Zborai.  This is the

7    training form for the day of the video that

8    we're watching right now.

9          A.     What's the date of that?

10         Q.     October 11th.  Is that what you

11   have?

12         A.     Okay.  Yes.

13         Q.     Okay.  Good.  And if you take a

14   look in the description on the -- on the

15   second page under the comment section it says,

16   hide five and six was a six vehicle search,

17   including two large flatbed trucks and four

18   school buses, and that then corresponds to

19   hides five and six is listed on the table.  Do

20   you see that?

21         A.     Yes.

22         Q.     Okay.  Did you write this form?

1          A.      No.

2          Q.      Okay, but you were there for the

3    training day, correct.

4          A.      I believe so, yes.

5          Q.      Okay.  Now, the search for

6    inside metal tubing on bed of boom crane is

7    hide five.  Do you see that?

8          A.      Yes.

9          Q.      All right.  And the boom crane

10   was the first vehicle that Zborai was

11   searching in video USCP2929?

12         A.      Correct.

13         Q.      Okay.  Now, was there any

14   physical impediment to Zborai getting his dog

15   up on the back of that boom crane?

16         A.      I can't answer that because I

17   don't know what the instructions were for the

18   exercise.

19         Q.      Well, if you look down hide

20   number five down in the comment section is

21   described as an exposure exercise to evaluate

22   the K-9's confidence on the back of the truck.

1          A.      Correct.

2          Q.      So it was the expectation that

3     the dog would get up on the back of the truck?

4                  MS. SCINDIAN:  Objection.  Calls

5     for speculation.

6          A.      I can't answer that because I

7     don't know what the instructions were for the

8     exercise.  This could've been something that

9     was done after -- afterwards that wasn't on

10    videotape because, as it states, exposed --

11    exposed exercise to -- to elevate the canine's

12    confidence on the back of a truck, which is

13    not something that we typically do when we

14    conduct our searches.

15         Q.      Okay.  Let me just ask the

16    question and did you see in the video any

17    physical impediment to Zborai getting the dog

18    up on the platform?

19         A.      No.

20         Q.      Okay.  Did you see any

21    discomfort or hesitation on the dog's part to

22    doing high searches on that truck?

1        A.       Appeared not to show any.

2        Q.       Okay.  I'm going to -- we're

3  going to keep on watching videos of this

4  search.  That was just the first one.

5        A.       Okay.

6        Q.       The next one is 2931.  And so

7  playing for you now USCP2931.

8        A.       Okay.

9  (Video played.)

10 (Video stopped.)

11       Q.       Now, one of the trainers just

12 whispered, platform truck.  Was that you?

13       A.       I don't recall.

14       Q.       Did it sound like your voice?

15       A.       I don't recall that being my

16 voice.

17       Q.       Okay.  Playing again from 15

18 seconds.

19 (Video played.)

20                SPEAKER:  Will you be here?

21                SPEAKER:  Unless I hit the

22 Powerball.

1    (Video stopped.)

2          Q.     Now, could you hear your voice?

3          A.     I believe that was me, the

4    louder voice.

5          Q.     The one that said unless I hit

6    the Powerball or something like that?

7          A.     I guess.  I'm not sure.  That's

8    what it said, what it sounded like.

9          Q.     Let me rewind it, just to get

10   you to confirm, back to 29 seconds.

11   (Video played.)

12              SPEAKER:  Unless I hit the

13   Powerball.

14   (Video stopped.)

15         Q.     Did you hear that?  It said,

16   unless I hit the Powerball.

17         A.     Correct.

18         Q.     Is that you?

19         A.     Sounds like me.

20   (Video played.)

21              SPEAKER:  To the end.

22              SPEAKER:  To the end.

1    (Video stopped.)

2          Q.     Now, right about one minute 29

3    or 30 seconds, the camera swings clearly to

4    the top of the platform truck.  You see that

5    to the left?

6          A.     I see it on the -- on the back

7    of the platform truck, yes.

8          Q.     That's got this crane on it or

9    some kind of it looks like a cherry picker or

10   something.  Can you tell what that is?

11         A.     No.

12         Q.     What color?  Can you tell what

13   color it is?

14         A.     No.  The crane/cherry picker

15   you're describing looks to be white in color.

16         Q.     Okay.  All right.  And based on

17   where you can -- would you agree that you're

18   holding the video camera?

19         A.     I believe so.

20         Q.     Okay.  And continuing at one

21   minute 30.

22   (Video played.)

1          SPEAKER:  Watch your back.  All

2  right.  So now what do you got?  Still haven't

3  searched it.  Going to tell you that right

4  now.

5          SPEAKER:  I still haven't

6  searched it.

7          SPEAKER:  No.

8  (Video stopped.)

9      Q.    Okay.  Pausing at four minutes

10  and six seconds.  Did you just tell Garrett

11  Zborai that he still hadn't searched the area

12  where the hide is located?

