<pre>
1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLUMBIA

3   --------------------------------x

4   MAURICIA VAN METER,                  :

5        Plaintiff,                      :    Case No.

6    vs.                                 :    1:18-cv-00476-KBJ

7   UNITED STATES CAPITOL POLICE,        :

8        Defendant.                      :

9   --------------------------------x

10

11

12            Deposition of FRED ROGERS

13                 Washington, DC

14            Tuesday, June 13, 2023

15                   1:04 p.m.

16

17

18

19

20   Job No.:  496160

21   Pages:  1 - 163

22   Recorded By:  Cody Handlir
</pre>

1        Deposition of FRED ROGERS, held at the offices

2    of:

3

4

5

6        Alderman, Devorsetz & Hora, PLLC

7        1025 Connecticut Avenue, NW

8        Suite 615

9        Washington, DC 20036

10

11

12

13        Pursuant to Notice, before Cody Handlir, Notary

14    Public, in and for the District of Columbia.

15

16

17

18

19

20

21

22

```
 1                  A P P E A R A N C E S

 2

 3        ON BEHALF OF THE PLAINTIFF:

 4              LESLIE D. ALDERMAN, III, ESQUIRE

 5              ALDERMAN, DEVORSETZ & HORA PLLC

 6              1025 Connecticut Avenue, NW

 7              Suite 615

 8              Washington, DC 20036

 9              202.969.8220

10

11        ON BEHALF OF THE DEFENDANT:

12              KELLY SCINDIAN, ESQUIRE

13              APRIL PUGH, ESQUIRE

14              SHEILA BERRY, PARALEGAL

15              UNITED STATES CAPITOL POLICE

16              119 D Street, NE

17              Washington, DC 20510

18              202.593.3619

19

20    ALSO PRESENT:

21        The Court - Judge Jia Cobb (Via telephone)

22        The Court Clerk (Via telphone)
```

1                    C O N T E N T S

2    EXAMINATION OF FRED ROGERS                              PAGE

3         By Mr. Alderman                                      6

4         By Ms. Scindian                                    158

5

6    RE-EXAMINATION OF FRED ROGERS                           PAGE

7         By Mr. Alderman                                    160

8

9                     E X H I B I T S

10                (Attached to transcript.)

11   DEPOSITION EXHIBIT                                      PAGE

12    Exhibit 1   Official Correspondence Endorsement   49

13                Sheet

14    Exhibit 2   EOD Canine Training Form - Van         63

15                Meter

16    Exhibit 3   Email - New Canines Assignments to     93

17                Handlers

18    Exhibit 4   Re: Email - New Canines Assignments    94

19                to Handlers

20    Exhibit 5   Re: Email - K-9 Billy (Mal) Static    102

21                Team - Concern

22

1          E X H I B I T S (Continued)

2              (Attached to transcript.)

3    DEPOSITION EXHIBIT                              PAGE

4      Exhibit 6    Course Mid-Point Performance       108

5                   Review

6      Exhibit 7    Email - Recommendation to Drop K-9  110

7                   Billy (Mal) from the Program

8    Exhibit 8      Re: Email - Recommending to Drop    112

9                   K-9 Billy (Blk Lab) From Tony Phelps

10     Exhibit 9    Re:Email - Recommending to Drop     116

11                  K-9 Billy (Blk Lab) from Fredinal

12                  P. Rogers

13   Exhibit 10     Email - Meeting with VanMeter       120

14                  (Missy)

15   Exhibit 11     Re: Email - Recommendations to      121

16                  Remove VanMeter from the Class

17   Exhibit 12     FW: Email - Daily USCP Publications 126

18                  - November 1, 2017

19   Exhibit 13     Email - During my Canine Training   130

20   Exhibit 14     FW: Email - The Reason for the      141

21                  Request of Meeting You

22   Exhibit 15     Memorandum                          144

1              P R O C E E D I N G S

2    Whereupon,

3                   FRED ROGERS,

4    being first duly sworn or affirmed to testify to

5    the truth, the whole truth, and nothing but the

6    truth, was examined and testified as follows:

7         EXAMINATION BY COUNSEL FOR THE PLAINTIFF

8    BY MR. ALDERMAN:

9         Q    Good afternoon.

10        A    Afternoon.

11        Q    My name is Les Alderman.  I represent

12   Mauricia Van Meter in the lawsuit that she's

13   brought against Capitol Police.  I want to thank

14   you for coming today and appearing as a witness.

15   For the record, could you please let us know your

16   full name and your home address?

17        A    It's Fredinal Rogers, 10813 Marathon

18   Drive, Upper Marlboro, Maryland.

19        Q    And earlier before the deposition

20   started, I asked how I should refer to you and Ms.

21   Scindian suggested that I call you -- that I refer

22   to you as Chief Rogers.  Can you tell me where

1    you're currently employed?

2         A    Georgetown University Law Center.

3         Q    And what's your position there?

4         A    Chief of Police, Director of Safety and

5    Security.

6         Q    Okay -- okay.  Have you had your

7    deposition taken before?

8         A    I have.

9         Q    How many times?

10        A    I don't know.

11        Q    More than five?

12        A    No more than five.

13        Q    No more than five.  Have you had your

14   deposition taken in any discrimination cases?

15        A    I don't remember, no.

16        Q    Okay.  Do you remember the cases that

17   you had your deposition taken?

18        A    The name is not coming to me right now.

19        Q    Was it a Capitol Police case?

20        A    It was Capitol Police, yes.

21        Q    And was it an employment case or was it

22   a criminal matter?

1      A     Employment case.

2      Q     Okay.  Do you remember if it was brought

3 by a man or a woman?

4      A     Woman.

5      Q     And were you the -- were you the accused

6 discriminating official?

7      A     Yes.

8      Q     Okay.  Was it -- do you remember what

9 the case was about, generally speaking?

10          MS. SCINDIAN:  Objection to the extent

11 it calls for confidential information made --

12 protected under the OCWR.  So what I want to say

13 here is that the case that he's referring to is a

14 case that was brought in the Office of

15 Congressional Workplace Rights and it's

16 confidential pursuant to the statute for those

17 cases.

18          MR. ALDERMAN:  Was there a final

19 decision in the case?

20          MS. SCINDIAN:  Yes.  But it didn't go to

21 an appeal, which --

22          MR. ALDERMAN:  Okay.

1          MS. SCINDIAN:  -- means that it's not

2     something that's public.

3          MR. ALDERMAN:  So if there was a final

4     decision, then the decision is final and it's

5     public.

6          MS. SCINDIAN:  It's not public.

7          MR. ALDERMAN:  Okay.  Well, there's no

8     reason under the law that that's confidential.

9          MS. SCINDIAN:  Yes, it is.  It's -- it's

10    confidential by statute.

11         MR. ALDERMAN:  No, it's not.

12         MS. SCINDIAN:  Yes, it is.

13         MR. ALDERMAN:  Once the case is over --

14         MS. SCINDIAN:  That incorrect.

15         MR. ALDERMAN:  -- and then the time for

16    appeal is done, the case is final and it's no

17    longer public -- it's no longer confidential.

18         MS. SCINDIAN:  That's not accurate.

19         MR. ALDERMAN:  Are you instructing the

20    witness not to answer?

21         MS. SCINDIAN:  I'm instructing the

22    witness not to answer.

1          MR. ALDERMAN:  What year was the case?

2          MS. SCINDIAN:  Sheila, do you recall the

3    year?

4          MS. BERRY:  (Inaudible.)

5          MR. ALDERMAN:  Before the amendments to

6    this CAA or after?

7          MS. SCINDIAN:  It was before.

8          MR. ALDERMAN:  Okay.  I'm going to

9    research it and if it's public, I'm going to call

10   the witness back.

11         MS. SCINDIAN:  You won't be calling them

12   back because I already know it's not public.

13         MR. ALDERMAN:  Well, it might not be the

14   first time you're wrong.

15         MS. SCINDIAN:  Well, in this case --

16         MR. ALDERMAN:  Okay.

17         MS. SCINDIAN:  -- I'm not wrong.

18         MR. ALDERMAN:  Okay.  Just -- just to

19   let you know what's going to happen if you're

20   wrong.  So you can --

21         MS. SCINDIAN:  Right.

22         MR. ALDERMAN:  -- either let the --

1             MS. SCINDIAN:  Well, I'm not wrong.

2             MR. ALDERMAN:  -- witness testify, and

3     we can mark it confidential --

4             MS. SCINDIAN:  I cannot let the witness

5     testify because it is a confidential matter under

6     the CAA.

7             MR. ALDERMAN:  No.

8             MS. SCINDIAN:  And it's confidential by

9     statute.

10             MR. ALDERMAN:  So you're wrong on

11     several points.  First, the facts of what happened

12     are not confidential.  The case and everything

13     filed in the case are confidential.  The fact that

14     a pleading was filed and a complaint was filed is

15     confidential.  You've already revealed that

16     information so any confidentiality you've now --

17             MS. SCINDIAN:  No.

18             MR. ALDERMAN:  -- waived.

19             MS. SCINDIAN:  Actually, I haven't

20     because you don't know who the case was filed by.

21     You don't know any information about the case

22     beyond what he's already provided to you.

1                MR. ALDERMAN:  Okay.

2                MS. SCINDIAN:  So, yes, we've kept the

3      confidentiality of the information involving that

4      case.

5      BY MR. ALDERMAN:

6          Q     Has -- have you ever been accused, Chief

7      Rogers, of discrimination?

8          A     Yes.

9          Q     By whom?

10               MS. SCINDIAN:  And again, if it's

11     related to the case that we're talking about, then

12     you cannot reveal that information.

13               MR. ALDERMAN:  Yes, he can.  It's a

14     fact.

15               MS. SCINDIAN:  No, it's not.

16               MR. ALDERMAN:  Yes, it is.

17               MS. SCINDIAN:  If somebody has brought a

18     complaint alleging --

19               MR. ALDERMAN:  I didn't ask that.

20               MS. SCINDIAN:  -- discrimination --

21               MR. ALDERMAN:  I asked, have you been

22     accused of discrimination.

1          MS. SCINDIAN:  But if it's accused --

2          MR. ALDERMAN:  You are bringing --

3          MS. SCINDIAN:  -- during the course of

4  --

5          MR. ALDERMAN:  -- in any confidentiality

6  --

7          MS. SCINDIAN:  -- of --

8          MR. ALDERMAN:  -- at this point in time.

9          MS. SCINDIAN:  No, I'm not.

10          MR. ALDERMAN:  You are?

11          MS. SCINDIAN:  No.  Actually, I'm not.

12          MR. ALDERMAN:  So I realize that you

13  think that you're never wrong.  In this case

14  you're -- you are wrong.

15          MS. SCINDIAN:  Please show me -- please

16  show me how I'm wrong.

17          MR. ALDERMAN:  Let's call the judge.

18  Jesus.

19  BY MR. ALDERMAN:

20     Q    Did you find out that you were accused

21  of discrimination outside of a complaint filed at

22  the OCWR, Chief Rogers?

1        A    I learned of the complaint as a result

2    of the hearing.

3        Q    You only learned of the complaint about

4    you because you went to a hearing?

5        A    I met with the department counsel.

6        Q    The first time you learned of the

7    complaint was at a hearing?

8        A    I learned of the complaint with

9    department counsel.

10       Q    Did you learn of the complaint -- the

11   accusation is what I'm asking about.  When did you

12   first learn of the accusation against you?

13       A    When I met with department counsel.

14       Q    And at that point in time, was it before

15   or after the complaint itself was filed?

16       A    I don't know.

17            MR. ALDERMAN:  And you're instructing

18   him not to tell me --

19            MS. SCINDIAN:  I am instructing him not

20   --

21            MR. ALDERMAN:  -- the name of the

22   accuser?

1           MS. SCINDIAN:  -- to tell you the name

2    of the accuser --

3           MR. ALDERMAN:  Okay.

4           MS. SCINDIAN:  -- because that's

5    confidential.

6    BY MR. ALDERMAN:

7        Q    How many other accusers have you had?

8        A    None that I'm aware of.

9        Q    None that you're aware of.  You've only

10   been accused of discrimination once, to your

11   knowledge?

12       A    To my knowledge.

13       Q    But you've been -- you've had your

14   deposition taken five times or so?

15       A    I did not say five times.  I don't know

16   how many times my deposition has been taken.

17       Q    Have you ever given testimony at trial

18   or hearing?

19       A    During my earlier years as a patrol

20   officer.

21       Q    Okay.  And in criminal cases or

22   employment type cases?

1       A     Criminal cases, traffic cases.

2       Q     Okay.  You haven't given evidence

3    testimony in a hearing or trial since you were a

4    patrol officer?

5       A     I don't recall.

6       Q     Okay.  So let me just go over some

7    ground rules for the deposition.  I'm going to ask

8    you a bunch of questions today.  Hopefully, you'll

9    have a bunch of answers for me.  If you don't

10   understand any of my questions, then it's really

11   important for you to let me know that.

12       If you answer my question, then the record,

13   that's ultimately going to be transcribed, will

14   make it appear as if you've understood what --

15   what I was asking.  And so if there's any

16   ambiguity in your mind, let me know.  I'll repeat

17   the question, I'll rephrase it, I'll come from a

18   different angle.  I'll do everything I can do to

19   make sure you understand what I'm asking; okay?

20       A     Okay.

21       Q     Let's see.  From time to time, Ms.

22   Scindian may object to my questions.  Unless she

1    specifically tells you not to answer, you'll need

2    to go ahead and give me a response if you can.

3    Let her finish her objection on the record so that

4    it's clear, but -- then you can answer if you can.

5    Does that make sense?

6         A    Yes.

7         Q    Okay.  It's really important that we try

8    not to talk over each other.  So even if you know

9    what I'm going to ask you -- exactly what I'm

10   going to ask you, let me finish the sentence or

11   the question before you begin your answer.  Does

12   that make sense?

13        A    Yes, it does.

14        Q    You realize you're under oath today, so

15   everything that you say is -- needs to be true

16   under penalty of perjury.  Do you understand that?

17        A    Yes.

18        Q    Okay.  But if you, you know -- as the

19   deposition goes on, if you remember additional

20   facts or additional detail, please feel free to

21   add to anything that you've said previously.  Just

22   let me know you'd like to go back to something

1    and, you know, give me the additional information.

2    The best time to do that is while we're here so

3    that I can ask you any follow up questions that I

4    may have.  Does that make sense?

5         A    It does.

6         Q    If you need to take a break or if anyone

7    needs to take a break, that's perfectly fine.  We

8    just take -- we take as many breaks as everybody

9    needs to be comfortable.  If I've asked you a

10   question though, I'll need you to give me an

11   answer.  I think that's about it on the ground

12   rules.  Can you tell me what you did to prepare

13   for your deposition today?

14        A    I met with Counsel.

15        Q    When?

16        A    I met with Counsel yesterday and I don't

17   remember the date, in May, I believe.

18        Q    Okay.  Have you reviewed any documents?

19   I don't want to know where the documents came

20   from.  I just want to know if you've reviewed any

21   documents to prepare for your deposition.

22        A    Yes, I did.

1     Q    Okay.  Can you tell me what documents do

2 you remember reviewing?

3     A    E-mails and memorandum.

4     Q    And what e-mails do you remember

5 reviewing?

6     A    An e-mail that I sent to the K-9 command

7 staff.

8     Q    Was that e-mail about Mike Riley?

9     A    It was about the switch of -- yes.

10     Q    It was an e-mail discussing transferring

11 Mike Riley from the static training group to the

12 PBIED training group?

13     A    Yes.

14     Q    Okay.  And did you remember that e-mail?

15 You know, I realize you reviewed it while you're

16 preparing for your deposition.  Did you -- did you

17 remember receiving that e-mail back in 2017?

18     A    No, I did not.

19     Q    Okay.  Did anyone -- has anyone

20 suggested to you any facts, while you're preparing

21 for your deposition, that you did not remember?

22          MS. SCINDIAN:  Objection to the extent

1   that it calls for attorney-client privilege

2   information.

3   BY MR. ALDERMAN:

4       Q    You can answer yes or no, but it needs

5   to include whether any attorney --

6            MS. SCINDIAN:  No, it does not.

7            MR. ALDERMAN:  -- offered you

8   information that you did not know.

9            MS. SCINDIAN:  You do not have to answer

10  as regards to any conversations or communications

11  you've had with your attorney.

12           MR. ALDERMAN:  You're instructing him

13  not to answer if you told him stuff that he didn't

14  know.

15           MS. SCINDIAN:  I'm instructing him not

16  to reveal any information that I've told him in

17  the course of preparing him for this --

18           MR. ALDERMAN:  I'm not --

19           MS. SCINDIAN:  -- deposition.

20           MR. ALDERMAN:  -- asking him for the

21  information you revealed.  I'm asking yes or no.

22           MS. SCINDIAN:  It doesn't matter because

1    when you ask him --

2              MR. ALDERMAN:  Listen to my --

3              MS. SCINDIAN:  -- if --

4              MR. ALDERMAN:  -- point --

5              MS. SCINDIAN:  -- I've revealed --

6              MR. ALDERMAN:  -- please.

7              MS. SCINDIAN:  -- facts or told him

8    certain facts, you're asking about what I've

9    talked to him --

10             MR. ALDERMAN:  No.

11             MS. SCINDIAN:  -- about, and that is

12   inappropriate.

