1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF COLUMBIA

3     --------------------------------X

4     MAURICIA VAN METER,                    :

5                Plaintiff,                  :

6          v.                          :Case No.

7     UNITED STATES CAPITOL POLICE,     :1:18-cv-00476-KBJ

8                Defendant.                  :

9     --------------------------------X

10                    Deposition of

11                    STEVEN SUND

12                     held at

13          ALDERMAN, DEVORSETZ & HORA, PLLC

14             1025 Connecticut Avenue

15               Washington, DC 20036

16           Thursday, December 15th, 2022

17                10:00 a.m. (EST)

18

19

20    Job No.: 472176

21    Pages 1 - 117

22    Reported by: Stefanie Towns, CCR

1          Deposition of STEVEN SUND, held at Alderman,

2     Devorsetz & Hora, Washington, D.C.:

3

4

5

6

7

8

9

10

11

12

13          Pursuant to agreement, before Stefanie

14     Towns, Notary Public in and for the District of

15     Columbia.

16

17

18

19

20

21

22

```
1                 A P P E A R A N C E S

2

3           ON BEHALF OF PLAINTIFF:

4           LESLIE D. ALDERMAN, III, ESQUIRE

5           ALDERMAN, DEVORSETZ & HORA, PLLC

6           1025 Connecticut Avenue

7           Suite 615

8           Washington, D.C. 20036

9           202.969.8220

10          lalderman@adhlawfirm.com

11

12          ON BEHALF OF DEFENDANT:

13          KELLY M. SCINDIAN, ESQUIRE

14          UNITED STATES CAPITOL POLICE

15          EMPLOYMENT LAW DIVISION

16          119 D Street, NE

17          Washington, D.C. 20510

18          202.593.3619

19          kelly.scindian@uscp.gov

20   Also Present:

21   Aaron M. Wilensky, Esq.

22   Sheila A. Berry, Paralegal
```

1                    C O N T E N T S

2   EXAMINATION OF STEVEN SUND                    PAGE

3       By Mr. Alderman                    5, 113

4       By Ms. Scindian                       112

5                 E X H I B I T S

6            (Attached to the Transcript.)

7                                               PAGE

8   1          USCP 12-17                       32

9   2          USCP 55-56                       35

10  3          USCP 6-7                         39

11  4          USCP 103-105                     46

12  5          USCP 1936-1937                   58

13  6          USCP 102                         63

14  7          USCP 964-988                     66

15  8          USCP 118-120                     71

16  9          USCP 1856-1858                   87

17  10         USCP 3135-3136                   90

18  11         USCP 1854-1855                   93

19  12         USCP 11                         100

20

21

22

1    Thereupon,

2                        STEVEN SUND,

3     called as a witness, and having been first duly

4      sworn, was examined and testified as follows:

5           EXAMINATION BY COUNSEL FOR PLAINTIFF

6    BY MR. ALDERMAN:

7    Q.    Good morning, Mr. Sund.

8    A.    Good morning.

9    Q.    My name is Les Alderman.  I represent

10         Mauricia Van Meter in a lawsuit that she's

11         brought against Capitol Police.  Thank you

12         for coming and appearing today as a witness.

13   A.    My pleasure.

14   Q.    For the record, can you give us your full

15         name and your home address?

16   A.    It's Steven S-T-E-V-E-N, middle name is

17         Andrew, last name is Sund, S-U-N-D.  Home

18         address 1125 Round Pebble Lane Reston,

19         Virginia 20194.

20   Q.    And have you ever had your deposition taken

21         before?

22   A.    Yes, I have.

1   Q.    Okay.  How many times?

2   A.    Maybe three.

3   Q.    Okay.  Any of those employment cases?

4   A.    I believe one.

5   Q.    Okay.  And do you remember what the name of

6         that case was?

7              MS. SCINDIAN:  Unfortunately, this is

8         one of those cases that is under the OCWR

9         confidentiality agreement under

10        confidentiality rules, so he can't provide

11        any information.  I can say it what a U.S.

12        Capitol Police case.

13  Q.    Do you remember who took your deposition in

14        the employment case, the lawyer on the other

15        side?

16  A.    No, I don't.

17  Q.    And do you remember what year that was?

18  A.    '20, '21.  2020, maybe.  I'm not sure.

19  Q.    You feel like it was during Covid?

20  A.    Maybe '21.  Yeah.  I'm going with '21.  Yeah.

21  Q.    Do you know if a decision has been reached in

22        that case?  Not what the decision is but

1          whether a decision was reached in that case?

2     A.   I believe one was.

3     Q.   Okay.  And do you know if a decision by the

4          Board of the Office of Congressional

5          Workplace Rights was issued in that case?

6     A.   I don't know.

7     Q.   Okay.  Do you know if the decision has been

8          made public in that case?

9     A.   I have no idea.

10    Q.   Okay.  Let me just go over some ground rules

11         then just to make sure they're fresh.

12    A.   Okay.

13    Q.   I'm going to have a bunch of questions for

14         you today and hopefully you'll have a bunch

15         of answers for me.

16    A.   Okay.

17    Q.   If you don't understand any of my questions

18         at any point, let me know.

19    A.   Okay.

20    Q.   Once you let me know, then I can do a bunch

21         of things to help out.  I can repeat the

22         question.  I can rephrase it.  I can come at

1        a different angle but to do any of that, I
2        need to know if there's a problem and so you
3        have to let me know if there's a problem
4        understanding the question.
5    A.   Okay.
6    Q.   All right.  If you respond to one of my
7        questions, then the record that Ms. Towns is
8        typing up for us, will make it appear as if
9        you understood what I was asking.  So it's
10       vital that you make sure you understand my
11       question.
12   A.   Okay.
13   Q.   To make things go smoother today, there's a
14       couple of rules but it sounds like we're not
15       going to have a problem with the first one,
16       if you are going to respond to one of my
17       questions in the affirmative or in the
18       negative, it's always best to say yes and no,
19       because body language doesn't pick up on the
20       transcript and things like uh-huh or uh-uh
21       are almost impossible to decipher a year from
22       now if we're reading this transcript.

1    A.    Understood.

2    Q.    Also, even if you know exactly what question

3          I'm going to ask you, let me finish the

4          question so that it's clear for the record.

5          Likewise, I'll let you finish your answers so

6          that it's clear for the record.

7                And if Ms. Scindian objects, let her

8             state her objection so that that's clear

9             for the record.

10   A.    Yes, sir.

11   Q.    On the point of objections, Ms. Scindian may

12         object from time to time to some of my

13         questions.  If she does so, you are free to

14         answer the question once she finishes her

15         objection if you can do so.  If Ms. Scindian

16         tells you not to answer the question,

17         however, stop your answer, okay?

18   A.    Okay.

19   Q.    If you need to take a break for any reason,

20         it's perfectly fine.  It doesn't matter.  We

21         can take as many breaks as we need to be

22         comfortable.  We can try to take a break once

1    every hour or so, but if you need an

2    additional break, it's okay.  If I'm on a

3    line of questioning, I may ask you to hold

4    off for a minute or two so that I can finish

5    that line of questioning.  But if it's an

6    emergency, then you tell me that it's an

7    emergency.  Also, if I have asked you a

8    question, you need to answer the question

9    before we take a break.

10   A.   Understood.  Yes, sir.

11   Q.   If at any point in time during the deposition

12        you feel like you remember something, you

13        want to add it to an answer that you've

14        already given, it's perfectly fine.

15            You understand that everything that you

16         say today is under oath and sworn

17         testimony.

18   A.   Yes.

19   Q.   But that doesn't mean that you don't remember

20        additional information as the deposition goes

21        on.  The best time to add that additional

22        information is while we're here sitting

1    around this table, so that I can ask you any

2    follow up questions that I may have.

3  A.   Okay.

4  Q.   Does that make sense?

5  A.   Understood.

6  Q.   Also, it's important for me to know where

7    your information comes from, okay?  So if

8    you, you know, you can have information

9    because you have firsthand information.  You

10   saw it, you heard it, you were there, you did

11   it, right, that's all firsthand?

12 A.   Mm-hmm.

13 Q.   Then there's secondhand, thirdhand and then

14   there's guesses, right?  So if you are

15   testifying about anything and it's not based

16   on your firsthand knowledge, would you please

17   tell me that it's based off of something that

18   you heard from someone else, something that

19   you read in a document, or you're taking an

20   educated guess, okay?

21 A.   Yup.

22 Q.   All right.  Can you tell me what you did to

1       prepare for your deposition?

2    A.   I met with my counsel.

3    Q.   And who's your counsel?

4    A.   Kelly Scindian.

5    Q.   Okay.  And when you did you meet?

6    A.   A couple of days ago.

7    Q.   Sometime this week?

8    A.   No, it was last week.  I think last week.  I

9         think it was last Thursday.

10   Q.   Okay.  And how long did you meet?

11   A.   An hour and a half.

12   Q.   Have you reviewed any documents in

13        preparation for your deposition?

14   A.   Yes, sir.

15   Q.   And what documents do you remember reviewing?

16   A.   A couple of e-mails and I think a memo or

17        two.

18   Q.   What e-mails did you review?

19   A.   I believe it was an e-mail from Officer Van

20        Meter to me.

21   Q.   And do you remember any other e-mails?

22   A.   Trying to -- I believe there was maybe an

1          e-mail with Mr. Richard Braddock.

2    Q.    Okay.

3    A.    Yeah.

4    Q.    An e-mail from you to Mr. Braddock?

5    A.    I don't remember if it was from Mr. Braddock

6          to me in the chain but that's from

7          Mr. Braddock to me.

8    Q.    Okay.  Is that the e-mail in which

9          Mr. Braddock told you that he was assigning

10         someone to investigate Van Meter's

11         allegations?  Does that sound right?

12   A.    Something along those lines.

13   Q.    Okay.

14   A.    I think he was saying that a meeting was

15         being conducted.

16   Q.    And the e-mail from Van Meter, was that one

17         where she was notifying you of concerns that

18         she had about her experience in the K9

19         training?

20   A.    I believe so, yes.

21   Q.    Yeah.  You also reviewed a memo or two?

22   A.    Yes.

1    Q.   And do you remember what memos those were?

2    A.   I believe one memo was, I don't remember who

3         it was from.  It was a memo about a review.

4    Q.   Okay.

5    A.   And I think the other memo was a decision

6         paper on Officer Van Meter --

7    Q.   Okay.

8    A.   -- being removed from the K9 unit.  I believe

9         that's it.

10   Q.   Do you remember any other documents?

11   A.   Nothing.

12   Q.   Okay.

13   A.   Not that I recall.

14   Q.   Have you talked to anyone besides counsel

15        about the facts of Van Meter's case?

16   A.   No.

17   Q.   Okay.

18   A.   Just the people that might be here at the

19        table with us.

20   Q.   Yeah.

21   A.   Yeah.

22   Q.   People, either counsel or people in counsel's

1        office.

2   A.   No, sir.

3   Q.   Okay.  When was the last time you talked to

4        Anthony Phelps, former Sergeant Phelps?

5   A.   I don't recall.  I don't recall talking to

6        him.  I may have said hi to him but I don't

7        have any recollection of talking to him.

8   Q.   Okay.  Are you currently employed?

9   A.   Yes, sir.

10  Q.   Do you currently perform work for Capitol

11       Police under contract --

12  A.   No.

13  Q.   -- or consulting basis?

14  A.   No, sir.

15  Q.   Okay.  When were you last employed with

16       Capitol Police?

17  A.   My separation date, I believe, was January 8

18       but I used some sick leave and so I want to

19       say April, early April.

20  Q.   What year?

21  A.   2021.

22  Q.   Okay.  And January 2022 would have been your

1        separation date?

2   A.   No.  No.  My separation date was the last

3        date that I was actually in the office doing

4        anything would have been, I would say,

5        January 8th the board made my separation

6        official.  I moved out that weekend.

7   Q.   What year?

8   A.   January 8th, 2021.

9   Q.   2021?

10  A.   Yes, sir.

11  Q.   Okay.  And was that -- and then but you had

12       sick leave --

13  A.   Yeah.

14  Q.   -- so that you stayed on the role until

15       April?

16  A.   Yeah.  So I got my financial house in order.

17  Q.   Got it.  Was your separation voluntary or

18       were you removed?