13      A.    It sounds to be my voice.

14      Q.    Okay.  And are you seeing in

15  this video so far any reason, any impediment

16  to getting the dog up on the boom -- on this

17  flatbed truck to the left of the screen?

18      A.    Not that I can tell from the

19  video.

20      Q.    Okay.  Continue to play four

21  minutes and six seconds.

22  (Video played.)

1          SPEAKER:  Hey Garrett, come back

2   this way for me.  Come back for me.  You going

3   to help him out?

4          SPEAKER:  No.

5   (Video stopped.)

6       Q.    Okay.  Now, one of the trainers

7   said, hey, Garrett, come back this way for me.

8   Was that Kenney Hill?

9       A.    I believe so.

10      Q.    And then you asked, are you

11  going to help him out, right?

12      A.    Correct.

13      Q.    And then Hill said, no, he's not

14  going to help him out.  Do you know what

15  happened next?

16      A.    No.

17      Q.    Okay.  And then in the sequence

18  of things, we watched that 22 minute video.

19  We fast forward through a lot of it, but

20  Garrett started at this -- at this boom crane

21  truck and then progressed to the buses and he

22  got a hide on the back of one of the buses?

1           A.      Correct.

2           Q.      Okay.  Do you know why Garrett

3    thinks he should still be searching?

4           A.      I have no idea.

5           Q.      Okay.  Did someone tell him that

6    he hadn't located all the hides?

7           A.      I do not recall the instructions

8    given to him at the start of the hide.

9           Q.      You don't know if he was told

10   there are two hides or just find the hides?

11          A.      Correct.

12          Q.      Or it might be empty?  He

13   could've been told that -- he could have been

14   told nothing at all.

15          A.      I'm not.  I can't comment on

16   what the instructions were at the time of that

17   exercise.

18          Q.      Can you explain why Zborai

19   thinks he should still be searching?

20          A.      I cannot.

21          Q.      Okay.  So the last thing we see

22   on this screen at four minutes, 13 seconds is

1    Zborai is approaching the camera at this

2    point, right?

3            A.      Correct.

4            Q.      After that comment about that

5    Hill made about Garrett come over here, and

6    then you asked you going to help him out and

7    Hill said no.  No, right?

8            A.      Correct.

9            Q.      Okay.  And now moving on to

10   2932, USCP2932 and at the beginning of the

11   video, just set it up for the record, you see

12   Garrett appearing to be walking down the left

13   hand side of that same boom truck, right, with

14   his dog?

15           A.      Well, before the video is being

16   played, it appears he's going to walk down the

17   side of a box truck, but he's looking at the

18   truck you're referencing.

19           Q.      He's walking down the lane

20   between the box truck on the left and the

21   platform truck on the right, correct?

22           A.      It appears that he's moving

1      doing that.

2              Q.      Okay.

3      (Video played)

4      (Video stopped.)

5              Q.      And pausing it at a second 14.

6      So Zborai makes a direct line for the stairs

7      on the boom crane, correct?

8              A.      It appears, yes.

9              Q.      Okay.  And then the camera even

10     nodded up and down, right?

11             A.      Correct.

12             Q.      Okay.  To say, you know, yes, he

13     finally made it, right?

14             A.      Correct.

15             Q.      Okay.  Were you still holding

16     the camera?

17             A.      I believe so.

18             Q.      Okay.  So do you think that one

19     of the trainers told Zborai where to go to get

20     this find?

21             A.      I can't answer that.

22             Q.      You don't remember either?

1    A.    I don't remember.

2    Q.    Now, if one of the handlers told

3  Zborai where to go, would that be a -- would

4  that indicate a handler miss?  That Zborai

5  failed to search the entire search area?

6         MS. SCINDIAN:  Objection.  Calls

7  for speculation.

8    A.    You have to reask your question

9  because I believe you said if one of the

10  handlers.

11    Q.    If one of the trainers, sorry.

12  If one of the trainers told Zborai where to go

13  to get this find, would you consider that a

14  handler miss?

15         MS. SCINDIAN:  Objection.  Calls

16  for speculation.

17    A.    I can't answer that.

18    Q.    Why not?

19    A.    Because I didn't give the

20  instructions.  You're asking me to speculate.

21    Q.    Okay.  And, yes, I am asking you

22  to speculate.  If one of the trainers told

1    Zborai where to get the find, would you

2    consider that a handler miss?

3            A.      I can't answer that because I

4    don't know what the instructions were.

5            Q.      And I'm asking you to assume for

6    the purpose of this deposition that one of the

7    trainers told Zborai to get up on the truck to

8    find the hide.  Under those circumstances,

9    would that be a handler miss for Zborai?