13             MR. ALDERMAN:  I'm just asking him yes

14   or no.

15             MS. SCINDIAN:  No.  He's not answering.

16             MR. ALDERMAN:  Has Counsel revealed to

17   you -- let me ask it for the record so that it's

18   clear and then you may object.

19   BY MR. ALDERMAN:

20       Q    Has Counsel offered to you facts or

21   information that you did not previously know?

22             MS. SCINDIAN:  And I'm instructing you

1   not to answer.

2   BY MR. ALDERMAN:

3        Q    Has Counsel provided to you information

4   in preparing for your deposition that you did not

5   remember?

6            MS. SCINDIAN:  Objection.  Again, to the

7   extent it calls for attorney-client privilege

8   information.

9            MR. ALDERMAN:  You're instructing him

10  not to answer?

11           MS. SCINDIAN:  To the extent it calls

12  for attorney-client privileged information.

13  BY MR. ALDERMAN:

14       Q    Okay.  Has anyone provided information

15  to you that you did not remember in preparation

16  for your deposition?

17           MS. SCINDIAN:  Same objection.  To the

18  extent it calls for attorney-client privileged

19  information.

20  BY MR. ALDERMAN:

21       Q    You may answer with respect to any other

22  information you received from anyone else besides

1    Counsel.

2        A    So repeat the question please.

3        Q    Has anyone provided you information that

4    you did not previously know about Officer Van

5    Meter's case or the facts of the case?

6            MS. SCINDIAN:  The same objection as it

7    applies to attorney-client privileged information.

8    You can answer as it applies to anyone else

9    providing information.

10           THE WITNESS:  I didn't know about this

11   case prior to speaking to Counsel.

12   BY MR. ALDERMAN:

13       Q    What do you mean you didn't know about

14   the case?

15       A    I did not know that I would be called to

16   testify or attend a deposition.

17       Q    Did -- you knew that Officer Van Meter

18   had been removed from the K-9 training program;

19   correct?  Before -- before you were preparing for

20   your deposition?

21       A    In 2017, you're asking me?

22       Q    Yes, sir.

1        A     Yes.  In --

2        Q     Okay.

3        A     -- 2017, yes.

4        Q     And did you know that Officer Van Meter

5    had filed a lawsuit back in 2018?

6        A     I left the USCP in 20 -- October 2018.

7    I don't recall a lawsuit.

8        Q     Okay.  So the -- the question stands.  I

9    realize you said that you didn't know that you

10   were going to be called as a witness in the case.

11   But my question was: Has anyone provided you

12   information relating to Officer Van Meter's case

13   that you did not previously know?

14        MS. SCINDIAN:  The same objection.  You

15   can answer to the extent that it does not involve

16   attorney-client privileged information.

17        THE WITNESS:  So let me just make sure

18   I'm getting this right in my head.  You're asking

19   me, did someone tell me about this case?

20   BY MR. ALDERMAN:

21        Q     Did anyone tell you anything related to

22   this case?  Any facts, any information that's

1   related to Van Meter's case that you didn't

2   previously know?

3           MS. SCINDIAN:  Same objection.

4   BY MR. ALDERMAN:

5       Q    For example, someone told you what her

6   dog's name was or the dates that she was in the

7   training class or, you know, anything else about

8   Van Meter's experience in K-9 training that you

9   were not aware of before that person told you?

10          MS. SCINDIAN:  Same objection.

11  Objection, vague and ambiguous.

12  BY MR. ALDERMAN:

13      Q    You can answer.

14      A    The information I have or had about the

15  Van Meter case was whatever I did in when making

16  that decision with regards to her participation in

17  the K-9 program.

18      Q    What I'm asking you is before today, has

19  anyone given you information that you did not

20  previously know about Van Meter's case, that you

21  didn't know at the time that you approved her

22  removal?

1           MS. SCINDIAN:  Same objection.

2           THE WITNESS:  So I'm not answering --

3    I'm not understanding your question, Counsel.

4    BY MR. ALDERMAN:

5        Q    Okay.  Did you approve Officer Van

6    Meter's removal?

7        A    I did.

8        Q    After that date, did anyone tell you

9    anything about Officer Van Meter and her

10   experience in K-9 training that you didn't know at

11   the time that you approved her removal?

12       A    No.

13       Q    Okay.  Did anyone remind you of facts

14   that you previously knew but had forgotten?

15          MS. SCINDIAN:  The same objection.

16          THE WITNESS:  I haven't spoken to anyone

17   about the Van Meter case that would give me

18   information like you're saying, that they gave me

19   that I didn't know?

20   BY MR. ALDERMAN:

21       Q    No.  That you didn't remember.  So I've

22   asked you first, did anyone tell you something you

1   didn't know.  Now I'm asking you, did anyone tell

2   you something you didn't remember?

3        A    So let me answer the question is the

4   conversations I've had about the Van Meter case

5   had been with counsel.

6        Q    Okay.  So other than counsel, no one has

7   provided you with any information that you didn't

8   remember?

9        A    No.

10       Q    Okay.  Has anyone shown you documents

11  that you had never seen before since the time that

12  you approved Van Meter's removal?

13       A    The only documents I have seen is in

14  consultation with counsel.

15       Q    Okay.  So it's a no?  No one besides

16  counsel has shown you any documents whether you

17  had seen them before or not?

18       A    No one other than counsel has shown me

19  any document.

20       Q    Okay.  Do you understand the nature of

21  Officer Van Meter's complaint against the Capitol

22  Police?

1      A     From speaking with Counsel.

2      Q     Okay.  So I'm going to characterize it

3  just so that we kind of have a shorthand.  She's

4  claimed that she was removed from the K-9 training

5  program because she's a woman, because she suffers

6  from anxiety, or because she was perceived to

7  suffer from anxiety and because there was a

8  perception that she had complained about

9  discriminatory treatment while she was in the

10  program; okay?

11      A     Okay.

12      Q     And do you understand those -- those

13  three, you know, aspects of her complaint?

14      A     One more time, repeat it.

15      Q     Yeah.  She was removed because she's a

16  woman.  She was removed because either she suffers

17  from anxiety or people believed she suffered from

18  anxiety.  And she was removed because of

19  retaliation because people believed that she had

20  complained about the treatment that she was

21  receiving.

22      A     Okay.

1      Q     Okay.  So I'm going to assume that you

2   knew that she was a woman; right?

3      A     Yes.

4      Q     Okay.  At the time that -- that you

5   approved her removal, you knew that she was a

6   woman --

7      A     Yes.

8      Q     -- right?  Did you know that she

9   suffered from anxiety at the time you approved her

10  removal?

11     A     No, I did not.

12     Q     Did you ever learn that?

13     A     No, I did not.

14     Q     Okay.  And did you have any information

15  about her -- complaining about her treatment

16  before the time she was removed?

17     A     No, I did not.

18     Q     Okay.  So you hadn't heard that she had

19  complained about her treatment and no one -- no

20  one told you that she did?

21     A     No, I did not.

22     Q     Okay.  Real quick, take me through your

1    history.  When -- when did you start at Capitol

2    Police?

3        A    1991 as a civilian, '92 as an officer,

4    and the remainder of my career until 2018.

5        Q    Okay.  Did you go through the -- the

6    typical chain from officer to sergeant, to

7    lieutenant to captain, inspector, deputy chief?

8        A    Correct.

9        Q    Okay.  Do you remember roughly when you

10   became deputy chief?

11       A    I don't remember.  You'd have to look at

12   the record or ask counsel for the record.

13       Q    Before you were deputy chief, you were

14   -- you would have been inspector?

15       A    Yes.

16       Q    What -- what were you -- where were you

17   posted when you were an inspector?  What was your

18   assignment when you were a inspector?

19       A    Senate Division, House Division.

20       Q    Both on the uniform side?

21       A    Yes.

22       Q    Okay.

1      A    I believe I was an inspector in the

2    Office of Administration, HR.  I was an inspector

3    at the Library of Congress.  I believe those were

4    all my assignments as inspector.

5      Q    Were you -- before you were deputy

6    chief, did you ever have any supervisory positions

7    over Special Operations or Special Operations

8    division?

9      A    No.  And when you talk about Special

10   Operations division, is there -- there are

11   different bureaus, which --

12     Q    I'm talking about the bureau that houses

13   K-9.

14     A    I did not have a command in that bureau

15   as an inspector.

16     Q    Okay.  How about be previously as

17   captain, lieutenant, sergeant?

18     A    As a lieutenant, I was a patrol

19   lieutenant on 3:00 to 11:00 and midnights.

20     Q    Is that in the PMRD?

21     A    Yes.

22     Q    Patrol and Mobile Response Division?

1      A      Yes.

2      Q      Okay.  And you remember what decade that

3  was?

4      A      2000 -- 2000-ish.

5      Q      Okay.  And then how long total were you

6  deputy chief?  Let's see if we can do it like

7  that.

8      A      I would have to look at my resume, or

9  we'd have to look at what records the department

10  has.

11     Q      I think it was longer than five years.

12     A      I would have to look at my resume to

13  answer that question.

14     Q      Why did you leave Capitol Police?

15     A      To take on a new job.

16     Q      At the time you left, were you under

17  investigation for anything?

18     A      Yes.

19     Q      What -- what were you under

20  investigation for?

21     A      The Office of IG, inspector general of

22  the department had an allegation that I assaulted

1    a female lieutenant in the command center.

2         Q    Okay.  And what -- what was the female

3    lieutenant's name?

4         A    Mendoza.

5         Q    Mendoza?

6         A    Yes.

7         Q    What's her first name?

8         A    Neysha.  N-E-Y-S-H-A

9              MS. SCINDIAN:  N-E-Y-S-H-A.

10   BY MR. ALDERMAN:

11        Q    And is -- to your knowledge, is

12   Lieutenant Mendoza still working in Capitol

13   Police?

14        A    I believe so.

15        Q    And did you assault her?

16        A    No.

17        Q    Do you know if that investigation was

18   ever concluded?

19        A    I do not know.

20        Q    Was that the only investigation into you

21   or your conduct at the time that you left Capitol

22   Police?

1        A    That I'm aware of, yes.

2        Q    Do you know if you've ever been

3   investigated by OPR?  The Office of Professional

4   Responsibility, just for the record.

5        A    I don't recall.  Somewhere along my

6   career probably, but I don't remember.

7        Q    Do you remember ever being investigated

8   by OPR for any kind of personnel action?  It's a

9   complaint brought by another officer.

10       A    I don't remember.

11       Q    And other than the -- the accusation

12  that we discussed earlier, are you aware of any

13  other discrimination allegations against you?

14       A    There was a case.  I don't know -- I

15  don't know if it was a discrimination case that I

16  spoke with Counsel with -- previous Counsel with.

17       Q    Was that a case at -- that was filed at

18  the Office of Compliance or OCWR?  Office of

19  Congressional Workplace Rights.

20       A    I don't know if that case was filed.

21       Q    Okay.  Do you remember the name of the

22  employee that -- that complained about you or that

1    made an allegation about you?

2        A    Drawing a blank.  Sergeant, K-9, drawing

3    a blank on the name.

4        Q    A K-9 sergeant?

5        A    Yes.

6             MS. SCINDIAN:  So I'm going to object

7    because this is also an OCWR matter that's made

8    confidential under the CAA.

9    BY MR. ALDERMAN:

10       Q    Did you learn about it because it was

11   filed at OCWR, or did you learn about it because

12   an allegation had been made against you?

13       A    I learned through it -- through USCP

14   counsel.

15       Q    Okay.  Was that a male or female that

16   made the complaint about you?

17       A    Male.

18       Q    Is there any Officer McBride that ever

19   made any allegations against you?

20       A    Yes.

21       Q    Okay.  And what allegations did -- did

22   McBride make?

1          MS. SCINDIAN:  And I'm going to object

2     again because once again, this is a matter covered

3     by the CAA, under the OCWR under the CAA.

4     BY MR. ALDERMAN:

5          Q     How did you find out that Officer

6     McBride made an allegation about you?

7          A     Through discussions with Counsel.

8          Q     And do you know if Officer McBride filed

9     an OCWR complaint?

10         A     Yes, sir.

11         Q     Do you know if that case went through a

12    hearing?

13         A     It did.

14         Q     Was there a final -- did the hearing

15    officer render a decision?

16         A     Yes.

17         Q     And was that decision appealed?

18         A     I don't know.

19         Q     Do you know what decade that was?

20         A     Post 2000.  Late 2000s.  I don't --

21         Q     Like, within the decade between 2000 and

22    2010?

1      A     I was already a deputy chief.  It was

2   post my promotion to deputy chief.

3      Q     Okay.  And was that a discrimination

4   complaint?

5            MS. SCINDIAN:  Again, I'm going to

6   object on the basis that it's covered by the CAA

7   and therefore it's confidential.

8            MR. ALDERMAN:  Okay.  We will revisit.

9   Counsel, do you know if that case was filed before

10  or after the change to the amendments to the CAA?

11           MS. SCINDIAN:   I believe it was before.

12           MR. ALDERMAN:  Do you know if the

13  decision was before or after?

14           MS. SCINDIAN:   I want to say it was

15  before, but it wouldn't matter because the statute

16  did not affect cases that were already in

17  progress.

18  BY MR. ALDERMAN:

19      Q     Are you aware of any complaints of

20  discrimination not about you or not -- I think

21  we've -- we've already discussed any complaints of

22  discrimination concerning you personally.  Are

1    there -- were there any more that we haven't

2    discussed?

3         A    Not that I'm aware of.

4         Q    Okay.  Are you aware of any complaints

5    of discrimination about the K-9 unit?

6         A    Say that again.

7         Q    Are you aware of any complaints of

8    discrimination involving the K-9 unit?

9         A    Involving a K-9 unit?

10         Q    Is the K-9 unit a separate, you know,

11    division or, you know, subdivision underneath the

12    bureau that we referenced earlier?  Is it called

13    K-9 unit?

14         A    Yes, it is.

15         Q    Okay.  So that's what I'm asking you.

16    Anything in -- any claims of discrimination

17    involving the K-9 unit to your knowledge?

18         A    Not that I'm aware of.

19         Q    Okay.  Do you know of any -- if there

20    were any OPR investigations into the K-9 unit

21    while you were deputy chief?

22         A    Not that I can recall.

1     Q     Do you remember Isaac Opie (phonetic)?

2  Do you remember who that was?

3     A     That name does not ring a bell.

4     Q     He was -- for a period of time, he was

5  the civilian head of K-9 training.

6     A     That name does not ring a bell.

7     Q     Doesn't ring a bell.  Okay.  You were

8  deputy chief -- just confirm this for me.  Were

9  you deputy chief at the time that Officer Van

10  Meter went through the K-9 training program in

11  2017?

12     A     Yes.

13     Q     Okay.  Were you deputy chief for the

14  2016 class?  Do you remember?

15     A     I don't remember.

16     Q     There was a officer removed from that --

17  from the 2016 class.  His name was Schwalm.  Do

18  you remember having any involvement in that

19  matter?

20     A     Yes.

21     Q     Okay.  And do you think you approved his

22  removal?

1     A     I would have to look at the documents

2     but I would have -- as the deputy chief, I would

3     have had to sign off.

4     Q     Okay.  So you think you were deputy

5     chief when Schwalm was removed in 2016?

6     A     If he was removed in 2016, I would have

7     been in the chain of command to sign off on the

8     removal.

9     Q     Okay.  Do you know if -- if you were in

10    that chain of command in 2015?

11    A     I don't remember.

12    Q     Okay.  But in 2016 yes?  Or --

13    A     Again --

14    Q     -- whenever Schwalm was removed?

15    A     Yeah.

16    Q     Yes.  You were deputy -- you were --

17    A     If you --

18    Q     -- deputy chief?

19    A     Yeah.  If my name, yes.

20    Q     Okay.  Tell me this.  What -- as deputy

21    chief, what responsibility did you have for

22    anything that was happening in the K-9 training

1    program?

2        A    I would have had overall responsibility

3    as one of the subcomponents of PMRD.

4        Q    Were there specific decisions or

5    employee actions involving folks in the training

6    program that you would have had to authorize?

7    Discipline, hiring, firing, removing candidates,

8    things of that nature?

9        A    Yes.  I would have taken part.

10       Q    Okay.  What -- what kind of actions

11   would you have taken part in involving the K-9

12   training program?

13       A    For example, vacancy announcements, I

14   would have been aware of vacancy announcements for

15   the positions.

16       Q    So if they were going to announce

17   vacancies, you would have to approve that

18   happening?

19       A    Correct.

20       Q    Okay.  How about selecting the actual

21   candidates who would be accepted into the program?

22   Would you have any involvement there?

1      A     I was not part of that process.

2      Q     Okay.  How about hiring the training

3   staff itself?  Would you have involvement there?

4      A     That would be primarily a HR function.

5      Q     Okay.  How about disciplining the

6   training staff?  What involvement would you have

7   in any disciplinary actions?