19  A.   Voluntary.

20  Q.   At the time that you separated were there --

21       I don't want to know what kind of

22       investigations, I'm just asking you a yes or

1         no, were there any internal investigations

2         into your performance or employment?

3    A.   No, sir, not that I'm aware of.

4    Q.   Okay.  Were there any proposals to remove you

5         in play at the time that you decided to

6         separate from the Capitol Police?

7    A.   Could you clarify that question a little?

8    Q.   Yeah.  Had you received notice that there

9         were any plans to remove you involuntarily?

10   A.   By the Capitol Police?

11   Q.   By the board, yeah.

12   A.   No, sir.

13   Q.   Okay.  By -- what about by Capitol Police?

14   A.   No, sir.

15   Q.   Okay.  And what was your position at the time

16        that you separated?

17   A.   The chief of police.

18   Q.   And how long had you been chief of police?

19   A.   Approximately 18 months.

20   Q.   And in the fall of 2017, what was your

21        position?

22   A.   Assistant chief.

1   Q.   Okay.  Were you also chief operating officer?

2   A.   No.

3   Q.   No?  I'm sorry.  Chief of operations?

4   A.   Yes, sir.

5   Q.   Okay.  And so I want to know about your

6        primary duties as assistant chief and then

7        also if there's any additional duties that

8        come from chief of operations, okay?  So

9        let's start with, what were your duties

10       particularly in the 2017 time period as

11       assistant chief?

12  A.   So assistant chief at that time was there was

13       a single assistant chief, so chief of

14       operations and the assistant chief are really

15       one in the same, so that's an easier answer

16       to the second question.

17  Q.   All right.  Good.

18  A.   And then my job was kind of overseeing really

19       all of the operations for the department.  So

20       if you had a number of different bureaus, you

21       know, I oversaw the operations of those -- of

22       those bureaus.

```
1    Q.   And did you oversee the operations of the

2         bureaus that housed the K9 division?

3    A.   Yes, I did.

4    Q.   Okay.  What was that bureaus called at the

5         time?

6    A.   Operational Services Bureau.

7    Q.   Okay.  And when you say you oversaw the

8         operations, what responsibility did you have

9         for personnel actions?

10   A.   Personnel actions usually would come up -- it

11        all depends but personnel actions usually

12        come up from me to the chain up to the chief,

13        the chief usually had the final authority for

14        personnel actions.

15   Q.   Okay.  So no personnel action could be taken

16        until the chief signed off on it?

17            MS. SCINDIAN:  Objection.  Vague and

18        ambiguous.  Calls for speculation.

19   A.   I want to make sure I answer your question

20        correctly.  So no personnel action could be

21        taken -- not sure what you -- can you clarify

22        that a little bit.
```

1    Q.    Yeah.  Let me break it down.  What personnel

2          actions required the chief's approval before

3          they could become effective?

4    A.    Let's see terminations.  I believe

5          reassignments, removal from the programs.

6          I'm just trying to think of the proper

7          terminology for that.  But I believe hirings

8          -- the hirings and firings.  I believe that

9          is about it.  There may be some -- something

10         additional that I missed.

11   Q.    Okay.  Taking Officer Van Meter's case as a

12         specific example, before Officer Van Meter

13         could be removed from the training program,

14         did that require the chief's approval?

15   A.    I believe it did.

16   Q.    Okay.

17   A.    I believe it did.

18   Q.    Did you have the authority to effectuate

19         Officer Van Meter's removal from K9 training?

20   A.    I don't believe so, no.

21   Q.    And when you said reassignments, if you were

22         going to be reassigning an employee out of

1        K9, for example, because they were being

2        failed out of the training program and back

3        to uniform services bureau, is that the kind

4        of reassignment that would require the

5        chief's approval?

6   A.   If I recall correctly, yes.

7   Q.   Okay.  When did you begin at Capitol Police?

8   A.   January 2017.

9   Q.   And before that, where were you?

10  A.   I was with a company for just a year in Falls

11       Church, Virginia.

12  Q.   Had you been with Capitol Police before -- in

13       other words, this spell between 2017 and

14       2021, was that your only tenure with Capitol

15       Police?

16  A.   Yes, sir.

17  Q.   Okay.  And what position did you have when

18       you started with Capitol Police?

19  A.   Assistant chief.

20  Q.   Okay.  And what was the company you worked

21       with before that?

22  A.   It was a company called Noblis, N-O-B-L-I-S.

1    Q.    And what was your position there?

2    A.    I was a director of business development.

3    Q.    What kind of business was it?

4    A.    They do -- it's a nonprofit that does a lot

5          of work with the government.

6    Q.    Think tank type?

7    A.    No, they were brand specific technologies,

8          service provided for -- for government, the

9          FAA, things like that.

10   Q.    Sorry you said FAE?

11   A.    No, FAA.  Federal Aviation Administration.

12   Q.    And what kind of technology is it?

13   A.    They do biometric technology.  They'll do

14         different -- trying to think what they do

15         with FAA, radar and different organization of

16         the technology.  The police work and the

17         intelligence community, we do some work with

18         that.

19   Q.    And why did you leave Noblis?

20   A.    To come to Capitol Police.

21   Q.    Was that a voluntary separation from Noblis?

22   A.    Yes, sir.

1   Q.   Okay.  And you said you worked there for

2        about a year?

3   A.   Yes, sir.

4   Q.   And before that?

5   A.   I was with the metropolitan police

6        department.

7   Q.   And what was your highest level of your

8        tenure?

9   A.   Commander.

10  Q.   And what -- was there a bureau or division

11       that you were command of?

12  A.   Last one was special operations division.

13  Q.   And did that include a K-9?  Did special

14       operations at MPD include K9?

15  A.   Yes, sir.

16  Q.   Okay.  And what were the years that you were

17       the commander over at the MPD Special Ops?

18  A.   2011 through 2015.

19  Q.   There was a lawsuit field against MPD over

20       the reorganization of the K9 units, do you

21       recall that lawsuit?

22            MS. SCINDIAN:  Objection.  Irrelevant.

1    A.   I believe it was with the previous chief.  I

2         don't much about it but I believe, and I'm

3         just -- this is just from the specu -- from

4         guessing --

5    Q.   Okay.

6    A.   -- I believe it was Chief Cataneer.  I don't

7         recall a lot of that.

8    Q.   Were you the -- were you the commander at the

9         time of the reorganization that was the

10        subject of that lawsuit?

11   A.   I don't believe so.

12   Q.   Okay.

13   A.   No, sir.

14   Q.   Okay.  Let me just make sure, I'm going to

15        characterize that lawsuit.  Let's see, there

16        was a unit -- let's see, the K9 units at MPD

17        were broken up into like a day shift, maybe

18        an evening shift, and a night shift.  The

19        night shift unit was almost all white.  I

20        think there was one African American person

21        but mostly white officers, and they -- the

22        statistics showed that they had more bites,

1      more dog bite cases than any other case.  And

2      I think there was an allegation that may have

3      been caused in part by racial issues, and as

4      a result, the units were reorganized and --

5      they were reorganized to make each unit more

6      diverse, one of the reasons they reorganized

7      was to make each unit more diverse.  So it

8      wasn't all white or mostly white, but each

9      one of those shifts would have a mix of black

10     and white people in it.  And the shifts also

11     rotated so that you didn't have one shift

12     that was always night shift, which may have

13     led to some isolation of that unit.  Okay,

14     that's my characterization of the case.  Do

15     you remember if you were the commander at the

16     time of that reorganization?

17          MS. SCINDIAN:  Objection.  Relevance.

18  A.  I don't believe I was the commander during

19      that time.

20  Q.  If you -- as the commander in special ops at

21      MPD, would you have had to approve of any

22      reorganization of the type that I just

1       described?

2              MS. SCINDIAN:  Objection.  Irrelevant.

3    A.   Yes, I believe so.

4    Q.   And do you remember approving that

5         reorganization?

6    A.   No, sir.

7              MS. SCINDIAN:  Objection.  Irrelevant.

8    Q.   Okay.  Let's see before -- when did you start

9         at MPD, Metropolitan Police Department?

10   A.   1990.

11   Q.   And in what capacity?

12   A.   A police officer.

13   Q.   Okay.  And your last position as commander,

14        is there an equivalent to that position at

15        Capitol Police, just in terms of the rank?

16   A.   I'd say deputy chief.

17   Q.   Okay.  Any complaints of discrimination

18        against you while you were employed at

19        Metropolitan Police Department?

20             MS. SCINDIAN:  Objection.  Relevance.

21   A.   No, sir.

22   Q.   Okay.  And are you aware of any claims of

1          gender discrimination against you while you

2          were employed at Capitol Police?

3     A.   Not that I recall, no.

4     Q.   Okay.  Have you ever testified in any trials?

5          Have you been a witness at any trial?

6     A.   Yes, sir.

7     Q.   Okay.  And how many trials?

8     A.   Several.

9     Q.   And were any of those civil cases?

10    A.   Not that I recall.

11    Q.   Okay.  So you testified in trials but to your

12         recollection those have always been in

13         criminal matters?

14    A.   I believe so, yes.

15    Q.   Okay.  When I asked about complaints of

16         discrimination, I realize that now that I

17         think about it, that can be a little

18         ambiguous.  So, you know, there's all kind of

19         different levels of complaints, I guess.  One

20         could be a lawsuit.  That is a pretty formal

21         complaint.  Another could be a complaint

22         communicated by an employee to a supervisor

1      or to human resources.  Do you know if there

2      were any of those types of complaints

3      concerning discrimination involving you at

4      Capitol Police?

5   A.  Not that I'm aware of.

6   Q.  Okay.  And did any -- has any employee of

7      Capitol Police ever formerly or informally

8      told you that they thought that you were

9      discriminating against them?

10  A.  Not that I recall, no.

11  Q.  Okay.  We had touched on this a minute ago

12      but did you know Anthony Phelps when you were

13      employed at Capitol Police?

14  A.  Not really, no.

15  Q.  Would you have known him by sight?

16  A.  No.  I would say, no.

17  Q.  You wouldn't even recognize him?

18  A.  I don't believe so, no.

19  Q.  How about Charles K. Hill, who was one of the

20      instructors in K9, did you know him?

21  A.  No.  Other than he may have been employed

22      there, no.

1    Q.    Okay.  I'm just going to name a couple of --

2          a few other employees.

3    A.    What type of response are you looking for

4          from me?

5    Q.    It's the same question.

6    A.    Okay.

7    Q.    Did you know that person?

8    A.    Got it.

9    Q.    So AJ Turner, another instructor at K9?

10   A.    Yeah.  The name sounds familiar.  And I may

11         have seen him when I went down and visited K9

12         or during graduations.

13   Q.    Okay.

14   A.    During K9 graduations usually the trainers

15         are there but other than that, no.

16   Q.    Okay.  Timothy Cullen or Timmy Cullen?

17   A.    The name sounds familiar.  May have met him

18         but didn't know.

19   Q.    How about Jeff Core?

20   A.    No.  No, sir.

21   Q.    Did you know Officer Van Meter?

22   A.    I met her couple of times when she was

1        working some of the posts.  I try to talk to

2        officers fairly often.

3   Q.   Okay.

4   A.   And I remember I think seeing her at one of

5        the traffic posts near the Rayburn Building

6        on the south side of the Rayburn building.

7   Q.   Okay.

8   A.   That's about it.

9   Q.   So you would have recognized Officer Van

10       Meter by sight in 2017?

11  A.   I don't even remember when I first met her.

12       It was probably some time after 2017.

13  Q.   Do you think you --

14  A.   I might recognize her by sight, just not 100%

15       and talked her a handful of times.

16  Q.   I'm not sure if I mentioned Jeff Core, did

17       you know Jeff Core?

18  A.   You mentioned him but, no.

19  Q.   Okay.  Can you tell me what your role in

20       Officer Van Meter's removal from the K9

21       training program was?  And just so you

22       understand the question, I'm not asking you

1    about any investigations that occurred after

2    her removal.  My question right now is, what

3    was your role, if any, in the decision to

4    remove her from the K9 training program?

5    A.   I'm part of the decision paper that came up,

6         and I reviewed the decision paper, and made a

7         recommendation based on that.