10           A.      It will be a -- the way you are

11   wording your question, if a trainer told

12   Zborai where it was, it would be classified

13   as a -- based off the trainer itself who's

14   filling out the form, it could be a trainer

15   assist.

16           Q.      Okay.  Now, what if Zborai, you

17   know, this is what if, right?  If Zborai said,

18   look, guys, I can't find it.  I'm done.  I'm

19   calling it, would that then be a handler miss?

20               MS. SCINDIAN:  Objection.  Calls

21   for speculation.

22           A.      It could be.  It depends on

1  who's doing the critiquing.

2          Q.    Okay.  If you were doing the

3  critiquing, would it be a handler miss?

4                  MS. SCINDIAN:  Objection.  Calls

5  for speculation.

6          A.    I can't answer that.

7          Q.    Okay.  Okay.  I'm now showing

8  you a video from this October 16th.  It's the

9  same day that you -- at least that the

10  termination memo is drafted October 16th,

11  2017.

12         A.    Okay.

13         Q.    You can verify that with

14  Exhibit 1 if you need.  Do you recall this?

15  So I've pulled up USCP2946.  All you see is

16  the still frame right now and you see Zborai.

17  You can see him through -- I would call these

18  some gators, like, four-by-four off road

19  utility vehicles.  Not a truck, but what is

20  that called?  Do you know?  Is it a gator?

21         A.    I believe so.  I think it's John

22  Deer gator.

1          Q.      Okay.  Do you remember the

2    search from this day?

3          A.      No.

4          Q.      Okay.  Exhibit 3.  Okay.  So

5    Exhibit 3, going back to Exhibit 3.  This is

6    USCP814 and 815, and this is the October 16th,

7    2017 EOD K-9 training form for Garrett Zborai,

8    and if you'll take a look at the second page

9    of the document, do you see your name anywhere

10   on there?

11         A.      At the bottom.

12         Q.      You signed for the supervisor,

13   right?

14         A.      Correct.

15         Q.      Do you know if you were present

16   for the training event?

17         A.      I do not recall.

18         Q.      Okay.  Just taking a look at the

19   first search, which is the lawnmower deck of

20   the West LEG garage.

21         A.      Okay.

22         Q.      Do you know what that is, the

1    LEG garage?

2           A.    It's a west legislative garage

3    for the Senator members.  Senators.

4           Q.    Legislative garage?

5           A.    Correct.

6           Q.    And you'll see that there's a

7    handler miss/find for Zborai for that hide?

8           A.    Correct.

9           Q.    And if you look at the comments

10   it says for hide number one, handler failed to

11   search area.  Once handler searched area,

12   canine responded well on trained odor.  Okay.

13   By this date, October 16th, 2017, if Garrett

14   Zborai mistakenly called a hit, dog reacts,

15   sits, does whatever, and Zborai says, that's

16   it.  He's on source and it was a mistake.  It

17   was a wrong call.  Do you know if that would

18   be considered a handler miss or handler error?

19              MS. SCINDIAN:  Objection.  Calls

20   for speculation.  Also, vague and ambiguous.

21          A.    I can't answer that without

22   knowing the instructions for the hide that he

1  was given and how he conducted the search

2  himself.

3        Q.     Okay.  So I'm going to try to

4  run because this is a 14 minute video, and I

5  don't want everybody to stick around for a 14

6  minute video.  I'm going to press play.  I'm

7  going to fast forward a little bit.

8        A.     Fair enough.

9        Q.     What you're going to see, I'll

10  describe it, but if you disagree with my

11  description at the end, please, you know, make

12  a note of that.

13        A.     Okay.

14        Q.     Zborai going to search around

15  these gators, and then he's going to go around

16  to the left and he's going to search for, at

17  least partially search some lawnmowers.  The

18  hide is in the lawnmowers, but he misses it

19  because he didn't thoroughly search the

20  lawnmowers, and he's going to continue to

21  search around in the garage, and he's going to

22  come to a -- it looks like a fire control

1    panel and then I'll pause it.

2            A.      Okay.

3            Q.      Okay.

4    (Video played.)

5    (Video stopped.)

6            Q.      Okay.  Replaying at normal

7    speed.  I've been -- just for the record, I've

8    been going at variable speeds between two

9    times and five times speed up until seven

10   minutes 46 seconds, at which time I want to

11   start playing at normal speed.

12   (Video played.)

13   (Video stopped.)

14           Q.      Okay.  So about eight minutes

15   35 seconds Pope sits near what I think looks

16   like a red panel to the left of an access

17   door.

18           A.      Okay.

19           Q.      And Zborai says stay and the

20   trainers call him off and say no, right?

21           A.      Correct.

22           Q.      Okay.  Did Zborai make a mistake

1   just there?

2                   MS. SCINDIAN:  Objection.  Vague

3   and ambiguous.