8      A     That would have taken two tracks.

9      Q     Okay.

10      A     One would have been internal to PMRD or

11   as a result of a OPR, Office of Professional

12   Responsibility case.

13      Q     And if it was internal to PMRD, what

14   would your role have been in any disciplinary

15   action?

16      A     To review the division commander's

17   decision.

18      Q     And at the time that Officer Van Meter

19   was there, do you know who the division commander

20   was?

21      A     Belknap.  Inspector Eric Belknap.

22      Q     Okay.  And if it was a -- if it was a

1   disciplinary matter that arose from an OPR

2   investigation, would your role have been

3   different?

4        A    The OPR investigation would have gone to

5   the division commander and the division commander

6   would have rendered a decision that I would have

7   reviewed.

8        Q    Okay.  So there's two paths that that

9   disciplinary action can take, either internal with

10  PMRD or through OPR, but in both cases it goes to

11  Belknap and then to you?  Or it went to Belknap

12  and then to you?

13       A    Correct.

14       Q    Because Belknap was the division

15  commander at the time?

16       A    Correct.

17       Q    Okay.  It's probably helpful if -- if

18  you could take us through the chain of command in

19  2000, you know -- the latter part of 2017 when

20  Officer Van Meter was removed.  Do you remember?

21  If Phelps was the -- was the sergeant, who was

22  above Phelps?

1    A    Phelps was the K-9 sergeant.  Stewart

2  Cromwell was the lieutenant.  I don't remember if

3  we had two captains at the time.  Belknap would

4  have been the inspector and I would have been the

5  deputy chief.

6    Q    And then above you, who would have been

7  next?

8    A    The assistant chief of -- the position

9  of assistant chief of police.

10    Q    Okay.  And do you remember that being

11  Assistant Chief Sund at the time?

12    A    At the time, correct.

13    Q    Okay.  And then who was the chief at

14  that time?

15    A    Chief Verderosa.

16    Q    Okay.  And the captain -- you -- you

17  said you didn't know if there was one or two

18  captains at the time.  Do you remember that

19  Captain Erickson was there at that time?

20    A    Yes.

21    Q    Okay.  And he would have been in the

22  chain of command between K-9 and you?

1    A    Yes.

2    Q    Okay.  Have you -- okay.  Before you

3    made your decision to approve the termination, did

4    you talk to any of the people that we just

5    mentioned?  I'll -- I'll repeat them.  Phelps,

6    Cromwell, Erickson, Belknap, Sund or Verderosa.

7    Did you communicate with any of them about whether

8    or not to remove Van Meter from the training

9    program?

10   A    The communication would have been the

11   written documentation that was submitted to me for

12   my review.

13   Q    But other than the written documentation

14   that went up the chain of command, did you have

15   any communications with anyone?

16   A    Not that I recall.

17   Q    Okay.  Now, after the point in time that

18   you approved the removal, did you have any

19   communications with those folks about -- about

20   that removal?

21   A    Not that I recall.

22   Q    Okay.  Do you remember having -- sorry,

1    it sounded like you --

2        A    No.

3        Q    Okay.  Before you decided to -- to

4    approve Van Meter's removal, had you heard or

5    learned anything, whether that was in a

6    conversation, in an e-mail, in a text message, had

7    you learned anything about her performance during

8    the training?

9        A    I don't recall.

10       Q    Do you remember learning anything about

11   any of those candidates, any of her classmates'

12   performance?

13       A    I don't recall.

14       Q    Do you remember who the -- the -- her

15   classmates were?

16       A    No, I do not.

17       Q    Okay.  Just for the record, just to help

18   out, I'm going to -- I'm going to list them for

19   you; okay?

20       A    Okay.

21       Q    There's Dmitrius Dantinne, there's Mike

22   Riley, Rob Meikrantz, Jay Schmid, Garrett Zborai,

1    and then Officer Van Meter.  Okay, six.  Does that

2    refresh your recollection if you learned anything

3    about their performance during the training class?

4         A    No.

5         Q    Okay.  Did you know any of those

6    officers that I just mentioned?

7         A    Not directly.

8         Q    Okay.  Would you have known any of them

9    by -- by sight, by face?

10        A    Zborai's name rings a bell because he

11   was a previous K-9 handler and he had been a

12   longtime K-9 handler.

13        Q    Okay.  Have you ever talked to any of

14   the trainers that were on staff at the time about

15   Officer Van Meter or her performance?

16        A    No.

17        Q    Okay.  I'm just going to --

18        A    That I recall.

19        Q    Okay.  I'm going to go through their

20   names real quick.

21        A    Okay.

22        Q    Okay.  This would be Kenny Hill, A.J.

1    Turner, Tim Cullen, Jeff Cord (phonetic) and

2    Melvin Smalls, and then of course, Sergeant

3    Phelps.  So with those names in mind, have you

4    ever had any communications with any of them about

5    Van Meter?

6         A    Not that I recall.

7         Q    Do you remember any communications with

8    any of them about any of the -- of the members of

9    that 2017 class?

10        A    Not that I recall.

11        Q    Have you ever seen any videos --

12   training videos from that class?

13        A    I don't remember seeing any videos.

14        Q    Do you remember ever seeing any training

15   videos from any class?

16        A    I don't remember seeing any videos.

17        Q    Okay.  Have you ever reviewed the

18   training records from the class, like the daily

19   training records?

20        A    No.

21        Q    Okay.  Chief Rogers, I've given you

22   what's been marked Rogers Exhibit 1.  This goes

1   from USCP and on the bottom right corner there's

2   -- there's numbers that we call the bates numbers.

3   This one goes from USCP 12 to 17.  Do you have all

4   those pages?

5          (Exhibit 1 was marked.)

6      A    Yes.

7   BY MR. ALDERMAN:

8      Q    Okay.  And have you seen this document

9   before?

10     A    Yes.

11     Q    And can you tell me what the document

12   is?

13     A    This is interoffice transmittal.

14     Q    So the first page is an interoffice

15   transmittal; right?

16     A    Correct.

17     Q    Do you see your signature on that page?

18     A    Yes.

19     Q    And what date did you sign it?

20     A    10/18 of '17.

21     Q    Okay.  And -- and then the remaining

22   pages in the exhibit are -- can you explain what

1    -- what that is?

2         A    It's a memorandum entitled

3    recommendation for removal of Officer Mauricia J.

4    Van Meter.

5         Q    Okay.  And so did you receive this

6    packet, the -- the cover page and then the memo on

7    or around October 18th, 2017?

8         A    I did.

9         Q    Okay.  And you said you've never seen

10   any of the daily training records from this class.

11   So I'm assuming that there weren't a big pile of

12   training records attached to the memo when you got

13   it?

14        A    Not that I recall.

15        Q    Can you read your handwriting?  Is that

16   -- let me-- let me ask.  On the left-hand side of

17   your signature, there is some handwriting.  Can

18   you read what that says?

19        A    Reviewed documentation is consistent

20   with unsatisfactory performance.  Return to

21   previous HD2 assignment.

22        Q    And is that your handwriting?

1      A     It is.

2      Q     Okay.  And when you -- when you write

3  there, the documentation is consistent with

4  unsatisfactory performance, you're referring to

5  the memo itself; correct?

6      A     Correct.

7      Q     Okay.  Did you notice when you -- when

8  you received the memo that Captain Erickson hadn't

9  marked the box for either approve or disapprove?

10      A     At the time?

11      Q     Yes, sir.

12      A     Yeah.  It's noted here.  He put comment.

13      Q     And did you ever communicate with him

14  about why he neither approved or disapproved?

15      A     I don't recall.

16      Q     So you may have?

17          MS. SCINDIAN:  Objection.  Calls for

18  speculation.

19          THE WITNESS:  This would have come from

20  Erickson to Belknap.

21  BY MR. ALDERMAN:

22      Q     Okay.  Did you have a communication with

1  anyone about why Erickson didn't either approve or

2  disapprove?

3      A    I don't recall having a conversation.

4      Q    Okay.  Was -- was there a requirement

5  that everyone in the chain of command approve this

6  thing?  The -- the memo or the -- I'm sorry, the

7  decision to remove Officer Van Meter?

8      A    A requirement?

9      Q    Yes, sir.

10     A    What do you mean by a requirement?

11     Q    Like, could Captain Erickson have

12 stopped the removal, if he disapproved?

13     A    If a different decision was made, this

14 would not have reached my desk.

15     Q    Okay.  So, then is it the case that if

16 Erickson had disapproved the removal decision,

17 then it would have stopped with him?

18         MS. SCINDIAN:  Objection, calls for

19 speculation.

20         THE WITNESS:  I don't know the answer to

21 that.

22 BY MR. ALDERMAN:

1      Q    Well, then what did you mean by if a

2    different decision had been made, it never would

3    have reached your desk?

4      A    Because the -- from Erickson, it went to

5    the inspector, who approved the -- the document

6    and forwarded it to me for my review.

7      Q    So then if Erickson had disapproved it,

8    would it have ever gone to Inspector Belknap?

9           MS. SCINDIAN:  Objection, calls for

10   speculation.

11          THE WITNESS:  I don't know because it

12   went to Belknap.

13   BY MR. ALDERMAN:

14     Q    Well, if you hadn't -- if you had

15   disapproved it, would you have sent it on to Sund?

16          MS. SCINDIAN:  Objection, calls for

17   speculation.

18          THE WITNESS:  I approved it.  I did not

19   disapprove it.

20   BY MR. ALDERMAN:

21     Q    If you had disapproved it, would you

22   have still forwarded it to Sund?

1          MS. SCINDIAN:  Same objection.

2          THE WITNESS:  Does that mean I have to

3   answer it?

4   BY MR. ALDERMAN:

5       Q    Yeah.

6       A    I did not disapprove the documents.

7       Q    I understand.  If you had disapproved

8   it, would you have still sent it to Sund?

9          MS. SCINDIAN:  Same objection.

10          THE WITNESS:  So let -- let me just be

11   clear, Counsel.  You're asking me to -- would I

12   have made a decision that I didn't make?  Is that

13   what you're asking me?

14   BY MR. ALDERMAN:

15       Q    I'm asking you if you disapproved of an

16   action -- of a recommended action, whether it be

17   Van Meter's removal, Schwalm's removal, anyone

18   else -- if you disapprove it, do you still forward

19   it to your supervisor in the chain of command or

20   does it end with your disapproval?

21          MS. SCINDIAN:  Objection, calls for

22   speculation.

1          THE WITNESS:  That -- that's not the

2    decision I made in this case.

3    BY MR. ALDERMAN:

4        Q    I understand.  Do you understand my

5    question?  What happens if you disapprove a

6    recommended action?

7        A    If I disapprove an action, it would be a

8    conversation with the inspector in that case.  If

9    I disapprove an -- an action, it stays with me

10   until it's resolved or would have stayed with me.

11       Q    Okay.  And then when you say it stays

12   with you until it's resolved, what resolution are

13   you referring to?

14       A    If it stays with me, that means I'm

15   asking questions or I have further questions that

16   need to be answered.

17       Q    And if after you have those questions

18   answered, you disapprove of the action, what

19   happens next?

20          MS. SCINDIAN:  Objection, calls for

21   speculation.

22          THE WITNESS:  So I -- I think --

1    Counsel, I -- I don't know how to answer your

2    question because you're asking me --

3    BY MR. ALDERMAN:

4         Q    Okay.  Did you have, when you -- have

5    you ever received any other forms like this that

6    ask for your approval?

7         A    Yes.

8         Q    Okay.  Were you free to -- to either

9    approve or disapprove?  Did you have the

10   discretion to choose to approve or disapprove or

11   did you have to approve every single

12   recommendation that came in front of your desk?

13        A    In receiving these or official

14   correspondence, they came in a variety of matters.

15        Q    Were you allowed to disapprove?

16        A    Yes.

17        Q    Did you ever disapprove of a recommended

18   decision?

19        A    You'd have to -- I don't recall.  You'd

20   have to look at the memorandum that I've signed

21   off on.

22        Q    Is there a policy that governs actions

1    such as this that tells us what happens if someone

2    in the chain of command disapproves?

3         A    The USCP probably has a directive on

4    correspondence sheets.  I don't remember.

5         Q    Okay.  Are you aware of any action that

6    you can think of right now that you ever

7    disapproved?

8         A    Not off the top of my head, Counsel.

9         Q    Are you aware of any action when anyone

10   below you ever disapproved?

11        A    I don't recall.

12        Q    How about anyone above you in the chain

13   of command ever disapproving?

14        A    I don't remember.

15        Q    You don't remember that ever happening?

16        A    No.

17        Q    Could you have stopped Officer Van

18   Meter's removal from K-9 training if you did not

19   approve?

20             MS. SCINDIAN:  Objection, calls for

21   speculation.

22             THE WITNESS:  Okay.  Let me -- again,

1  let me make sure I understand your question.

2  You're asking me if I made a different decision?

3  BY MR. ALDERMAN:

4       Q    Did you have the authority to stop

5  Officer Van Meter from being removed from K-9

6  training?

7       A    Yes.

8       Q    Okay.  And you would exercise that

9  authority by marking disapprove on the first page

10  of Exhibit 1; correct?

11      A    If that's the decision that I made.

12      Q    Right.  Okay.  Do you know if Inspector

13  Belknap had the authority to block Officer Van

14  Meter's removal?

15      A    You mean -- what do you mean by block?

16      Q    To stop it from happening?

17      A    I don't know, Counsel.

18      Q    Okay.  And so then the same answer, you

19  -- you don't know if Erickson had the authority to

20  stop the removal from happening?

21      A    With reviewing the -- the document, he

22  just commented on it.

1      Q     Did he have the authority to stop the

2    removal from happening?

3      A     So let -- let me -- maybe I can answer

4    your question differently.  The person who has the

5    authority to remove someone from the program is

6    the assistant chief of police.

7      Q     And at -- at this time, that was Sund?

8      A     Correct.

9      Q     So it needed to have his approval;

10   correct?

11     A     Correct.

12     Q     But in order to even get to his desk,

13   you needed to approve it; right?

14     A     Correct.

15     Q     Okay.  And in order to get to your desk,

16   Belknap needed to approve it; correct?

17     A     Correct.

18     Q     And in order to get to Belknap's desk,

19   Erickson needed to approve it; right?

20     A     In this case, he just commented on it.

21     Q     In order to get to Erickson's desk,

22   Cromwell needed to approve it; correct?

1      A     Correct.

2      Q     Okay.  Did you interpret Erickson's --

3  Erickson as either approving or disapproving?

4      A     Just that he made a comment on the

5  document.

6      Q     He commented and then forwarded it onto

7  Belknap; right?

8      A     Correct.

9      Q     Okay.  But you didn't have any

10 communications about what Erickson meant by

11 commenting?

12     A     Say that again.

13     Q     You didn't have any communications about

14 Belknap -- I'm sorry, Erickson's action; right?

15 His, rather than approving or disapproving,

16 commenting.

17     A     One more time, please.

18     Q     Erickson only commented.  He did not

19 approve or disapprove; correct?

20     A     Correct.

21     Q     Did you have any communications with

22 anyone about that phenomenon?

1      A     No.

2      Q     Sticking with Exhibit 1, do you know if

3  -- you just said that the -- it was the assistant

4  chief that actually -- that had the authority to

5  remove someone from K-9 training; right?

6      A     To remove someone from PMRD to another

7  division.

8      Q     Okay.  And that's what happened to

9  Officer Van Meter; correct?  She was removed from

10 PMRD and -- and placed back in another division?

11     A     Correct.

12     Q     Okay.  Did -- to your knowledge, did

13 Sergeant Phelps have the authority to stop Officer

14 Van Meter from continuing in the training course

15 before Assistant Chief Sund signed the approval?

16     A     Did he have the authority?

17     Q     Yes, to stop her from continuing in

18 training.

19     A     Until a decision was made by the -- by

20 the assistant chief; is that what you're asking?

21     Q     I'm asking at -- at any time before the

22 assistant chief signed Exhibit 1, did Phelps have

1    the authority to stop Van Meter from training?

2        A    He took her out of the training with the

3    K-9 at the time.

4        Q    Did he have the authority to do that?

5        A    The trainers have the ability to make

6    the determination of day-to-day training out at

7    the K-9 academy.

8        Q    Now, are -- you're aware then that

9    Sergeant Phelps removed Officer Van Meter from the

10   training program on October 18th, 2017?

11       A    That I do not know.

12       Q    Okay.  You weren't aware that -- that

13   Phelps removed Officer Van Meter -- where -- well,

14   let me ask you differently.  Were you aware that

15   Officer Phelps removed Van Meter from training

16   before Assistant Chief Sund approved of her

17   removal?

18       A    I am not aware.

19       Q    Okay.

20            MS. SCINDIAN:  This is just one

21   document; right?

22            MR. ALDERMAN:  Yeah.

1          MS. SCINDIAN:  Okay.

2          Pass that way.

3    BY MR. ALDERMAN:

4    Q    Chief Rogers, I've given you what's been

5    marked Rogers Exhibit 2.  It's a two-page document

6    that goes from 3135 to 3136.  Have you ever seen

7    the document before?

8          (Exhibit 2 was marked.)

9    A    I have not.

10   BY MR. ALDERMAN:

11   Q    Okay.  And I asked you earlier if you

12   had ever seen any training records for this class;

13   this is the type of training record that I was

14   referring to.  Have you ever seen one of these

15   before?