8    Q.   Other than the decision paper, did you do

9         anything, make any inquiries, you know, talk

10        to anyone, or review any documents, that is

11        what I mean by anything, did you do anything

12        to investigate whether the decision to remove

13        Officer Van Meter was legitimate?

14   A.   Yeah, I thought when your initial question

15        was my role.  So investigations, I believe

16        she sent me an e-mail.

17   Q.   Sorry.  We're going to talk about that.  But

18        what I'm saying is, you said you reviewed a

19        decision paper, you were part of the approval

20        chain --

21   A.   Mm-hmm.

22   Q.   -- right?

1   A.   Yes, sir.

2   Q.   So what I'm asking is, before you signed that

3        decision paper, did you do anything to make

4        any inquiry about whether or not the

5        recommendation to remove Officer Van Meter

6        was legitimate?

7   A.   Again, I refer back to actions I took on the

8        e-mail but it sounds like that's another

9        question.

10  Q.   That's another question.  So, in other words,

11       let's just look at it.

12       (Exhibit 1 was marked for identification and

13       is attached to the transcript.)

14  Q.   Mr. Sund, I've given you what's been marked

15       Sund Exhibit 1.  And you'll see that this on

16       goes -- so if you take a look at the bottom

17       right-hand corner, it's got an identifying

18       number on each page.  We call those Bates

19       numbers.

20  A.   Okay.

21  Q.   And Exhibit 1 goes from USCP 12 all the way

22       to 17.  Take a moment, peruse the document as

1          much as you need to.  My question for you is,

2          is this -- I believe you refer to a

3          recommendation memo that you were part of the

4          approval chain for, is this the document that

5          you were thinking of?

6     A.   Yes, sir.  This would be the decision paper,

7          yes.

8     Q.   The decision paper?

9     A.   Yes.

10    Q.   What is a decision paper?  Is that a term of

11         art at Capitol Police?

12    A.   It is a -- yes, it's a term that refers to a

13         paper that usually requires an action be

14         taken.

15    Q.   Okay.  All right.  And do you see your

16         signature on the first page of the exhibit?

17    A.   I'm still reviewing it.

18    Q.   Okay.  Oh, yeah.  No.  I'm sorry, take your

19         time.  Is this the decision paper that you

20         were referring to earlier?

21    A.   Yes, sir.

22    Q.   And you said you were part of the, I think,

1          the approval chain or something of that

2          nature?

3     A.   Yes, sir.

4     Q.   Okay.  And do you see your signature on the

5          first page of the document?

6     A.   Yes, sir.

7     Q.   And does that -- you also -- in your

8          signature block there are three choices

9          approve, disapprove, or a comment.  And in

10         your signature block, the box to approve is

11         checked, did you check that?

12    A.   Yes, sir.

13    Q.   Okay.  And so that was an indication that you

14         approved of the decision paper or the

15         recommendation made in the decision paper?

16    A.   Yes, sir.

17    Q.   Okay.  And that recommendation was to remove

18         Officer Van Meter from the program, right?

19    A.   Yes, sir.

20    Q.   From the training program?

21    A.   Yes, sir.

22    Q.   So my question is, other than reading the

1      decision paper and the information found in

2      the decision paper, did you do anything to

3      make any inquiries or investigation into

4      whether Officer Van Meter should be removed?

5  A.  Other than the discussion on the other

6      e-mail, I don't recall any other instruction.

7  Q.  Okay.  So, in other words, before you signed

8      the document -- the approval on October 20th,

9      2017 did you review any other documentation

10     relevant to Van Meter's performance in that

11     training program?

12 A.  Not that I recall.

13     (Exhibit 2 was marked for identification and

14     is attached to the transcript.)

15 Q.  Mr. Sund, you've been now given Sund Exhibit

16     2.  This one goes from the Bates numbers 55

17     to 56.  So it's USCP 55 to 56.  The document,

18     the title of the document at the top is, EOD

19     Canine Training Form.  This one in particular

20     is dated September 5th, 2017.  Do you see

21     that at the top left.  The handler for which

22     this form is relevant is Van Meter and the K9

1        is Jayden.  Do you see all that information?

2  A.   Yes.

3  Q.   Okay.  So have you ever seen an EOD Canine

4        Training Form like this before?

5  A.   No, sir.

6  Q.   Okay.  And so before you signed your approval

7        on the decision paper, you didn't review any

8        EOD Canine Training Forms to see what is

9        training form said about the class, did you?

10 A.   Not that I recall, no, sir.

11 Q.   Okay.  You didn't review documents to see

12       what the actual source documents said about

13       Van Meter's performance?

14 A.   I don't believe so, no, sir.

15 Q.   Okay.  And were you aware that the training

16       exercises for this class or a lot of training

17       exercises for this class were videotaped?

18 A.   I believe it discussed the videotaping of

19       some of the exercises in the decision making.

20 Q.   Did you ever review any of those videos?

21 A.   No, I have not.  No, sir.

22 Q.   Okay.  Did you speak to any of the training

1          staff before you signed your approval?

2     A.   I don't believe so, no.

3     Q.   Did you speak to anyone in the chain of

4          command, I guess the chain of command below

5          you, before you signed your approval?

6     A.   Not that I recall, no.

7     Q.   Okay.  And when I say the chain of command

8          below you, do the names on the first page of

9          Exhibit 1 reflect the chain of command below

10         you?

11    A.   Yes.

12    Q.   Okay.  So immediately below you would have

13         been deputy chief Fred Rogers?

14    A.   Yes, sir.

15    Q.   And then below him would have been Inspector

16         Belknap?

17    A.   Yes, sir.

18    Q.   And then below him Captain Erickson?

19    A.   Yes, sir.

20    Q.   And below him Cromwell -- Lieutenant

21         Cromwell?

22    A.   Yes, sir.

1    Q.    And lieutenant Cromwell would have been

2          Sergeant Phelps' first line supervisor?

3    A.    Yes, sir.

4    Q.    Okay.  Now, using this exhibit as an example,

5          Exhibit 1, or as a reference, before Officer

6          Van Meter could be removed from K9 training,

7          were the approvals of all these officials

8          required?

9              MS. SCINDIAN:  Objection.  Vague and

10         ambiguous.

11   Q.    All of the officials listed on the approval

12         page, the first page of the exhibit.

13             MS. SCINDIAN:  Same objection.

14   A.    I believe so.

15   Q.    Okay.  Before October 20th, 2017 do you

16         remember anyone giving you either verbal or

17         written information about how that training

18         class was progressing?

19   A.    Not that I recall, no, sir.

20   Q.    Okay.  Do you remember anyone giving you any

21         verbal or written information about concerns

22         over any particular handlers or trainees in

1          that class?

2     A.   Not that I recall.

3     Q.   Okay.  Do you remember anyone informing you

4          in any way in communicating any concerns

5          about any of the K9's, the dogs in that

6          class?

7     A.   Not that I recall, sir.

8     Q.   Okay.

9               MR. ALDERMAN:  Just give me a minute.

10         I'll be right back.

11         (A recess was taken)

12         (Exhibit 3 was marked for identification and

13         is attached to the transcript.)

14    Q.   Mr. Sund, you've now been given Exhibit 3.

15    A.   Mm-hmm.

16    Q.   This one goes from USCP 6 to 7.  And you'll

17         see it's an e-mail chain that begins with an

18         e-mail from Sergeant Phelps to Lieutenant

19         Cromwell on September 7th, 2017.  Cromwell

20         then sends it up to Belknap on -- sometime

21         between September 8th it looks like and

22         September 11th.  And then Belknap sends it to

1        Rogers, Fred Rogers, on the 11th, copying

2        Marvin Reed.  Take a look at the e-mail

3        chain, essentially the e-mail from Phelps to

4        Cromwell from September 7th.

5    A.  Okay.

6    Q.  And my question is, have you ever seen this

7        before?

8    A.  Okay.

9    Q.  Have you ever seen any part of this e-mail

10       before?

11   A.  I don't recall seeing it.

12   Q.  Who was Marvin Reed?

13   A.  Marvin Reed was Chief Rogers, refer to him as

14       an executive XL, executive officer.

15   Q.  Okay.  Do you believe that anyone

16       communicated any of the information contained

17       in this e-mail to you at any time before

18       October 20th, 2017?

19   A.  Not that I recall, sir.

20   Q.  Okay.  So you don't remember anyone informing

21       you in any way about any concerns regarding

22       Officer Van Meter in that training program

1       before October 20th, 2017?

2  A.   I don't recall anything specific to Officer

3       Van Meter.

4  Q.   Okay.  How about Officer Riley, Mike Riley,

5       do you remember anyone expressing any

6       concerns to you or informing you of any

7       concerns regarding Mike Riley, who was a

8       trainee in that class?

9  A.   Not that I recall.  No, sir.

10  Q.   Did you know Mike Riley?

11  A.   I've known Mike Riley since.

12  Q.   How have you known him since?

13  A.   Just having talked him after, seen him around

14       the Hill, things like that.

15  Q.   Were you friends with Mike Riley?

16  A.   No.

17  Q.   Okay.  So --

18  A.   Nothing outside of work so, no, sir.

19  Q.   Okay.  What about Dmitrius Dantinne, did

20       anyone inform you about any concerns about

21       regarding him as a trainee in that class?

22  A.   No, sir.  Not that I recall.

1    Q.    How about Officer Meikrantz did anyone

2          express or inform you about any concerns

3          about his performance in that class?

4    A.    Not that I recall, sir.

5    Q.    And Garrett Zborai, did anyone concern or

6          express any concerns about his performance?

7    A.    Not that I recall.

8    Q.    Did you know Garrett Zborai?

9    A.    The name doesn't even sound familiar.

10   Q.    Okay.

11   A.    But, again, it's a big agency, so it could be

12         that I know him.

13   Q.    Do you know Michelle Gonzalez?

14   A.    The name sounds familiar, yeah.  She one of

15         the K9 officers.

16   Q.    Did anyone ever communicate to you any

17         concerns about Michelle Gonzalez's

18         performance when she was a trainee going

19         through that same program?

20   A.    Not that I recall, sir.

21   Q.    Okay.  Okay.  Have you been involved, just

22         like you were involved in the Van Meter case

1      as an approving official, or -- or any other

2      manner, have you been involved in anyone's --

3      any other trainee's removal from the K9

4      program?

5  A.  I don't know.  Maybe I did and just don't

6      recall.

7  Q.  Okay.  Do you remember being involved in the

8      removal of Officer Schwalm in the 2016 class?

9  A.  No.  The name sounds familiar.  I just don't

10     recall being involved in any removal.

11 Q.  When did you begin at Capitol Police?

12 A.  January of 2017.

13 Q.  '17, okay.  And so you would not -- based on

14     those dates, you would have no involvement

15     with the removal of a trainee back in August

16     of 2016?

17 A.  I don't believe so, sir.

18 Q.  Could you have had any involvement in the

19     removal of a trainee in August of 2016?

20 A.  Not that I remember, no.

21 Q.  I'm sorry, were you an employee of Capitol

22     Police in August of 2016?

1    A.   No, sir.

2    Q.   So you couldn't have had involvement in that

3         employee's removal, right, from training?

4    A.   I would suspect that would be right.  Yes,

5         sir.

6    Q.   Okay.  You weren't a consultant or anything

7         to Capitol Police in August of 2016?

8    A.   No, sir.

9    Q.   Okay.  Do you know what a form 550 is used

10        for in Capitol Police?  And, again, I'm

11        directing my question to this 2017 timeframe,

12        not what's happening right now but in the

13        2017 timeframe do you know what a form 550

14        was used for?

15   A.   I believe it's a form of counseling.

16   Q.   Okay.  And is that form used to notify an

17        employee of deficiencies so that they can be

18        corrected?

19        MS. SCINDIAN:  Objection.  Calls for

20        speculation.  Vague and ambiguous.

21   A.   I believe it can be, yes.

22   Q.   Okay.  Do you know if a form 550 was required

1          to be issued to an employee before a

2          corrective action can be taken?

3              MS. SCINDIAN:  Objection.  Vague and

4          ambiguous.

5    A.    I don't specifically recall, no.

6    Q.    Okay.  Was there some official notice

7          required to be given to officers before

8          corrective action could be taken?  And when I

9          say corrective action, that would be

10         something that would include removing the

11         officer from a training program.

12             MS. SCINDIAN:  Objection.  Vague and

13         ambiguous.