4          A.      I don't know.

5          Q.      Why don't you know?

6          A.      I don't know what Zborai did,

7   whether he boxed the dog in or if the dog gave

8   him a change of behavior and sat.  From the

9   video it's hard to tell if Zborai made a

10  mistake or not.

11         Q.      Okay.  Can I play it for you

12  again?  Would it help to determine whether the

13  dog gave a change of behavior or if Zborai

14  boxed him in?

15         A.      Sure.

16         Q.      Okay.  Rewinding to 732.

17  (Video played.)

18  (Video stopped.)

19         Q.      Okay.  And playing it through

20  eight minutes 33 seconds.  Based on your

21  review of the video, what's your conclusion?

22  Did Zborai make a mistake?

1          A.      No.

2          Q.      Why not?

3          A.      Because he saw a change in

4    behavior from the dog.  He presented up.  The

5    dog went up, smelled the -- what we're calling

6    fire panel box, came back down and sat.

7    Contrary to what I said earlier about him

8    boxing him in, Zborai did not box him in.  So

9    the dog came down, smelled the box and went to

10   a sit position.

11         Q.      Now, did you see any change of

12   behavior from the dogs -- from the dog?

13         A.      From what the video clip you

14   showed me, the biggest change of behavior I

15   saw was the dog smelling low underneath that

16   fire box, then when Zborai presented up to

17   search it, the dog came down and sat.

18         Q.      What was the change of behavior

19   that you saw?

20         A.      Have everything that I saw, the

21   dog was smelling, casting, what we call

22   casting low, Zborai presented up, the dog

1    smelled it, came down and sat.

2            Q.      Would you say the dog gave a

3    strong change of behavior?

4            A.      Gave a change of behavior.

5            Q.      Recognizable change of behavior?

6            A.      Correct.

7            Q.      Were there times when if a

8    handler made a mistake, even if let's say the

9    dog showed a change of behavior, but it wasn't

10   on odor and the handler erroneously called it

11   like Zborai just did there, right, are there

12   times when that is a mistake on the handler's

13   part?

14           MS. SCINDIAN:  Objection.  Vague

15   and ambiguous.  It calls for speculation.

16           A.      It depends on the hide, the

17   training exercise, all these elements.  There

18   could be wind flow we talked about earlier.

19   With the garage doors opening and closing, the

20   wind flow could be pushing the odor, scent

21   odor into this area and pulling.  So the dog

22   could technically be right.

1          Q.      Right.  And that's what I mean.

2    If the dog shows a clear change of behavior

3    and then goes to final response the sit, under

4    those conditions, the handler is -- it's

5    reasonable for the handler to conclude that

6    the dog is on odor, right, is on the source?

7                   MS. SCINDIAN:  Objection.  Calls

8    for speculation.

9          A.      It's probable.  It's probable.

10         Q.      Okay.  This one is 2957.  I may

11   be wrong here so error goes to the owner.  I'm

12   showing you 2957.  This one's dated October

13   17th, 2017.

14   (Video played.)

15   (Video stopped.)

16         Q.      Okay.  For that particular hide,

17   would you say, so this is -- would you agree

18   this is Zborai and Pope?

19         A.      Yes.

20         Q.      Okay.  And it's at a car lot?

21         A.      Yes.

22         Q.      Okay.  And the search is of what

1    appears to be a silver Honda Civic.

2          A.     Okay, yes.

3          Q.     Small Honda.

4          A.     Okay.

5          Q.     Okay.  And the hide is over here

6    on the passenger side of the Honda Civic.

7          A.     Okay.

8          Q.     Did Pope show strong interest in

9    that passenger side rear well?

10         A.     Appears to show, yes.

11         Q.     Did he show that strong interest

12   twice in the wheel -- in that rear and wheel

13   well?  You want to see it again?  It's a 36

14   second video.  Won't take that long.

15         A.     No.  I don't need to see it

16   again.  Again, I don't know what the

17   instructions were for that hide.  Whether he

18   was instructed to do a systematic search to

19   start with or do a scan to start with.  The

20   handler's option to do it, but you can't clear

21   it until you do a systematic search.  So based

22   off what I'm seeing, it appears Zborai is

1    doing a scan, and then he notices the change

2    of behavior and started work -- relied on the

3    canine to work that area before he stepped in

4    to provide assistance.

5         Q.    Okay.  And so Zborai did what

6    he's supposed to do, right?

7         A.    It appears.

8         Q.    So Zborai looked like he was

9    working a pattern, right?  He was going around

10   the car?

11        A.    Correct.

12        Q.    And the dog wanted to break that

13   pattern and go back to the front right side?

14        A.    It appears, yes.

15        Q.    Right, and Zborai noticed that

16   and broke pattern and allowed the dog to go

17   where it wanted to?

18        A.    Correct.

19        Q.    And it got the hide?

20        A.    Correct.

21        Q.    Okay.  So that's what they're

22   taught to do?