16   A    I have not.

17   Q    Okay.  If you would -- so, just to

18   identify it for the record, this is an EOD K-9

19   training form that was dated October 18th, 2017.

20   You see that at the top and top left?

21   A    Yes.

22   Q    Okay.  And the handler identified on the

1    form at the top is -- is Officer Van Meter; do you

2    see that?

3         A    Yes.

4         Q    And if you take a look at the second

5    page in the comments section, towards the middle,

6    it says -- this is towards the bottom of the

7    comment.  It says, unfortunately, because of the

8    handler's pattern of inconsistency, the handler

9    has been removed from the USCP explosive detection

10   K-9 course.

11        The handler was advised to return all issued

12   equipment.  So that was -- do you then agree,

13   based on the documentation, that Officer Van Meter

14   was removed from the class on October 18th, 2017?

15        A    According to this document.

16        Q    Okay.  And Assistant Chief Sund didn't

17   sign his approval of removing her until October

18   20th; right?  If you take a look at the -- Exhibit

19   1.

20        A    Yes.  That's the assistant chief's

21   signature.

22        Q    And then Verderosa didn't sign until the

```
1   23rd; right?

2       A    Yes.

3       Q    Do you know what -- what would have

4   happened if either Sund or Verderosa disapproved

5   of Officer Van Meter's removal?

6            MS. SCINDIAN:  Objection, calls for

7   speculation.

8   BY MR. ALDERMAN:

9       Q    Would she have been placed back in

10  training?

11           MS. SCINDIAN:  Same objection.

12           THE WITNESS:  Yeah.  I mean, the final

13  -- the chief has the final decision-making

14  authority.

15  BY MR. ALDERMAN:

16      Q    And so if he disapproved of the removal,

17  he would have placed the -- Officer Van Meter

18  would have gone back to the training class; right?

19           MS. SCINDIAN:  Same objection.

20           THE WITNESS:  The chief would have had

21  the final authority to make whatever decision he

22  thought was necessary in this particular case.
```

1    BY MR. ALDERMAN:

2        Q     When you're referring to the chief, are

3    you talking about Assistant Chief Sund or are you

4    talking about Chief Verderosa?

5        A     Ultimately, the chief of police has

6    final authority.

7        Q     Okay.  And so ultimately Verderosa had

8    to approve Officer Van Meter's removal before she

9    could be taken out of PMRD; right?

10           MS. SCINDIAN:  Objection,

11    mischaracterizes the testimony.

12    BY MR. ALDERMAN:

13       Q     Correct?

14       A     Ultimately, the chief of police is

15    responsible for actions that take place within the

16    department.

17       Q     So can you explain what you meant -- you

18    said earlier that the assistant chief was who

19    needed to approve the removal -- Officer Van

20    Meter's removal from PMRD, so was it the assistant

21    chief or the chief that needed to approve it?

22       A     So the chief has ultimate overall

1    authority of the department.

2         Q    Okay.

3         A    In practice, the assistant chief makes

4    the assignment of personnel within the chief of

5    operations sphere, under the guidance of the chief

6    of police; that's how that works.

7         Q    Okay.  But on this particular occasion,

8    this official correspondence endorsement sheet has

9    Verderosa as the last signature; right?

10        A    Yes.

11        Q    And that means that he was in the

12   decision-making chain; correct?

13        A    Yes.

14        Q    And so if he disagreed, he could have

15   stopped Officer Van Meter from being removed from

16   the training class; correct?

17             MS. SCINDIAN:  Objection, calls for

18   speculation.

19             THE WITNESS:  Again, Counsel, I think

20   you're asking me to answer a question of something

21   that didn't happen.

22   BY MR. ALDERMAN:

1      Q     Right.  I'm asking you if he had the

2   authority to disapprove of Officer Van Meter's

3   removal.

4            MS. SCINDIAN:  Objection, calls for

5   speculation.

6            THE WITNESS:  The chief of police runs

7   the overall operations of the USCP.

8   BY MR. ALDERMAN:

9      Q     Okay.  And if Officer Van Meter had been

10  restored to training, do you know would it have

11  been possible to give her -- she would have then

12  missed about five days of training, plus or minus

13  -- would it have been possible to give her

14  additional time in training so that she could

15  catch up?

16           MS. SCINDIAN:  Objection, calls for

17  speculation.

18           THE WITNESS:  Okay.  So I think you just

19  -- so -- repeat the question.

20  BY MR. ALDERMAN:

21     Q     If Officer Van Meter had been restored

22  to the training -- so Sergeant Phelps removed her

1   on the 18th.  If Verderosa had disapproved on the

2   23rd, she would have missed several days of

3   training; correct?

4           MS. SCINDIAN:  Objection, calls for

5   speculation.

6           THE WITNESS:  That is -- that is not

7   what happened in this case.

8   BY MR. ALDERMAN:

9       Q    I understand.  So listen to the

10  question.

11      A    Okay.

12      Q    I'm not asking you what happened, I know

13  what happened.

14      A    Okay.

15      Q    Okay.  I'm asking you what if; okay?

16  You were an employee of Capitol Police for over 30

17  years; right?

18      A    27-ish --

19      Q    And you were in the supervisory ranks

20  for a large part of that; right?

21      A    Yes.

22      Q    You were the deputy chief over a bureau;

1    right?

2         A    Yes.

3         Q    Okay.  You're familiar -- you were

4    familiar with Capitol Police rules and regulations

5    at the time; right?

6         A    You're asking me, was I familiar?

7         Q    Yeah.

8         A    Yes.

9         Q    Okay.  So my question is: Based on your

10   knowledge of Capitol Police operations and rules

11   and regulations, if Verderosa had disapproved of

12   the removal and Officer Van Meter went back to

13   training after having missed several days, could

14   she have been given additional time in training to

15   make up for what she lost?

16        MS. SCINDIAN:  Objection.  Calls for

17   speculation.

18        THE WITNESS:  You're asking me what

19   decision the chief of police would have made --

20   BY MR. ALDERMAN:

21        Q    No.

22        A    -- I don't know the answer to that.

1      Q      No, no, no. I'm asking you, was it

2   possible to give Van Meter more time in training?

3      A      Who to give Van Meter more time in

4   training?

5      Q      Anyone.  Were you above -- I'm sorry,

6   were you above the K-9 training program in the

7   chain of command?

8      A      Yes.

9      Q      Were you above Sergeant Phelps?

10      A      Yes.

11      Q      Could you have given instructions to

12   Sergeant Phelps?

13      A      Yes.

14      Q      Could you have told him to give Van

15   Meter more time in training?

16      A      But that's not the case.

17      Q      Could you have?  Do you understand I'm

18   asking you about your authority?

19          MS. SCINDIAN:  Same objection.

20   BY MR. ALDERMAN:

21      Q      Not what you did it, what you could have

22   done.

1       A    You're asking me to speculate on a

2    decision I didn't make.

3       Q    Yeah, you're right.  Could you have done

4    the right thing, in my point of view, and given

5    Van Meter more time in training?

6            MS. SCINDIAN:  Objection.  Calls for

7    speculation and argumentative.

8    BY MR. ALDERMAN:

9       Q    And now you can answer.

10      A    That's not the decision I made in this

11   case, Counsel.

12      Q    I understand.  Are you refusing to

13   answer my question?

14      A    No, I am not.

15      Q    Okay.  Then please answer it.

16      A    Repeat your question, Counsel.

17      Q    Could you have made sure that Officer

18   Man [sic] Meter received more time in training?

19           MS. SCINDIAN:  Objection.  Calls for

20   speculation.

21           THE WITNESS:  To answer your question,

22   Counsel, in this case, I made the decision that

1    she was to be removed from training.

2    BY MR. ALDERMAN:

3         Q    I know what you did in this case.  I'm

4    the lawyer for Van Meter, I know everything that

5    happened.  What I'm asking you is what was your

6    authority?  Could you have instructed the training

7    staff to give Officer Van Meter or any other

8    student more time in training?

9              MS. SCINDIAN:  Same objection.

10             THE WITNESS:  Counsel, I'm answering

11   your question as best as I understand it.  That is

12   not the decision that I made in this particular

13   case.

14   BY MR. ALDERMAN:

15        Q    Okay.  So let me get one thing straight.

16   I know what you did; okay?  I know that you

17   approved Van Meter's termination from the program.

18   I'm not asking you about that.  What I'm asking

19   you about is what you had authority to do.  Did

20   you have authority to instruct the training staff

21   to extend the training program for any handler

22   candidate?  Forget Van Meter.  Any handler

1    candidate.

2              MS. SCINDIAN:  Same objection.

3              THE WITNESS:  Counsel, I don't know how

4    to answer your question.

5    BY MR. ALDERMAN:

6        Q    Well, you already answered it, actually,

7    at the time when you told the training staff that

8    they could keep a handler in training for several

9    more weeks and that there was no rush to complete

10   the training.

11             MS. SCINDIAN:  Question --

12   BY MR. ALDERMAN:

13       Q    Remember that?

14             MS. SCINDIAN:  -- that's -- that's not

15   even a question.  Argumentative.

16   BY MR. ALDERMAN:

17       Q    You remember doing that?

18       A    I do.

19       Q    Okay.  So why are you giving me such a

20   hard time with my question?

21       A    Sir, I have no intent of giving you a

22   hard time --

1      Q      Okay.

2      A      -- with your question.

3      Q      So for whom did you tell the training

4   staff that they could give more time?  Which

5   handler did you tell the training staff that they

6   could give more time in training?

7      A      In this -- in --

8      Q      Sure.

9      A      -- in this case or in general?

10     Q      Have you done it more than once?

11     A      No.

12     Q      Okay.  Then just tell me what you know.

13     A      So the case that I believe you're

14   referring to is Officer Riley.

15     Q      Okay.  And did you tell the training

16   staff that Officer Riley could have more time in

17   training?

18     A      In this case, it's because Officer Riley

19   switched from the static program to the PBIED

20   program mid training.

21     Q      Was there some rule that restricted your

22   ability to extend training only for handlers who

1    were switching from static to PBIED?

2        A     K-9 program is fixed in terms of

3    training weeks or hours.

4        Q     Was there some rule, policy, practice

5    that prevented the trainine -- the training

6    program from being extended for Officer Van Meter?

7            MS. SCINDIAN:  Objection.  Asked and

8    answered.

9            THE WITNESS:  The training program is a

10   fixed period of time.

11   BY MR. ALDERMAN:

12       Q     Was there a rule that prevented you or

13   anyone else from extending that fixed period of

14   time?

15           MS. SCINDIAN:  Objection.  Asked and

16   answered.

17           THE WITNESS:  Counsel, there was --

18   there's a fixed period for training for those

19   programs.

20   BY MR. ALDERMAN:

21       Q     Was there a rule that stopped you or

22   anyone else from extending the period of time in

1   training?

2          MS. SCINDIAN:  Objection.  Asked and

3   answered.

4          THE WITNESS:  The K-9 training program

5   is a fixed --

6   BY MR. ALDERMAN:

7      Q    So why are you --

8      A    -- period of time.

9      Q    But you agree that -- that you said that

10  Riley could have additional time; correct?

11     A    I did.

12     Q    Okay.  Was there a rule that stopped you

13  from doing that, that you had to make an exception

14  to?

15         MS. SCINDIAN:  Objection.

16  BY MR. ALDERMAN:

17     Q    And if so, where is that rule?

18         MS. SCINDIAN:  Objection.  Asked and

19  answered.

20         THE WITNESS:  In extending the time for

21  Riley, it was meeting the same K-9 program

22  requirements.

1    BY MR. ALDERMAN:

2        Q    What same K-9 program requirements?

3        A    However long the training program was.

4        Q    Are you aware, sitting here today --

5    listen to the question; okay?  Because I want an

6    answer to it.  Are you aware of a rule that said

7    that the K-9 training program must be completed

8    within the time period defined, 14 weeks for the

9    static?

10            MS. SCINDIAN:  Objection.  Asked and

11   answered.

12            THE WITNESS:  That will be the defined

13   period for the training program.

14   BY MR. ALDERMAN:

15       Q    Are you aware of a rule that makes that

16   set in stone and it cannot be extended?

17            MS. SCINDIAN:  Same objection.

18            THE WITNESS:  That is the period of time

19   that's allocated for training.

20   BY MR. ALDERMAN:

21       Q    Have you ever been late for anything?

22       A    I have.

1          MS. SCINDIAN:  Objection.

2          MR. ALDERMAN:  Okay.

3          MS. SCINDIAN:  Irrelevant.

4    BY MR. ALDERMAN:

5        Q    So you have a meeting that's starts at

6    5:00; right?  The meeting starts at 5:00, but

7    people are late, right, to meetings.  Are you

8    aware --

9        A    It's not quite the --

10       Q    -- of this phenomena?

11       A    Meeting starts at 5:00, people arrive

12   late.

13       Q    Or a meeting is supposed to be two hours

14   and it goes two-and-a-half hours, have you ever

15   heard of anything like that happening?

16          MS. SCINDIAN:  Objection.  Irrelevant,

17   and calls for speculation.

18          THE WITNESS:  Have I heard of that?

19   BY MR. ALDERMAN:

20       Q    Yeah.

21       A    Yes, I have heard of --

22       Q    Yeah.

1      A      -- that.

2      Q      Have you ever had a meeting that went

3 longer than it was supposed to?

4            MS. SCINDIAN:  Same objection.

5 Irrelevant.  Calls for speculation.

6            THE WITNESS:  Yes.

7 BY MR. ALDERMAN:

8      Q      Okay.  So we know that things can go

9 beyond the initially previewed time; correct?  In

10 general, in life.

11            MS. SCINDIAN:  Objection.  Irrelevant.

12 Calls for speculation.

13            THE WITNESS:  In life, yes.

14 BY MR. ALDERMAN:

15      Q      Okay.  Are you aware of some rule or

16 policy that prohibited the K-9 training program

17 from being extended for any particular handler?

18            MS. SCINDIAN:  Same objection.  Asked

19 and answered.

20            THE WITNESS:  In this particular case,

21 the K-9 training is within a defined period.

22            MR. ALDERMAN:  Okay.  You keep repeating

1    the same thing, which is not my question, okay.

2    It's not responsive.

3           MS. SCINDIAN:  It is responsive.

4    BY MR. ALDERMAN:

5        Q    I'm asking you, is there a rule that

6    stops that defined period of time from being

7    extended?

8           MS. SCINDIAN:  Same objection.  Asked

9    and answered.

10          THE WITNESS:  Counsel, I'm answering --

11   BY MR. ALDERMAN:

12       Q    Do you know of a rule --

13       A    -- we have a rule, Counsel.

14       Q    Okay.  Do you know of a rule that

15   prohibits that defined period of time from being

16   extended?

17       A    That training period is a fixed amount

18   of time, Counsel.

19       Q    Do you know of a rule that stops that

20   set period of time from being extended, yes or no?

21          MS. SCINDIAN:  Same objection.

22          THE WITNESS:  Counsel, the answer is the

1    same.  It's a fixed amount of time that's

2    dedicated for K-9 training.

3    BY MR. ALDERMAN:

4        Q    I'm going to ask it again.  Are you

5    aware of a rule that stop that fixed amount of

6    time from being extended?

7            MS. SCINDIAN:  Same objection.  Asked

8    and answered.

9    BY MR. ALDERMAN:

10       Q    Not answered yet.

11       A    Counsel --

12       Q    We'll keep going.

13       A    -- the answer is the same, Counsel.

14       Q    What's the -- tell me -- let's break

15   down your answer.  You're saying that there is --

16   where does this fixed period of time exist?

17       A    You would have to go to the SMEs and ask

18   that particular question, Counsel.

19       Q    You don't know?  You don't know where

20   the fixed period of time exists; right?

21       A    K-9 training is defined as a fixed

22   amount of time in the program.

1      Q    Do you know of a rule that stop someone

2    from extending that period of time?

3           MS. SCINDIAN:  Objection.  Asked and

4    answered.

5           THE WITNESS:  Counsel --

6    BY MR. ALDERMAN:

7      Q    It's -- it's okay to say, I don't know

8    --

9      A    -- Counsel --

10     Q    -- if you don't know.  You realize that;

11   right?

12     A    -- I'm telling you what I know, Counsel.

13     Q    And what do you know?

14     A    It's a fixed -- K-9 training --

15     Q    Okay.

16     A    -- is a fixed amount of time.

17     Q    Where's the rule that says it's a fixed

18   amount of time?

19     A    That's the amount of time that's --

20     Q    Where -- you're saying you're -- you

21   know this.  Where do you know it from?  What's

22   your source of information?

1     A     -- that's the length of time that

2  students are in the K-9 training program.

3     Q     How do you know that?

4     A     That students graduate after the fixed

5  amount of time is complete.

6     Q     So students must graduate together after

7  the fixed amount of time?

8          MS. SCINDIAN:  Objection.

9  Mischaracterizes the testimony.

10 BY MR. ALDERMAN:

11    Q     Is that what you say?

12    A     They're in the program for a fixed

13 amount of time -- I -- I -- I just don't know how

14 else to answer your question.