14   A.    Can you rephrase your question again?

15   Q.    Yeah.  Was there -- was there some official

16         notice requirement before removing an officer

17         from a training program like the K9 training

18         program?

19             MS. SCINDIAN:  Objection.  Vague and

20         ambiguous.

21   A.    I don't specifically recall.  There may have

22         been.  I just don't specifically recall.

1    Q.   Okay.

2         (Exhibit 4 was marked for identification and

3         is attached to the transcript.)

4    Q.   Mr. Sund, you referenced earlier a

5         communication that Van Meter had sent to you.

6         Do you remember what the gist of that

7         communication was?

8    A.   When you say the communication, you're

9         talking about the e-mail?

10   Q.   Yes, sir.

11   A.   I believe she was raising concerns with the

12        process for her time at K9.

13   Q.   And to your recollection was she asserting

14        that she thought that she had been treated

15        differently because she was a woman in the

16        program?

17   A.   No, sir.

18   Q.   Was she asserting that she was treated

19        differently because of some sort of

20        discrimination?

21   A.   No, that wasn't my interpretation.  No.

22   Q.   If she had made a claim or a complaint about

1        discrimination, would you have been obligated

2        to refer her complaint to the Office of

3        Professional Responsibility?

4   A.   Quite possibly, yes.

5   Q.   Office of -- is it the Office of Professional

6        Responsibility, do I have that right?  OPR?

7   A.   Yes, that's correct.

8   Q.   And was OPR the office or division that was

9        responsible for investigating claims of

10       discrimination made by Capitol Police

11       officers?

12  A.   Yes.  For the most part, yes.

13  Q.   What do you mean for the most part?

14  A.   I mean if, I guess, depending on where the

15       claim would come in from, but I guess -- you

16       know, I'm trying to think if they're the ones

17       that we made a complaint that comes in from

18       OCWR, whether OPR investigates that or

19       someone else.

20  Q.   So if an officer makes an internal complaint

21       about discrimination, was OPR office that was

22       charged with investigating?

1    A.    Yes.

2    Q.    And if you received, you as the supervisor

3          received a complaint from an officer about

4          discrimination, were you under an obligation

5          to then forward that to OPR for

6          investigation?

7    A.    Just -- let's see, so when you say -- I think

8          you have an obligation to deal with it if

9          someone brings up an allegation of disparate

10         treatment.  So, yeah, OPR would be one

11         method.  You may have some people that take

12         it to their direct supervisor, as well.  But

13         OPR would be the ultimate ones to investigate

14         that, yes.

15   Q.    If an employee brings a complaint of

16         discrimination to their supervisor in 2017,

17         was the supervisor required by Capitol Police

18         regulations to notify OPR of that complaint?

19   A.    Yeah.  Have to review the regulation again

20         but, yeah, make some type of notification

21         associated with the complaint either --

22         either to OPR or to their supervisor, yes.

1   Q.   Who would have to make notification, the

2        notification that you just referenced?

3   A.   Probably the employee being notified of the

4        disparate treatment.

5   Q.   So if this notice came to you as assistant

6        chief, what were the requirements on you?

7   A.   I'd have to look at the memorandum to be sure

8        but either to refer to OPR or bring it to the

9        next level of official.  But that would be my

10       two thoughts for --

11  Q.   So --

12  A.   So if you had a complaint that was a clear

13       complaint of violation of disparate

14       treatment, probably refer to an OPR.

15  Q.   Okay.  Mr. Sund, I've given you now what's

16       been marked Exhibit 4.  This one bears the

17       Bates numbers USCP 103 to 105.  And can you

18       tell me, is this the e-mail that you received

19       from Officer Van Meter in which she was

20       asserting complaints about how she was

21       treated in the training program?

22            Yes, sir.

1  Q.   And your testimony earlier was that you did

2        not perceive Officer Van Meter to be

3        complaining about discrimination in this

4        e-mail that we've marked Exhibit 4?

5  A.   Yes, sir.  That's correct.

6  Q.   And then now I want to talk about how you

7        perceived the e-mail, how you interpreted it,

8        okay?  In the second paragraph of the e-mail,

9        Officer Van Meter refers to having to quote,

10       prove myself to the men that I could do the

11       job.  Do you see that?  It's the paragraph

12       that starts, for approximately --

13 A.   Okay.

14 Q.   Do you see that?

15 A.   Yes, sir.

16 Q.   And did you read that at the time that you

17       received the e-mail back in October of 2017?

18 A.   I believe I did, yes.

19 Q.   Okay.  And why did you think that Officer Van

20       Meter was referring to having to prove

21       herself to the men that she could do the job?

22       If she wasn't complaining about

1      discrimination, why do you think that she

2      included that language?

3   A.   Because I think a lot of times women in

4      police feel that they are oftentimes, you

5      know, surrounded by men and they got to show

6      that they can carry -- carry their weight, so

7      it appear that they're proving themselves.

8   Q.   Did you think that she was talking about a

9      discriminatory environment at the Capitol

10      Police?

11   A.   I didn't interpret that way no.

12   Q.   Skipping down a few paragraphs on the same

13      page where she says, quote, diversity among

14      our specialty units is very minimal.  Below

15      are just some examples of how I felt I was

16      treated.  Did you interpret that statement to

17      be a complaint about discrimination?

18   A.   No, I didn't.

19   Q.   And why not?  How did you interpret it?

20   A.   Well, the diversity among special units, you

21      know, her interpretation of it, it may be

22      that she wanted to know that she would add to

1      the diversity within the unit, and then was

2      explaining how below are some of the ways

3      that she felt the training and some of the

4      process of the training, and how she had some

5      issues with it.

6  Q.   But you didn't think that concerns about

7      diversity created barriers or problems that

8      she was identifying to you?

9           MS. SCINDIAN:  Objection.  Calls for

10     speculation.

11 A.   No, sir.  That's not how I interpreted, no,

12     sir.

13 Q.   Do you think that her reference to minimal

14     diversity in that sentence is synonym for

15     discrimination?

16          MS. SCINDIAN:  Objection.  Calls for

17     speculation.

18 A.   Again, I took that as kind of her

19     interpretation.

20 Q.   Right.  That she interpreted things as

21     discriminatory?

22          MS. SCINDIAN:  Objection.  Calls for

1       speculation.

2   A.   I didn't take it that she interpreted it as

3        discriminatory.  She just felt that -- she --

4        that there should be more women in these

5        positions.

6   Q.   So your interpretation was that she was

7        communicating to you that there should be

8        more women in some of these specialty

9        positions, right?

10  A.   By her sentence there that's what her opinion

11       was.

12  Q.   But you didn't think that she was complaining

13       to you about discrimination?

14  A.   No, I didn't.

15  Q.   You didn't think that she was telling you

16       that discrimination was the reason there

17       weren't more women in the specialty units?

18  A.   I didn't interpret it that way, no, sir.

19  Q.   Did you know that she was the only female in

20       the training program?

21            MS. SCINDIAN:  Objection.  Lacks

22       foundation.  Calls for speculation.

1    A.    No, I was not aware.

2    Q.    The last paragraphs reads, USCP 105 quote,

3          these are a few of the things that I went

4          through during my time in K9 training.  I

5          will not be putting in again for K9 or any

6          other specialty units.  I just hope this

7          gives management a chance to see the gap in

8          our diversity among special units.  You did

9          not interpret that paragraph to be a

10         reference to discrimination?

11   A.    No sir, I didn't.

12   Q.    What did you think it was a reference to?

13   A.    Again, it's her interpretation of, you know,

14         because, you know, had some of these issues,

15         I wouldn't be able to address the gap that

16         she perceives exists.

17   Q.    So taking a look at the highlighted language

18         that I raised with you, she's telling you

19         that for years she had to prove herself to

20         the men, then she says that diversity among

21         our specialty units is very minimal, and then

22         she gives you examples of how she felt she

1    was treated.  And then she says at the very

2    end, I hope this gives management a chance to

3    see the gap in our diversity among specialty

4    units.  And you didn't interpret those

5    comments either alone or together as a

6    complaint about discrimination?

7         MS. SCINDIAN:  Objection.  Asked and

8    answered.

9  A.  No.  Again, I -- when you talk about having

10   highlighted stuff, I think the highlight is

11   on yours but --

12 Q.  It's the phrases that I've highlighted to you

13   in --

14 A.  Okay.  Got you.

15 Q.  -- my question.

16 A.  Okay.

17 Q.  You can answer.

18 A.  Okay.  Yeah.  I just wanted to make sure she

19   was going to say anything.  No, I did not.

20 Q.  Okay.  You can put that aside.  Did you

21   interpret Officer Van Meter's e-mail to you

22   to be an indication that she thought that she

1          was treated differently because she was a

2          woman?

3     A.   No.

4     Q.   Okay.

5     A.   No, sir.

6     Q.   Did you think that she was -- did you

7          interpret her e-mail to you as saying she

8          thought that she was treated differently

9          because of a lack of diversity in the

10         specialty units?

11    A.   No, sir.

12    Q.   I'm sorry, just to refer you back to Exhibit

13         4.  It looks like you e-mailed Officer Van

14         Meter's October 23rd, 2017 e-mail to

15         yourself.  Do you see that at the very top of

16         the page on USCP 103 where there's an e-mail

17         from Steven Sund to Steven Sund dated

18         October 26th?

19    A.   Yes, sir, I see it.

20    Q.   Do you know why you e-mailed that to

21         yourself?

22    A.   I don't recall.  No.

1    Q.   Did you BCC anyone on that e-mail?

2    A.   I don't believe so, no.

3    Q.   Is there any reason that you would have

4         forwarded that e-mail to yourself that you

5         can think of now?

6    A.   Not that I recall, no.

7    Q.   Did you e-mail that to a different e-mail

8         address?

9    A.   No, sir, not that I recall.

10   Q.   So you sent it from your Capitol Police

11        e-mail address to your Capitol Police e-mail

12        address?

13   A.   That's what it appears, yes.

14   Q.   Were you in the practice of doing that?

15   A.   I don't know if I did it to bring it to the

16        top of the queue or something like that, I

17        just don't recall.

18   Q.   At the time -- at or before the time that she

19        wrote her October 23rd, 2017 e-mail to you,

20        which we have marked as Exhibit 4, were you

21        aware that Officer Van Meter had also

22        communicated with Mr. Braddock about her

1       concerns over her treatment in the training

2       program?

3   A.  I don't recall, no.

4   Q.  Okay.  Who was Mr. Braddock at the time?

5   A.  Mr. Braddock in 2017 I believe his title

6       would have been the chief administrative

7       officer, CAO.

8   Q.  Were there any other positions he may have

9       held around that time to your recollection?

10  A.  I don't recall, no.

11      (Exhibit 5 was marked for identification and

12      is attached to the transcript.)

13  Q.  Okay.  Mr. Sund, you've now been given

14      Exhibit 5, which goes from Bates USCP 1936 to

15      1937.  And just for the record, I'll

16      characterize it.  This is an October 20th,

17      2017 e-mail from Van Meter to Richard

18      Braddock in which she lists many of the same

19      concerns she raised with you in her

20      October 23rd, 2017 e-mail.  Were you aware

21      that Officer Van Meter was communicating with

22      Richard Braddock at the time?

1    A.    No, I was not.  I do not recall.  No, I

2          don't.

3    Q.    Do you remember any communications between

4          you and Mr. Braddock about Officer Van Meter

5          around the time that she sent you her

6          October 23rd, 2017 e-mail?

7    A.    Not that I recall, no.

8    Q.    Okay.  You can put that aside.

9    A.    Okay.  You need me to finish reviewing it?

10   Q.    I think you've already testified that you're

11         not aware of any communications between Van

12         Meter and Braddock.

13   A.    Okay.  Very good.

14             MS. SCINDIAN:  Is this a good time for a

15         break?

16             MR. ALDERMAN:  Yeah.

17         (A recess was taken)

18   Q.    Mr. Sund, taking a look at Van Meter's e-mail

19         just to give you some reference looking at

20         dates.  Officer Van Meter sends you her

21         e-mail at 9:19 a.m. eastern or EDT, October

22         23rd, 2017.  You can see that in Exhibit 4,

1        right?

2    A.   Yes, sir.

3    Q.   Now, by that time it looks like you had

4         already signed, if you take a look at Exhibit

5         1, you had already signed the decision paper

6         because your signature is on October 20th,

7         2017.  Right?