1          A.      Correct.  As a tool.  As a tool.

2    (Exhibit 17, document Bate-stamped USCP1481 to

3    USCP 1508, marked for identification.)

4    (Exhibit 18, document Bate-stamped USCP276 to

5    USCP 280, marked for identification.)

6          Q.      Okay.  Mr. Phelps, I've handed

7    you what's been marked Exhibit 17, and this

8    document goes from USCP1481 all the way to

9    1508.  And do you recognize this as a

10   collection of the standard operating

11   procedures that the handlers were expected to

12   be familiar with in the training program?

13         A.      I believe so.

14         Q.      Okay.  And now, Mr. Phelps,

15   you've been given Phelps Exhibit 18, which is

16   a packet that goes from USCP276 to 280.  Do

17   you see that?

18         A.      Yes.

19         Q.      And this is a USCP K-9 SOP test.

20         A.      Okay.

21         Q.      It's for handler one, which is

22   Demetrius Dantinne and it's dated October

1    18th, 2017.  You recognize that?

2            A.      No.  Not really.

3            Q.      Well, do you see where it says

4    handler one in the top right corner?

5            A.      Yes.

6            Q.      Okay.  And then you see the date

7    October 18th, 2017?

8            A.      Correct.

9            Q.      Okay.  Have you ever seen this

10   document before?

11           A.      It appears to be a written test

12   on our SOPs.

13           Q.      Okay.  And what was the minimum

14   acceptable score for these written tests?

15           A.      I don't recall, but I believe 80

16   sounds right.

17           Q.      Okay.  And so did you -- did you

18   grade these?  You said I think you -- that you

19   helped to grade these tests or you were one of

20   the -- one of the people that graded these

21   tests, right?

22           A.      Yes.

1          Q.        Would you take a look -- look at

2     the second page in particular?  There appears

3     to be some notes written, like some scoring

4     written.

5          A.        Okay.

6          Q.        At the top of the second page

7     USCP277 it says, PMRD supervisor at the top.

8     Maybe it's written in colored highlighter or

9     something like that.  You see that?

10         A.        Yes.

11         Q.        Do you recognize that as your

12    handwriting?

13         A.        No.

14         Q.        Okay.  I want to -- all right.

15    Scanning the test, you'll see that it appears

16    to be broken up into different sections,

17    right?  The first section, which starts on

18    USCP276 is testing the handler's knowledge of

19    SOP OS130-04 K-9 procedures, right?

20         A.        Correct.

21         Q.        And that SOP corresponds to one

22    of the SOPs listed and contained in Exhibit

1    17, right?

2         A.     Correct.

3         Q.     Okay.  So I want to direct your

4    attention to the portion of the test for SOP

5    130-9 and --

6              MS. SCINDIAN:  Where are you

7    seeing that because I don't see it?

8              MR. ALDERMAN:  It starts on page

9    277.  See in the bold 130-09?

10             MS. SCINDIAN:  Yes.

11        Q.     And I want to direct your

12   attention to question three under that SOP,

13   which is at the top of 278.  The question

14   reads, when and why should the canine involved

15   in the incident be taken to the contract

16   veterinarian, right?

17        A.     Okay.

18        Q.     And Dantinne's response is,

19   quote, to make sure the canine can return to

20   unrestricted duty, end quote, right?

21        A.     Okay.

22        Q.     Dantinne didn't respond to the

1 question when should the canine involved in

2 the incident be taken to the contract

3 veterinarian, did he?

4       A.     I can't answer it.  I can't

5 answer that because I'm not the one grading

6 it.  So I'm not sure the person that's grading

7 it, their interpretation of his answer.

8       Q.     In his response, he has not

9 answered when the dog should be taken to the

10 veterinarian, right?

11       A.     That's correct.

12       Q.     Okay.  And that is part of the

13 question asked, correct?

14       A.     Correct.

15       Q.     Okay.  And if you flip to Phelps

16 17, Exhibit 17, and that SOP starts --

17 actually, do you know the answer to the

18 question when should the K-9 involved be taken

19 to the contract veterinarian?

20       A.     I don't recall.

21       Q.     Okay.  So that SOP starts on

22 page 1493 of Exhibit 17.  There you go.  And

1    if you take a look at paragraph H in the right

2    hand column, you see it says as soon as

3    possible after the incident the canine should

4    be taken to the contract veterinarian for an

5    examination?

6            A.      I see that.

7            Q.      Okay.   And so the correct answer

8    for when should the K-9 involved in the

9    incident be taken to the contract veterinarian

10   is as soon as possible after the incident.

11           A.      Well, this SOP is written when

12   we had patrol dogs because it states canine

13   hands performance -- when releasing canine

14   during the performance of duties, the

15   following actions should be taken.   This SOP

16   is actually written for patrol dogs that we

17   had at the time.