15         MR. ALDERMAN:  See because the reason

16 is, you're deliberately not answering my question,

17 and it's clear based on our colloquy that you

18 don't want to answer the question.

19         MS. SCINDIAN:  He's answered the

20 question.

21         MR. ALDERMAN:  No.  He hasn't.

22         MS. SCINDIAN:  I'm going to object to

1    this sort of argumentative -- just because you're

2    not getting the answer that you want --

3              MR. ALDERMAN:  I'm not getting any

4    answer.

5              MS. SCINDIAN:  -- you do not get to

6    attack my witness.  He's given you an answer and

7    that's it.  He can't answer further than what he

8    know.

9              MR. ALDERMAN:  So you instruct him not

10   to answer my question.

11             MS. SCINDIAN:  No, I'm not going to do

12   that.

13             MR. ALDERMAN:  So that I can bring to

14   the judge.

15             MS. SCINDIAN:  No.

16             MR. ALDERMAN:  Okay.

17             MS. SCINDIAN:  I'm not going to do that

18   --

19             MR. ALDERMAN:  Okay.

20             MS. SCINDIAN:  -- because he's answered

21   it 100 times already.

22             MR. ALDERMAN:  No.

1          MS. SCINDIAN:  Just because you're not

2    --

3          MR. ALDERMAN:  None that he wants --

4          MS. SCINDIAN:  -- getting the answer

5    that you want --

6          MR. ALDERMAN:  Are you

7          MS. SCINDIAN:  -- does not mean that you

8    can sit here and berate my witness.

9          MR. ALDERMAN:  Just getting an answer.

10          MS. SCINDIAN:  No, you've gotten an

11    answer --

12          MR. ALDERMAN:  Are you aware --

13          MS. SCINDIAN:  -- a 100 times.

14    BY MR. ALDERMAN:

15       Q    -- Chief, are you aware of a rule that

16    prohibits the training period being extended for

17    any particular handler?

18          MS. SCINDIAN:  Objection.  Asked and

19    answered.

20          THE WITNESS:  Counsel, training for K-9

21    is within a fixed amount of time.

22    BY MR. ALDERMAN:

1      Q     Are you aware of a rule that prohibits

2   that fixed amount of time from being extended?

3            MS. SCINDIAN:  Same objection.

4            THE WITNESS:  Counsel, training is for a

5   fixed amount of time.

6   BY MR. ALDERMAN:

7      Q     Where are you getting your knowledge

8   from?

9      A     From the training program that exists

10   within K-9.

11      Q     Are you saying that the training -- I'm

12   sorry, maybe I'm asking it different.  Are you

13   saying the training period cannot be extended?

14      A     I'm saying the training program is a

15   fixed amount of time within the K-9 program.

16      Q     Can it be extended?

17            MS. SCINDIAN:  Objection.  Asked and

18   answered.

19            THE WITNESS:  It is the fixed amount of

20   time within --

21   BY MR. ALDERMAN:

22      Q     Can it be extended?

1      A      -- that program.

2             MS. SCINDIAN:  Same objection.

3             THE WITNESS:  Counsel, the answer is the

4      same.

5      BY MR. ALDERMAN:

6      Q      Do you know if it can be extended?

7             MS. SCINDIAN:  Same objection.

8             THE WITNESS:  Training is that the fixed

9      amount of --

10     BY MR. ALDERMAN:

11     Q      Okay.  I'm going to go to the Judge.

12     A      -- time, Counsel.

13            MS. SCINDIAN:  Sir, we can take a break.

14            (Whereupon, a recess was taken.)

15     BY MR. ALDERMAN:

16     Q      So we're going to put a pin in that line

17     of questioning and move on to something else until

18     we get a -- a ruling.  Can you tell me about how

19     many classes -- how many K-9 training classes you

20     think went through while you were deputy chief?

21     A      I don't know.

22     Q      More than five, less than five?

1        A     I don't know, Counsel.

2        Q     Were you aware of sort of the general

3    progress of those classes, you know, kind of how

4    the classes went or were organized?  Let me -- let

5    me -- let me make sure that you understand what

6    I'm asking.

7         I'm asking, like, did you know that there was

8    a period in time when the handlers were not

9    assigned to dogs and they were working with

10   various dogs, and then a period of time in which

11   all of the teams work together before they were

12   split off into PBIED and static training groups,

13   aware of things like that?

14       A     Generally?

15       Q     Yes, generally.

16       A     Yes.

17       Q     Okay.  And how -- how did you become

18   aware, generally, of that, you know, progression

19   through?

20       A     Through conversation, through the

21   program.  I -- I don't know if there's one

22   specific way --

1      Q    Okay.

2      A    -- that I learned about it.

3      Q    Okay.  And did the trainers ever tell

4  you sort of what their expectations were for the

5  class as it continued -- as it progressed?  Like,

6  in other words, did anyone ever say, you know, the

7  first few weeks they expect people don't really

8  know what they're doing because they haven't

9  handled the dog before, and so everybody is -- you

10  know, there's a learning curve, you know, anything

11  like that?

12      A    I don't recall any trainer telling me

13  that specifically.

14      Q    Okay.  Okay.  Did you keep -- did you

15  keep track of the training progression, how the

16  class was progressing?

17      A    I did not.

18      Q    Okay.  Did you receive any briefings

19  about how those classes were progressing?

20      A    I did not.

21      Q    Okay.  Did you receive any memos or

22  e-mails giving you -- you know, just information

1    about the class' progress?

2        A    Not that I recall.

3        Q    Did you ever speak to Phelps directly

4    about that K-9 training class, the 2017 class?

5        A    Not that I recall.

6        Q    How about Cromwell?  Did you ever talk

7    to Cromwell specifically about that class?

8        A    Not that I recall.

9        Q    And same question, but instead of just

10   talking, did you have any communications with

11   Phelps about that training class?

12       A    Not that I recall.

13       Q    And Cromwell?

14       A    Not that I recall.

15       Q    How about Belknap?

16       A    Not that I recall.

17       Q    Okay.  Do you remember when you first

18   learned that there was any problem with Officer

19   Van Meter in that class?

20       A    No.

21       Q    Did you learn that there were any issues

22   with Van Meter before you got the -- the

1    recommendation to remove her --

2        A    Not that I --

3        Q    -- to your knowledge?

4        A    Not that I recall.  Not that I recall.

5        Q    Okay.  Let me -- are you saying that it

6    could be either way?  Maybe you did, maybe you

7    didn't, you just don't remember?  Or are you

8    saying that I don't remember receiving --

9        A    I don't remember receiving any

10   communication.

11       Q    Okay.  Did you ever learn that anyone

12   else -- that there were any issues with anyone

13   else in that class?

14       A    I don't remember.

15       Q    Okay.

16            MS. SCINDIAN:  I should have a career or

17   something again.  I feel bad.

18            MR. ALDERMAN:  Good.  Good.

19            MS. SCINDIAN:  Pass that down.

20   BY MR. ALDERMAN:

21       Q    Chief Rogers, you've been given Exhibit

22   3.  This one bears the Bates number 4116.  And

1    it's an August 22nd, 2017 e-mail from Phelps to

2    Stewart Cromwell with a copy to Captain Erickson.

3    Have you ever seen this document before?

4              (Exhibit 3 was marked.)

5        A    I have not.

6    BY MR. ALDERMAN:

7        Q    Have you ever seen any part of the -- of

8    that e-mail from Phelps?

9        A    I do not remember this document.

10       Q    Okay.

11             MS. SCINDIAN:  One second.  Do you hear

12   ringing?

13             MS. BERRY:  I do.  I hear a ringing, but

14   I think it's somewhere else.

15             MR. ALDERMAN:  I think it's -- I think

16   it's somewhere else.

17             MS. SCINDIAN:  Oh, okay.

18             MR. ALDERMAN:  And this phone finally

19   works.  How exciting.

20   BY MR. ALDERMAN:

21       Q    Okay.  Never seen this document before?

22       A    No.

1       Q    Okay.  Go ahead and turn it over.

2  Thanks very much.

3            MS. SCINDIAN:  Oh no, that one's yours.

4            MR. ALDERMAN:  Oh, okay.  Sorry.

5  BY MR. ALDERMAN:

6       Q    Okay.  Chief Rogers, you've now been

7  given Exhibit 4.  This one bears the Bates number

8  of USCC 4097.  And you'll see at the bottom it's

9  the same e-mail from Phelps dated August 22nd that

10 we were looking at in Exhibit 3.

11           PARARGRAPH:  And above that is -- are --

12 an e-mail chain between Captain Erickson and

13 Phelps, where Erickson is asking if Phelps

14 documented something on a CP 550.  Have you ever

15 seen this or any part of this e-mail chain before?

16           (Exhibit 4 was marked.)

17      A    I have not.

18 BY MR. ALDERMAN:

19      Q    Okay.  Do you know what a CP 550 is?

20      A    Yes.

21      Q    What -- what is it?

22      A    It's a performance note.

1     Q     Okay.  And is that a performance note

2  that goes in someone's personnel folder?  That

3  employee's personnel folder?

4     A     Yes.

5     Q     Okay.  And is that used to -- to warn an

6  employee that action might be taken as a result of

7  their performance?

8     A     It's used to document performance.

9     Q     Okay -- okay.  But you were not aware of

10  this e-mail exchange back on August 22nd?

11     A     No.

12     Q     Okay.  Were you aware at any point in

13  time before your deposition, if you take a look at

14  the very bottom of the e-mail on Exhibit 4.  So,

15  this is Phelps' August 22nd e-mail.  Do you see

16  where he refers to if Officer Van Meter's

17  performance doesn't improve within the next few

18  weeks, a recommendation will be put forward to

19  remove her from training.  Do you see that?

20     A     Yes.

21     Q     Were you aware that Officer Van Meter

22  was warned that she could be removed from training

1    back on August 22nd, 2017?

2          A    I was not.

3          Q    Okay.  So, when you approved her

4    removal, you weren't aware that she had been

5    warned on August 22nd?

6          A    I was not.

7          Q    Okay.  Do you recall any other -- I'll

8    just benchmark this thing and you can verify this,

9    I think on Exhibit 1.  If you take a look at the

10   second page of Exhibit 1, which bears the Bates

11   number USCP 13.

12         A    Okay.

13         Q    Paragraph -- look at the second page if

14   you don't mind, Chief.  Paragraph 3A?

15         A    Yes.

16         Q    Says that the training class began on

17   August 7, 2017?

18         A    Yes.

19         Q    Do you see that?

20         A    Yes.

21         Q    Okay.  And now referring to --

22         A    August 7.

1      Q      Seventh.

2      A      Yes.

3      Q      Yeah.  August 7, 2017?

4      A      Yes.

5      Q      Now, referring you back to Exhibit 4, I

6  just wanted to benchmark for you when the class

7  started.  Do you see Officer Van -- this -- this

8  e-mail notation about Officer Van Meter being

9  warned about removal occurred on August 22nd?

10     So, 15 days after the class started is when

11 she received the warning.  Are you aware of any

12 other student being warned about removal within

13 the first 15 days of training?

14     A      I am not.

15     Q      Are you aware of other folks that were

16 removed from training?

17     A      What do you mean removed from training?

18     Q      Failed out.  Removed like Van Meter?

19     A      You mentioned earlier --

20     Q      Schwalm?

21     A      Schwalm.

22     Q      Okay.  Anyone else?

1      A      Not that I recall.

2      Q      Did you review any documents in the

3  Schwalm letter?

4      A      I -- I don't even know how long ago that

5  was.

6      Q      Okay.  Do you know when he was first

7  warned that he -- he could be removed?

8      A      I do not know.

9      Q      Okay.  If you had known -- if -- if you

10  had received this e-mail on August 22nd, 2017,

11  would you have made any inquiries about Van

12  Meter's performance upon reading this?

13          MS. SCINDIAN:  Objection.  Calls for

14  speculation.

15          THE WITNESS:  I didn't know about --

16  BY MR. ALDERMAN:

17      Q      Do you understand my question?

18      A      -- I just got you.

19      Q      If you had known, would you have made

20  any inquiries?

21          MS. SCINDIAN:  The same objection.

22          THE WITNESS:  I'm sorry, Counsel.  But I

1  didn't know.

2  BY MR. ALDERMAN:

3      Q    Yes.  If you didn't know, do you

4  understand that phrase?  If you didn't know, would

5  you have -- sorry.  If you did know, would you

6  have made inquiries?

7          MS. SCINDIAN:  Same objection.

8          THE WITNESS:  I'm sorry, Counsel.  I

9  didn't know about it, so I don't know how I would

10  have made an inquiry about it.

11  BY MR. ALDERMAN:

12      Q    Okay.  Do you have -- do you have any

13  conditions -- medical conditions, mental health

14  conditions, or otherwise that -- that prohibit you

15  from testifying today truthfully and fully?

16      A    No, sir.

17      Q    Okay.  Do you have any medical

18  conditions or otherwise that stop you from

19  contemplating hypothetical situations?

20      A    No.

21      Q    Okay.  So, I'll ask the question again

22  and then -- and then we'll add it to the list of

1    things to talk about with the judge if -- if I get

2    the same answer.  If you had known that Officer

3    Van Meter was threatened with removal on August

4    22nd, would you have made any inquiries?

5                MS. SCINDIAN:  Same objection.

6                THE WITNESS:  The answer is I did not

7    know about this.

8    BY MR. ALDERMAN:

9        Q    Okay, we will add that note.  Okay.  You

10   can put that aside.  Did Lieutenant Cromwell ever

11   tell you about communications he had with the

12   training staff concerning Officer Van Meter?

13       A    Not that I recall.

14       Q    Did he ever tell you about

15   communications he had with the training staff

16   about any of the other handlers in her class?

17       A    I that I recall.  Not -- sorry.  Not

18   that I recall.

19       Q    Sorry.  Taking a look back at Exhibit 4,

20   you see this is about halfway through under the --

21   there's a heading called EDD on this thing and

22   there's an entry about K-9 Billy (Lab) - Riley?

1      A    Yes.

2      Q    Do you see that?  And then it says,

3    quote, Mike's footwork when working the K9s is

4    very stiff.  PBIED handlers need to be fluid and

5    smooth, which Mike isn't.  When meeting with him,

6    he understood how he came to the decision we did.

7    Have you ever seen or -- or yeah, that part of the

8    e-mail?

9      A    I have not.

10     Q    Okay.  Were you aware that a decision

11   was made that Riley would not be assigned to PBIED

12   because he was very stiff when working a K9 and he

13   was not fluid and smooth?

14     A    I'm not aware of that.

15     Q    Okay.  Were you aware -- later on --

16   you're -- you're aware later on that Mike Riley

17   was switched to PBIED?

18     A    Yes, I am.

19     Q    Okay.  Were you involved in that

20   decision making?

21     A    No.

22     Q    Did you have to approve switching him to

1   PBIED?

2          A      No.

3          Q      Okay.  Were you aware that anyone

4   questioned Phelps on the decision to switch Riley

5   to PBIED?

6          A      I'm not aware of that.

7          Q      Chief Rogers, you've now been given

8   Exhibit 5.  This one goes from USCP 6-7.  Do you

9   see that on the bottom right corner?

10             (Exhibit 5 was marked.)

11         A      Yeah.

12  BY MR. ALDERMAN:

13         Q      The earliest e-mail on the two-page

14  document appears on the second page.  It's dated

15  September 7, 2017 from Tony Phelps and it's

16  address to Lieutenant.  Have you ever seen that

17  e-mail before?

18         A      Prior to this?  No.

19         Q      Prior to today?

20         A      Was prior -- this was forwarded to me --

21         Q      Yes.

22         A      -- on Monday, September 11th.

1     Q     Did you read it?

2     A     Do I -- do I remember this document?  I

3  do not remember this document.

4     Q     Okay.  Did you read it when it was

5  forwarded to you on the 11th?

6     A     Yes.

7     Q     Okay.  But you don't remember -- you

8  don't -- you didn't remember receiving it before I

9  asked you about it?

10     A     That is correct.

11     Q     Okay.  Is this a document you reviewed

12  in preparation for your deposition?

13     A     It is not.

14     Q     Okay.  So looks like what -- Inspector

15  Belknap forwarded this document to you just to

16  keep you updated; is that right?

17     A     Yes.

18     Q     Was he in regular practice of doing that

19  with respect to the progress of the training

20  class?

21          MS. SCINDIAN:  Objection.  Vague and

22  ambiguous.

1          THE WITNESS:  I don't even remember this

2    particular e-mail.

3    BY MR. ALDERMAN:

4          Q    Do you remember receiving any

5    communications from Belknap regarding this

6    training class?

7          A    Apart from the documents that you're

8    showing me, no, I do not.

9          Q    Okay.  Did you have any communications

10   with anyone related to the information found in

11   Phelps' e-mail?

12         A    Did I have communication with anyone?

13         Q    Yes.

14         A    Not that I recall.

15         Q    And so if you take a look at Phelps'

16   e-mail, the first two paragraphs, he's referring

17   to problems associated with Billy the Mal, which

18   is one of the dogs that was assigned to Dmitrius

19   Dantinne.  Do you remember having any

20   communications about any issues with Officer

21   Dantinne's dog?

22         A    I don't recall.

1      Q      And do you remember any issues with

2   respect to Dantinne and his performance in

3   training?