8    A.   Yes, sir.

9    Q.   And is that date accurate, October 20th,

10        2017?

11   A.   It should be, yes.

12   Q.   The date of your signature?

13   A.   Yes, sir.

14   Q.   But chief Verderosa only signed on October

15        23rd, 2017.  Do you see that?

16   A.   Yes, sir.

17   Q.   And that's the same day that Officer Van

18        Meter sent you her e-mail?

19   A.   Yes, sir.

20   Q.   Did you do anything to notify Chief Verderosa

21        that there might be some questions about how

22        Van Meter was treated or questions about her

1      removal before he signed?

2  A.  I don't -- I don't know what time he signed

3      it, so I don't know if any of my

4      communications with him would have been

5      before or after the signature.

6  Q.  Okay.  Did you communicate with Chief

7      Verderosa on the day that Officer Van Meter

8      sent you the October 23rd, 2017 e-mail?

9  A.  I don't recall what date it was that I talked

10     to him about it.

11 Q.  Okay.  Do you remember talking to Chief

12     Verderosa about --

13 A.  Yes.

14 Q.  -- officer Van Meter's removal?

15 A.  About her e-mail, yes.

16 Q.  Okay.  And what do you remember speaking to

17     him about or communicating to him about?

18 A.  I believe I went and talked to him about the

19     e-mail that she sent to me and I don't

20     remember when it was.  He had talked to me

21     about it.  I don't know if I showed him the

22     e-mail or just talked to him about it.  And

1      he directed me to have HR do a review of the

2      process, make sure the process was -- there

3      was no issues with the process itself.

4  Q.  Did you show the chief, Officer Van Meter's

5      e-mail?

6  A.  I may have.  I don't -- I just don't

7      remember.

8  Q.  Okay.  And so the chief instructed you to get

9      HR to do an inquiry of some sort?

10  A.  Yes, if I remember correctly.

11  Q.  Okay.  But you don't know if it was before or

12      after Chief Verderosa signed Exhibit 1 --

13  A.  No, sir.

14  Q.  -- the recommendation paper --

15  A.  No, sir.

16  Q.  -- or the decision paper?

17  A.  No, sir.

18  Q.  Once you received the e-mail from Van Meter,

19      did you do anything to notify Verderosa that

20      there may be an issue?

21  A.  Other than what we just talked about, I

22      didn't talk to him.

1    Q.    But you don't remember what day it was?

2    A.    No, sir.

3    Q.    Do you know if it was the day that you

4          received Van Meter's e-mail?

5    A.    I don't recall.

6    Q.    Do you remember when you first reviewed Van

7          Meter's e-mail?

8    A.    No, sir, I don't.

9    Q.    Do you know if it was on the 23rd?

10   A.    No, sir, I don't.

11         (Exhibit 6 was marked for identification and

12         is attached to the transcript.)

13   Q.    Mr. Sund, you've been given what's been

14         marked Exhibit 6.  This one bears the Bates

15         numbers USCP 102.  It's a single page

16         document.  This is a October 25th, 2017

17         e-mail sent at 2:11 p.m. from Van Meter to

18         you, did you receive this e-mail?

19   A.    I believe I did, yes.

20   Q.    Okay.  Have you had a chance to review it?

21   A.    I'm reviewing it now.

22   Q.    Okay.  Let me know when you're finished.

1    A.   Okay, I looked at it.

2    Q.   In her October 25th, 2017 e-mail to you, she

3         first writes quote, I don't want to be a

4         pain.  I'm just trying to see if you have

5         received my e-mails.

6    A.   Mm-hmm.

7    Q.   Do you see that?

8    A.   Yes, sir.

9    Q.   And do you know if by October 25th, 2017 when

10        you received this e-mail from Officer Van

11        Meter that we've marked as Exhibit 6, had you

12        reviewed her October 23rd, 2017 e-mail?

13   A.   I do not recall.

14   Q.   Okay.  Do you remember when you reviewed the

15        October 25th, e-mail that we've marked as

16        Exhibit 6?

17   A.   No, I don't.

18   Q.   Do you know if it was on October 25th?

19   A.   I don't recall.

20   Q.   She writes continuing on in that October 25th

21        e-mail in, Exhibit 6, she writes quote, I

22        just needed a little extra help.  I passed on

1       my written test but was unable to complete

2       the course by quote, recommendations, unquote

3       versus failing a part of the course.  In our

4       K9 SOP's it states, handler can request

5       additional training, which I was not given,

6       end quote.  Did you do anything to find out

7       if the rules required that Van Meter be given

8       additional training if she requested it?

9   A.  Yeah, I don't recall.  No, sir.

10  Q.  All right.  Did you do anything to inquire

11      whether Officer Van Meter had been given

12      additional training?

13  A.  I don't recall.  No, sir.

14  Q.  Do you remember what you did as a result of

15      receiving this e-mail on October 25th?

16  A.  I don't know.  I don't recall.  I don't know

17      if this was part of it, what I discussed with

18      Verderosa or not, but off the top of my head,

19      I don't recall no, sir.

20  Q.  All right.  You can put that aside.  Do you

21      remember ever looking at any of the rules or

22      policies that applied to that K9 training

1        class?

2    A.   When you say rules and policies that apply to

3         that training class, can you be more

4         specific?

5    Q.   Sure.  Any of the materials that explained

6         how the course was to be run --

7    A.   Okay.

8    Q.   -- what rights the students had, how they can

9         be terminated, things of that nature?

10   A.   No, I don't recall that, doing that.  No.

11   Q.   Okay.

12        (Exhibit 7 was marked for identification and

13        is attached to the transcript.)

14   Q.   Mr. Sund, you've now been given Exhibit 7.

15        This one goes from USCP 964 to 988.  Do you

16        have that?

17   A.   Yes.

18   Q.   And the title of the document on the first

19        page is Canine Handler Notebook, August 2017.

20        Have you ever seen this document before?

21   A.   Not that I recall, no.

22   Q.   Okay.  Take a moment to flip through it just

1          to see if it refreshes your recollection.

2    A.    Okay.

3    Q.    And I'll ask you again, have you ever seen

4          this document before?

5    A.    Not that I recall, no.

6    Q.    I want to direct your attention to Page 970.

7          There's a provision, a section entitled,

8          elimination.  And it reads at the bottom, any

9          handler who after counseling, remediation

10         retesting reevaluation fails to demonstrate

11         proper knowledge and application of the

12         learning objectives and any discipline, may

13         be removed from training.  Were you aware

14         that handlers were to be given counseling,

15         remediation retesting and reevaluation before

16         being removed?

17   A.    Not off the top of my head, no.

18   Q.    Do you know if -- do you know if Officer Van

19         Meter received counseling before she was

20         removed from training?  Actually let me

21         change that question.  As of October 20th

22         when you signed the approval, the

1       October 20th, 2017 did you know whether or

2       not Officer Van Meter had received

3       counseling?

4   A.  Oh, I believe -- can I go back and look at

5       the --

6   Q.  Yeah.

7   A.  I believe as I look through, give me a second

8       here.  I believe the memo outlines some

9       instances where she's counseled.

10  Q.  Okay.  Other than reviewing the memo, did you

11      do anything to determine whether Officer Van

12      Meter had received counseling?

13  A.  Not that I recall.  No, sir.

14  Q.  Okay.  And I guess what I -- part of that is,

15      did you do anything to determine whether or

16      not the memo was accurate when it said she

17      had received counseling?

18  A.  No, sir.

19  Q.  Okay.  The next thing that -- at least

20      according to Exhibit 7, a handler is entitled

21      to is remediation.  Prior to your signing the

22      approval memo, do you know if Officer Van

1              Meter received remediation.  And that term is

2              actually defined on Page 969 of Exhibit 7.

3              Yeah, just the page before that.

4    A.    Just based on the -- this decision memo, I

5              believe she did receive remediation.

6    Q.    Based on the information you received from

7              the memo?

8    A.    That is correct.

9    Q.    Were you aware of any formal remediation

10            which is defined as scheduled instructor

11            training, tailored to address the handler's

12            performance deficiencies that she received?

13   A.    I don't recall off the top of my head.

14   Q.    So if it's not listed in the memo, in the

15            recommendation memo, then you wouldn't be

16            aware of it, right?

17   A.    Correct.

18   Q.    You're only information was what was

19            contained in the recommendation memo in the

20            decision making memo --

21   A.    I believe so.  Yes, sir.

22   Q.    -- that's marked as Exhibit 1?

1    A.    Yes, sir.

2    Q.    Okay.  How about retesting, are you aware of

3          any retesting that Officer Van Meter was

4          given?

5    A.    Not specifically unless it's listed in the

6          memo.  Not outside of that, no.

7    Q.    And how about reevaluation are, you aware of

8          any reevaluation -- sorry, as of the time

9          that you signed in October -- on

10         October 20th, 2017 were you aware of any

11         retesting?

12   A.    Outside of what was in the decision memo, now

13         sir.

14   Q.    Okay.  And as of that same time,

15         October 20th, 2017 when you signed your

16         approval for the decision paper, were you

17         aware if she had received any reevaluation?

18   A.    Not outside the decision memo, no, sir.

19   Q.    But at the time of October 20th, 2017 when

20         you signed your approval on the decision

21         paper, you were not aware of these

22         requirements, were you, the requirements

1       listed on Page 970?

2   A.  No, sir, not that I recall.  No.

3   Q.  Okay.

4       (Exhibit 8 was marked for identification and

5       is attached to the transcript.)

6   Q.  Before I show you the document I just want to

7       see what you remember versus what you were

8       reading from a document that I show you.

9   A.  Mm-hmm.

10  Q.  Your testimony earlier was that you thought

11      that you asked human resources to do an

12      inquiry into Van Meter's removal from K9 at

13      the direction of Chief Verderosa.  Is that

14      right?

15  A.  That's what I said.

16          MS. SCINDIAN:  Objection.

17      Mischaracterizes his testimony.

18  Q.  Is that what you remember?

19  A.  Again, can you restate it again.

20  Q.  Yeah.  Did you ask human resources to do an

21      inquiry into Van Meter's removal at Chief

22      Verderosa's request or direction?

1    A.    That's what I recall, yes.

2    Q.    Okay.  Mr. Sund, you've now been given

3          Exhibit 8.  This one goes from USCP 118 to

4          120.  Just for the record, this document

5          contains, I guess, starting at the bottom of

6          Bates 118 and continuing through the end of

7          120 it contains Officer Van Meter's e-mail --

8          I'm sorry.  Scratch all that.  Beginning on

9          Page 119 and continuing through 120, it

10         contains Officer Van Meter's October 23rd,

11         2017 e-mail to you, which we previously

12         marked as an exhibit.  Do you recognize that?

13   A.    Yes, I do.  Yes, sir.

14   Q.    We previously marked that as Exhibit 4, just

15         for the record.  On October -- let's see, if

16         you take a look at the first page of Exhibit

17         8, so USCP 118 at the bottom of that page

18         there's an October 27th, 2017 e-mail from you

19         from 6:23 a.m. in which you say, I'll

20         evaluate the information and get to you.

21         Does that help you remember when you first

22         reviewed Officer Van Meter's e-mail to you,

1         the October 23rd, e-mail to you?

2    A.   No, sir.

3    Q.   And then on October 27th, so the next day at

4         5:42 p.m. did you send the e-mail to Richard

5         Braddock that's listed at the top of Exhibit

6         8?

7    A.   When you say the next day, what day?

8    Q.   Thank you.  So on October 27th at 5:42, same

9         day, that evening, the same day that you

10        responded to Van Meter saying that you would

11        evaluate the information and get back to her,

12        you then wrote an e-mail to Richard Braddock,

13        correct?

14   A.   Yes, sir.

15   Q.   And that e-mail appears at the top of Exhibit

16        8, correct?

17   A.   Yes, sir.

18   Q.   And it's the October 27th, 2017 e-mail from

19        5:42 p.m.?

20   A.   Yes.

21   Q.   And is it -- after reviewing that e-mail from

22        you to Mr. Braddock, is it still your

1      recollection that the request to have human

2      resources investigate came from Verderosa,

3      Chief Verderosa?

4  A.  Yes, sir.

5  Q.  And you ask HR to do a deep dive into the

6      allegations brought forth by Officer Van

7      Meter, correct?

8  A.  That's what it says, yes.

9  Q.  In your mind, what is a deep dive mean?

10 A.  Doing a review of the process that she was

11     put through.