18           Q.      Take a look at question two.   So

19   on 277 under 130-09 it says, when a canine

20   bites or in any other way injures an

21   individual, whether or not it is in the line

22   of duty, what's the handles first

1    responsibility?  That's question two, right?

2            A.     Okay.

3            Q.     And take a look at paragraph F

4    on the right hand column.  If an animal bite

5    occurs while on duty, the same report should

6    be taken, right.  So this SOP applies to when

7    the canine bites somebody, right?

8            A.     Inflicts injury on individual.

9            Q.     Okay.  And when that occurs, the

10   handler is supposed to take the canine as soon

11   as possible after the incident to the vet,

12   right?

13           A.     Correct.

14           Q.     Okay.  All right.  Now, flipping

15   to the section for SOP130-10 and in particular

16   question five.  You see the question is, what

17   should the handler do if his or her dog

18   indicates at any point during the search that

19   there appears to be an explosive odor present?

20   Do you remember what the answer is?

21           A.     From the SOP?

22           Q.     Yeah.

1        A.      No.

2        Q.      Okay.  So if you take a look at

3  starting at 1495 on the SOP, here you go and

4  take a look at 1496 under paragraph O and

5  that's -- is that the part of the SOP that

6  corresponds to the question -- question number

7  five?  Question number five is, what should

8  the handler do if his or her dog indicates at

9  any point during the search that there appears

10 to be an explosive odor present?  And looking

11 at the SOP in Exhibit 17, paragraph O on page

12 1496 the SOP reads, if a dog indicates at any

13 point during the search that there appears to

14 be an explosive odor present, depart the

15 immediate area and advise a K-9 supervisor and

16 HDS member of the description and location on

17 which the dog indicated.  The team should then

18 proceed away to a safe distance, right?

19       A.      That's what the SOP states.

20 Yes.

21       Q.      Okay.  So the correct answer, at

22 least in terms of who's to be notified, is the

1    K-9 supervisor and HDS, correct?

2           A.      Correct.

3           Q.      What's HDS?

4           A.      Hazardous Device Section.  The

5    bomb squad.

6           Q.      Okay.  And what the SOP says is

7    the handler is supposed to notify the K-9

8    supervisor and HDS member, correct?

9           A.      That's what the SOP states and

10   that's also what his answer states, as well.

11          Q.      Where do you see in his answer?

12   It says the handler is supposed to notify HDS

13   directly.

14          A.      Notify K-9 supervisor.

15          Q.      Okay.

16          A.      That covers the first part and

17   the SOP states and an HDS member of the

18   description and location of which the dog

19   indicated.  He writes, explain -- notify K-9

20   supervisor once you leave the area.  Explain

21   exactly where a canine indicate so that the

22   information can be passed along to HDS.  It's

1    semantics.

2         Q.    No.  He's saying that the

3    supervisor passes the information on to HDS in

4    his response, right?

5              MS. SCINDIAN:  Objection.  Calls

6    for speculation.

7         A.    I'm not reading it the same way.

8         Q.    Do you see anywhere in here

9    where he specifically says the handler is to

10   contact both the K-9 supervisor and HDS

11   member?

12        A.    He doesn't say state handler.

13   He states his answer is to notify K-9

14   supervisor, which clearly states in the SOP,

15   and then to leave the area, explain exactly

16   where the canine indicate so that the

17   information can be passed along to HDS.

18        Q.    Does Dantinne's answer explain

19   who is to pass the information on to HDS?

20        A.    That's not clear, but I will say

21   he's the one that's going to have to explain

22   it to HDS because he's the one that's calling

1    -- his dog indicated on whatever room,

2    vehicle.

3          Q.      Well, what Dantinne says is

4    notify a K-9 supervisor once you leave the

5    area, explain exactly where the canine

6    indicated.  Explain to the K-9 supervisor,

7    right?

8                  MS. SCINDIAN:  Objection.  Calls

9    for speculation.

10         Q.      In that sentence?

11                 MS. SCINDIAN:  Same objection.

12         A.      When I show up as a supervisor,

13   I'm going to ask him what do you have?  He's

14   going to explain to me what he had, then the

15   bomb squad, yes, is going to show up.  He has

16   to do the explaining because he's making the

17   call.  Not me.

18         Q.      Okay.  So you would give him

19   credit for that answer?

20         A.      I would.

21         Q.      Okay.  Let's go to the question

22   for SOP OS130-11.  Question number two reads,

1    while on duty, the technician will

2    investigate.  Sorry.  Just for the record,

3    this SOP refers to the radiation pagers that

4    K-9 technicians are issued, right?

5         A.    What document number are you

6    reading this from?

7         Q.    On the test.  So that's Exhibit

8    18.  It's page 279.

9         A.    Okay.

10        Q.    And it's question number two

11   under SOP 130-11.