4      A      I don't remember.

5      Q      The third paragraph relates to Officer

6   Van Meter, and again, it refers to making a

7   recommendation on her.  The last couple lines

8   there, Phelps writes, quote, It's early on -- it's

9   early on making a recommendation on her, but

10  wanted you to be aware as we reach the halfway

11  point next week.  Do you remember having any

12  communications about Van Meter's performance in

13  training around the time of this e-mail?

14     A      I do not.

15     Q      Do you remember receiving any

16  information about the class in general around this

17  time, early September 2017?

18     A      I do not remember.

19     Q      Did anyone ever tell you that Phelps,

20  two days earlier on September 5th, told the entire

21  class that they were unacceptable for a class

22  progressing through training at that time?

1          A     I am not aware of that.

2          Q     Were you aware that Phelps pulled Mike

3    Riley aside and told him that his performance was

4    unsatisfactory?

5          A     I am not aware of that.

6          Q     If you had been aware of that, that that

7    occurred on September 5th and then two days later

8    you received or you -- you found out that -- that

9    Phelps was talking about Van Meter's performance,

10   would you have made an inquiry about whether or

11   not Van Meter was being treated appropriately?

12          MS. SCINDIAN:  Objection.  Calls for

13   speculation.

14          THE WITNESS:  I wasn't aware of the

15   conversation.

16   BY MR. ALDERMAN:

17          Q     Okay.  If you had been aware, knowing --

18   you know yourself; right?

19          A     It's a question?

20          Q     Yeah.  Do you know yourself?

21          A     Yes.

22          Q     Okay.  If you had been aware that Phelps

1    declared the entire class unsatisfactory on

2    September 5th and pulled Riley aside in

3    particular, told him that his performance was

4    unsatisfactory and needed to improve.  And then

5    shortly thereafter, you received this e-mail,

6    Exhibit 5, would you have made any inquiries or

7    done anything to make sure that Van Meter was

8    being treated fairly?

9            MS. SCINDIAN:  Same objection.

10           THE WITNESS:  I wasn't aware of the

11   conversation that took place, can't tell.

12   BY MR. ALDERMAN:

13       Q    Are you going to continue to give me the

14   same answer so that I can add that to the list of

15   -- I'm -- I know you weren't aware of the

16   September 5th.  I'm asking you if you were aware

17   -- if you had been aware, would you have done

18   anything to make sure that Van Meter was being

19   treated fairly?

20       A    But I wasn't aware.

21           MR. ALDERMAN:  Counsel.  Okay.  Let's

22   take a break and call the -- call The Court.

1          MS. SCINDIAN:  Okay.  Step out.

2          (Whereupon, a recess was taken.)

3     BY MR. ALDERMAN:

4          Q     Okay.  Chief Rogers, after you received

5     the exhibit -- the e-mail that -- that appears on

6     Exhibit 5 from Eric Belknap, do you remember

7     making any inquiries or -- or taking any action

8     based on the information contained in that e-mail?

9          A     No, I do not remember.

10         Q     Do you know if you ever saw the mid

11    course reviews for the handlers in Van Meter's class?

12         A     I don't remember seeing it.

13         Q     I'm just going to -- Chief Rogers,

14    you've now been given what's been marked Exhibit

15    6.  This is four pages.  The first one is USCP 63,

16    the seventh -- second one is 472, the third is

17    856, and the fourth is 2978.  These are the mid

18    course reviews for the handlers that were on the

19    static team.  They're all dated September 11th,

20    2007 -- 17.  You see that on the top right corner

21    of each page.  Do you see that?

22         (Exhibit 6 was marked.)

1      A      The 472 just has 9/11?

2   BY MR. ALDERMAN:

3      Q      Just has 9/11.

4      A      Doesn't have a year.

5      Q      Okay.  The rest of them have the year;

6   correct?

7      A      Yes.

8      Q      Have you ever seen these documents

9   before?

10     A      I have not.

11     Q      Okay.  Then you can put them aside.

12  Okay.  Chief Rogers, you've now been given Exhibit

13  7.  This one goes from USCP 4083 to 4084.  And you

14  may recognize the e-mail on 4084.  That's Sergeant

15  Phelps' September 7th, 2017 e-mail to Lieutenant

16  Cromwell.

17         Then up from there, you see that Cromwell

18  forwarded -- responded to Phelps with copies to

19  Captain Erickson, Inspector Belknap, and members

20  of the training team.  And then Phelps, looks like

21  on September 12th, I guess, replied to -- to

22  Cromwell copying Erickson Belknap and the training

1    team.  Have you ever seen these e-mails before?

2              (Exhibit 7 was marked.)

3              I -- I realize you haven't seen the --

4    well, no.  Let me strike that.

5              Have you ever seen the September 12th,

6    2017 e-mail from Phelps?

7         A    No.

8    BY MR. ALDERMAN:

9         Q    No?

10        A    No.

11        Q    Okay.

12        A    I have not.

13        Q    Okay.  If you take a look at the second

14   paragraph in Phelps' September 12th, 2017 e-mail,

15   he's referring to options for K-9 trainee

16   Dantinne.  He says, The first option is to move

17   PBIED K-9 Rocket to static and allow Dantinne to

18   continue as a static handler.

19        And the second is -- option is to move

20   Dantinne to PBIED side and assigned PBIED K-9

21   Rocket to him.  And then Phelps makes a

22   recommendation.  Do you remember there being any

1    discussion or -- or deliberations about what to do

2    with -- with handler Dantinne?

3         A    I do not.

4         Q    Okay.  Did you ever -- to your

5    recollection, did you ever give your opinion on

6    what should happen with Dantinne?

7         A    Not that I remember.

8         Q    Okay.  Do you remember, you know, after

9    reviewing this e-mail and, you know, talking about

10   this training class more, do you remember learning

11   anything about Dantinne's performance during that

12   training class?

13        A    No, I do not.

14        Q    Same question for Mike Riley.  Do you

15   remember learning anything about his performance

16   during the training class?

17        A    No, I do not.

18        Q    How about Zborai, do you remember

19   learning anything about his performance during the

20   training class?

21        A    No, I do not.

22             MR. ALDERMAN:  Is that Exhibit 8?

1    BY MR. ALDERMAN:

2        Q    Chief Rogers, you've now been given

3    what's been marked Exhibit 8.  This is a

4    three-page document.  It goes from USCP 4080 to

5    4082.  And the oldest document or the oldest

6    communication in the exhibit is a September 28th,

7    2017 e-mail from Phelps to Cromwell with copies to

8    Erickson and Belknap, as well as the members of

9    the training staff.

10        Have you ever seen the e-mail that appears on

11    the third page of the exhibit, the September 28th,

12    2017 e-mail from Phelps?

13            (Exhibit 8 was marked.)

14        A    I don't remember this e-mail.

15    BY MR. ALDERMAN:

16        Q    Do you remember there being a discussion

17    about moving -- whether or not to move Riley from

18    PBIED to static?

19        A    I do not remember a discussion on this.

20        Q    Okay.  Do you remember any

21    communications whether it was a verbal discussion

22    or e-mail, text message, anything like that?

1      A     I don't remember a discussion on this.

2      Q     Okay.  Taking a look at the second page

3  of the Exhibit 4081, you see there's a e-mail from

4  Sergeant Phelps dated October 3rd, 2017 at 7:08 to

5  Cromwell with copies to Erickson, Belknap, and the

6  training staff?

7      A     Yes.

8      Q     Have you ever seen that communication?

9      A     I have not.

10     Q     Were you aware of the information

11 contained in that communication before today?

12     A     Do you want me to read it?

13     Q     Sure.  Yeah -- yeah.

14     A     I don't remember this e-mail.

15     Q     Okay.  What I'm asking you is do you

16 remember the information contained in the e-mail?

17 Do you remember there being a discussion about

18 Riley and what to do with him?

19     A     I do not.

20     Q     Okay.  At the top of that page that

21 you're looking at, 4081, Belknap asks Phelps a

22 question about whether Riley's footwork when

1    working a K-9 and the need to be fluid and smooth,

2    which Mike isn't.  Belknap asks, Has that changed?

3    Do you remember -- do you remember Belknap asking

4    questions about whether it was a good idea to

5    transfer Riley from static to PBIED?

6          A    I do not.

7          Q    Okay.  And then taking a look at the

8    first page, 4080 you see there's e-mail from

9    Belknap to Phelps, copies to Cromwell, Erickson

10   and the training staff at 7:34 in the morning

11   where Belknap says, I'm not questioning a dog, I'm

12   questioning the fact that earlier you stated Riley

13   wasn't fluid enough for PBIED.

14         Has that changed?  Does that refresh your

15   recollection as to whether you were aware of any

16   discussion about what to do with Riley?

17         A    I'm not aware of it.

18         Q    And then take a look at the top e-mail

19   on 4080.  This is Phelps response, October 3rd,

20   2017 at 7:46.  Towards the bottom of that e-mail,

21   Phelps says, Is Riley smooth and fluid on his

22   feet?  Not really.  Do you remember ever learning

1    that information?

2         A    No, I do not.

3         Q    Okay.  You can put that aside.  Let me

4    ask you this.  If you had been aware that Phelps'

5    opinion was that Riley was not smooth and fluid on

6    his feet, would you have taken any action?

7              MS. SCINDIAN:  Objection.  Calls for

8    speculation.

9              THE WITNESS:  I was not aware of this

10   statement in the e-mail.

11   BY MR. ALDERMAN:

12        Q    Had you been aware, would you have done

13   anything?

14             MS. SCINDIAN:  Same objection.

15   BY MR. ALDERMAN:

16        Q    You're going to give the same answer?

17        A    Yes, Counsel.

18        Q    Okay.  Do you remember any

19   communications about whether or not Officer

20   Dantinne was hindering his assigned dogs

21   progression through training?

22        A    I am not aware.

1        Q     Are you aware of any communications

2    about whether or not Officer Riley was hindering

3    his assigned dog through training?

4        A     I'm not aware of that.

5        Q     Are you aware of any communications

6    about whether or not Officer Van Meter was

7    hindering her dog's progression through training?

8        A     I'm not aware of that.

9        Q     Chief Rogers, you've now been given

10   Exhibit 9.  This one bears the Bates number USCP

11   4124.  It's a two-page -- sorry.  It's a two-page

12   document.  Goes 4124 to 4125.  And you'll see on

13   4125, that's the October 3rd, 2017 e-mail from

14   Sergeant Phelps that we saw in Exhibit 8.

15   Recognize that?

16             (Exhibit 9 was marked.)

17       A     I don't remember the document.

18   BY MR. ALDERMAN:

19       Q     I'm just asking you to verify --

20       A     Oh, I'm sorry.

21       Q     -- that it's the same e-mail that

22   appears in Exhibit 8 on page 4081?

1        A     It is.

2        Q     And so Inspector Belknap forwarded

3    Phelps's e-mail to you at 9:34 a.m. as it appears

4    on USCP 4124; is that correct?

5        A     Yes.

6        Q     Okay.  And then did you write the e-mail

7    that appears at the top of page 4124?

8        A     Yes.

9        Q     And is this a e-mail that you reviewed

10   in preparation for your deposition?

11       A     It is.

12       Q     And between the time that you wrote it

13   and the time you were preparing for your

14   deposition, had you ever reviewed the e-mail?

15       A     I did not.

16       Q     Okay.  Did you remember this e-mail at

17   the time that you began preparing for your

18   deposition?

19       A     I did not.

20       Q     Okay.  You can put that aside.  Thanks.

21   Sorry.  Before we put that away, Rogers Exhibit 9,

22   did anyone ever respond to you to your October

1    3rd, 2017 e-mail at 9:49?

2         A    I don't remember.

3         Q    You don't remember?  Do you remember

4    there being a discussion stemming from your

5    communication?

6         A    I don't remember.

7         Q    Did anyone, to your recollection, push

8    back on the suggestion that as you write, quote,

9    We would keep the person longer in training if we

10   have to and that's it.  Whether it's two, three or

11   four weeks after.  Remember anyone pushing back or

12   letting you know that that was not possible?

13        A    I don't remember.

14        Q    Before you ever received the memo

15   recommending Officer Van Meter's removal, so the

16   memo that we marked as Exhibit 1, did you -- did

17   you give your approval, you know -- an informal

18   approval to move forward with removing Officer Van

19   Meter?

20        A    I don't -- I don't remember, but I

21   didn't -- I don't remember doing that.

22        Q    Okay.  You don't remember doing that;

1  right?  Meaning it's not just a total lack of

2  recollection, you don't remember doing anything

3  like that, is what you're saying?

4          MS. SCINDIAN:  Objection.  Vague and

5  ambiguous.

6          THE WITNESS:  If your -- your question

7  to me is, do I remember giving the informal

8  approval of her, I -- I don't remember that.

9  BY MR. ALDERMAN:

10     Q    Okay.  Okay.  Could you definitively say

11  you did not do that?

12          MS. SCINDIAN:  Objection.  Calls for

13  speculation.

14          THE WITNESS:  I don't remember --

15  BY MR. ALDERMAN:

16     Q    I know you --

17     A    -- this incident in general.

18     Q    What's the incident in general that you

19  don't remember?

20     A    The e-mails, this whole training.  I --

21  I don't remember.

22     Q    You don't remember the details about

1    Officer Van Meter's removal from training?

2         A     I -- yeah.  I don't remember that at

3    all.

4         Q     Okay.  Chief Rogers, you've now been

5    given Exhibit 10.  This one is a single-page

6    document that has Bates number 4092 at the bottom

7    right.  This is an October 10th, 2017 e-mail from

8    Tony Phelps to Captain Erickson, Inspector Belknap

9    -- I'm sorry, it's to Lieutenant Cromwell with

10   copies to Captain Erickson, Inspector Belknap, and

11   the training team.

12        And it refers to another -- it refers to

13   Phelps telling Van Meter that if she doesn't

14   improve quickly and if it -- yeah.  If she doesn't

15   improve quickly, a decision will be made to remove

16   her from the program.  Do you see that?

17             (Exhibit 10 was marked.)

18        A     Where -- where are you looking --

19   BY MR. ALDERMAN:

20        Q     Take your time, read the whole thing.

21        A     Okay.

22        Q     Have you ever seen this e-mail before?

1       A    I have not.

2       Q    Okay.  Were you aware that on October

3   10th or on or about October 10th, 2017, Phelps

4   told Van Meter that if she doesn't improve

5   quickly, a decision will be made to remove her

6   from the program?

7       A    No, I did not.

8       Q    Okay.

9       A    Was not.  Sorry.  I -- no, I was not.  I

10   said no, I did not.  No, I was not aware --

11       Q    You were not aware?

12       A    -- of the conversation.

13       Q    Okay.  To your knowledge, was there any

14   consideration given to providing Van Meter more

15   time in training?  In other words, extending the

16   training for her?

17       A    I'm not aware of that.

18       Q    Chief Rogers, I've given you now what's

19   marked Rogers Exhibit 11.  This one is a

20   single-page document that bears USCP 4099 on the

21   bottom right.  Do you have that?

22            (Exhibit 11 was marked.)

1      A      Yes.

2  BY MR. ALDERMAN:

3      Q      Okay.  There are two e-mails on the

4  exhibit.  The -- the earliest one is dated October

5  12th, 2017 at 4:34 a.m.  And in that e-mail, and

6  please feel free to read it, I'll characterize it

7  for the record, as Phelps asking Lieutenant

8  Cromwell to let Officer Van Meter know that she's

9  being removed from the training program.  Before

10 -- have you ever seen this document?

11     A      I have not.

12     Q      Okay.  Before today, were you aware that

13 Phelps recommended that Cromwell communicate to

14 Van Meter that she was being removed?

15     A      I have not.  I did not.

16     Q      You were not aware of this?

17     A      I was not aware of it.

18     Q      Okay.  And then you'll see Cromwell

19 responded at 7:16 a.m. that same morning with

20 copies to Erickson, Belknap and, the training

21 staff.  And he writes, Sergeant, as I informed you

22 earlier, you need to send up a memo to include all

1    training documentation justifying her dismissal

2    from the training program for the Deputy Chiefs

3    review.

4          However, since the memo and documentation I

5    requested has not been completed, she will remain

6    in her current state until said documentation

7    explaining her removal has been completed and

8    forwarded, end quote.  Have you ever seen that

9    e-mail?

10         A    I have not.

11         Q    Were you aware that Cromwell sent that

12   e-mail to Phelps?

13         A    No, I was not.

14         Q    Okay.  Are you the deputy chief that

15   Cromwell is referring to there?

16         A    I believe so.

17         Q    There was no other deputy chief over at

18   K-9; was there?

19         A    At the time, no.

20         Q    Okay.  And Cromwell -- Cromwell says, as

21   I informed you earlier, in the top line, are you

22   aware of a prior communication between Cromwell

1    and Phelps?

2         A    I am not.

3         Q    Do you know if the training staff ever

4    forwarded records to Cromwell for his

5    consideration?

6         A    I do not.

7         Q    Did Cromwell ever tell you that -- that

8    he went to the training facility to watch videos

9    of Van Meter doing the training exercises?