12 Q.  But what does deep dive indicate?

13 A.  Take a look at it and evaluate.

14 Q.  Does that indicate the level of investigation

15     that you wanted to be conducted?

16 A.  It's to conduct a review of the evaluation.

17 Q.  So just to conduct any review of the

18     allegation?  What I'm trying to figure out

19     is, what does that phrase, deep dive,

20     indicate in this e-mail?

21 A.  Take a look at the process and evaluate if,

22     you know, the process was adhered to.

1    Q.   So it doesn't indicate that you wanted him to

2         do a more detailed search than just a typical

3         review?

4              MS. SCINDIAN:   Objection.  Vague and

5         ambiguous.

6    A.   Conduct a review.

7    Q.   Just any -- just a review?

8    A.   Yeah, conduct a review.

9    Q.   So were you looking for a deep dive or just a

10        review?

11   A.   A review of the process.

12   Q.   Okay.  Now, you indicate in your e-mail that

13        you were interested in determining quote, if

14        her previous concerns were ever addressed.

15        What did you mean by that, her previous

16        concerns?

17   A.   The concerns that she raised in the e-mail.

18   Q.   I see.

19   A.   Was there any concerns that she had that, you

20        know -- were there any issues with them.

21   Q.   What do you mean by that?

22   A.   With the process that she goes through with

1            training, were her -- were her issues

2            appropriately dealt with.

3     Q.     So when you ask if her previous concerns were

4            addressed or were -- I'm sorry, if her

5            previous concerns were ever addressed, were

6            you asking if HR ever looked into concerns

7            that Van Meter had raised in her e-mail to

8            you?

9     A.     No, it was more in the process she was going

10           through at K9 training with the concerns that

11           she raised up in K9 training, were they

12           addressed in the training process.

13    Q.     So were you expecting an answer as to whether

14           anyone associated with K-9 training had

15           looked into Officer Van Meter's concerns?

16    A.     Just in the process of the training process,

17           you know, the issues that she brought up were

18           they dealt with appropriately in the K9

19           training process.

20    Q.     I'm sorry, tell me exactly what you meant

21           when you said, I am interested in determining

22           if her previous concerns were ever addressed.

1       What previous concerns were you referencing

2       there?

3   A.  The ones in the letter -- her e-mail to me.

4   Q.  Okay.  And when say were ever addressed, who

5       did you mean?  Addressed by whom?

6   A.  Addressed as in the appropriate -- in the

7       process for K9 training.  So if she's

8       concerned about how she handles the lead, the

9       leash on the dog, is it appropriately dealt

10      with.

11  Q.  Well, what you say is, I'm interested in

12      determining if her previous concerns were

13      ever addressed, so what did you mean by were

14      ever addressed?

15          MS. SCINDIAN:  Objection.  Asked and

16      answered.

17  A.  Any concerns she raised up in training were

18      appropriately addressed.

19  Q.  At the time?

20  A.  In the training process, yes.

21  Q.  By whom?

22  A.  The training staff.

1   Q.   And did you find out if her previous concerns

2        were addressed by the training staff?

3   A.   I'm trying to recall.  I believe the process

4        was to see if the proper procedure were

5        followed for that.

6   Q.   Okay.  But did you find out specifically if

7        any previous concerns had ever been

8        addressed, any previous concerns that Van

9        Meter was raising in her e-mail, had ever

10       been addressed?

11  A.   I do not recall.

12  Q.   Do you remember how -- when you say, I'm

13       interested in determining, you know, these

14       questions in the e-mail that you wrote to

15       Braddock on October 27th, do you remember how

16       your questions were answered?

17  A.   I don't recall.  Not off the top of my head,

18       no.

19  Q.   I mean the form.  Did you receive a telephone

20       call, a briefing, a memo, or some

21       combination?

22  A.   I believe there was a memo that came from HR.

1    Q.    Was that the only information that you

2          received in response to your request, as far

3          as the written memo?

4    A.    As far as I remember, yes.

5    Q.    Did you ever meet with the HR person that was

6          investigating?

7    A.    I don't recall.  No.

8    Q.    Did you ever meet with Braddock to discuss

9          the findings?

10   A.    I don't recall, no.

11   Q.    Okay.  You once you received the memo, the

12         investigatory memo, did you have any follow

13         up questions?

14   A.    Not that I recall.  No, sir.

15   Q.    Did you receive any early drafts of the

16         investigatory memo?

17   A.    Not that I recall.

18   Q.    Okay.  So the next thing that you list in

19         your e-mail to Braddock on Exhibit 8, so this

20         is the October 27th, 2017 e-mail to Richard

21         Braddock you say, I am interested in

22         determining if the K9 processes were

1          appropriately followed.  And what did you

2          expect that review to entail?

3     A.   Indication that the processes were

4          appropriately followed.

5     Q.   And what were you expecting to be done to

6          make sure that the processes were followed?

7     A.   Someone would in HR would review the

8          processes for the class.

9     Q.   The processes, for example, that we just

10         reviewed in Exhibit 7, the elimination

11         process?

12              MS. SCINDIAN:  Objection.  Calls for

13         speculation.

14    A.   Whatever the processes would have been for

15         the -- that particular K9 class.

16    Q.   Okay.  And would you agree that some of those

17         processes are listed in what we've marked as

18         Exhibit 7, including the process for

19         eliminating a candidate?

20    A.   It appears that way, yes.

21    Q.   Okay.  And you say you're interested in

22         determining, and I'm skipping the ones that

1      we have covered, the next thing that you're

2      interested in determining was whether the

3      processes were properly documented, correct?

4   A. That's what it says, yes.

5   Q. And what did you mean by that?

6   A. The appropriate documentation that would be

7      required for a training class would have been

8      followed.

9   Q. And what were you expecting the inquiry to

10     entail?

11  A. If that was, in deed, the case.

12  Q. To review the documentation and make sure the

13     appropriate documentation was completed?

14  A. I believe so, yes.

15  Q. Okay.  And then you say, if any abnormalities

16     or inappropriate actions/conduct identified

17     that would warrant a referral to OPR.  What

18     did you mean by that?

19  A. That if there was any inappropriate

20     activities or processes in that training

21     program, that we would require a referral

22     OPR.

1    Q.   And what do you mean by inappropriate

2         actions?

3    A.   Well, any that wouldn't be within the

4         guidelines that would have been a violation

5         of any of our policies or anything.

6    Q.   And you said abnormalities, what do you mean

7         by abnormalities in that sentence?

8    A.   I'm saying not the usual process for our

9         training classes.

10   Q.   Okay.  So were you expecting that the human

11        resources would investigate whether Van Meter

12        was treated differently than other members of

13        her class?

14   A.   If there was any abnormalities to the

15        training concerns, yes.

16   Q.   And would an abnormality mean that Van Meter

17        was treated differently than other members of

18        her class?

19   A.   It could, yes.

20   Q.   And were you expecting that the human

21        resources person would then review the

22        training records?

```
 1   A.   I don't recall.

 2   Q.   Well, how would they find out if there were

 3        any abnormalities if they didn't review the

 4        training?

 5   A.   They very well could possibly reviewed the

 6        training records, yeah.

 7   Q.   Did you expect the human resources person to

 8        interview Officer Van Meter?

 9   A.   I don't know.

10   Q.   Do you think that a human resources

11        investigator could conduct a thorough

12        investigation of Officer Van Meter's

13        complaints without interviewing Officer Van

14        Meter?

15          MS. SCINDIAN:  Objection.  Calls form

16        speculation.  Vague and ambiguous.

17   A.   I don't know.

18   Q.   You don't know?

19   A.   I don't know.

20   Q.   You've been a police officer before, right?

21   A.   Mm-hmm.

22   Q.   And you've investigated crimes --
```

1   A.   Mm-hmm.

2   Q.   -- or crimes before or alleged crimes before?

3        Yes?

4   A.   Yes, sir.

5   Q.   When you investigated the alleged crimes, did

6        you speak to the victim?

7             MS. SCINDIAN:  Objection.  Irrelevant.

8   A.   It all depends on the type of crime.

9   Q.   A crime against a victim is what -- I guess I

10       mean.  Not a property crime or anything like

11       that, if you were investigating a crime

12       against a victim, would you interview the

13       victim, if the victim was still alive?

14            MS. SCINDIAN:  Objection.  Irrelevant.

15  A.   It all depends -- again, it all depends on

16       the type of crime.

17  Q.   What type of crime against a person would you

18       not interview the victim for?

19            MS. SCINDIAN:  Objection.  Irrelevant.

20  A.   Theft from auto.

21  Q.   Why wouldn't you interview in a theft from

22       auto?

```
 1            MS. SCINDIAN:  Objection.  Irrelevant.
 2   A.   The information I need is right there in the
 3        complaint.  It wouldn't be something that I
 4        need additional information.  There's -- I
 5        don't know.
 6   Q.   Any other crimes that you wouldn't talk to
 7        the victim about?
 8            MS. SCINDIAN:  Objection.  Irrelevant.
 9   A.   I don't know off the top of my head.
10   Q.   Okay.  When you were -- was your expectations
11        that the human resources investigator would
12        interview witnesses?
13   A.   My expectation was that they would review the
14        process to make sure that the process was --
15        current process was followed.
16   Q.   And would that include interviewing witnesses
17        to find out what processes were followed?
18   A.   Not necessarily.
19   Q.   So for you, human resources could do a deep
20        dive into Van Meter's allegations without
21        interviewing witnesses and without
22        interviewing Van Meter?
```

1          MS. SCINDIAN:  Objection.

2     Argumentative.

3  A.  Yes.

4  Q.  Did you expect that human resources

5     investigator to review training videos to see

6     how people were treated?

7  A.  I don't know what -- if the training itself

8     is -- I don't know if any training videos

9     were available.  I'm just trying to remember

10     what --

11  Q.  Didn't the termination memo, the decision

12     paper tell you that videos were taken?

13  A.  Verbal, yes.  I don't know in reviewing this

14     process, I didn't tell them specifically to

15     review the training videos.

16  Q.  I realize you didn't tell them specifically.

17     I mean at least in your e-mail you don't

18     mention that.  Were you expecting that they

19     would review videos, if videos were

20     available?

21  A.  It's possible.

22  Q.  Do you know if they did?

1    A.   I don't know.

2    Q.   Was any conduct identified to you that

3         warranted a referral to OPR?

4    A.   Not that I recall, no.

5         (Exhibit 9 was marked for identification and

6         is attached to the transcript.)

7    Q.   Okay.  Mr. Sund, you've now been given

8         Exhibit 9.  This one goes from USCP 1856 to

9         1858.  It's a November 20th, 2017 memorandum

10        to you, from Francine Benko through Richard

11        Braddock.  Do you recognize the document?

12   A.   Yeah.  Give me a minute.

13   Q.   Do you recognize the document?

14   A.   Yes, sir.

15   Q.   And is this a response that you received in

16        answer to your October 27th, 2017 request for

17        a deep dive into the allegations brought

18        forth by Officer Van Meter?

19   A.   I believe so, yes.

20   Q.   Okay.  Did you receive any information aside

21        from this memo which we've marked as Exhibit

22        9?

1   A.   Not that I recall, sir.

2   Q.   Okay.  So you don't remember any personal

3        briefings, any telephone calls, any

4        additional information that you may have

5        received?

6   A.   No, not that I recall.  No, sir.

7   Q.   Take a look at Page 1857.  Sorry, so this is

8        just the second page of Exhibit 9.  In the

9        discussion section it refers to two

10       candidates who did not successfully complete

11       the program, one male candidate, and then

12       Officer Van Meter, right?

13  A.   Yes, sir, I see that.

14  Q.   Was it your understanding then that a male

15       candidate was removed at the same time that

16       Officer Van Meter was removed?

17  A.   That's impression I got from it, yes.

18  Q.   Okay.  You can put that aside, please.  And

19       you don't remember ever talking to Francine

20       Benko about her investigation?

21  A.   I don't recall.  No, sir.

22  Q.   Did you know Francine Benko?

1    A.    She was in our human resources office.  I may

2          have talked to her when I went through but I

3          didn't know her well.