12        A.    Okay.

13        Q.    All right.  And the question

14   reads, while on duty, the technician will

15   investigate any indication for the presence of

16   radiation above blank on the pager.  And

17   there's a multiple choice.  The answer is

18   either A5 on the pager, B10 on the pager, C6

19   on the pager, or D7 on the pager.  Dantinne

20   has circled the number letter D indicating

21   seven, correct?

22        A.    Yes.

1          Q.      Okay.  And do you know what the

2     correct answer is?

3          A.      No.

4          Q.      Okay.  Let's take a look at the

5     SOP itself, so this is Exhibit 17, page 1497.

6          A.      Okay.

7          Q.      You see the big -- there's a big

8     box in the lower half of the left hand column?

9          A.      Yes.  Midway?

10          Q.      Yeah.  And it says that a

11     dose -- a low dose is five and a high is 20?

12          A.      Okay.

13          Q.      Okay.  And so does that help you

14     answer the question?

15          A.      No.

16          Q.      Take a look at the SOP, and I'll

17     ask you is the answer 5A?

18          A.      I do not see where it states a

19     number.

20          Q.      Do you see any that --

21          A.      It gives an alarm setting, but

22     it does not state where the technician should

1    investigate.

2         Q.    Well, it indicates that the

3    alarm will go off at five, right?

4         A.    Okay.

5         Q.    Right?

6         A.    I'm not familiar with the paging

7    system, so I can't recall.

8         Q.    Well, you just referred to the

9    alarm setting and that alarm setting says that

10   the initial dose, the low dose is at five,

11   right?

12        A.    It's what it states here, yes.

13        Q.    Okay.  Do you see it refer to

14   any, you know, reading of seven or six or ten,

15   the other choices in the multiple choice

16   question?

17        A.    No.

18        Q.    Okay.  Now, question number

19   three under that same SOP 130-11 says, to

20   ensure the technician's radiation pager is

21   always operational, a blank check is required.

22   And do you know what the answer to that is?

1          A.      No.

2          Q.      And it's actually you could fill

3   in the blank if you wanted to, right?

4          A.      No.

5          Q.      Okay.  So if you take a look at

6   under procedures on the SOP page 1497.

7          A.      Okay.

8          Q.      See where it says daily check?

9          A.      Yes.

10         Q.      And it says when the PRD, I

11  guess that's the Personal Radiation Device, is

12  first turned on, the user will conduct a self

13  test and then clear the dose.  That's for the

14  daily check, and then there's an explanation

15  of the daily -- the self test, which is a

16  daily check, right?

17         A.      Can you repeat that?

18         Q.      Yeah.  Under procedures on the

19  left hand column.

20         A.      Okay.

21         Q.      There's an explanation for

22  conducting a daily check, right?

1          A.     I understand.

2          Q.     Okay.  Do you see anything in

3    here for a weekly or biweekly or a monthly or

4    a semiannual check?

5          A.     I do not.

6          Q.     Okay.  So the only check that

7    corresponds to ensuring the technician's

8    radiation pager is always operational is a

9    daily check, right, in the SOP?

10          A.     I can't answer that because I'm

11    not familiar with the paging system or the

12    SOP.

13          Q.     Well, the procedures dictate a

14    daily check, right?

15          A.     It states that.  Yes.

16          Q.     Okay.  Do you think that might

17    be the answer to the question on the test?

18          A.     I don't know.

19          Q.     You would have to check the

20    answer key, right?

21          A.     I assume so.

22          Q.     Okay.  That's all I have for

1   you.  Thank you.

2              MS. SCINDIAN:  I have a

3   question.

4           EXAMINATION BY COUNSEL FOR THE

5       DEFENDANT, UNITED STATES CAPITOL POLICE

6   BY MS. SCINDIAN:

7       Q.     Okay.  Sergeant Phelps, looking

8   at Exhibit 17 and 18, I want to direct your

9   attention back to let's start with USCP 000279

10  on Exhibit 18.  You were asked about question

11  number two under SOP OS130-11 radiation pager

12  instructions for K-9 technicians.  Do you

13  recall about that?

14      A.     Yes.

15      Q.     Okay.  Question number two

16  reads, while on duty the technician will

17  investigate any indication for the presence of

18  radiation above and then there's a blank on

19  the pager and then there are multiple choice

20  questions.  Do you see that?

21      A.     Yes.

22      Q.     Or multiple choice options.

1    Excuse me.

2          A.     Yes.

3          Q.     Now, I want you to look at SOP

4    10S130-11.

5          A.     Okay.

6          Q.     Do you see anywhere on here

7    where it says what the technician -- what

8    level of indication for the presence of

9    radiation the technician will be -- will have

10   to investigate?

11         A.     No.  And that's what I tried to

12   relay to Mr. Alderman.  That there's no number

13   on here that states that the handler

14   technician should investigate.