10        A    I don't remember that conversation.

11        Q    Did Cromwell ever let you know that the

12   training staff wanted to remove Officer Van Meter

13   at any time before you received the -- the memo

14   itself?

15        A    I don't remember that.

16        Q    Did you do anything to independently

17   verify that it was appropriate to remove Officer

18   Van Meter from the training program?

19        A    No, I did not.

20        Q    Were you involved in the decision to

21   transfer Sergeant Phelps out of K-9?

22        A    Yes.

1      Q     What was your involvement?

2      A     As the deputy chief, the -- a discussion

3   would have occurred about the transfer with the

4   other deputy chiefs and the assistant chief.

5      Q     Did the idea to transfer Sergeant Phelps

6   originate with you?

7      A     I don't remember.

8      Q     Was there any reason -- well, tell me

9   this, what was the reason -- why did Phelps get

10  transferred away from K-9?

11     A     I don't remember the reason why.

12     Q     Do you remember anyone else suggesting

13  that Phelps be transferred out of K-9?

14     A     I don't remember.

15     Q     Did this transfer have anything to do

16  with Officer Van Meter?

17     A     Not that I recall.

18     Q     This is Rogers 12.  Chief Rogers, you've

19  been given a document labeled Rogers Exhibit 12.

20  This one goes from USCP 1905 to 1906.  And it is a

21  November 2nd, 2017 e-mail from you to John

22  Erickson and John Planchart with copies to Makema

1    Turner and Vestina Lucas.  Did you draft this

2    e-mail?

3            (Exhibit 12 was marked.)

4        A    Yes.

5    BY MR. ALDERMAN:

6        Q    Can you tell me who John Planchart was

7    at the time?

8        A    The other captain assigned to PMRD.

9        Q    Okay.  And how about Makema Turner, who

10   was that?

11       A    I don't recall the official name.  She

12   was at admin staff.

13       Q    Admin staff for the Bureau or for Human

14   Resources?

15       A    For the Bureau.

16       Q    Okay.  And how about Vestina Lucas?

17       A    Admin staff for the Bureau.

18       Q    Okay.  And were you the one -- so if you

19   take a look at the second page of the exhibit,

20   1906, there's an entry for K-9 Phelps actually,

21   let me step back.  Can you -- can you explain what

22   -- what it is that you're communicating in this

1  e-mail?

2     A    It's the results of the sergeant and

3  lieutenant voluntary reassignment that was

4  published the day before.

5     Q    You're saying that this is the result or

6  this is what you were considering putting in as

7  your recommendation for transfers?

8     A    I would have to look at the -- the

9  publication -- daily USCP publication from

10  November 1st.  I -- I don't remember specifically.

11     Q    Do you see on the second page where it

12  says K-9 Phelps?

13     A    Yes.

14     Q    It says K-9.  And then under K-9,

15  Phelps, and it says, potential change and/or

16  recommendations.  Did you write that?

17     A    Yes.

18     Q    Okay.  And why did you write that there

19  was a potential for change and/or recommendations

20  for Phelps?

21     A    I don't remember why.

22     Q    Was it -- to your recollection, was it

1  because he no longer had a K-9 assigned to him?

2      A    I do not remember.

3      Q    Was -- was there any investigation or

4  inquiry into Phelps's performance or conduct at

5  the time?

6      A    I do not remember.

7      Q    Do you remember if anyone above you in

8  the chain of command had recommended that Phelps

9  be removed from K-9, or transferred out of K-9?

10     A    I do not remember.

11     Q    And do you remember if anyone below you

12  in the chain recommended or asked for Phelps to be

13  removed from K-9?

14     A    I do not remember.

15     Q    Did you ever talk to Phelps about his

16  transfer out of K-9?

17     A    Not that I recall.

18     Q    Did you communicate with him, by e-mail

19  or otherwise?

20     A    Not that I recall.

21     Q    Did anyone communicate with you about

22  Phelps's removal from K-9?

1       A       Not that I remember.

2       Q       Okay.  Were you aware that after she was

3    removed, Officer Van Meter complained about her

4    treatment to Assistant Chief Sund?

5       A       I was not aware.

6       Q       Did she complain to you about her

7    treatment after she was removed?

8       A       I don't remember that.

9       Q       Do you know if she complained to Mr.

10   Braddock?

11      A       I don't remember that.

12      Q       Do you know who Mr. Braddock was at the

13   time?

14      A       Yes.

15      Q       Who was he?

16      A       The chief administrative officer.

17      Q       And is that someone who's above or over

18   Human Resources?

19      A       Yes.

20      Q       And also General Counsel, do you know?

21      A       I don't know.

22      Q       Okay.  Did you ever encourage Officer

1  Van Meter to -- to try out for K-9 again after she

2  was removed?

3        A    I don't remember.

4        Q    Is that something that you ever

5  considered, you know, that she should try out again?

6        A    The vacancy announcements comes out and

7  anybody can apply for the vacancy announcements.

8        Q    Did you ever have any communications

9  with anyone about -- about encouraging Officer Van

10 Meter to try out for K-9 again?

11       A    I don't remember having any conversation

12 like that.

13       Q    Were you aware that Human Resources

14 conducted an investigation into Officer Van

15 Meter's removal from the K-9 training program?

16       A    I was not aware.

17       Q    Chief Rogers, you've -- you've got

18 Exhibit 13, which is an October 20th, 2017 e-mail

19 from Officer Van Meter to Richard Braddock that

20 bears the page numbers USCP 1936 and 1937 at the

21 bottom right.  Do you have that in front of you?

22            (Exhibit 13 was marked.)

1       A    Yes.

2  BY MR. ALDERMAN:

3       Q    Have you ever seen that document before?

4       A    I have not.

5       Q    Okay.  Now, go ahead and take as long as

6  you need to -- to familiarize yourself with the

7  e-mail or with her communication.  And then I'll

8  ask you if it refreshes your recollection as to

9  whether or not you knew that she had made a

10  complaint about her treatment.

11       A    Okay.

12       Q    After having a chance to review Exhibit

13  13, pages 1936 and 37, were you aware of Officer

14  Van Meter's complaint about her treatment?

15       A    I was not aware.

16       Q    Okay.  Let's go ahead and put that

17  aside.

18            MR. ALDERMAN:  Chambers e-mailed to let

19  us know that they're available.

20            MS. SCINDIAN:  Oh, okay.

21            MR. ALDERMAN:  Okay.

22            MS. SCINDIAN:  So I think let's go and

1  I'll just hit the bathroom real fast.

2             MR. ALDERMAN:  Sure.

3             (Whereupon, a recess was taken.)

4             THE COURT:  All right, I don't know what

5  the issue is.  Who wants to tell me the issue and

6  what's going on and who's being deposed, and then

7  I'll hear from the other party.

8             MR. ALDERMAN:  Thank you, Your Honor.

9  So Les Alderman for the record.  We -- it -- it's

10  my deposition and I've called former Deputy Chief

11  Fred Rogers with the Capitol Police, and I've

12  asked Rogers four different questions that in my,

13  you know, our position is that he's refusing to

14  answer.

15             And instead of, I mean, the first one

16  probably took at least five minutes, probably more

17  of me asking the same question and not getting a

18  response.  And so instead of doing that repeatedly

19  for the other three questions, we just got to the

20  point where Mr. Rogers indicated that he would not

21  provide a further answer, and so we added it to

22  the list to address with you.

1          THE COURT:  Okay.  What -- what's the

2   question and what response were you given?

3          MR. ALDERMAN:  So the first question --

4   I asked Deputy Chief Rogers if there was a rule

5   that prohibited the training staff from extending

6   the period of training for any handler.  The --

7   the training course was supposed to be 14 weeks,

8   and my question was, was there any rule that

9   stopped the Capitol Police from extending the

10  class beyond 14 weeks.

11         THE COURT:  Okay.

12         MR. ALDERMAN:  The response was, the

13  class was only 14 weeks.

14         MS. SCINDIAN:  Actually, the response

15  was, the class is a fixed period of time, and to

16  also be clear, Your Honor, the first question that

17  he asked, was there a rule, practice, regulation,

18  or policy that prevented a person from being

19  extended in the class?  And my client's response

20  was, there is a fixed period of time for training

21  which would be the 14 week period.

22         THE COURT:  Okay.  So then the -- but

1    then the question is, and so that can -- can that

2    be extended or can that not be extended --

3            MS. SCINDIAN:  And his response --

4            THE COURT:  -- and that wasn't answered.

5            MS. SCINDIAN:  Well, the response is,

6    that's the fixed period of time.  So the time is

7    fixed.

8            MR. ALDERMAN:  But Your Honor, you're --

9    you're right.  The -- the witness would then not

10   answer if that period of time could be extended.

11           THE COURT:  Yeah, that's -- and the --

12   the question is can that -- if there's a fixed

13   period of time and so can that -- can that period

14   of time be extended or not?  Then if the answer is

15   no, it's no, if it's yes, maybe, but the witness

16   needs to answer that question.

17           MR. ALDERMAN:  Okay.

18           THE COURT:  So do I need to speak to the

19   -- to the witness and -- and advise him or this or

20   how -- how do you want to handle this?

21           MS. SCINDIAN:  I will advise him, Your

22   Honor.

1          THE COURT:  Yes.  I mean, does everyone

2    understand what the issue is?  I mean, yes, I know

3    it's a fixed period, but that could be subject to

4    interpretation about whether or not that fixed

5    time or something that's otherwise fixed can be

6    extended.  So he -- he -- it's a fair question he

7    needs to answer.  Either it can be extended, it

8    can't be extended, or he doesn't know.  Those are

9    the -- the choices he has.

10          MS. SCINDIAN:  Understood.

11          THE COURT:  All right.  Is there

12    anything else that I need to resolve?

13          MR. ALDERMAN:  Yes, Your Honor,

14    unfortunately.  The other -- the other three

15    questions kind of fall under the same category.

16    There -- there appear to be e-mails, about which

17    Deputy Chief Rogers was unaware, that provided

18    information about warnings given to Officer Van

19    Meter that she would be removed from the training

20    class.

21          And my questions fall, I think, under

22    the same broad category of, if you had known that

1   information, would you have done anything?  Would

2   you have made inquiries?  Would you have

3   investigated?  And each time the witness says, but

4   I didn't know.  And so then it would fall into the

5   same circle of yes, but if you had known, would

6   you have done something?

7           THE COURT:  Okay.  Ms. Scindian, is that

8   -- first, is that true with respect to how Mr.

9   Alderman is characterizing the question and

10  answer, or is there something that you want to

11  say?

12          MS. SCINDIAN:  Yeah.  I do think that's

13  an accurate account.  Essentially, Mr. Alderman

14  would ask the witness, well, had you known this

15  information, what would you have done with it?

16  The witness says, I didn't know this information,

17  though.  Ultimately, I think what the witness is

18  getting at is, I don't know what I would've done

19  because I didn't know this information.  And, you

20  know, that's where we are.  That's how he's

21  answering the question.

22          MR. ALDERMAN:  Your Honor, what he's

1    answering is, but I didn't know.  He's not saying,

2    I don't know what I would have done.  He's saying,

3    I didn't know.

4            THE COURT:  And can you -- what -- what

5    is the information again?  I'm sorry.  What --

6    what -- what is it that he did not know, so there

7    were warnings to Officer Van Meter?

8            MR. ALDERMAN:  Yes, Your Honor.  So

9    there was one warning at the beginning of the

10   third week of training, out of a 14-week training

11   class, a warning that she would be removed.  That

12   warning came awfully early in the training class,

13   and so my question was, if you found out that

14   someone was being threatened with removal that

15   early in class, would you have done something?

16           Would you have made inquiries?  Would

17   you have talked to Phelps?  Would you have

18   reviewed the records to see if she was being

19   treated fairly?  And -- and I kept getting the

20   answer, but I didn't know.  The -- the second

21   question along those lines, there was another

22   threat to remove Van Meter on September 5th -- I'm

1    sorry, on September 7th, 2017.

2         And just two days earlier, the same

3    author, Sergeant Phelps, had told the entire class

4    that they were unacceptable and had pulled out one

5    of the men -- one of the male handlers, and

6    specifically told him that his performance was

7    unacceptable and needed to improve.

8         And so my question for the deputy chief

9    was, if you had been aware of these criticisms

10   just two days prior to the e-mail in which Phelps

11   says that he was considering removing Van Meter,

12   but didn't mention any of the other handlers, and

13   didn't mention the male handler who had been

14   pulled aside, would you have done anything?  Would

15   you have made inquiries?  Would you have reviewed

16   documents?

17        And again, the answer was, but I didn't

18   know.  And then the last one was the same male

19   handler who had come in for criticism on September

20   5th.  There was an e-mail that at the outset of

21   class, he was not viewed as someone who was a good

22   candidate for the PBIED, the Person-Borne

1   Improvised Explosive Device group, because his

2   footwork wasn't good, and he wasn't fluid when he

3   searched.

4              And deputy chief indicated that he was

5   not aware of that criticism, and I asked if he had

6   been aware.  Then later on in the class when that

7   same handler was transferred over to the PBIED

8   side, again, would he have made any inquiries,

9   reviewed documents, talked to anybody about it,

10  and the same answer, but I didn't know.

11             THE COURT:  Okay.  He can -- he needs to

12  answer that question as well.  And if he didn't --

13  if he doesn't know what he would have done, and I

14  think these are the types of questions that are

15  getting at how matters are generally handled by

16  someone in his position, you can ask a witness,

17  even a lay witness, certain hypotheticals that are

18  based on their training and experience and, you

19  know, I think they're fair questions, particularly

20  for a deposition.

21             And we all know that he didn't know, but

22  the question posed is when you as your capacity

1   as, I don't know, training director or whoever he

2   is has information such as X, how do you handle

3   that?  What do you do with that information?

4            And he's free to say that he doesn't

5   know how he handled it or that there's -- he

6   wouldn't have done anything or he would have done

7   something, but he has to answer the question.  So

8   all of these questions need to be answered.

9            MR. ALDERMAN:  Thank you, Your Honor.

10           THE COURT:  Any questions?

11           MR. ALDERMAN:  Not from Plaintiff's

12  side.

13           MS. SCINDIAN:  Not from Defendant.

14           THE COURT:  Okay.  So, Ms. Scindian, you

15  can let your witness know what my order is and --

16  and going forward that -- that he needs to answer

17  the questions that are posed unless of course you

18  have some objection on privilege or -- or

19  something that would necessitate him not

20  answering.

21           MS. SCINDIAN:  That is correct, Your

22  Honor.

1          THE COURT:  All right.  Thank you.

2          MS. SCINDIAN:  Thank you.

3          MR. ALDERMAN:  Thank you, Your Honor.

4          THE COURT:  Okay.  Bye-bye.

5          MR. ALDERMAN:  Ready?

6          THE WITNESS:  Yep.

7   BY MR. ALDERMAN:

8          Q    Okay.  Chief Rogers, the last exhibit we

9   looked at was Exhibit 13, which was Officer Van

10  Meter's October 20th, 2017, e-mail to Richard

11  Braddock in which she describes her concerns about

12  her treatment.  And you indicated you had never --

13  you had never seen that e-mail and were not aware

14  that she had complained; correct?

15         A    Correct.

16         Q    Okay.  And, Chief Rogers, you've now

17  been given Exhibit 14.  This one bears the Bates

18  numbers 118 through 120.  Do you have those pages?

19         (Exhibit 14 was marked.)

20         A    Yes.

21  BY MR. ALDERMAN:

22         Q    And you'll see that on the second two

1   pages, that contains an e-mail from Officer Van

2   Meter to Assistant Chief Sund dated October 23rd,

3   2017, in which she describes some of her

4   experience in K-9.  Are you aware that Officer Van

5   Meter sent that e-mail?

6        A    I am not.

7        Q    Okay.  Have you ever seen Officer Van

8   Meter's October 23rd, 2017, e-mail to Chief Sund?

9        A    No, I've never seen.

10       Q    Okay.  And taking a look at the top of

11  page 118, Chief Sund writes to Richard Braddock.

12  And he writes, Richard, can you have HR do a deep

13  dive into the allegations brought forth by Officer

14  Van Meter?  Were you aware that Chief Sund had

15  asked Richard Braddock to have HR conduct an

16  inquiry?

17       A    I am not aware of this.

18       Q    This is the first time you've ever

19  learned that -- that HR conducted an -- I'm sorry,

20  that Chief Sund asked that HR conducted an

21  inquiry?

22       A    Yes.

1        Q      Okay.  And Chief -- I'm sorry, Chief

2   Rogers, you've now been given Exhibit 14.  This

3   one goes from 1856 to 1858.  It is a November

4   20th, 2017, memo from Francine Benko to Steven

5   Sund through Richard Braddock.  Do you know who

6   Ms. Benko is?

7        A      I don't remember this person.

8        Q      Okay.  And have you ever seen this

9   document before?

10       A      No, I have not.

11       Q      Okay.  And were you aware that -- that

12  the investigation that's summarized in this

13  document occurred?  Were you aware of the

14  investigation that's summarized in this document?

15       A      I was not.

16       Q      Okay.  So you -- you're learning this

17  for the first time today?

18       A      Yeah.  I don't remember this document at

19  all.