4    Q.    And do you know anyone besides Francine Benko

5          who was looking into Officer Van Meter's

6          allegations?

7                MS. SCINDIAN:  Objection.  Vague and

8          ambiguous.

9    A.    No.  No, sir, I didn't.

10   Q.    Okay.  Did you ever speak or communicate with

11         in any Lieutenant Cromwell about Van Meter's

12         removal from the training program?

13   A.    Not that I recall, sir.

14   Q.    How about Captain John Erickson, did you ever

15         communicate with him about Van Meter's

16         removal?

17   A.    Not that I recall.

18   Q.    How about Inspector Belknap, did you speak

19         with him about -- speak or communicate with

20         him?

21   A.    Again, not that I recall, no.

22   Q.    How about Deputy Chief Rogers, did you speak

1          or communicate with him about the removal?

2     A.   Not that I recall.

3     Q.   Taking a look, again, if you needed to

4          reference Exhibit 1, which is USCP 12 through

5          17.

6          (Exhibit 10 was marked for identification and

7          is attached to the transcript.)

8     Q.   Mr. Sund, you've now been given Exhibit 10.

9          This one goes from Bates USCP 3135 to 3136

10         and you will note that it's an October 18th,

11         2017 EOD Canine Training Form for Officer Van

12         Meter.  Do you recognize that on the first

13         page?

14    A.   I see where it says that.

15    Q.   You see that?

16    A.   Yes.

17    Q.   And I just want to direct your attention to

18         the second page of the document in the

19         comments section.  About mid page it says,

20         second to the last line, the handler has been

21         removed from the USCP explosive detection

22         canine course.  Do you see that?

1   A.   Yes, sir.  I'm just reading the rest of it.

2   Q.   Yes, please.

3   A.   Okay.

4   Q.   If you didn't sign off and approve of Officer

5        Van Meter's removal until October 20th, and

6        if Chief Verderosa didn't approve it until

7        October 23rd as reflected on Exhibit 1, do

8        you know why Officer Van Meter was removed on

9        October 18th?

10  A.   It may have been part of the process as it

11       comes up for final determination that their

12       level, meaning take her out of the program,

13       so they can move forward with the program,

14       that's the official determination.  That's

15       the only -- only thing I can think of.

16  Q.   To your knowledge did Sergeant Phelps have

17       the authority to remove Van Meter from the

18       training program before you and Verderosa

19       signed off your approvals for her removal?

20  A.   Again, that's the official final action on

21       it.  I'm not sure -- and you said it was, who

22       that did it?

1    Q.    Sergeant Phelps.

2    A.    Yeah, I'm not sure what discussions he had

3          with anybody else.  But I think the

4          temporarily removal of somebody, that

5          wouldn't require the chief.

6    Q.    Okay.  And then what would happen if you

7          disapproved, you or Verderosa disapproved of

8          her removal?

9    A.    She would be returned.

10   Q.    Has that ever happened?

11   A.    I don't know.  I don't know.

12   Q.    In your experience has it ever happened?

13   A.    Not that I recall, no.

14   Q.    Do you remember ever disapproving a removal

15         action?

16             MS. SCINDIAN:  Objection.  Vague and

17         ambiguous.

18   Q.    While you were at Capitol Police?

19             MS. SCINDIAN:  Same objection.

20   A.    I don't recall.

21   Q.    Just thinking back about the e-mail that you

22         received -- sorry, not the e-mail but the

1      memorandum that you received from Francine

2      Benko through Richard Braddock, which we

3      marked as Exhibit 9.  Do you remember having

4      any follow up questions after you reviewed

5      the memo?

6   A.  When you say follow up questions?

7   Q.  With respect to Van Meter's removal or the

8      processes that were followed.

9   A.  Not that I recall, no.

10  Q.  Okay.  Do you remember asking anyone to get

11     additional information for you about that

12     removal?

13  A.  Not that I recall.  No, sir.

14     (Exhibit 11 was marked for identification and

15     is attached to the transcript.)

16  Q.  And, Mr. Sund, taking a look at Exhibit 11

17     which is marked USCP 1854 and 1855.  You

18     approved of Benko's memorandum on

19     November 28th, 2017.  Correct?

20  A.  Yes, sir.  That's what it looks like.

21  Q.  Now, do you know why, if you take a look at

22     that approval page on Exhibit 11 --

1    A.    Mm-hmm.

2    Q.    -- looks like Francine Benko approved it on

3          November 21st 2017.  Is that when she would

4          have sent forward to Richard Braddock for his

5          signature?

6              MS. SCINDIAN:  Objection.  Calls for

7          speculation.

8    A.    Again, that's when she would have signed off

9          on it.  I don't know what when she with it

10         then.

11   Q.    So do you know why it took Richard Braddock

12         until November 27th to approve of the memo?

13   A.    No idea, sir.

14   Q.    Do you know what was happening between the

15         21st and the 27th relative to Officer Van

16         Meter or the investigation into her

17         allegations that would account for that six

18         day gap?

19   A.    I have no idea.  I don't know.

20   Q.    Okay.  You can put that aside.  Now, were you

21         involved in the decision to reassign Sergeant

22         Phelps out of K-9?

1    A.   Not that I recall, no.

2    Q.   Do you know why Sergeant Phelps was removed

3         out of K9, reassigned out of K9?

4    A.   Not off the top of my head.  No, sir.

5    Q.   Do you know who was involved in that

6         decision?

7    A.   No, sir, I don't.

8    Q.   I'll characterize Sergeant Phelps' testimony,

9         he indicated that he was told that he had to

10        complete a sergeant's voluntary reassignment

11        preference sheet, do you know what that

12        process is, the reassignment preference

13        sheets?

14   A.   Say it again, your characterization --

15   Q.   Yeah.

16   A.   Can you repeat it again?

17   Q.   Sergeant Phelps stated that he was told that

18        he needed to fill out a preference sheet

19        associated with the Sergeant's reassignment?

20   A.   Okay.

21   Q.   Okay.  Does that make sense?  I'm not --

22        that's not word for word what he said but --

1    A.    I think he maybe referring to -- I forget the

2          acronym but it's a process where every couple

3          of years, yearly, I don't know how often it

4          occurs, the Capitol Police will send a survey

5          out, if I'm thinking one of the same.

6          Sometimes it's the officers, sometimes it's

7          the officials, ask them if you had the

8          opportunity to do reassign or reassign ment

9          what's your first, second, third preference

10         things like that.  That might be what he

11         talked about.

12   Q.    That aligns with what he --

13   A.    Okay.

14   Q.    -- said.  I don't know if it's perfect but it

15         sounds like we're talking about a similar

16         process.  And what he testified to was that

17         when he went to fill out those first, second,

18         third, and fourth preferences, that he was

19         essentially blocked by the system from

20         listing K9 as his first, second, or third

21         preference and the only opportunity to list

22         K9 was his fourth preference.  Are you aware

1       of anything like that regarding Sergeant

2       Phelps?

3            MS. SCINDIAN:   Objection.   Lack of

4       foundation.

5   A.   No, I'm not aware of anything like that with

6       Sergeant Phelps.

7   Q.   Do you know how anything like that would be

8       effectuated in the Avue personnel system at

9       that time?

10  A.   No, sir.

11  Q.   Have you ever heard of anything like that

12      happening?

13  A.   I'm trying to think.   I think the process is

14      they make a selection with what their

15      preference is, I don't know how that works

16      with where you're currently assigned.   If the

17      question is, where do you want to go or where

18      are the assignments that you want, wouldn't

19      allow you to indicate your current

20      assignment, that may be the case but I don't

21      know.

22  Q.   Are you aware of any specific changes made to

1          Sergeant Phelps', you know, account in Avue

2          that would have blocked him from selecting --

3          remaining in K9 as his first, second, or

4          third option?

5     A.   Specific to him?

6     Q.   Yes.

7     A.   No, sir.

8     Q.   He also testified that he was told that he

9          needed to sign into the Avue system again and

10         update a password before he could do that

11         reassignment preference sheet.  Are you aware

12         of anything like that?

13              MS. SCINDIAN:  Objection.  Lack of

14         foundation.  Mischaracterizes the testimony.

15    A.   No, sir.

16    Q.   Did Fred Rogers at any time in 2017 indicate

17         to you that he thought that the sergeant over

18         at K9 training should be changed?

19    A.   He may have.  I just don't remember --

20         specifically recall it, no.

21    Q.   Okay.  Do you remember him informing you that

22         he was considering a change in that position?

1    A.    He very well may have.  I just don't -- I

2          don't recall anything specific on that.

3    Q.    Do you remember anything about discussions

4          with Rogers or anyone else about reassigning

5          Phelps out of K9?

6    A.    Not specifically.  Not that I recall, no.

7    Q.    Okay.  Do you remember any discussions,

8          communications, considerations about

9          reassigning Phelps out of the supervisor over

10         K9 training position?

11   A.    I'm trying to recall if any of my discussions

12         came up.  I just don't recall.  I may have.

13   Q.    Do you remember anything about any

14         conversations you had with Rogers or

15         discussions about Phelps?

16   A.    Not -- no, not specifically, no.

17   Q.    Are you aware of any other complaints, aside

18         from Van Meter, anyone else who's complained

19         about their treatment from Sergeant Phelps?

20   A.    No, not that I recall.  No, sir.

21   Q.    Are you aware of any complaints of

22         discrimination about -- involving Sergeant

1       Phelps?

2   A.   Not that I recall.  No, sir.

3        (Exhibit 12 was marked for identification and

4        is attached to the transcript.)

5   Q.   Okay, Mr. Sund, you've now been given Exhibit

6        12.  This one bears the Bates numbers USCP

7        11.  And it's a -- this is October 24th, 2017

8        dated document --

9   A.   Mm-hmm.

10  Q.   -- that looks like it was signed by you.  Do

11       you recognize the document?

12  A.   Yes, sir.

13  Q.   Is that your signature?

14  A.   Yes, sir.

15  Q.   Okay.  And agree that this is -- the document

16       is titled or the subject is command directed

17       reassignment.  That's the command directed

18       reassignment for Officer Van Meter, right?

19  A.   Yes, sir.

20  Q.   What is a command directed reassignment?

21  A.   It's a reassignment of an individual from

22       within the -- within the department from one

1          bureau to -- to another.

2    Q.    Okay.  And that kind of reassignment is one

3          of the things that had to be approved by

4          Chief Verderosa, right?

5    A.    Yeah.  Myself or -- this one would be by

6          myself because I'm just moving her

7          temporarily until the final reassignment

8          takes place.

9    Q.    Okay.  Now, this document is dated

10         October 24th, 2017.  Right?

11   A.    Yes, sir.

12   Q.    Okay.  So that would be the day after Chief

13         Verderosa signed the approval letter,

14         correct?  You take a look at Exhibit 1.

15   A.    That's correct, sir.

16   Q.    Okay.  But it refers to, down at the bottom

17         it says, quote effective Sunday,

18         October 22nd, 2017 this individual will be

19         detailed to USBHD2 until the reassignment

20         occurs.  The reassignment wasn't supposed to

21         be effective until October 29th, 2017.

22         Correct?

1    A.   I'm sorry, who are we --

2    Q.   On Exhibit 12 the first line of the actual

3         memo it says effective, Sunday, October 29th,

4         2017.

5    A.   Got it.  Oh, okay.

6    Q.   The below listed individual is reassigned as

7         follows.  And it shows that she's reassigned

8         from OSB K9 to USBHD2, correct?

9    A.   Yes, sir.

10   Q.   What's USBHD2?

11   A.   It's uniformed Services Bureau.  It's a

12        separate bureau.  HD2 is house division,

13        second shift.

14   Q.   Okay.  OSB K9 is the K9 unit, right?

15   A.   Yes, sir.

16   Q.   That was her assignment while she was in K9

17        training, correct?

18   A.   Yes, sir.

19   Q.   So this document reflects the official

20        reassignment from K9 to USB house division,

21        correct?

22   A.   That's what appears, yes.

1    Q.    Okay.  And that reassignment was supposed to

2          be effective on October 29th, 2017.  Correct?

3    A.    Correct.

4    Q.    Okay.  But it also states that as of

5          October 22nd, 2017 she was being detailed to

6          USBHD2 --

7    A.    Mm-hmm.

8    Q.    -- until the reassignment became official,

9          correct?