15         Q.     Okay.

16         A.     That the pager setting just

17   talks about the pager alerting as far as the

18   alarm for the pager.  It doesn't state

19   anywhere that the handler should investigate

20   when it reaches a number.

21         Q.     Okay.  Turning to the question

22   number three.  You were asked whether the

1    technicians were required to perform daily

2    checks on the radiation pager to determine

3    whether it was operational.  Do you recall

4    that?

5              A.      Yes.

6              Q.      Okay.  Now, looking at question

7    three, it's a multiple choice question,

8    correct?

9              A.      Correct.

10             Q.      Okay.  Do you see daily as an

11   option --

12             A.      No.

13             Q.      -- on this question?

14             A.      No.

15             Q.      Okay.  And do you see anywhere

16   in the document, which specifically states

17   whether a check should be performed, whether a

18   technician is required to perform a check

19   weekly?

20             A.      No.

21             Q.      Do you see anywhere where it

22   states that a technician is required to

1   perform a check on the radiation pager

2   biweekly?

3          A.    No.

4          Q.    Do you see anywhere in the SOP

5   where it says a technician is supposed to

6   perform a check on the radiation pager

7   monthly?

8          A.    No.

9          Q.    Do you see anywhere in the

10  document the SOP where it says that the

11  technician is supposed to perform a check on

12  the radiation pager semiannually?

13         A.    No.

14         Q.    Okay.  No further questions.

15               MR. ALDERMAN:  Yeah.  I just

16  have one follow-up question.

17  CONTINUED EXAMINATION BY MR. ALDERMAN:

18         Q.    Take a look, if you would, Mr.

19  Phelps, so this would be Exhibit 14.  Sorry.

20  Exhibit 17, the SOPs themselves.

21         A.    Which one?

22         Q.    Page 1497.  So this is the SOP

1    for 130-11.

2             A.      Okay.

3             Q.      Okay.  And refer back in Exhibit

4    18 to question number two under SOP 130-11,

5    okay?

6             A.      Okay.

7             Q.      Do you see over -- under in the

8    right hand column under employees paragraph

9    two, see that?

10            A.      Yes.

11            Q.      It says, during the course of

12   screening activities, any activation of the

13   PRD constitutes a detection of significant

14   radiation levels, right?

15            A.      It's what it states.

16            Q.      Okay.  And if you look at that

17   box to the left in the left hand column, that

18   indicates that the device is going to alert at

19   a dose of 5R, right?

20            A.      I cannot answer that.  I'm not

21   trained to answer what a radiation pager will

22   alert to.

1        Q.     The SOP states what the alarm

2    settings are and that it alerts at five,

3    right?

4        A.     I do not see that it alerts at

5    five.

6        Q.     Okay.  So in order that you

7    would not be able to score that test on your

8    own, you would have to look at the answer

9    sheet, right?

10       A.     Correct.

11       Q.     Okay.  And same question for

12   number three.  As a result of the confusion

13   that Miss Scindian and I identified, you would

14   have to check the answer sheet to be able to

15   accurately score that test, right?  For

16   question three under SOP 130-11, right?

17       A.     Correct.  Depends what the

18   answer sheet says because it could be a bad

19   question and should be thrown out.

20       Q.     Okay.  No more questions.

21            MS. SCINDIAN:  One final

22   question for you, Sergeant Phelps.

1    CONTINUED EXAMINATION BY MS. SCINDIAN:

2          Q.      Do you know what the circles on

3    the side of the numbers mean --

4          A.      No.

5          Q.      -- for the questions?

6          A.      No.

7          Q.      Okay.  No further questions.

8                  (Concluded at 6:13 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

1    CERTIFICATE OF COURT REPORTER-NOTARY PUBLIC

2         I, Chris Melton, the officer before

3    whom the foregoing deposition was taken, do

4    hereby certify that said proceedings were

5    electronically recorded by me; and that I am

6    neither counsel for, related to, nor employed

7    by any of the parties to this case and have no

8    interest, financial or otherwise, in its

9    outcome.

10        IN WITNESS WHEREOF, I have hereunto

11   set my hand and affixed my notarial seal this

12   27th day of December, 2022.

13

14   _____

15

16   Chris Melton, Court Reporter

17

18

19

20

21

22

1              CERTIFICATE OF TRANSCRIBER

2          I, Cynthia Bauerle, do hereby certify

3     that the foregoing transcript is a true and

4     correct record of the recorded proceedings;

5     that said proceedings were transcribed to the

6     best of my ability from the audio recording

7     and supporting information; and that I am

8     neither counsel for, related to, nor employed

9     by any of the parties to this case and have no

10    interest, financial or otherwise, in its

11    outcome.

12

13    *Cindy Bauerle*

14    _____

15    Cynthia Bauerle

16    December 27, 2022

17

18

19

20

21

22