20       Q      No, no, no. I'm asking you, were you

21  aware of the investigation that's memorialized in

22  the document?

1     A     No.  I do not remember this

2  investigation.

3     Q     Okay.  Are you learning today for the

4  first time that this investigation occurred?

5     A     Yes.

6          MR. ALDERMAN:  Okay.  You can put that

7  aside.

8          THE REPORTER:  For the record, you

9  called that one 14 but it is 15.

10          MR. ALDERMAN:  Oh, thank you.

11          (Exhibit 15 was marked.)

12  BY MR. ALDERMAN:

13     Q     So just to correct the record, the

14  document that we were just referring to which

15  bears the Bates number USCP 1856 to 1858 is

16  Exhibit 15; okay?

17     A     Yes.

18     Q     Perfect.  Okay.  Okay.  Now, I want to

19  -- I want to go back to some questions that I

20  asked you previously, now that we've got the

21  judge's ruling on -- on that issue.  So my first

22  question is: Are you aware of a rule that

1    prohibited the K-9 training course from being

2    extended?

3         A    Generally, the training -- the K-9

4    training is 12 to 14 weeks.  I don't remember

5    which one it is.  So training is not extended.

6         Q    I'm going to ask the question one more

7    time.  Are you aware of a rule that prohibited the

8    training from being extended?

9         A    Generally, I'm not aware of a rule that

10   prohibits training from being extended.

11        Q    Are you aware of a policy that prohibits

12   training from being extended?  Whether it's a --

13   whether it's titled a rule or not, you know, some

14   standard operating procedure or policy at Capitol

15   Police.

16        A    I think I revert back to my answer,

17   Counsel, that generally that training is between

18   the 12 to 14 week period.

19        Q    Are you aware of a rule, policy, or

20   procedure that prohibits the training from being

21   extended?  We will get the judge back on the

22   phone.

1          MS. SCINDIAN:  Let him answer the

2   question, please.

3          THE WITNESS:  I'm sorry?

4          MS. SCINDIAN:  I said, let him answer

5   the question, please.

6          THE WITNESS:  I'm sorry.  Oh, generally,

7   training is between the 12 to 14 week period.

8   BY MR. ALDERMAN:

9      Q    I'm going to ask it one more time.  Are

10  you aware of a rule, policy, or procedure that

11  prohibits the training from extending beyond that

12  12 or 14 week period?

13     A    Generally, that's the period of time for

14  training.

15         THE CLERK:  Good afternoon.  You've

16  reached the chambers of Judge Cobb.

17         MR. ALDERMAN:  Hi, it's Les Alderman and

18  Kelly Scindian calling this time with the witness.

19         THE CLERK:  Okay.

20         MR. ALDERMAN:  I'm sorry.

21         THE CLERK:  And so just -- just to

22  confirm, this is a continued dispute?

1           MR. ALDERMAN:  Yes.

2           THE CLERK:  Okay.  Can I please put you

3    on a brief hold again, and just to confirm that

4    Judge Cobb's available?

5           MR. ALDERMAN:  Yes, of course.  Thank

6    you.

7           THE CLERK:  Okay.  Thank you.  Hello.

8    And just to confirm, everyone is present?

9           MR. ALDERMAN:  Yes.

10          MS. SCINDIAN:  Yes.

11          THE CLERK:  Great.  And let me set the

12   transfer again.  And like I said earlier, if it

13   drops for some reason, please call back.  One

14   moment.

15          THE COURT:  Hello.

16          MR. ALDERMAN:  Judge Cobb, it's Les

17   Alderman, Kelly Scindian.  The same individuals

18   are here, but we also have Deputy --

19          THE COURT:  Okay.

20          MR. ALDERMAN:  -- we have Deputy Chief

21   Rogers.

22          THE COURT:  Okay.  What's the issue?

1          MR. ALDERMAN:  So on the -- the first

2     question, which is, is he aware of a rule, policy,

3     or procedure that prohibited the training period

4     from being extended, Deputy Chief Rogers continues

5     to give me the answer that in general, that's how

6     long the training class lasted.

7          MS. SCINDIAN:  And that is not correct.

8     Can you go back in the transcript to the question

9     generally, is there a rule that prohibits the

10    training period from being extended and relay

11    Deputy Chief Rogers' answer to that question,

12    please?

13         MR. ALDERMAN:  I will stipulate that he

14    said that there -- he's not aware of any rule.  I

15    then asked if he was aware of any procedure or

16    policy that prohibited the class from being

17    extended and that's when I received the answer,

18    generally, that's how long the class lasted.

19         THE COURT:  Okay.  So what's the

20    question that hasn't been answered?  You want to

21    know -- so the training class is generally 14

22    weeks.  You want to know is there any procedure or

1    policy that prohibits that 14-week class from

2    being extended?

3              MR. ALDERMAN:  Right.  Whether or not

4    it's called a rule, if there's a procedure or

5    policy or practice that prohibits the extension,

6    that's all I need to know.

7              THE COURT:  Okay.  And what is the

8    answer to that question?

9              THE WITNESS:  Good afternoon.  Sorry.

10   Good afternoon, Your Honor.  The general rule is

11   that the training is between those -- the 12 to 14

12   weeks.

13             THE COURT:  And is there anything that

14   prohibits the department from extending that

15   training period?

16             THE WITNESS:  I believe in a case by --

17   in a case by case, I guess training, I -- I don't

18   know the word for it.  In a case by case situation

19   --

20             THE COURT:  It can be extended?

21             THE WITNESS:  Not extended.  It's a

22   defined -- so it's a defined period.

1          THE COURT:  But can it be longer?

2          THE WITNESS:  Generally, Your Honor, no.

3   And, Your Honor --

4          THE COURT:  And is there any rule or

5   practice or policy that prohibits the department

6   from making that training period longer?

7          THE WITNESS:  Not that I'm aware of.

8          THE COURT:  Okay.  Mr. Alderman, are

9   there any further questions that you want to ask?

10          MR. ALDERMAN:  Your Honor, there are the

11   -- that second category of questions that I'm

12   hoping that we don't need you for, but --

13          THE COURT:  I'm hoping so as well.

14          MR. ALDERMAN:  So with that, we'll --

15   we'll let you drop off and -- and hope to not call

16   you back.

17          THE COURT:  Okay.  Okay.  Thank you so

18   much.

19          MR. ALDERMAN:  Thank you, Your Honor.

20          THE COURT:  Bye-bye.

21          THE WITNESS:  I was supposed to greet

22   her; right?

1          MS. SCINDIAN:  Yes.

2          THE WITNESS:  Okay.

3          MS. SCINDIAN:  You're fine.

4          THE WITNESS:  Okay.

5    BY MR. ALDERMAN:

6      Q    Okay.  Now, I want to redirect your

7    attention to the August 22nd, 2017, e-mail which

8    is marked Exhibit 3.  This is another question

9    that the judge has directed that you give an

10   answer to.

11     My question is: Had you known that Sergeant

12   Phelps informed Van Meter on August 22nd, 2017,

13   that if she doesn't improve within the next few

14   weeks, a recommendation would be put forward to

15   remove her from training, had you known that at

16   the time the communication was made, would you

17   have taken any action in response?

18     A    I don't know what action I would've take

19   taken in response had I known about this.

20     Q    So, you don't know if you would've

21   talked to Sergeant Phelps?

22     A    I don't know what action I would have

1    taken.

2         Q     Why is it that you -- that you don't

3    know?

4         A     Because this is just one piece that

5    you're offering here.  I -- I -- given the time

6    frame, I would've potentially asked for -- but I

7    just don't know what I would've done.  This might

8    have just been informational.

9         Q     You would have potentially done what?

10        A     This might have been informational.

11        Q     You said I would have potentially.  What

12   would you have potentially done?

13        A     I just -- well, that kind of goes back

14   to my previous question.  I don't know what I

15   would've done.

16        Q     Has your management style changed

17   between now and 2017; would you say?

18        A     Has my management style changed?

19        Q     Yeah.

20              MS. SCINDIAN:  Objection.  Irrelevant.

21              THE WITNESS:  I don't know.

22   BY MR. ALDERMAN:

1      Q     Okay.  And if you would take a look at

2   Exhibit 5.  Okay.

3      A     That would be the last one.

4      Q     Of course.

5      A     I got it.

6      Q     Thanks.  Exhibit 5 is Bates numbers USCP

7   6 and 7.  This begins with the September 7, 2017

8   e-mail from Phelps, at which he makes another

9   comment about making a recommendation on removing

10  Officer Van Meter, which then gets forwarded to

11  you on September 11, 2017.

12     And my question is: When you received this on

13  September 11, 2017, had you known that Sergeant

14  Phelps told the entire class that they were

15  performing in an unacceptable manner and pulled

16  Riley out specifically to tell him that his

17  performance needed to improve.

18     Would you have done anything, made any

19  inquiries about Phelps' comment that he was

20  considering removing Van Meter without mention of

21  any of the other handlers in the class?

22     A     I was not aware of the meeting.

1    Therefore, I don't know what I would have done

2    given that particular information.

3        Q    I realize you were not aware of the

4    meeting.  I'm asking you, if you were aware of the

5    events that I described on September 5th, what

6    would you have done when you received the

7    September 11, 2017 e-mail from Delner?

8        A    I do not know what I would have done for

9    this instance.

10        Q    Okay.  All right.  The next one we're

11    going to look at is -- there's the Bates Number

12    4080 on the first page.

13            MS. SCINDIAN:  Do you know the Exhibit

14    Number?  It's 8.

15            MR. ALDERMAN:  Exhibit 8.  Thank you

16    very much.

17            MS. SCINDIAN:  Sure.

18    BY MR. ALDERMAN:

19        Q    And Chief Rogers, Exhibit 8 bears the

20    Bates Number USCP 4080.  And, you may recall, this

21    is the e-mail exchange in which Belknap, on

22    October 3rd, 2017, was asking Phelps about his

1    recommendation to remove Riley from static to

2    PBIED.  And Phelps, back on August 22nd, had

3    indicated that Riley's footwork when working the

4    canines is very stiff.

5          PBIED handlers need to be fluid and smooth,

6    which Mike isn't.  Following up on October 3rd,

7    Phelps says, Is Riley smooth and fluid on his

8    feet, not really.  If you had received these

9    communications, would you have made any inquiries

10   with respect to the decision to transfer Riley

11   from static to PBIED?

12         A    I don't know what I would have done in

13   this particular case.

14         Q    Do you know if there's a -- is there --

15   was there I'm sorry, back in 2017, 2018 before you

16   left Capitol Police, was there a standard

17   discipline that would be applied in cases in which

18   a supervisor was found to have discriminated

19   against a subordinate?

20         A    I don't know.

21         Q    Okay.  Discrimination, however, was

22   prohibited -- gender discrimination was prohibited

1    in 2017, 2018 by policy at Capitol Police; right?

2          A    I would say generally, yes.

3          Q    Okay.  And discrimination based on

4    disability or perceived disability, was that also

5    prohibited at Capitol Police?

6          A    I would say generally, yes.

7          Q    And retaliation for making protected

8    complaints about discrimination, was that

9    prohibited by policy at Capitol Police in 2017 and

10   '18?

11         A    Generally, yes.

12         Q    Okay.  Did you ever go observe any of

13   the training exercises in the 2017 class?

14         A    Not that I recall.

15         Q    Are you aware that the -- the K-9 Unit

16   keeps a training database or kept a training

17   database that tracked the explosives that the dog

18   and handler were exposed to, the number of hits

19   and misses that the dog and handler achieved?

20         A    I was not aware.

21         Q    Did you ever receive any reports with

22   statistics from the training unit?

1        A      Not that I recall.

2        Q      Were you informed about anything that

3    happened in the certification exams for this

4    class?

5        A      Not that I recall.

6            MS. SCINDIAN:  Objection.  Vague and

7    ambiguous.

8    BY MR. ALDERMAN:

9        Q      Were you informed that one of the

10   certification exams had to be reconfigured for

11   Officer Dantinne?

12       A      No, I'm not.

13       Q      And were you aware that for Officer

14   Zborai, he and his team missed one of the hides

15   and it had to be re-run?

16       A      I'm not aware of that.

17       Q      Did anyone -- other than the -- the memo

18   recommending Officer Van Meter's removal, did

19   anyone specifically tell you why she was being

20   removed?

21       A      Not that I remember.

22       Q      Whether they told you verbally or, you

1    know, gave you a summary or, you know, sent you an

2    e-mail, text message.  Did anyone communicate to

3    you any reasons for Officer Van Meter's removal?

4         A    Not that I remember.

5         Q    Do you remember why Schwalm was removed

6    the year before?

7         A    I don't remember.

8              MR. ALDERMAN:  Okay.  That's all I have.

9              MS. SCINDIAN:  I'm going to have a few.

10         EXAMINATION BY COUNSEL FOR THE DEFENDANT

11   BY MS. SCINDIAN:

12        Q    Okay.  Chief Rogers, can you take a look

13   at Exhibit 9, please?  And before I focus you

14   specifically on Exhibit 9, let me ask you this,

15   you've testified that, generally, the rule is the

16   training program for K-9 is 12-14 weeks, whatever

17   it was at that time period; is that correct?

18        A    Yes.

19        Q    Are you aware of any exceptions during

20   your time in OSB?  Are you aware of any exceptions

21   prior to 2017 of that time being extended for

22   anyone?

1      A      No.  I'm not aware of it.

2      Q      Okay.  Now, looking at Exhibit 9.

3  Exhibit 9 is a e-mail that you sent.  The receiver

4  is Belknap and CCed are Marvin Reid, John

5  Planchart, and John Erickson.  And to be clear,

6  Exhibit 9 is USCP 004 124-300-4125.  It appears in

7  this e-mail, Chief Rogers, that you are stating

8  that an extension could be given for Mike Riley.

9  Is that an accurate interpretation of this e-mail?

10     A      It is not.

11     Q      Okay.  Can you explain what this e-mail

12 is and what it is you're conveying?

13     A      In this case, Riley, somewhere within

14 the program, was switched from static to PBIED.

15 And, in this case, I wanted to make sure that he

16 still received the same 12 to 14 weeks of training

17 as a regular PBIED team had received to that

18 point.

19     Q      Okay.  So, if I'm understanding you

20 correctly, if the PBIED teams -- the regular PBIED

21 teams, the people who were in PBIED all along, had

22 received ten weeks of training, then what was your

1   expectation of how many weeks of training Riley

2   would receive?

3       A    If PBIED was ten weeks, I would expect

4   Riley to have received ten weeks of training.

5       Q    Okay.  Is there anything else that you

6   want to convey about this e-mail?

7       A    I just wanted to make sure that he

8   received the same amount of time as the other

9   PBIED teams received for their training.

10      Q    Okay.  Do you know whether or not

11  Riley's training ultimately went longer in terms

12  of, if persons in PBIED graduated on a specific

13  date, he graduated on another date, do you know

14  whether or not that happened?

15      A    I do not know.

16          MS. SCINDIAN:  Okay.  No further

17  questions.

18      RE-EXAMINATION BY COUNSEL FOR THE PLAINTIFF

19  BY MR. ALDERMAN:

20      Q    The information you just conveyed with

21  Counsel, that your intent was only to make sure

22  that Riley received the same number of weeks that

1   the other PBIED handlers received.  Is that

2   something you discussed with Counsel during break?

3          MS. SCINDIAN:  You're not -- he's not

4   going to answer that.

5   BY MR. ALDERMAN:

6      Q    Okay.  Do you see that information, that

7   all you wanted to do was make sure Riley received

8   the same number of weeks as the other PBIED

9   handlers, do you see that in your e-mail anywhere?

10     A    No.

11         MR. ALDERMAN:  That's all I got for you.

12         MS. SCINDIAN:  Nothing further.

13         MR. ALDERMAN:  Can I get some -- or --

14   can I get trace reporters?

15         MS. SCINDIAN:  You don't have to worry

16   about that.

17         MR. ALDERMAN:  Okay.

18         (Off the record at 4:50 p.m.)

19

20

21

22

1    CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

2           I, Cody Handlir, the officer

3    before whom the foregoing deposition was taken, do

4    hereby certify that said proceedings were

5    electronically  recorded by me; and that I am

6    neither counsel for, related to, nor employed by

7    any of the parties to this case and have no

8    interest, financial or otherwise, in its outcome.

9           IN WITNESS WHEREOF, I have hereunto set

10   my hand and affixed my notarial seal this 23rd day

11   of June, 2023.

12

13

14

15

16   _____

17   Cody Handlir, Notary Public, in and for the

18   District of Columbia

19

20

21

22

1              CERTIFICATION OF TRANSCRIPT

2              I, Krystin Spolar, do hereby certify that

3      the foregoing transcript, to the best of my ability,

4      knowledge, and belief, is a true and correct

5      record of the proceedings; that said proceedings

6      were reduced to typewriting under my supervision;

7      and that I am neither counsel for, related to, nor

8      employed by any of the parties to this case and

9      have no interest, financial or otherwise, in its

10     outcome.

11

12

13     *Krystin Spolar*

14     Krystin Spolar

15     Planet Depos, LLC

16     June 23, 2023

17

18

19

20

21

22