10   A.    Correct.

11   Q.    So why if you -- if the document was dated

12         October 24th, 2017 had she already been

13         detailed to October 22nd, 2017?

14   A.    Can you repeat your question again?  Sorry.

15   Q.    What was your purpose of signing this

16         document, Exhibit 12?

17   A.    To codify the transfer and the pending

18         reassignment.

19   Q.    To approve the personnel move that's

20         memorialized in the document, correct?

21   A.    Yes.

22   Q.    And you signed this document on October 24th,

1          2017.  Correct?

2     A.   That's -- yeah, what the date is on there,

3          yes.

4     Q.   Okay.  But does this document reflect that

5          Officer Van Meter had been detailed to this

6          USBHD position two days earlier on

7          October 22nd, 2017?

8     A.   Yes, that's what it states.

9     Q.   And who has the authority to detail -- yeah,

10         what level of authority would have been

11         required to detail Officer Van Meter from K9

12         to USBHD?

13    A.   From division to division I think it's the

14         assistant chief.

15    Q.   Assistant chief.  And if you take a look at

16         the -- yeah, and you were the assistant

17         chief?

18    A.   Yes, sir.

19    Q.   And so had you approved that detail before

20         October 22nd, 2017?

21    A.   I do not recall.  Also I don't know what her

22         days off would have been, so that would have

1          affected when she actually the detail took

2          effect so I'm just --

3    Q.    Well, the detail says it took effect on

4          October 22nd, 2017.

5    A.    Yes, sir.

6    Q.    So do you know if you approved that detail

7          before it was effective?

8    A.    I don't recall.

9    Q.    And where would we look for any documentation

10         that you approved that detail before it took

11         effect?

12   A.    I don't know.

13   Q.    And back in 2017, October of 2017 where would

14         that documentation have been kept, if you

15         indeed did approve the detail?

16   A.    Well, this would have been the process for

17         approving it.  I don't know if possibly HR,

18         if there's anything additional.  But this

19         would have been the process that I would have

20         used for approval of the detail.

21   Q.    Okay.  So there would be another memo just

22         like this approving a detail in advance?

1        MS. SCINDIAN:  Objection

2        mischaracterizes the testimony.

3    A.  I was going to say, this -- this is probably

4        the one only one document.

5    Q.  Okay.  But this shows that you didn't approve

6        the detail until October 24th, right?

7    A.  That's what it's dated but, yes, that's what

8        it shows.

9    Q.  And sitting here today you can think of no

10       information you have that explains why

11       Sergeant Phelps was reassigned out of K9?

12   A.  Not that I recall, no, sir, as I sit here

13       today.

14   Q.  When did you first learn about the lawsuit

15       that Officer Van Meter filed?

16   A.  I don't specifically recall the date.

17   Q.  You think it was shortly after she filed it

18       or it was served?

19   A.  I don't know.

20       MS. SCINDIAN:  Objection.  Calls for

21       speculation.

22   A.  Again, I don't specifically recall when I

1          heard about it.  I just don't know when.

2     Q.   Did you have any discussions with Chief

3          Verderosa about officer Van Meter's lawsuit?

4     A.   Not that I recall.

5     Q.   How about any of the other officials listed

6          on the approval page on Exhibit 1?  Do you

7          remember discussing Officer Van Meter's

8          lawsuit with any of those officials?

9     A.   No, not that I recall, sir.

10    Q.   Do you remember discussing her allegations

11         with any of those officials?

12    A.   Not that I recall, no, sir.

13    Q.   Do you remember discussing the department's

14         response to Van Meter's allegations with any

15         of those officials?

16    A.   No.

17              MS. SCINDIAN:  Objection.  Vague and

18         ambiguous.

19    A.   Again, not that I recall, sir.

20    Q.   Do you remember discussing the department's

21         actions in the course of removing Van Meter

22         with any of those officials listed on Exhibit

1       1?

2               MS. SCINDIAN:  Objection.  Vague and

3       ambiguous.

4    A.  Not that I recall, sir.

5    Q.  Okay.  Do you know if Chief Verderosa

6       conducted any review or inquiry into the

7       facts surrounding Officer Van Meter's removal

8       from K9 before he signed the approval memo?

9    A.  I'm not aware.  Not that I recall.  I have no

10      knowledge of any additional investigation.

11   Q.  Chief Verderosa asked you to get HR to look

12      into it, right?

13   A.  Yes, sir, that's what I recall.

14   Q.  And then you received a memo from HR and you

15      approved that on or about November 27th?

16   A.  Hold on.  Looks like it's going to be on

17      Exhibit Number 11.  The 28th.

18   Q.  28th.  Okay.  And do you remember briefing

19      Chief Verderosa on the conclusion of this

20      investigation that HR conducted?

21   A.  I believe he may have been either briefed or

22      given a copy of it.

1    Q.    Okay.  Did you do that?  Did you brief him or

2          give him a copy of it?

3    A.    I'm trying to recall.  Since he asked for it,

4          probably during the usual course of business.

5          I just don't specifically remember.

6    Q.    And other than that HR investigation that you

7          requested, you're not aware of any of the

8          officials listed on Exhibit 1 conducting any

9          inquiry into the facts surrounding Officer

10         Van Meter's removal from K9 training, right?

11   A.    Not that I am aware of, no.

12   Q.    How long did you work under Chief Verderosa

13         as assistant chief?

14   A.    Two and a half years.

15   Q.    And in that time, did Chief Verderosa ever

16         disapprove of a personnel action that you had

17         approved?

18   A.    I don't --

19             MS. SCINDIAN:  Objection.  Vague and

20         ambiguous.

21   A.    I don't recall.  Not that I'm aware of.

22   Q.    Okay.  Do you know if in that time Chief

1       Verderosa ever did any independent

2       investigation into any personnel actions that

3       you had already approved?

4           MS. SCINDIAN:  Objection.  Calls for

5       speculation.  Vague and ambiguous.

6   A.  Very well might have.

7   Q.  Are you aware of any investigation that Chief

8       Verderosa did following your approval of a

9       personnel action?

10          MS. SCINDIAN:  Same objection.

11  A.  Not that I'm aware of.

12  Q.  So the only thing that you are aware of that

13      Chief Verderosa did in association with

14      conducting any kind of review over Van

15      Meter's removal, was to ask you to have HR

16      look into it, right?

17  A.  That I am specifically aware of, yes.

18  Q.  Looking at Exhibit 8 again, which is your

19      request to Braddock for the investigation, if

20      you thought that any of the questions that

21      you asked Braddock to look into, had not been

22      answered in Benko's memo, which is marked as

1          Exhibit 9, would you have asked for

2          additional inquiry to be made?

3               MS. SCINDIAN:  Objection.  Calls for

4          speculation.

5     A.   If I -- if I didn't feel satisfied with it,

6          yes, probably.

7     Q.   So when you say, for example, I'm interested

8          in determining if her previous concerns were

9          ever addressed, if the K9 processes were

10         appropriately followed, and properly

11         documented.  And if any abnormalities or any

12         an appropriate actions or conduct identified

13         that were warrant a referral to OPR.  If you

14         didn't feel like you got answers to those

15         specific questions, would you have asked for

16         follow up inquiries at that period of time?

17              MS. SCINDIAN:  Objection.  Calls for

18         speculation.

19    A.   That would have been my usual action, yes.

20              MR. ALDERMAN:  Okay.  Thanks.  That's

21         all I have.

22              MS. SCINDIAN:  Chief just some real

1          quick questions for you.

2      CROSS-EXAMINATION BY COUNSEL FOR THE DEFENDANT

3    BY MS. SCINDIAN:

4    Q.    Okay.  Can you look at Exhibit 1, which is

5          the decision paper.  Do you see a

6          recommendation from Chief Rogers to have

7          Officer Van Meter return to her HD2

8          assignment?

9    A.    Yes, I do.

10   Q.    And how did you respond to that

11         recommendation?

12   A.    I recommended approval.

13   Q.    And that's written on what's noted as Exhibit

14         1?

15   A.    Yes, ma'am.

16   Q.    And what was date of that notation?

17   A.    October 20th, 2017.

18   Q.    Chief, do you recall with Exhibit 1 when you

19         received the decision paper, were there

20         attachments to this document?

21   A.    There may have been.  I just don't recall.

22         MS. SCINDIAN:  Okay.  No further

1       questions.

2   REDIRECT EXAMINATION BY COUNSEL FOR THE PLAINTIFF

3   BY MR. ALDERMAN:

4   Q.   Mr. Sund, you were just asked if there were

5        additional attachments to Exhibit 1 and you

6        said, there may have been, you don't recall?

7   A.   I don't recall if there was additional

8        attachments.

9   Q.   Okay.  Do you see any attachments referenced

10       or identified anywhere either on the approval

11       page or in the decision memo?

12  A.   No, sir.

13  Q.   There's no reference to additional

14       attachments or exhibits, is there?

15  A.   Not that I see, sir.

16  Q.   And so as of October 20th, 2017 when you

17       signed your approval stating member will be

18       returned to HD2, let's break that down for a

19       second.  Did you write that notation, member

20       will be returned to HD2 on October 20th, 2017

21       at the time that you signed the approval

22       memo?

1    A.    Yes.

2    Q.    Okay.  And at that point in time was that all

3          the authority needed to remove Officer Van

4          Meter from the training program?

5    A.    For the temporary detail from bureaus to

6          bureau, yes.

7    Q.    So to take her out of the training program

8          and detail her somewhere else, correct?

9          MS. SCINDIAN:  Objection.

10         Mischaracterizes the testimony.

11   A.    Yeah, it's to move her from bureau to bureaus

12         it could be done by assistant chief.

13   Q.    Okay.  So as of the 20th of October 2017 your

14         signature was all the authority needed to

15         remove Officer Van Meter from the K9 -- the

16         bureau that houses K9 and send her back to

17         the bureau that houses the house division,

18         right?

19         MS. SCINDIAN:  Objection.

20         Mischaracterizes the testimony.  Vague and

21         ambiguous.

22   A.    Yeah.  Just to clarify, a temporary detail,

1        my signature is all that's needed to move

2        somebody from one bureau to another.  Yes,

3        sir.

4    Q.  Okay.  So as of October 20th, 2017 your

5        signature gave all the authority required to

6        remove Officer Van Meter and place her in a

7        detail -- to remove Officer Van Meter from K9

8        training and place her in a detail to HD2,

9        right?

10           MS. SCINDIAN:  Objection.  Compound.

11       Mischaracterizes the testimony.  And vague

12       and ambiguous.

13   A.  To enact a temporary detail, yes, that is

14       correct.

15   Q.  It's a correct that you -- your signature on

16       the 20th is all the authority required to

17       reassign Officer Van Meter on a temporary

18       detail out of K9 to HD2, correct?  I just

19       want to make sure we have --

20   A.  Correct.  I just want to make sure the

21       terminology is right to detail her,

22       reassignment is the final official one but to

1      detail her, yes.

2    Q.   Detail her from where?

3    A.   From OSB K9 to HD2, yes, sir.

4    Q.   Okay.  And that detail removed her from the

5         K9 training program, correct?

6           MS. SCINDIAN:  Objection.  Vague and

7         ambiguous.

8    Q.   At least on a temporary basis?

9    A.   Yes.

10   Q.   And she never went back, did she?

11   A.   Not that I'm aware of, no.

12          MR. ALDERMAN:  Okay.  That's all the

13        questions I have.

14          MS. SCINDIAN:  Okay.  Read and sign.

15          (The Deposition was concluded at 12:35

16        p.m. EST)

17

18

19

20

21

22

1          CERTIFICATE OF REPORTER - NOTARY PUBLIC

2          I, Stefanie Towns, the officer before whom the

3     foregoing deposition was taken, do hereby certify

4     that the foregoing transcript is a true and correct

5     record of the testimony given; that said testimony

6     was taken by me and thereafter reduced to

7     typewriting under my direction; that reading and

8     signing was requested; and that I am neither

9     counsel for, related to, nor employed by any of the

10    parties to this case and have no interest,

11    financial or otherwise, in its outcome.

12         IN WITNESS WHEREOF, I have hereunto set my

13    hand and affixed my notarial seal this 27th day of

14    December 2022.

15    My Commission Expires:

16

17

18    _Stefanie Towns_

19    _____

20       Stefanie Towns

21

22