1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF COLUMBIA

3     -------------------------------X

4     MAURICIA VAN METER,                :

5                    Plaintiff,          :

6              v.                        :   Case No.

7     UNITED STATES CAPITOL POLICE,      :   1:18-cv-00476-KBJ

8                    Defendant.          :

9     -------------------------------X

10

11          Deposition of RICHARD LEE BRADDOCK

12                 Conducted Virtually

13                 Washington, D.C.

14            Wednesday, June 30, 2021

15                  9:56 a.m. EDT

16

17

18

19

20    Job No. 382196

21    Pages 1 - 118

22    Reported by:  Jacquelyn C. Jarboe, RPR

1          Deposition of RICHARD LEE BRADDOCK,

2     conducted virtually.

3

4

5

6

7          Pursuant to Notice of Deposition of

8     Richard Braddock, before Jacquelyn C. Jarboe,

9     Registered Professional Reporter and Notary Public

10    in and for the State of Maryland, who officiated in

11    administering the oath to the witness.

12

13

14

15

16

17

18

19

20

21

22

1              A P P E A R A N C E S

2

3    ON BEHALF OF PLAINTIFF, MAURICIA VAN METER:

4         LESLIE D. ALDERMAN III , ESQUIRE

5         ALDERMAN, DEVORSETZ & HORA PLLC

6         1025 Connecticut Avenue, Northwest

7         Suite 615

8         Washington, D.C. 20036

9         (202) 969-8220

10

11   ON BEHALF OF DEFENDANT, UNITED STATES CAPITOL

12   POLICE:

13        BRITNEY BERRY, ESQUIRE

14        OFFICE OF THE GENERAL COUNSEL

15        Employment Law Division

16        499 South Capitol Street, Southwest

17        Suite 820

18        Washington, D.C. 20003

19        (202) 593-3619

20

21

22

```
1      A P P E A R A N C E S   (Continued)

2

3   ALSO PRESENT:

4        SHEILA BERRY, Paralegal

5        SARAH LOILER, AV Technician

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22
```

1                    C O N T E N T S

2  EXAMINATION OF RICHARD LEE BRADDOCK              PAGE

3          By Mr. Alderman                            6

4          By Ms. Berry                              76

5          By Mr. Alderman                           83

6          By Ms. Berry                              92

7          By Mr. Alderman                           97

8

9                    E X H I B I T S

10          (Attached to the Transcript)

11  BRADDOCK DEPOSITION EXHIBIT                      PAGE

12  Exhibit 1     United States Capitol Police

13                K-9 Unit, Canine Handler

14                Notebook, USCP000964 - 988         38

15  Exhibit 2     Memo dated 11-20-17,

16                USCP001856 - 1858                  51

17  Exhibit 3     Official Correspondence Endorse-

18                ment Sheet, USCP000012 - 17        64

19  Exhibit 4     Email, USCP000118 - 120            65

20  Exhibit 5     Email, USCP001936 - 1937           67

21  Exhibit 6     Email, USCP000121                  68

22

1                    P R O C E E D I N G S

2    Whereupon,

3                    RICHARD LEE BRADDOCK,

4    having been first duly sworn or affirmed to testify

5    to the truth, the whole truth, and nothing but the

6    truth, was examined and testified as follows:

7                  EXAMINATION BY COUNSEL FOR

8                  PLAINTIFF, MAURICIA VAN METER

9    BY MR. ALDERMAN:

10       Q    Good morning, Mr. Braddock.

11       A    Good morning.

12       Q    My name is Les Alderman.  I represent

13   Mauricia Van Meter in a lawsuit that she's brought

14   against the U.S. Capitol Police.  Thank you very

15   much for showing up today as a witness.

16       A    Good morning.

17       Q    For the record, would you tell us your

18   full name.

19       A    Sure.  It's Richard Lee Braddock.

20       Q    And what is your current title?

21       A    Chief administrative officer.

22       Q    For the U.S. Capitol Police?

1        A      Yes, sir.

2        Q      Okay.  Have you had your deposition taken

3    before, Mr. Braddock?

4        A      When I came to Capitol Police, I had to

5    go back to FEMA for a discussion with lawyers.  I

6    don't know if it was a deposition or not.  So,

7    that's the only other time.

8        Q      Okay, super.

9               So, I'm going to go over some ground

10   rules.  You may have heard some of these from

11   Ms. Berry, but just bear with me.

12              The most important thing today, the most

13   important instruction, I think, is that you

14   remember if you don't understand any of my

15   questions, make sure you tell me that you don't

16   understand my question.  I will repeat the

17   question, I'll come at it from a different angle,

18   I'll rearrange things, I will do everything in my

19   power to make sure that you understand what I'm

20   asking you.  But you have to tell me first if

21   there's any ambiguity in your mind.  Make sense?

22       A      Yes, sir, it does.

1      Q      Super.

2             Because Jackie is typing down everything

3      that you and I say and we have the added

4      complication of video, it's going to be super

5      important that you let me finish my question, even

6      if you know exactly what I'm going to ask you.  And

7      likewise, I will let you finish your answer even if

8      I think I know exactly what you're going to say.

9             Also, if Ms. Berry begins to make an

10     objection, make sure you stop answering so that her

11     objection can be clear on the record.

12             MR. ALDERMAN:  Ms. Berry, I just noticed

13     someone else in the room with you guys.

14             MS. BERRY:  Yes, Sheila Berry, our

15     paralegal specialist.

16             MR. ALDERMAN:  Okay, and one of the

17     stipulations is that anyone who's present is on the

18     video.

19             MS. BERRY:  Yes, we're trying to scoot

20     her onto the screen.  So, you know, even though,

21     you know, six feet is not what we're doing in this

22     room right now, but we're trying to fit her on the

1  screen.  Sheila -- is that -- how is that?

2          MR. ALDERMAN:  That's fine.  And that's

3  everybody in the room?

4          MS. BERRY:  Yes, that's everyone in the

5  room.

6          MR. ALDERMAN:  Okay.  Actually,

7  Ms. Berry, or the other Ms. Berry, if you could

8  scoot in a little bit just so I can make sure I see

9  you.  Thank you.

10          MS. SHEILA BERRY:  I'll lean.

11          MR. ALDERMAN:  Okay.

12      Q    So, make sure we don't talk over each

13  other, that's rule number 2.

14          Rule number 3 is, you know, every single

15  thing that you're testifying to and about today is

16  under oath, which means that you have to tell the

17  God's honest truth about anything that you're

18  saying.  But, you know, we're all human, and if you

19  think of something that you would like to add to

20  your prior testimony or if you want to go back and

21  change anything that you said during your prior

22  testimony, you should feel free to do that during

1    the deposition.  In fact, during the deposition is

2    the best time for you to do that because it allows

3    me the opportunity to ask you questions about any

4    new information that you want to add or anything

5    that you want to change about your prior testimony.

6           Does that make sense?

7    A    Yes.

8    Q    So, at any point in time just say,

9    Mr. Alderman, I forgot, I would like to -- you

10   know, I'd like to go back to something I said.

11   That's perfectly, perfectly acceptable.

12           If you need to take any breaks, that is

13   also perfectly fine.  You know, we're here as long

14   as this deposition takes today, there's no -- you

15   know, there's no particular rush.  I think we've

16   got plenty of time to finish your deposition.  So,

17   if you need to get up and stretch your legs, you

18   need to go down the hall, if you need anything to

19   be comfortable, just let us know, and we'll take as

20   many breaks as you need.

21           With respect to objections, Ms. Berry may

22   object to some of my questions from time to time.

1  For the most part, you will go ahead and answer my

2  question.  Let Ms. Berry finish her objection, and

3  then you go ahead and answer the question, if you

4  can.  If Ms. Berry instructs you not to answer my

5  question, then you need to stop right there,

6  because it probably involves some kind of

7  attorney/client privilege issue, and we don't want

8  you to inadvertently disclose anything like that on

9  the record in particular.  So, if you hear

10 Ms. Berry say stop, definitely stop.

11          I think that's about it.

12          Can you tell me what you did to prepare

13 for your deposition today.

14     A    I went through and looked at the email

15 exchange I had with Chief Sund, and I looked at the

16 anti-discrimination and anti-harassment directive

17 and our complaints directive briefly.

18     Q    Okay.  Do you know what the effective

19 date of that complaints directive that you

20 referenced?

21     A    I do not.

22     Q    Do you have a copy of it with you?

1      A      No, sir.

2      Q      Okay.  And the harassment directive, do

3  you know the date of that directive?

4      A      I do not.

5      Q      Did you meet with counsel in preparation?

6      A      Yes, sir.

7      Q      And at any point in time when you were

8  preparing for your deposition, did anyone offer to

9  you facts that you did not remember?

10     A      No.

11     Q      Okay.  No one offered you information

12 that you did not recall or that you disagreed with,

13 did you?

14     A      No.

15     Q      Okay.  Can you tell me when you began

16 working at the Capitol Police.

17     A      November of 2004.

18     Q      And in what capacity did you start?

19     A      I was the executive officer for the chief

20 administrative officer.

21     Q      And as the executive officer, what were

22 your duties?

1    A    I was responsible for taking actions that

2  the CAO, the chief administrative officer, asked

3  the various directors under that purview to do and

4  to follow those projects, deliverables, making sure

5  they were on time and that they were in the format

6  that the CAO was asking them for.

7    Q    And were there certain types of tasks

8  that you're talking about right now?

9    A    Things like we were purchasing a new

10  command vehicle, and watching the delivery dates,

11  and how it was going to be used, was the right

12  equipment being installed.  So, I was responsible

13  for asking follow-up questions and keeping track of

14  timelines, helping to review the report that we had

15  to do on the command vehicle.  That's an example of

16  the kinds of stuff that I did.

17    Q    How about human resources projects, were

18  you responsible for any human resources type --

19    A    Yes.

20    Q    Go ahead.  And what sorts of human

21  resources issues?

22    A    They ranged from position descriptions

1    that were being put together, vacancy

2    announcements, tracking the number of onboard

3    people.

4         Q    How about training programs?

5         A    Yes.

6         Q    Were you responsible for implementing

7    training programs?

8         A    Not implementing.

9         Q    What was your responsibility when it came

10   to training programs as the executive officer?

11        A    Making sure that they were being

12   administered, you know, when we sent recruiting

13   classes through are they getting in there, are they

14   getting their training done, when are they coming

15   back from our facility in Georgia.  Those types of

16   administrative functions.

17        Q    As executive officer, did you have any

18   activities associated with the K-9 training

19   program?

20        MS. BERRY:  Objection, vague.  You can

21   answer.

22        A    I'm sure things came across around K-9,

1    but I don't remember what they were.

2         Q    Did you have any involvement in putting

3    together, for example, the training materials for

4    the K-9 program?

5         A    No.

6         Q    Okay.  How about staffing the K-9

7    training program?

8         A    I'm sure things came through, because we

9    monitor the number of positions and organizations

10   against our budget.  So, I'm sure there was

11   paperwork, but I don't remember anything.

12        Q    At the time that you were the executive

13   officer for the CAO, do you know what the CAO's

14   primary areas of responsibility were?

15        A    Very similar to what I oversee now.  So,

16   you would have human resources, the office of

17   facilities and logistics, the office of financial

18   management, which at the time contained procurement

19   and acquisition management, training services

20   bureau.  We had policy, but it was not in its

21   current form.  We had -- sorry, let me go through.

22   Information systems, employment counsel.  Give me

1    one second, because I'm just going through.

2           I believe that's everything.

3       Q    Okay.  And so as executive officer your

4    responsibilities were to implement whatever

5    instructions the CAO had related to those different

6    areas of responsibility?

7       A    Correct.

8       Q    And how long were you the executive

9    officer?

10      A    Estimate, probably -- let me do my math

11   here -- about four years.

12      Q    So, 2004 to two thousand --

13      A    2008, yes.

14      Q    Do you remember what month in 2008?

15      A    I do not.

16      Q    Okay.

17           MR. ALDERMAN:  Let me just ask, Jackie,

18   are we speaking clearly enough, slowly enough for

19   you?

20           THE REPORTER:  Yes, everything's coming

21   through well, thank you.  Just try to wait until

22   the question's finished, if you would, please, Mr.

1   Braddock.  That's the only thing, a couple little

2   ones of that.  But it's okay.  Thank you.

3        Q     Oh, I forgot one rule.  Mr. Braddock, I

4   haven't seen you or heard you do it, but if I ask

5   you questions that call for a yes or no, you know,

6   an affirmative or a negative answer, if you could

7   try to say yes or no instead of uh-huh or uh-uh or

8   body language, that makes Jackie's life a lot

9   easier.  And since she can't throw anything at us

10  because it's on video, it will also make her a lot

11  less frustrated.  Okay.

12            So, 2008 forward, what was your position

13  at the Capitol Police?

14       A     I became the deputy chief administrative

15  officer.

16       Q     Who was the chief administrative officer

17  when you were the exec?

18       A     Anthony Stamillo.

19       Q     Can you spell that.

20       A     S-T-A-M-I-L-L-O.

21       Q     And when you became the deputy CAO, was

22  that due to a competitive promotion process?

1      A    No, it was a creation of a position.  The

2   executive officer position morphed into the deputy

3   position.

4      Q    And did that come with a pay raise?

5      A    I don't remember.

6      Q    Who was responsible for changing the

7   executive officer position into the deputy

8   position?

9           MS. BERRY:  Objection, mischaracterizes

10   earlier testimony.

11      A    Can you clarify what -- because I want to

12   make sure I have timelines correct.  Can you ask me

13   that again, please.

14      Q    You indicated that the executive officer

15   position had morphed into the deputy position, and

16   the question is who was responsible for that

17   morphing?

18      A    It would have been the chief

19   administrative officer.

20      Q    And at the time that the position changed

21   from exec officer to deputy, who was the CAO?

22      A    We had an acting in between, because I

1    acted for a period of time until a new CAO -- that

2    was a transition period, so we had a new CAO,

3    Gloria Jarman, coming onboard.  And I believe it

4    changed when she came onboard.  I believe I was

5    still the executive officer when they asked me to

6    act in the interim of Mr. Stamillo leaving and Ms.

7    Jarman coming onboard.

8          Q    And how long were you acting CAO?

9          A    From November 2007, I believe, until

10   February of 2008.

11         Q    And did you become the deputy CAO before

12   or after Ms. Jarman became the CAO?

13         A    After.

14         Q    And you believe that that was

15   Ms. Jarman's decision, to change your position from

16   executive officer to deputy?

17         A    I believe so.

18         Q    How did your duties change in that change

19   from executive officer to deputy?

20         A    I became more supervisal of the directors

21   that reported to the CAO.

22         Q    Were you inserted into their chain of

1    supervision as the deputy?

2         A    Yes, yes.

3         Q    Okay.  And before that you were not a

4    direct supervisor to any of those directors?

5         A    Correct.

6         Q    You would have had like a dotted line

7    where no one answered to you but you got to hound

8    everybody?

9         A    That would be correct.

10        Q    Okay.  And can you tell me, as the deputy

11   CAO who were the directors that you supervised?

12   And right now let's do titles instead of names.

13        A    Right, right.

14        Q    Okay.

15        A    So, it was director of OHR, the director

16   of financial management, training services bureau

17   commander, director of facilities and logistics,

18   director of information systems.  I want to make

19   sure I don't miss anybody.  Employment counsel.  I

20   believe that's everybody.

21        Q    Procurement?

22        A    I'm sorry?

1     Q    What about procurement, were they a

2  separate director?

3     A    Not yet.

4     Q    Okay.  I think the other one that you

5  mentioned was policy, you mentioned that earlier.

6     A    Yes.  Thank you, yes, policy.

7     Q    Who was the director of the training

8  division that you mentioned?  In -- sorry, this

9  would be when you were the deputy.

10    A    We rotate them, because mostly they're

11 sworn supervisors.  So, I don't remember who was

12 there during that time.

13    Q    What was the rotation policy?  In other

14 words, how often did they rotate in and out?

15    A    It could be as little as a year or two or

16 three years, it just depended on the mission, and

17 it usually generated from operations and what they

18 needed.

19    Q    Can you repeat your answer.  I was having

20 something fall under my desk.

21    A    Absolutely.

22         It could range anywhere from a year to a

1  couple of years based on -- usually, it was driven

2  from what operations needed.  So, those deputy

3  chiefs would rotate out and go back over into the

4  operational side of the department.

5      Q    And so the director of training would

6  have been a deputy chief?

7      A    At that time, yes.

8      Q    And how long were you deputy CAO, from

9  2008 through when?

10     A    2011.

11     Q    And do you remember about the month?

12     A    I do not.

13     Q    Okay.  After that what was your position?

14     A    I -- hold on, let me back up, because I'm

15 screwing up my timeline.  2008 to 2010, I believe,

16 because then I went over and became the chief of

17 staff.

18     Q    And how long were you chief of staff?

19     A    Until I became the CAO in 2011.

20     Q    Okay.  So, you were the chief of staff,

21 that would put you directly under the chief of

22 police?

1        A     Correct.

2        Q     And what were your duties, generally

3   speaking, as chief of staff?

4        A     Very similar to what I did for the CAO.

5   So, I monitored things that the chief wanted done

6   on both the operational side of the department and

7   the administrative side of the department, followed

8   up on projects, tracked timelines, helped monitor

9   his schedule, a whole variety of things.

10       Q     Who was the chief at the time?

11       A     Philip Morse.

12       Q     And that's M-O-R-S-E?

13       A     Correct.

14       Q     Did I see he's coming on as a consultant

15   with the Capitol Police?

16             MS. BERRY:  Objection, irrelevant.

17       A     Yes.

18       Q     And why did you stop being chief of staff

19   in 2011?

20       A     I competed to become the chief

21   administrative officer.

22       Q     Okay.  And that was 2011.  Did you

1    interview for that position?

2        A    I did.

3        Q    And do you remember who was on the

4    interview panel?

5        A    The chief of police, and I believe the

6    assistant chief, but I could be wrong.

7        Q    And who was the chief of police at the

8    time?

9        A    Philip Morse.

10       Q    And the assistant?

11       A    Daniel Nichols.

12       Q    And do you know who the selecting officer

13   was?

14       A    It would have been the chief of police,

15   Philip Morse.

16       Q    Is that a selection that would have to be

17   approved by the Capitol Police board?

18       A    No.

19       Q    And so you have been chief administrative

20   officer from 2011 to the present date?

21       A    That's correct.

22       Q    And that is a civilian position?

1      A      Correct.

2      Q      Have you ever been a sworn officer?

3      A      No.

4      Q      Where did you work before you came to

5   Capitol Police, the first position immediately

6   before Capitol Police?

7      A      The Department of Homeland Security in

8   the Federal Emergency Management Agency.

9      Q      And what was your position?

10     A      At the time that I left there I was the

11  response -- trying to get the right thing here --

12  response operations administrative director, I

13  believe, but I think I'm messing up the title.

14     Q      It's okay.  Why did you move from FEMA to

15  Capitol Police?

16     A      When we went into the Department of

17  Homeland Security, we went from being a small

18  agency to this big Goliath.  And I prefer to work

19  in a smaller agency, and Capitol Police is like

20  that.

21     Q      Okay.  Now, have your duties as chief

22  administrative officer been stable since 2011?  In

1    other words, have you had the same mix of

2    responsibilities?

3         A    No.

4         Q    Okay.  Then I would like to focus on the

5    2017 time period, which is the time period that

6    most of the events relevant to this case occurred.

7    Can you tell me what your responsibilities were in

8    2017.

9         A    Sure.  It was to oversee the statutory

10   areas that the chief administrative officer is

11   required to oversee in addition to other areas that

12   are not covered in the statute, some of the various

13   offices that are attached to the CAO's side of the

14   house.

15        Q    And what's the statute that we're talking

16   about?

17        A    It's the statute that authorizes the

18   chief administrative officer.

19        Q    Do you know the citation to that statute?

20        A    I believe it's 2 USC 1903.

21        Q    And what are those statutory areas that

22   you're required to oversee?

1      A     Mainly their financial information and

2    human resource related.

3      Q     And that was the case in 2017?  I should

4    have made sure that you understood my question

5    related to 2017.

6      A     Yes, sir.

7      Q     And you said there were additional areas

8    of responsibility in addition to the statutory

9    areas.  What were those?

10      A     So, I oversaw the office of human

11    resources, the office of background and

12    investigations, the office of acquisition

13    management, the office of financial management,

14    training services bureau, the office of policy and

15    logistics, information systems.  Let me go back

16    through.  The office of inclusion, diversity,

17    equity, and action, the office of employment

18    counsel, the office of facilities and logistics.

19      Q     Is that all?

20      A     Yes, sir, I believe I -- I was counting

21    on my fingers.

22      Q     That's quite a bundle.

1          Each of the areas that you just mentioned

2     just now, do they have a director over them or, you

3     know, managing them?

4          A    Yes, the only one that would be different

5     is training services bureau.  At one point it had a

6     director and at another point it had a bureau

7     commander.  I can't remember in 2017 which it was.

8          Q    Okay.  In levels of supervision between

9     you and those directors, can you tell me what

10    positions are between you and those directors?

11         A    They're all direct to me, but I have a

12    deputy chief administrative officer and I've had at

13    times an assistant deputy chief administrative

14    officer.

15         Q    And in 2017 did you have a deputy CAO?

16         A    I did.

17         Q    And do you remember who that was?

18         A    Dominic Storelli.

19         Q    And can you spell both first and last

20    names?

21         A    Sure, it's D-O-M-I-N-I-C,

22    S-T-O-R-E-L-L-I.

1      Q      Was that E-L-L-I?

2      A      S-T-O-R-E-L-L-I.

3             And if I can clarify, because I'm trying

4      to remember, I also had a deputy, Jay Miller, and

5      I'm not sure when he retired and Dominic moved into

6      that position.

7      Q      And did you have an assistant, assistant

8      deputy during the 2017 time period?

9      A      If Jay had not retired yet, it would have

10     been Dominic.

11     Q      And after Dominic became the deputy, did

12     you backfill the assistant deputy position?

13     A      We did.  I don't remember if it was in

14     2017, it all kind of runs together.  But we had

15     another person come in, yes.

16     Q      And who was that assistant deputy?

17     A      Rachelle Schroeder.

18     Q      Spelling on it?

19     A      Sure.  Rachelle is R-A-C-H-A-L-L-E, and

20     Schroeder is S-C-H-R-O-E-D-E-R, I believe.  I don't

21     think I screwed that up.

22     Q      In 2017 as the CAO, what was your

1    responsibility over the training division?

2         A    I gave general guidance to them to make

3    sure that we were handling our recruit training and

4    our in-service training appropriately and that we

5    were trying to develop training programs for our

6    civilian employees.

7         Q    When it came to the internal training

8    programs, would K-9 be included in one of the

9    internal training programs?

10        A    When you say internal, are you referring

11   to what I said about in-service?

12        Q    Sorry, yes, in-service.

13        A    No.  The specialty units did their own

14   training programs.

15        Q    So, you did not have oversight over the

16   specialty units training programs?

17        A    Only through training services bureau

18   reviewing the lesson plans.  But I did not directly

19   oversee that.

20        Q    And how did the training services bureau

21   oversee lesson plans?

22        A    The specialty units were instructed to

1    send those to training services bureau to make sure

2    that they hit the -- trying to remember the term.

3    There are learning objectives that you are supposed

4    to hit as a part of a lesson plan.  It was to make

5    sure that they were put together properly and that

6    they had those -- I can't remember the term, but

7    it's a specific learning objective.

8         Q    And who in 2017 was in charge of the

9    training bureau?

10        A    I believe that's the period we had our

11   civilian director, so that would have been Cathy

12   English.

13        Q    Was there any official who was in charge

14   of the specialty units training?

15        A    Can you clarify that?  Are you asking

16   from a training perspective, training services

17   perspective?

18        Q    You've indicated that the specialty units

19   were in charge of their own training; is that

20   correct?

21        A    Correct.

22        Q    So, does that mean that whoever is -- and

1    speaking specifically about K-9, whoever was in

2    charge of the K-9 program itself would have also

3    been in charge of the training for that program?

4         A    Correct.

5         Q    And does that mean that that person,

6    whoever it is, would be responsible for approving

7    training materials for the K-9 unit?

8         A    Correct.

9         Q    In charge of implementing the standards

10   for the canine training program?

11            MS. BERRY:  Objection, vague.

12        A    Are you referring to the parts of the

13   lesson plan and them being taught?

14        Q    I'm referring to the policy that

15   indicates who gets the pass and who fails the K-9

16   training program.

17        A    Yes, that's laid out in the lesson plan.

18        Q    Okay.  And so whoever is the head of the

19   K-9, or was the head of the K-9 program at that

20   time would be in charge of approving those

21   standards?

22        A    Yes.

1      Q      Did you have any involvement in approving

2   those standards, specifically for K-9?

3      A      Not to my knowledge.

4      Q      Did you review them or comment on them?

5      A      I review policy.  I don't know if it's

6   included in the policies or not.

7      Q      Okay.  And when you say you review the

8   policy, that's in your role as the supervisor of

9   who's over the policy and logistics division; is

10  that right?

11     A      It's policy, it's called policy and

12  management systems, but we call it OPOL, O-P-O-L.

13     Q      And is that what you were referencing

14  when you said you review the policies?

15     A      So, OPOL generates them, they go through

16  a chain of command to include the entire executive

17  team, which I'm a member of, and we all review

18  them.

19     Q      But in terms of, while OPOL is drafting

20  the policies themselves, you have oversight over

21  OPOL and its activities, correct?

22     A      Correct.

1          Q     Okay.  And in 2017, who was the director
2     over OPOL?
3          A     I believe it was Jerry, Jerome Boerste.
4          Q     Spelling on that?
5          A     Sure.  His last name is B-O-E-R-S-T-E.
6          Q     Now, you said that, I think you
7     referenced a management team that reviews the
8     policies and approves them before they're
9     effectuated; is that correct?
10         A     The executive team.
11         Q     Executive team.  Can you tell me who
12    else, what other positions are on the executive
13    team?
14         A     Sure.  It's the chief of police, the
15    assistant chief over uniformed services, the
16    assistant chief over protective and intelligence
17    services, the chief administrative officer, and
18    then the general counsel.
19         Q     And as CAO you were over employment
20    counsel, but you were not over general counsel,
21    correct?
22         A     That's correct.

1       Q     In that 2017 time period, who was in

2   charge of the diversity unit, diversity inclusion?

3       A     I believe at that time frame it was

4   Natalie Holder.

5       Q     And what was the primary function of that

6   diversity unit?

7       A     It was to help us look at our policies

8   and our processes to make sure that they were

9   developed in a way that didn't create barriers for

10  employees to be successful.  They also helped with

11  our recruiting efforts to be able to tap into

12  underrepresented populations, and then to help

13  develop things like our mentoring program.  And

14  they began the process of developing a peer support

15  program.  They also did some limited training with

16  our recruits and executive team.

17      Q     Were they responsible for investigating

18  claims of discrimination?

19      A     No.

20      Q     Internal complaints.

21      A     No, sir.

22      Q     Okay.  And under the policy that existed

1    in 2017, what division or organization within the

2    Capitol Police would have been responsible for

3    investigating internal claims of discrimination?

4              MS. BERRY:  Objection, vague and

5    ambiguous.

6         A    Which directive are you referring to?

7         Q    That's what I'm asking you, actually.

8    Which directive would be responsible for

9    investigating internal complaints of

10   discrimination?

11        A    I believe it's covered under our

12   anti-harassment/anti-discrimination policy.

13        Q    And under that policy, which organization

14   is supposed to investigate?

15        A    So, it could either be the office of

16   professional responsibility, the office of

17   inspector general, and in certain times if it was

18   regarding litigation, it could be the office of

19   general counsel.

20        Q    And that's as that policy existed in

21   2017, correct?

22        A    To the best of my knowledge.

1      Q    Mr. Braddock, have you been responsible

2   for providing any information that was shared with

3   us in discovery?  In other words, responsible for

4   providing information in response to our

5   interrogatory requests?  We'll break it down.

6      A    I -- I don't -- no, I don't think so.

7      Q    Okay.  How about our requests for

8   admissions?

9      A    Not to my knowledge.

10      Q    And what about our requests for

11   documents?

12      A    When counsel asks us any time there's a

13   case to gather up documents, we provide them.  But

14   I don't know what's provided after that.

15      Q    And have you provided documents to

16   counsel related to this litigation?

17      A    I don't even remember.  I don't know.

18          MR. ALDERMAN:  All right.  I'd like to go

19   ahead and introduce the first exhibit.  This one's

20   marked USCP, I think it starts 968.

21          AV TECHNICIAN:  I have a 965, I have a

22   USP 965988.

1          MR. ALDERMAN:  That's it.

2          AV TECHNICIAN:  Okay, great.  Please

3    hold.

4          (Braddock Deposition Exhibit 1 was marked

5    for identification and is attached to the

6    transcript.)

7     Q    Now, Mr. Braddock, do you have a device

8    or anything there that would allow you to navigate

9    in this document?

10         MS. BERRY:  I'll interject here, we have

11   a mouse.  It may or may not allow us to navigate

12   through the document.

13         MS. SHEILA BERRY:  She has to give

14   access.

15         MS. BERRY:  I was just informed that I

16   think the host has to give us access in order for

17   us to navigate the document.  For the witness to

18   navigate it, rather.

19         MR. ALDERMAN:  Okay.  Sarah, is that

20   possible?

21         MS. BERRY:  Okay, I don't know how you do

22   it, but --

1          THE WITNESS:  Let me see here.  Yes, I

2    believe we have access now.

3          MR. ALDERMAN:  Awesome.

4      Q    Mr. Braddock, have you ever seen -- well,

5    let me just identify the document for the record.

6          You've been given a document now that has

7    been labeled Braddock Exhibit 1.  It goes from USCP

8    964, and I think the last page on this is 988.

9    Yes, last page is 988.  The title of the document

10   is United States Capitol Police K-9 Unit, Canine

11   Handler Notebook.  And this is dated August 2017.

12         Have you ever seen this document before,

13   Mr. Braddock?

14     A    I don't remember ever seeing this.

15     Q    Go ahead and scroll through it.  And

16   after you've had time to scroll through it, I'd

17   like to ask you that same question.

18     A    I'm having a hard time seeing it.  I can

19   see the colors and things, but my eyes are not

20   fantastic.

21     Q    There's a -- yes.

22     A    There we go.  Thank you.  Perfect, thank

1    you.  I don't have control anymore.  Thank you.

2            Okay, I believe I've completed looking at

3    it.

4        Q    And, Mr. Braddock, have you ever seen

5    this document before?

6        A    I don't remember ever seeing it.

7        Q    Do you know who would have been

8    responsible for putting this document together?

9        A    No.

10       Q    You indicated that the specialty units

11   were in charge of their own training.  Does that

12   indicate to you that the K-9 unit or the K-9

13   program would have been in charge of putting this

14   together?

15           MS. BERRY:  Objection, calls for

16   speculation.

17       A    I would assume that they would, yes.

18       Q    This is not something that you would have

19   been called upon to review or approve either in

20   your role as the CAO or in your role on the

21   executive team?

22           MS. BERRY:  Objection, vague and

1    ambiguous, and compound.

2         A    I mean, I would be asked if it required

3    money or resources, because I have to go out and

4    get that for the department.  Those kinds of

5    ancillary kinds of interactions.  But not putting

6    this together, no.

7         Q    What about approving it as a policy, as

8    the training policy?

9         A    If the policy was developed by our office

10   of policy and sent through and this was an

11   attachment to it, yes, I look at those, my deputies

12   look at those on my behalf.

13        Q    And how would we know if that was the

14   case?

15             MS. BERRY:  Objection, vague.

16        A    Are you asking if it was attached to a

17   policy or if we would have seen it?

18        Q    No, how would we know if this was a

19   policy that was originated in your office of

20   policy?

21        A    I'd have to go back and ask them

22   specifically.

1      Q    And if it was -- if it did originate in
2  your office of policy, then you would have seen
3  this before it was used?
4      A    Not necessarily.
5      Q    And why is that?
6      A    If they took information out of it to
7  create a policy, I would have seen the policy, not
8  this document.  It's only if it was an attachment
9  to the policy that I would see it or my team would
10 see it coming through the office.
11     Q    Is it possible that this is a policy
12 document that your policy team itself put together?
13          MS. BERRY:  Objection, calls for
14 speculation.
15     A    It does not match the format we use for
16 our policies, the headers and the way it's
17 formatted.
18     Q    In 2017 do you know who was in charge of
19 the K-9 program?
20     A    No, I don't -- I don't remember.
21     Q    Do you know if that was Lieutenant
22 Cromwell?

1       A    I know he has been.  I don't know the

2   time period.

3       Q    Mr. Braddock, did you have any

4   involvement in the decision to remove Officer Van

5   Meter from the K-9 training program in 2017?

6       A    Not to my knowledge, no.

7       Q    Were you involved in any decision-making,

8   any discussions about --

9            MS. BERRY:  Objection.  Sorry, continue.

10       Q    Were you involved in any discussions

11   about removing Officer Van Meter from the K-9

12   training program?

13       A    Not that I can remember, no.

14       Q    Were you a party to any written

15   communications about Officer Van Meter being

16   removed from the training program?

17       A    I don't remember, but a lot of stuff

18   comes through my office that's handled by my

19   deputies on my behalf.

20       Q    Were you tasked with investigating

21   Officer Van Meter's claims that she had been

22   discriminated against while she was a candidate

1    while she was in the training program?

2        A    I was not tasked with investigating any

3    claim of discrimination.

4        Q    Were you tasked with investigating

5    anything related to Officer Van Meter?

6        A    I was asked to look at the process that

7    had gone -- had taken place with that training

8    program from the perspective of diversity.  We are

9    trying to help to make sure we address gaps in

10   representation in our specialty units, and I was

11   asked to look at that process and make sure it

12   didn't have any inherent barriers that would keep

13   any of the candidates from being successful.

14       Q    And how did you receive that request or

15   that instruction?

16       A    I received it via email.

17       Q    From whom?

18       A    Then Assistant Chief Steven Sund.

19       Q    And what did you do in the course of

20   responding to his request?

21       A    I advised him that I was going to ask

22   Francine Benko, who's in our office of human

1   resources, to engage with the K-9 unit and to go

2   through the process and then provide a report back

3   at his request so that he could take further

4   action.

5        Q    And did you have any direct involvement

6   in Ms. Benko's inquiry?

7        A    Other than just -- I'm sorry, were you

8   saying something?

9        Q    No.

10       A    Other than asking her to look at the

11  process and provide a report back, no.

12       Q    And how did you ask her to look at the

13  process and provide a report back?

14       A    I believe it was via email.

15       Q    Did you have any discussions with her

16  about what it was that you wanted her to do?

17       A    I don't remember.  I may have talked to

18  her on the phone, but I don't remember.

19       Q    Are you a note-taker when you have

20  conversations with people on the phone, do you take

21  notes?

22       A    No, sir.  I have so many per day, I just

1    move to the next one.

2         Q    How did you first learn that Officer Van

3    Meter was being removed from the training program?

4         A    I believe it was from a phone call from

5    Assistant Chief Sund.

6         Q    And what did he tell you?

7         A    That he had received an email from

8    Officer Van Meter and that he wanted me to take a

9    look at it, because it spoke to diversity in our

10   unit and the process she had gone through.

11        Q    He told you that Officer Van Meter had

12   emailed him and had complained about diversity

13   issues with respect to the training program?

14        MS. BERRY:  Objection, mischaracterizes

15   the earlier testimony.

16        A    He told me that she had contacted him,

17   that she was being removed, and that he had seen an

18   email from her and it spoke to diversity issues,

19   gaps in our specialty units, and talked about the

20   process that she had gone through.

21        Q    Now, he indicated that Officer Van

22   Meter's email spoke to diversity gaps, but you

1    didn't interpret that as a complaint about

2    discrimination?

3         A    No, sir.

4         Q    Why not?

5         A    Because as a department we're looking to

6    expand underrepresented populations in all of our

7    specialty units, and if somebody was talking about

8    there's not a lot of X or Y in it, we're trying to

9    address that.  So, I didn't look at that as a

10   discriminatory thing, because it's not speaking to

11   somebody not being treated fairly, it's just

12   talking about the fact that we don't have a lot of

13   people in various categories in the unit.

14        Q    So, you thought that Officer Van Meter

15   was only raising an issue that there weren't many

16   women in the K-9 program?

17        A    Yes, based on what he said to me over the

18   phone, yes.

19        Q    Did you ever receive a communication from

20   Officer Van Meter herself where she identified the

21   issues to you?

22        A    I don't remember ever having contact with

1    her about her K-9 experience.

2        Q    So, your understanding was that Officer

3    Van Meter was not complaining that she was being

4    treated unfairly and instead she was just

5    identifying that there was not much diversity in

6    the K-9 program?

7        A    It had to do with underrepresentation,

8    diversity in the program, as well as her process

9    she had gone through.

10       Q    You indicated earlier that your

11   understanding was that she was not complaining that

12   she was being treated unfairly.

13       A    Based on what he was telling me over the

14   phone, that was how I interpreted it, yes.

15       Q    And so when you gave instructions to

16   Francine Benko, you did not tell her to look into

17   any claims of unfair treatment; is that right?

18       A    Correct.

19       Q    And how was Ms. Benko -- according to

20   your instructions and your discussion with her, how

21   was Ms. Benko supposed to identify if there were

22   barriers to diversity in the K-9 program?

1    A    I asked her to go down and look at all of

2  the processes that had taken place.  Acceptance

3  into K-9 requires that you get through that

4  training, and it's tied back to the selection

5  processes.  So, I asked her to go and make sure

6  that they walk her through the process and that she

7  looks at it to make sure that everyone could

8  complete that process.

9    Q    And does that mean that she was supposed

10  to go through and make sure that the requirements

11  that were applied to the different candidates

12  actually had objective standards attached to them?

13    A    I didn't hear her specific instructions.

14  I asked her to just look at the process

15  holistically.

16    Q    So, you didn't ask her to identify any

17  particular things that helped promote diversity,

18  like objective standards?

19    A    No, I asked her to look at the entire

20  process that had taken place, all the components.

21    Q    Did you ask her to look into what

22  discretion the training staff had to pass or fail

1    people?

2        A    I did not, I didn't give her any specific

3    direction.

4        Q    No specific direction, just look into it?

5        A    To go into the program, take a look at

6    it, identify any issues or barriers that were

7    coming up, and to report back so that I could give

8    that to the assistant chief, which is what he asked

9    me to take care of.

10       Q    Did you ask her to do like a deep dive

11   into any particular concerns that Officer Van Meter

12   had raised?

13           MS. BERRY:  Objection, vague and

14   ambiguous.

15       A    I asked her to look at the holistic

16   process, take a look at the whole thing.

17       Q    But no -- you didn't ask her to pay any

18   particular attention to any specific issues that

19   Officer Van Meter had raised?

20       A    No.

21       Q    Did Ms. Benko issue a report?

22       A    She issued a memo, I believe.

1        Q    Do you know if she issued one report or

2    more than one reports?

3        A    I don't know.

4             MR. ALDERMAN:  Sarah, could you bring up

5    what's been marked USCP 1856.

6             AV TECHNICIAN:  Absolutely.  Please hold.

7             MR. ALDERMAN:  Thank you.

8             THE WITNESS:  Mr. Alderman, when we

9    finish this I need to use the restroom, please.

10             MR. ALDERMAN:  Let's go ahead and do that

11    now before we get on a new topic.

12             THE WITNESS:  Okay, thank you.

13             (A recess was taken from 11:05 a.m. to

14    11:18 a.m.)

15             MR. ALDERMAN:  Sarah, could we go ahead

16    and mark what is labeled or titled USCP 1856 to

17    1858 as Exhibit 2.

18             (Braddock Deposition Exhibit 2 was marked

19    for identification and is attached to the

20    transcript.)

21    BY MR. ALDERMAN:

22        Q    Mr. Braddock, before the break I asked

1    you if Francine Benko had issued a report in

2    association with her inquiry.  The document that

3    we're looking at here has been marked Exhibit 2.

4    It bears the page numbers or the Bates numbers on

5    the bottom right-hand corner, it says USCP001856

6    and it goes all the way to 1858.  And we've marked

7    it as Braddock Exhibit 2.

8           Is that the report that Ms. Benko

9    produced?

10          MS. BERRY:  Could we have a moment to

11   allow him to scroll through the document?

12          MR. ALDERMAN:  Yes.

13          MS. BERRY:  Thank you.

14    A    Okay, I'm done.

15    Q    Is this the report that Francine Benko

16   issued as a result of your request?

17    A    It's the report I remember reading as a

18   result of my request, yes.

19    Q    Did you have any involvement in drafting

20   her report?

21    A    No.

22    Q    Did you review or edit the report before

1    it was finalized?

2         A    No.

3         Q    Did you ask anyone else to work with Ms.

4    Benko on the report?

5         A    No.

6         Q    Do you know if anyone else worked with

7    Ms. Benko on the report?

8         A    I don't.

9         Q    Do you know of any other versions of this

10   report that Ms. Benko or anyone else issued?

11        A    No.

12        Q    Do you know of any other versions that

13   anyone else drafted?

14        A    No.

15        Q    Do you know of any other reports that Ms.

16   Benko drafted other than this one?

17        A    Not to my knowledge, no.

18        Q    Did Ms. Benko keep you apprised of her

19   inquiry while she was doing it?

20        A    I don't remember any discussions with

21   her.  I remember seeing this.  I was on vacation

22   and this came through.

1        Q      Do you know if Ms. Benko interviewed any

2   of the candidates --

3        A      No.

4        Q      -- the K-9 -- the folks who were in the

5   K-9 training program as trainees?

6        A      No, I don't know.

7        Q      Do you know if she interviewed any of the

8   trainers aside from Sergeant Phelps?

9        A      I don't know.

10       Q      Did you ask her to interview anyone?

11       A      I asked her to look at this process and

12  identify anything that would affect our ability to

13  close our diversity gap in our specialty units.  I

14  wanted her to really pay attention to all the

15  processes and whether or not they create any kind

16  of barrier.

17       Q      Do you see anything like that in her

18  report that -- anything in this report indicating

19  that it was -- the purpose of the report was to

20  identify barriers to diversity?

21       A      The second line from the bottom where she

22  talks about it appears to have been conducted in a

1    fair and consistent manner.

2        Q    But there's nothing in this report that

3    says this report is intended to address whether

4    there are any obstacles to diversity or anything of

5    that nature, is there?

6        A    No, nothing direct.

7        Q    And you would agree that this report

8    doesn't address any specific issues that Ms. Van

9    Meter or Officer Van Meter raised, right?

10       A    When I looked at the email that came in

11   from Officer Van Meter and I looked at the

12   components of it, I did not see anything that was

13   specific to an unfair process.  So, I was not

14   specific with Ms. Benko.  What she did was look at

15   the process as I asked her to and provide her

16   perspective back to me.

17       Q    I'm sorry, you just said that when you

18   looked at the email from Officer Van Meter.  Before

19   the break you indicated that Officer Van Meter had

20   never communicated directly with you.

21       A    That's correct.  So, let me make sure

22   that I'm clear.

1          After I spoke to Assistant Chief Sund, he

2     forwarded me in the trail her email, asking me to

3     move that process and to look at it.

4          Q    Did you provide Ms. Benko with Officer

5     Van Meter's email?

6          A    I don't remember whether I did or not.

7          Q    Okay.  And you would agree that Ms.

8     Benko's report doesn't address any specific issue

9     raised by Officer Van Meter, correct?

10          MS. BERRY:  Objection, mischaracterizes

11     earlier testimony, if that question is based on

12     earlier testimony.

13          A    I would have to sit and go back and forth

14     in looking at what Ms. Benko provided versus the

15     email that I looked at.

16          Q    Well, if you take a look at the first

17     page of Ms. Benko's report, it indicates that the

18     purpose of the memorandum is to provide a summary

19     of findings for the administrative review of the

20     K-9 technician training process, right?

21          A    Correct.

22          Q    So, the purpose was to provide an

1    administrative review of the training process,

2    correct, not to investigate any particular claims

3    raised by Officer Van Meter.

4            MS. BERRY:  Objection, compound, vague

5    and ambiguous.

6       A    It was an administrative review to look

7    at how that process was done.  Again, to look at

8    whether there were issues that would keep us from

9    filling our gaps in diversity.

10      Q    Take as much time as you need to read

11   through the report.  My question is does the report

12   address whether the K-9 -- you know, the policies,

13   the training policies for the K-9 training program

14   were actually followed.

15           MS. BERRY:  Objection, vague.

16      A    Can you repeat your question to me,

17   please.

18      Q    Does Ms. Benko's report address whether

19   the K-9 training policies were actually followed?

20      A    There is no reference to policies.

21      Q    Well, if you take a look at the last

22   paragraph on 1856 of Exhibit 2, it states there,

1  quote, training includes 40 hours of lecture and

2  five written examinations on a variety of subjects.

3  Scores cannot fall below 90 percent by the end of

4  the training.

5          Is there any indication whether Ms. Benko

6  examined the trainees' scores to see if any of the

7  candidates fell below 90 percent?

8      A    I wouldn't draw a conclusion from what

9  was written there whether she did or not.

10     Q    Is there any indication in this report

11 where Ms. Benko says I examined the tests and

12 confirmed that this policy, that scores cannot fall

13 below 90 percent was respected?

14         MS. BERRY:  Objection, asked and

15 answered.

16     A    When I looked down on, I believe it's

17 1857, and it has specific references to the two

18 candidates and their rankings -- I'm sorry, that's

19 not the right reference.  Let me go down further.

20         Can you repeat that question again for

21 me.

22     Q    Is there any indication in this report

1   that Ms. Benko actually examined the trainees'

2   scores while they were in the program to make sure

3   that this requirement that no one fall below

4   90 percent by the end of the training was actually

5   respected?

6           MS. BERRY:  Objection, same objection,

7   and also compound.

8       A    No, there's nothing that directly says

9   it.  I took that from her summary paragraph for

10  each candidate.

11      Q    Sorry, you took what?

12      A    That she had looked at the process

13  itself, because she was summarizing it for me for

14  each of the two that had not made it through, the

15  male and the female, what had transpired.  But

16  there's nothing particular that says that she

17  looked at any particular training, tests, scores,

18  or anything like that.

19      Q    Is there anything in the report that

20  indicates that Ms. Benko compared Officer Van

21  Meter's performance against any of the other male

22  handlers?

1     A     There's nothing that I see that's

2  specific to that, no.

3     Q     Is there anything in the report that

4  indicates that Ms. Benko has identified what the

5  documentation policy is for the training course and

6  verified that that documentation policy was

7  actually respected?

8           MS. BERRY:  Objection, compound.

9     Q     Well, break that up then.  Is there

10 anything -- first, is there anything in the report

11 that indicates that she's reviewed the

12 documentation policies --

13          MS. BERRY:  Objection, vague.

14    Q     -- for the K-9 training program?

15          MS. BERRY:  Sorry.

16    A     Can you say that again.

17    Q     Yes.  Is there anything in the report

18 that indicates that Francine Benko identified what

19 the documentation policies were for the K-9

20 training program?

21    A     There is nothing specific to what we in

22 the department call a policy.

1      Q    Okay.  If you would, take a look at the

2  bottom paragraph on 1857.  And I'm going to read to

3  you from the -- I think it's the third line down.

4  "They" -- and here "they" is the trainees -- quote,

5  are provided with a wealth of feedback on a daily

6  basis.

7           Is there anything in Ms. Benko's report

8  that specifies what that feedback is that's

9  provided to the trainees?

10     A    The following sentence speaks to daily

11 reports, reviews, and they sign and acknowledge it.

12     Q    And is there any indication in Ms.

13 Benko's report that she's actually reviewed those

14 files to make sure that there are daily reports for

15 every day?

16     A    No, there's nothing that specifically

17 says it.

18     Q    Okay.  Now, skipping down to the next --

19 it's the top paragraph on the next page.  So, she

20 refers to videotape recordings of the trainees

21 performing exercises that are reviewed with them

22 and critiqued.  Is there anything in the report

1    that indicates that those videotapes were actually

2    taken on a daily basis, in other words, that video

3    recordings were made of the trainee exercises on

4    every day of the training?

5            MS. BERRY:  Objection, vague.

6        A    Can you repeat that question, please.

7        Q    Is there any indication in Ms. Benko's

8    report that she's verified that videos were taken

9    on a daily basis of the training exercises?

10       A    Not that I see.

11       Q    Staying in that same paragraph at the top

12   of 1858, in the middle Ms. Benko writes, At the

13   midpoint of the training, they are also evaluated

14   one-on-one to discuss strengths and weaknesses,

15   which is also documented and maintained in their

16   binder, end quote.

17           Is there any indication in Ms. Benko's

18   report that she's actually looked at those binders

19   to verify that these midterm evaluations are

20   actually being provided?

21       A    There's a reference to looking at the

22   training binders, but I don't see anything that

1    says that she looked at that specific document.

2        Q    Is there any indication in Ms. Benko's

3    report that she made any assessment of whether the

4    trainees were treated similarly to each other?

5        A    I'm referencing page -- the one that's

6    marked 1858.

7        Q    Okay.

8        A    And that first paragraph,

9    second-to-the-last sentence, "This process appears

10   to have been conducted in a fair and consistent

11   manner," that's how I read that.

12       Q    Do you see any -- so, that's the

13   conclusion from Ms. Benko is that the process

14   appears to have been conducted in a fair and

15   consistent manner, correct?

16       A    That's how I read that.

17       Q    Is there any support for that conclusion

18   in the report?  For example, is there any

19   indication that Ms. Benko has examined videos from

20   the training exercises to make sure that all of the

21   handlers and trainees were treated the same?

22       A    As I stated before, there's nothing that

1    says she specifically watched any specific video.

2          Q    Is there any indication in the report

3    that gives support to the conclusion that the

4    process was conducted in a fair and consistent

5    manner?

6                MS. BERRY:  Objection, asked and

7    answered.

8          A    There's the summary sentence that I read

9    earlier, "The process appears to have been

10   conducted in a fair and consistent manner."

11         Q    But other than that conclusion, there's

12   no detail that supports the conclusion that the

13   process was conducted in a fair and consistent

14   manner in the report, correct?

15         A    Correct.

16               MR. ALDERMAN:  Sarah, could you pull up

17   the document that's labeled USCP 12 to 17.  And can

18   we mark that as Exhibit 3, please.

19               (Braddock Deposition Exhibit 3 was marked

20   for identification and is attached to the

21   transcript.)

22         Q    Mr. Braddock, what we have before us has

1    been marked Exhibit 3.  This is a document that

2    goes from USCP 12 to 17, those are the Bates

3    numbers on the bottom right corner.  Have you ever

4    seen this document before?

5             THE WITNESS:  Could I have control of it,

6    please.

7        A    I don't remember ever seeing it.

8        Q    Well, do you know if you or anyone else

9    provided Ms. Benko with a copy of this document

10   before she --

11       A    I know I did not.

12            MR. ALDERMAN:  All right, we can put that

13   away then.  Thank you.

14            Sarah, could you mark -- or call up USCP

15   118 to 120, and could we please mark that as

16   Exhibit 4.

17            (Braddock Deposition Exhibit 4 was marked

18   for identification and is attached to the

19   transcript.)

20            MR. ALDERMAN:  And could you please give

21   Mr. Braddock control over the document so he can

22   take a look at it.

1              THE WITNESS:  Could you also increase the

2    size for me.  Thank you.

3         Q    Mr. Braddock, my question for you is is

4    this an email that you received from Assistant

5    Chief Sund on October 27, 2017, at 5:42 p.m.?

6         A    It appears to be the one that I received,

7    yes.

8         Q    And did you read that email when you

9    received it?

10        A    Yes, sir.

11        Q    And do you remember if you ever

12   forwarded -- you agree that starting on about the

13   second page of the exhibit there's a statement from

14   Officer Van Meter about her experience in the

15   training program?

16        A    Which are you referring to, sir?

17        Q    The statement that we're looking at on

18   page USCP 119 from Officer Van Meter.

19        A    Which one of them?  I just want to make

20   sure I'm focused on the same one that you are.

21        Q    I'm sorry, there's an email from Officer

22   Van Meter dated October 23, 2017, at 9:19 that

1    Assistant Chief Sund forwarded to you.

2        A    Yes, sir.  Are you referring to the whole

3    topic or a particular paragraph?

4        Q    No, that's her statement, that's how I'm

5    referencing the email.

6        A    Okay.  I just wanted to be clear.

7        Q    And you received that from Assistant

8    Chief Sund, correct?

9        A    That's correct.

10       Q    Did you provide that email statement from

11   Officer Van Meter to Ms. Benko?

12           MS. BERRY:  Objection, asked and

13   answered.

14       A    I do not remember if I did or did not.

15           MR. ALDERMAN:  Okay.  We can put that one

16   away.  Thank you, Sarah.  And could you call up,

17   please, the document titled USCP 1936 to 37.  And

18   could we mark that as Exhibit 5, please.  And could

19   you zoom in on that and give him control.

20           (Braddock Deposition Exhibit 5 was marked

21   for identification and is attached to the

22   transcript.)

1        Q    And, Mr. Braddock, what we're looking at

2    now has been marked as Exhibit 5.  It is an October

3    20, 2017, email from 3:08 p.m. from Mauricia Van

4    Meter to you.  Did you receive that email on

5    October 20th?

6        A    I don't remember it.  I don't know.

7        Q    Any reason to believe that you did not

8    receive this email?

9        A    No.

10        MR. ALDERMAN:  Okay.  We can put that one

11    away, thank you.

12        Sarah, could you call up USCP 121,

13    please.  And could you give Mr. Braddock control so

14    he can zoom and scroll.

15        (Braddock Deposition Exhibit 6 was marked

16    for identification and is attached to the

17    transcript.)

18        Q    So, Mr. Braddock, here is a document

19    that's been marked as Exhibit 6.  The top email is

20    the one that I wanted to address with you.

21        A    Yes, sir.

22        Q    That's from you to Assistant Chief Sund

1    on October 27, 2017, at 6:20 p.m., correct?

2        A    Yes.

3        Q    And did you send that email to Assistant

4    Chief Sund?

5        A    Yes.

6        Q    Now, in your email you write, quote, I

7    will meet with Francine Benko, one of my associate

8    directors, and task her with this on Monday.  She

9    and I will develop a plan for the review so it's

10   done in an expeditious but thorough manner, end

11   quote.

12           Did you and Francine Benko work on a plan

13   for the review?

14       A    No.  And when I refer to that, it's about

15   her timelines in getting down there and taking care

16   of it so we can get a response back to the chief.

17       Q    Okay.  So, you didn't give Ms. Benko any

18   particular instructions about how she was to

19   conduct the review?

20       A    The only instructions I remember had to

21   do with going in and looking at the processes to

22   make sure that there was nothing that was causing

1    anybody to not be successful.  I don't remember

2    specificity.

3         Q    You gave her that instruction by email,

4    or in person, or --

5         A    I don't remember.

6         Q    Well, do you know why Officer Van Meter's

7    concerns were not investigated by -- sorry, scratch

8    that.

9              Do you know why Officer Van Meter's

10   concerns were not investigated under the

11   anti-discrimination policy?

12        A    I got this from Assistant Chief Sund,

13   asking me to take a look at her concerns, and the

14   concerns that I saw that were noted were around

15   diversity and around the process she went through.

16        Q    So, you identified that her concerns were

17   concerns related to diversity, but you didn't

18   interpret them to be a concern about

19   discrimination; is that correct?

20        A    I did not -- I didn't see anything

21   specific to references of her being compared

22   differently than other people.

1      Q    And if you had, would your advice have

2 been then that this needs to be investigated under

3 the discrimination and harassment policy?

4      A    Yes.

5      Q    And that would have meant that it would

6 need to be investigated by either OPR, OIG, or the

7 office of general counsel?

8      A    Correct.

9      Q    Do you know anything about the pay that

10 the K-9 handlers received?  You know, after they

11 successfully completed the K-9 program, do you know

12 anything about what pay they received?

13      A    They go into what's called the technician

14 line of our -- it's called the LP, law enforcement

15 pay -- pay chart, and it's technician pay.  It

16 includes additional pay that relates to the

17 handling of the dogs, the time it takes to care for

18 them.

19      Q    As soon as an officer becomes a K-9

20 technician, so they pass the certification course,

21 they're now a technician, do they all receive the

22 same rate of pay or is their beginning rate of pay

1    as a technician dependent on how many years they've

2    been at Capitol Police?

3         MS. BERRY:  Objection, compound, vague

4    and ambiguous, and calls for speculation.

5         A    It's dependent on the employee and their

6    years of service.  And human resources would take

7    that data and place them somewhere on that

8    technician line in the pay chart.

9         Q    Based on their years of service?

10        A    Yes, it's where they're at in their step

11   and their years of service.

12        Q    And do you know if that's in accordance

13   with a table or a chart that human resources can

14   reference?

15        A    We have in our Capitol Police board

16   regulations on pay, it speaks to how you do these

17   calculations.  And HR has a pay setting form that

18   they use.

19        Q    So, there's a policy that defines how

20   that salary is supposed to be determined, correct?

21        A    It defines how our general salary process

22   is laid out and the steps and so forth for the

1    various parts of the civilian and law enforcement

2    pay plans.

3         Q    And so you could take that policy and you

4    could apply it to any uniformed position, correct?

5         A    Correct.

6         Q    It would give you the instructions to

7    determine which pay grade a newly minted K-9

8    technician should be placed into?

9         A    It tells you the process by which you

10   determine that.

11        Q    Great, okay.  And do you know what that

12   policy is called?

13        A    It's Capitol Police board regulation -- I

14   believe it's uniformed regulation on pay, but I

15   don't remember the exact title.

16        Q    Do you know if you ever spoke to the

17   lieutenant who was in charge of the K-9 training

18   program about any concerns that Officer Van Meter

19   raised?

20        A    Which lieutenant are you referring to?

21        Q    Whichever lieutenant it was.

22             MS. BERRY:  Objection, vague and

1   ambiguous.

2       A    I didn't speak to anyone in the program

3   about Van Meter's concerns, no.

4       Q    Did you speak to anyone -- I think that's

5   a better question, thanks.  I like the way you

6   answered it.

7            Did you speak to anyone in the training

8   K-9 program about Ms. Van Meter's removal from the

9   program?

10      A    Not to my knowledge.  I was relying on

11  Ms. Benko.

12      Q    Do you know why Sergeant Phelps was

13  removed from the K-9 training program?

14      A    I do not.

15      Q    Did you have any discussions about why

16  Sergeant Phelps was removed from the K-9 training

17  program?

18      A    Not that I remember.

19      Q    Any communications, whether they were

20  verbal or written, about why Sergeant Phelps was

21  removed from the K-9 training program?

22      A    Not that I remember.

1        Q    Do you know why he separated from the

2    Capitol Police?

3        A    No.

4        Q    Have you heard any complaints at all

5    about Sergeant Phelps?

6             MS. BERRY:  Objection, vague and

7    ambiguous, and also irrelevant.

8        A    Not that I remember hearing, no.

9        Q    Are you aware of any complaints anyone

10   else has raised about Sergeant Phelps?

11            MS. BERRY:  Objection, same objection.

12       A    No, not that I'm aware of, no.

13       Q    Are you aware of any concerns regarding

14   discrimination that anyone has raised about

15   Sergeant Phelps?

16            MS. BERRY:  Objection, irrelevant.

17       A    Not that I remember, no.

18       Q    Are you aware of any concerns raised by

19   anyone about how Sergeant Phelps ran the training

20   program?

21            MS. BERRY:  Objection, vague, ambiguous,

22   and irrelevant.

1      A      The references that are in Van Meter's

2   email trail that has his name in it.

3      Q      Other than concerns raised by Van Meter.

4      A      Not that I remember, no.

5           MR. ALDERMAN:  Okay.  That's all the

6   questions I have for you.

7           MS. BERRY:  Okay.  Can we take a quick

8   break?  Because I want to use some of your

9   exhibits, but I want to make sure that I can orient

10  Sarah to the correct Bates numbers.  So, can we

11  take like maybe a ten-minute break so I can --

12          MR. ALDERMAN:  Sure.

13          MS. BERRY:  -- confirm that the Bates

14  numbers are the same ones?

15          MR. ALDERMAN:  Okay.

16          MS. BERRY:  Okay, thanks.

17          (A recess was taken from 12:05 p.m. to

18  12:13 p.m.)

19             EXAMINATION BY COUNSEL FOR

20       DEFENDANT, UNITED STATES CAPITOL POLICE

21  BY MS. BERRY:

22     Q    Mr. Braddock, I'm going to call your

1    attention back to Plaintiff's Exhibit 2 and your

2    responses, your earlier testimony.

3              Did you ever ask Ms. Benko to list in

4    this report all of the documents that she reviewed

5    as part of her report?

6         A    I did not.

7         Q    Did you ever ask her to list any videos

8    that she reviewed or considered as part of her

9    report in this document?

10        A    I did not.

11        Q    And why is that?

12        A    My experience with Francine over the

13   years is that she goes through things with great

14   thoroughness.  So, I didn't expect -- I didn't feel

15   like I had to tell her every specific thing,

16   because she's always produced things for me that

17   went through all the processes.

18             She also came out of an IG's office, so I

19   understood the methodologies that she was used to

20   doing in that office.

21        Q    Okay.  Is there any indication in this

22   report, and you can take a moment to look through

1    it again if you need to, but is there any

2    indication in Ms. Benko's report that she did not

3    review any documents, or videos, or any other

4    information in drafting her findings?

5           THE WITNESS:  Sarah, may I get control

6    again, please.  Thank you.

7       A    Can you repeat your question, please.

8       Q    So, is there anything in this document,

9    being Exhibit 2, that suggests Ms. Benko did not

10   review any documents or videos when she drafted

11   this report?

12          MR. ALDERMAN:  Objection.

13      A    There's nothing that I see, no.

14      Q    Is there anything in this document to

15   suggest that she did not review any videos before

16   drafting this report?

17          MR. ALDERMAN:  Objection.

18      A    Nothing that I see, no.

19      Q    So, you testified earlier about her

20   conclusion that this was an equitable and -- well,

21   let's use the exact words, let's scroll down,

22   please.

1          You testified earlier about the support

2    for her conclusion that this appears to have been

3    conducted in a fair and consistent manner.  Can you

4    scroll up to the top of the first page, 1856,

5    please.  I'll ask you to read silently the second

6    paragraph.

7        A    Are you talking about the second

8    paragraph under background?

9        Q    Under background, yes.

10       A    Okay.

11       Q    In your view, does this background

12   information support her final conclusion?

13            MR. ALDERMAN:  Objection, leading.

14       A    You're referring to this when it starts

15   with "as with," correct?

16       Q    Oh, I'm sorry, I meant the third.

17       A    Okay.  Okay, can you tell me your

18   question again, I'm sorry.

19       Q    Sure.

20            In reading this report, does this

21   paragraph support that this report was done --

22   well, the process was done in a fair and consistent

1    manner?

2            MR. ALDERMAN:  Objection, leading.

3        A    That's how I read it, yes.

4        Q    Okay.  I'll call your attention now to

5    the fourth paragraph under the same section.

6        A    The one that begins with the average

7    class size?

8        Q    Yes.

9        A    Okay.

10       Q    And if you will read the fourth and fifth

11   paragraphs silently.

12       A    Okay.

13       Q    After reading those paragraphs, what did

14   you interpret Mrs. Benko's investigation to have

15   included?

16       A    That she went through and looked at -- as

17   referenced in the top, she was given the binders,

18   the syllabus, and so forth, and that she went

19   through all of those in this process.

20       Q    And as to the discussion section, does it

21   discuss any of the items that were addressed in the

22   background section?

1          MR. ALDERMAN:  Objection, vague.

2          MS. BERRY:  And strike that, I'll

3     rephrase.

4          Q    Does the discussion section of this memo

5     discuss how the trainees were selected for Ms. Van

6     Meter's class?

7          A    Yes, it does.

8          Q    Does it discuss any candidates who did

9     not successfully complete the program?

10          A    In the discussion section --

11          Q    Yes.

12          A    -- it implies people who were not moved

13     on in the process.

14          Q    Okay.  Does it identify the gender of the

15     individuals from Ms. Van Meter's class who did not

16     complete the program?

17          A    Yes, it does, there's a male and a

18     female.

19          Q    In the findings section right below the

20     discussion section in the same exhibit on the same

21     page, does it explain why the male and female did

22     not successfully complete the program?

1    A    It recaps for both, yes.

2    Q    Based on this information -- or what's

3  your conclusion based on this information as to the

4  sufficiency of Ms. Benko's review of the K-9

5  training program?

6         MR. ALDERMAN:  Objection, form, leading.

7    A    Based on my experiences with Ms. Benko's

8  work, it implied to me that she had looked through

9  the process and therefore was recapping what she

10 had observed.

11        MS. BERRY:  Thank you.  Sarah, could you

12 now please present or post Plaintiff's Exhibit 4.

13   Q    And you can take a moment to review it.

14   A    Okay.

15   Q    Do you know whether the claims in Officer

16 Van Meter's email were investigated by OPR?

17   A    I don't have any knowledge of that.

18   Q    Do you know whether they were

19 investigated by the OIG?

20   A    I don't know that.

21   Q    Do you know whether her claims were

22 investigated by the OGC?

1      A      I know when litigation is involved the

2   OGC does look at them and investigate them, but I

3   don't know in this case.

4           MS. BERRY:  Okay.  Sarah, could you now

5   post Exhibit 5, Plaintiff's Exhibit 5.

6      Q    Mr. Braddock, do you ever recall getting

7   or receiving this email?

8      A      I do not.  I get several hundred a day,

9   and things come in that I miss and don't see.

10          MS. BERRY:  Okay.  No further questions.

11          MR. ALDERMAN:  I have a couple follow-up

12   questions.

13          MS. BERRY:  Sure.

14        FURTHER EXAMINATION BY COUNSEL FOR

15           PLAINTIFF, MAURICIA VAN METER

16   BY MR. ALDERMAN:

17      Q    Mr. Braddock, you indicated that based on

18   your experience with Ms. Benko you assumed that she

19   had done a thorough job in this investigation,

20   correct?

21      A      Yes, based on my experience with her and

22   the way she had done previous projects, yes.

1          MR. ALDERMAN:  If you would, let's pull

2   up Exhibit 2, please.  And if you can, please,

3   let's scroll down to the bottom half of 1857, the

4   findings section.  There you go.

5          Q    Mr. Braddock, can you read that okay?

6          A    I can, yes.  Thank you.

7          Q    I'd like to address your attention

8   specifically to the second paragraph under the

9   findings section on page 1857.  It reads,

10  "Ms. Buscher was not successful in the program.

11  She lacked consistency."  I'm going to stop right

12  there.

13          Is there anything in this document, which

14  you -- you've had the opportunity to read a few

15  times during today's deposition, is there any

16  detail that would explain Ms. Benko's statement

17  that Officer Van Meter lacked consistency?

18          A    There's not a specificity, no.

19          Q    There's no support for that conclusion in

20  this report, is there?

21          MS. BERRY:  Objection, mischaracterizes

22  earlier testimony.

1      A    She's recapped the process above.  And

2   based on my experience with her, when she's

3   referring to that it's drawing them together.

4      Q    Okay.  But this report was intended not

5   for you, but for Chief Sund, correct?

6      A    That is correct.

7      Q    And nothing in this report gives any

8   detail to the conclusion that Officer Van Meter,

9   quote, lacked consistency, correct?

10          MS. BERRY:  Objection, mischaracterizes

11   earlier testimony.

12      A    There's no specific references that go to

13   specific things, no.

14      Q    Do you even know what Ms. Benko means

15   when she says that Officer Van Meter lacked

16   consistency?

17      A    I believe I do.

18      Q    Based on something that she wrote in the

19   report or based on something that she told you?

20      A    No, based on my experiences with her

21   looking at processes and whether they followed

22   processes.

1      Q     Okay, so I'm not asking for an

2   assumption.

3      A     Okay.

4      Q     I'm asking do you know what Ms. Benko

5   meant when she wrote "lacked consistency"?

6      A     I don't know specifically her intent of

7   that word, no.

8      Q     And there's no explanation for "lacked

9   consistency" in this document, is there?

10     A     Not a specific tie between that word and

11  other parts of the memo.

12     Q     And Ms. Benko, just continuing in that

13  paragraph, she says that Officer Van Meter lacked

14  adaptability, correct?

15     A     It says that, yes.

16     Q     Is there any factual support for the

17  conclusion that Officer Van Meter lacked

18  adaptability in this report?

19     A     A direct tie between that word and other

20  parts of the memo, no.

21     Q     Any explanation in the memo for the

22  conclusion that Officer Van Meter lacked

1  adaptability?

2       A     Not specific to her, no.

3       Q     Do you know what Ms. Benko meant when she

4  wrote that Officer Van Meter lacked adaptability?

5       A     Not her specific use of that word, no.

6       Q     Continuing in that paragraph, Ms. Benko

7  writes that Officer Van Meter had a poor pattern of

8  performance.  Is there anything in this report that

9  gives any detail to the conclusion that Officer Van

10 Meter had a poor pattern of performance?

11      A     I'd like to look at one thing.

12            THE WITNESS:  Sarah, can I have control,

13 please.

14      A     Nothing that specifically points back to

15 those words, no.

16      Q     The last is that Ms. Benko writes that

17 Officer Van Meter, quote, had issues with the

18 mechanics of working with a canine.  I'm sorry, I

19 skipped something.  Excuse me.

20            Next Ms. Benko writes that Officer Van

21 Meter was, quote, not able to display proper

22 techniques.  Is there any factual support for that

1    conclusion in this report?

2         A    It doesn't specifically tie to specifics,

3    no.

4         Q    Does she explain what proper techniques

5    Officer Van Meter was not able to display?

6         A    Specific to Van Meter, no.

7         Q    And last, Ms. Benko writes that Officer

8    Van Meter, quote, had issues with the mechanics of

9    working with a canine.  Is there any factual

10   support for that conclusion in this report?

11        A    Specific to the use of those words, no.

12        Q    And do you know what Ms. Benko meant when

13   she wrote that Officer Van Meter had issues with

14   the mechanics of working with a canine?

15        A    I don't know her intent in using those

16   words, no.

17        Q    Now, if you would scroll to the very --

18   let's see, the first page, the first paragraph

19   under background.

20        A    Okay.

21        Q    Ms. Benko wrote, "On November 6, 2017, I

22   visited the K-9 training facility and met with

1  Sergeant Tony Phelps, Canine Training Specialist,

2  Kenny Hill, and Technician Timothy Cullen.  During

3  our meeting I requested an overview of the training

4  process, asked specific questions from a list that

5  I prepared in advance; reviewed the K-9 technician

6  training manual, and training binders."  Correct?

7      A    That's what it says, yes.

8      Q    So, in her first paragraph in the

9  background she specifies who she spoke to, correct?

10     A    Correct.

11     Q    And she specifies that she talked to the

12 trainers, correct?

13     A    On that visit she does, yes.

14     Q    And she does not specify that she talked

15 to any of the candidates, the trainees, correct?

16     A    Related to that visit, no.

17     Q    Does she anywhere list having spoken to

18 any trainee in this document?

19     A    None that I see.

20     Q    So, it's not just that event, she's -- in

21 her first paragraph she's telling the reader who

22 she spoke to, correct?

1      A      Again, related -- that paragraph relates

2   to that visit, so, yes.

3      Q      Does she refer to any other visit?

4      A      No, sir.

5      Q      So, there's no indication that there was

6   any other visit, correct?

7      A      None that I'm aware of from this reading.

8      Q      So, the only visit that she's referencing

9   is a visit on November 6th, correct?

10     A      Based on the paragraph, yes.

11     Q      And she's specifying who she spoke to,

12  correct?

13     A      Yes.

14     Q      And she's only specifying trainers and

15  not trainees, correct?

16     A      Yes.

17     Q      She does not mention having spoken to

18  Officer Van Meter anywhere in this report, correct?

19     A      Correct.

20     Q      She also specifies that she received an

21  overview of the training process from the trainers,

22  correct?

1      A      Correct.

2             MS. BERRY:   Objection, mischaracterizes

3   the document.

4      Q      She says she asked specific questions

5   from a list that she prepared in advance, correct?

6      A      Yes.

7      Q      Do you know what questions she asked?

8      A      I don't.

9      Q      Did you work with her on the list of

10  questions?

11     A      No.

12     Q      Have you ever seen her list of questions?

13     A      Not that I recall ever seeing them.

14     Q      She then specifies that she reviewed the

15  K-9 technician training manual, correct?

16     A      That's what it says.

17     Q      And the training binders, correct?

18     A      Yes, that's what it says.

19     Q      She specifies what she reviewed, correct?

20     A      In this visit on the paragraph, yes, she

21  does.

22     Q      You know of no other visit, correct?

1      A      That's correct.

2      Q      So, on this visit, for her report, she's

3  listing the items that she reviewed, correct?

4      A      What's listed up here, yes.

5      Q      Does she list videos?

6      A      There's no word "video" in that, no.

7      Q      Does she list end-of-day reports?

8      A      They're not specifically referenced.

9      Q      Does she refer to certification exam

10  results?

11     A      No.

12     Q      Does she refer to weekly exam results?

13     A      No.

14            MR. ALDERMAN:  That's all the questions I

15  have for you.  Thank you.

16            MS. BERRY:  I have a few follow up.

17         FURTHER EXAMINATION BY COUNSEL FOR

18          DEFENDANT, UNITED STATES CAPITOL POLICE

19  BY MS. BERRY:

20     Q      Just in keeping with this same exhibit,

21  do you know whether Ms. Benko visited the K-9 unit

22  on more than one occasion?

1      A      I don't know.

2      Q      And if you could scroll down to the

3  findings section, please.

4             So, is it possible that she went to the

5  K-9 unit on more than one occasion?

6             MR. ALDERMAN:  Objection.

7      A      It is possible, yes.

8             MR. ALDERMAN:  Speculation.

9             THE WITNESS:  I'm sorry.

10             MS. BERRY:  No, that's okay.

11      Q      Scroll down to findings.  Thank you.

12             So, in reading the paragraphs, the first

13  and second paragraph of the findings section, are

14  they similar?

15             MR. ALDERMAN:  Objection, vague.  Also,

16  leading.

17      A      Are you referring to the one that says

18  "Mr." and blacked out, and then the second says

19  "Ms. Buscher"?

20      Q      Yes.  So, in the first paragraph of the

21  findings section it says that Mr. Handler was not

22  successful in the program.  Do you see that

1    paragraph?

2        A    I do.

3        Q    Are the specifications regarding his

4    errors in the program the same as the ones in the

5    following paragraph, paragraph 2?

6        A    The summations are similar, yes.

7        Q    And Ms. Benko made both findings, right?

8    This is her report.

9        A    That is correct.

10       Q    Would you scroll down, we'll just take a

11   look at the last sentence on this page.  It reads,

12   "This comes in the form of daily reports that they

13   discuss, review, and sign in order to acknowledge

14   receipt, as well as videotapings of the trainees

15   performing exercises that are reviewed with them

16   and critiqued."

17            Does it indicate that Ms. Benko did not

18   review these videos --

19            MR. ALDERMAN:  Objection, leading.

20       Q    -- in this paragraph?

21       A    That she did not review them?  No, it

22   does not.

1      Q     And what do you understand this full

2  paragraph, the last full paragraph of her report to

3  mean, what's your interpretation?

4            MR. ALDERMAN:  Objection, calls for

5  speculation and leading.

6      A     I read this to summarize what she had

7  looked at and the way she had gone about drawing

8  her conclusions, that it was -- appeared to be

9  conducted in a fair and consistent manner.

10     Q     And based on this paragraph, what did you

11 conclude that she had looked at?

12     A     The holistic process.

13     Q     Anything in particular?

14     A     Well, all of the parts, the various

15 forms, the references, the videos, all the things

16 that were referenced.

17     Q     Did she look at anything else regarding

18 the process to your knowledge?

19     A     Than what's captured in this paragraph?

20     Q     And also just in the entire document.

21 You can take a moment to review it.  I'll call your

22 attention specifically to the discussion section.

1           MR. ALDERMAN:  Objection.

2      A    Can you restate your question, please.

3      Q    What else do you -- if you know, what

4  else did she consider when she reviewed this entire

5  process based on this report?

6           MR. ALDERMAN:  Objection.

7      A    I read this section to refer to the

8  vacancy process to move people along to be

9  considered for training.

10     Q    Okay.  Is that an important element of

11  the overall training process?

12     A    It is, because it speaks to who was

13  basically qualified to be considered, and it has a

14  reference to the numbers of women and men that

15  moved along in the process.

16     Q    And why is that important in terms of the

17  assignment that you gave Ms. Benko?

18     A    It helps me understand that women were

19  moved along in the process, which is what we're

20  trying to do, is to make sure that underrepresented

21  populations can compete and be successful, which is

22  part of the diversity gap that we're trying to

1    address in our specialties.

2              MS. BERRY:  Okay.  No further questions.

3              MR. ALDERMAN:  As you may have guessed.

4         FURTHER EXAMINATION BY COUNSEL FOR

5              PLAINTIFF, MAURICIA VAN METER

6    BY MR. ALDERMAN:

7         Q    Yes, so we're on the right exhibit, and

8    actually in the right screen.  So, I'm referring

9    you to Exhibit 2, the second paragraph under

10   discussion.  Ms. Benko makes it appear that this

11   male handler was in the same training class as

12   Officer Van Meter, correct?

13             MS. BERRY:  Objection,

14   mischaracterization of the evidence.

15        A    She spoke to the program.  I didn't imply

16   one way or the other.

17        Q    Well, she writes there were two

18   candidates who did not successfully complete the

19   program, one male and a female candidate.

20        A    That is correct.

21        Q    And so she gives the impression in the

22   report that those candidates were in the same

1    training class, correct?

2          MS. BERRY:  Objection, same objection.

3      A    When I look further up in the document,

4    it speaks to the two different types of trainings

5    in the program.  One's the Vapor-Wake and I forget

6    the official name of the other one.  So, it speaks

7    to the program holistically.  I didn't take it to

8    mean the same training program itself, because

9    there's two different types.

10     Q    You believe that they were going through

11   the training program at the same time, though,

12   correct?

13     A    Yes.

14     Q    That's the way it's written, correct?

15          MS. BERRY:  Objection,

16   mischaracterization of the evidence.

17     A    They each have a different timeline.

18     Q    Show me what you --

19     A    I'm sorry?

20     Q    Show me what you're talking about with

21   the different timelines.

22     A    What I'm referring to --

1          THE WITNESS:  Can I have control, please,

2    Sarah.

3          AV TECHNICIAN:  You do have control

4    still.

5          THE WITNESS:  Oh, thank you, I appreciate

6    it.

7      A    I'm referring to this right here where it

8    speaks of vacancies occur, ranked order, placed

9    into either one of these two trainings.  So, I look

10   at the training program holistically for K-9, and I

11   don't differentiate when I read which bucket

12   they're in, because they each have a different

13   timeline.

14     Q    Right, you thought they were in the same

15   bucket, correct?  They were both in the training

16   program together.  They may have been assigned to

17   different parts of that training, static versus

18   PBIED, but you believed that they were going

19   through at the same time, correct?

20     A    Correct.

21     Q    Now, you indicated when Ms. Berry was

22   asking you questions, you indicated that it was

1    your belief based on how the report is written that

2    Francine Benko reviewed all of the documents that

3    are referenced in the report and all --

4              MS. BERRY:  Objection.  Oh, sorry.

5         Q    That are referenced in the report,

6    correct?

7              MS. BERRY:  Objection,

8    mischaracterization of earlier testimony.

9         A    What I said was the things were

10   summarized, and because she indicated she'd

11   received the binders and the training materials,

12   and based on my knowledge of my background with

13   her, that she had gone through all of it.

14        Q    So, you're saying that your belief was

15   that she had reviewed the videos?

16        A    My background with Francine is that she

17   doesn't leave any stone unturned.  So, I have no

18   reason to believe otherwise.

19        Q    Did you believe that she reviewed the

20   videos?

21              MS. BERRY:  Objection, asked and

22   answered.

1      A      Yes, I did.

2      Q      Did you believe that she had reviewed all

3  of the trainees' test scores?

4      A      Yes.

5      Q      Did you believe that she had reviewed the

6  midterm evaluations for all the trainees?

7      A      Yes.

8      Q      Did you believe that she had reviewed the

9  end-of-day reports for all of the trainees?

10     A      Yes.

11     Q      Did you believe that she had reviewed the

12 certification exam results for all of the trainees?

13     A      Yes.

14     Q      And you believed that she had viewed all

15 of those materials with an eye to make sure that

16 everyone was treated the same, correct?

17     A      Correct.

18     Q      And would it be your opinion that this

19 wouldn't be a very good investigation if Ms. Benko

20 did not do those things?

21         MS. BERRY:  Objection, calls for

22 speculation.

1     A     Well, again, I didn't look at it as an

2   investigation.  I asked her to review a process.

3     Q     And it wouldn't have been a very good

4   review if she had not --

5             MS. BERRY:  Oh, hold on one second.

6             THE WITNESS:  Sorry, I caused a bunch of

7   stuff to come up on the screen.  Sorry.

8             MS. BERRY:  Okay, there we go.

9     Q     It would not have been a very good review

10  if she had not viewed all of those records,

11  correct?

12    A     I wouldn't pass judgment on it because of

13  her background, she knows what to review in the

14  process.

15    Q     But in your mind if she didn't review all

16  those things, would it have been a thorough review?

17    A     I believe, yes, it would have, because

18  she's determining what she believes needs to be

19  reviewed.  I'm not -- I'm not in a place to

20  second-guess Francine's work.

21    Q     So, your understanding was that she

22  reviewed all those things and that her report was

1    premised on all of those things, correct?

2        A    Yes, sir.

3        Q    Do you think that it would be possible

4    for Ms. Benko to conclude that everyone was treated

5    fairly if she had not reviewed all of the records

6    that we've been discussing?

7        A    Can you restate that again, please.  I

8    just want to make sure I'm hearing you.

9            MS. BERRY:  And objection, compound.  Go

10   ahead.

11       Q    Do you think that it would be possible

12   for Ms. Benko to conclude that everyone was treated

13   fairly if she had not reviewed the records that we

14   have been discussing?

15       A    Again, based on Francine's background,

16   she could draw that conclusion, yes.

17       Q    By guessing that people were treated

18   fairly?

19       A    I wouldn't say that Francine ever

20   guesses.

21       Q    So, is it -- do you think it would be

22   possible for her to have an informed conclusion

1    that everyone was treated fairly and the same if

2    she had not reviewed the records?

3         MS. BERRY:  Objection, asked and

4    answered.  Oh, sorry.

5         A    I'm sorry, are you done talking?  Okay.

6              Francine would not have written that if

7    she had not reviewed what was necessary to draw

8    that conclusion.

9         Q    Do you think it's possible to determine

10   if everyone was treated fairly if you don't look at

11   the test results?

12        A    I would expect us to look through the

13   process holistically, at all of it, and make sure

14   that everybody had a chance to operate.  Because if

15   she's not looking at the test results for anybody,

16   everyone's being looked at holistically from her

17   perspective.  Again, I don't draw conclusions as to

18   what she did or didn't do based on my knowledge of

19   her work.

20        Q    No, I'm asking you to draw a conclusion

21   about the quality of the work.  If she didn't

22   review the videos, if she didn't review the tests,

1    if she didn't review the midterms, do you think it

2    would be fair of her to draw the conclusion that

3    this process was conducted fairly?

4              MS. BERRY:  Objection, calls for

5    speculation.

6        A    I believe that she -- again, if she's

7    looking at everything for each person holistically,

8    the same stuff, that she could draw conclusions.

9    I've never known her not to look at everything.

10       Q    And if she didn't look at everything, it

11   wouldn't be possible to draw those conclusions,

12   right?

13             MS. BERRY:  Objection, asked and

14   answered.

15       A    Restate your question again, please.

16       Q    If she didn't look at the records, she

17   couldn't conclude that the process was conducted

18   fairly, right?

19             MS. BERRY:  Objection, same objection.

20       A    Not -- not necessarily.  I mean, she's

21   got to go through all the parts and pieces.

22       Q    And if she doesn't go through all the

1    parts and pieces, she can't come to the conclusion

2    that the process was fair, correct?

3         MS. BERRY:  Objection, same objection.

4    A    You know, again, I would say Francine, if

5    she's looking at all of the parts, like she's

6    looking at the same people who took the same types

7    of tests, if she doesn't look at videos for

8    anybody, then it doesn't factor into that, her

9    perspective.  She makes -- she draws the conclusion

10   as to what she's going to look at in this process.

11   I didn't give her specific instructions.

12   Q    That's not my question.

13   A    Can you restate it again, please.

14   Q    Sure.  If she didn't look at the records

15   from the training that you told Ms. Berry that you

16   assumed that she looked at, do you think that she

17   could come to the conclusion that the process was

18   fair?

19        MS. BERRY:  Objection, asked and

20   answered.

21        MR. ALDERMAN:  Not answered, not yet.

22        MS. BERRY:  In our view it has been

1  several times.

2      A    I believe in reading this that Francine

3  looked at all these elements.  If she didn't look

4  at them and she had similar data for everyone, she

5  could draw a conclusion.

6      Q    She what?

7      A    She could draw a conclusion it was fair,

8  because she looked at the same stuff for everybody.

9      Q    So, let's say she looked at -- the only

10 record she looked at was a sign-in sheet for one

11 day, but she looked at everybody's sign-in sheet.

12 Could she conclude that this process was fair?

13         MS. BERRY:  Objection, calls for

14 speculation.

15     A    That's a singular item.  And when I read

16 this memo holistically, and again, knowing my

17 processes with Francine, she indicates that all of

18 these were items, and I believe she looked at them.

19 If she looked at one singular sign-in sheet, that's

20 not looking at the process.

21     Q    And if she says that videos were taken of

22 all of the training exercises, and that there were

1    midterm evaluations, and that there were tests, but

2    she didn't look at those tests or videos or

3    midterms, then she didn't conduct a very good

4    inquiry, did she.

5            MS. BERRY:  Objection, misconstrues

6    earlier testimony.

7        Q    You're dancing around this.  If you've

8    got someone who is -- says that they're looking at

9    stuff or you believe that they're looking at stuff

10   and they haven't, how can you conclude that that's

11   still a good inquiry?

12           MS. BERRY:  Objection, asked and

13   answered.

14       A    Because you're asking me to conclude

15   whether she thought it was relevant to look at or

16   not.  I don't know, I wasn't doing the review

17   myself.

18       Q    So, if your read of her report indicates

19   that she reviewed the videos, the test results, the

20   end-of-day reports, and she has not actually

21   reviewed those things, would you say that the

22   investigation report gives incorrect impressions?

1          MS. BERRY:  Objection, asked and

2     answered.

3      A     Again, I'm drawing that from my knowledge

4     of Francine and how she wrote this.  I wouldn't go

5     back and second-guess, necessarily, if she decided

6     that she looked and saw everyone had a video but

7     didn't open every single one to look at them.  She

8     made a determination based on looking at the

9     process whether or not it was relevant and what she

10    was looking at.

11     Q     Basically, you just took Ms. Benko's word

12    for it, that it was fair, correct?  Based --

13         MS. BERRY:  Objection.

14     Q     -- on your knowledge of Ms. Benko and

15    what she wrote in the report, you took her word for

16    it?

17         MS. BERRY:  Objection, mischaracterizes

18    earlier testimony, vague and ambiguous, and a

19    compound question.

20     A     My experience with Ms. Benko on the work

21    that she's done, she's always been incredibly

22    thorough.  So, I have no reason to believe that

1   that was not the case here.

2        Q    And it's your testimony, you don't want

3   to change it, your assumption was that she had

4   reviewed the videos, that's what you told

5   Ms. Berry, correct?

6             MS. BERRY:  Objection, mischaracterizes

7   the evidence.  Excuse me, the earlier testimony.

8             MR. ALDERMAN:  No.

9        Q    That was your assumption, correct?

10            MS. BERRY:  Same objection.

11       A    My assumption was that all the stuff that

12   was listed were things that she considered.

13       Q    The videos are one thing listed, correct?

14       A    That is correct.

15       Q    The test results are one thing that's

16   listed, correct?

17       A    That's correct.

18       Q    The end-of-day reports are also listed?

19       A    I believe they are.  I believe they are,

20   yes.

21       Q    And it was your -- you believed that you

22   could rely on Ms. Benko's report and her conclusion

1    that this was a fair process because you believed

2    that she had reviewed all of those documents,

3    correct, and records?

4           MS. BERRY:  Objection, mischaracterizes

5    earlier testimony.

6    A    I believed I could rely on this because I

7    know the quality of the work that Francine does.  I

8    didn't necessarily go into every specific item to

9    validate whether or not she had looked at it or

10   not.  I've always known her to look at everything

11   necessary, and I felt like I could stand behind

12   that.

13   Q    All that's despite the fact that there

14   are no specific factual allegations that supported

15   any of the conclusions in her findings section, as

16   we discussed earlier, correct?

17          MS. BERRY:  Objection, calls for a legal

18   conclusion.

19   A    Can you state that for me again, please.

20   Q    As you said earlier, based on your past

21   experience with Ms. Benko and the confidence that

22   you have in her, you assumed that this report was

1    accurate despite the fact that there was no factual

2    support for the findings that she has included in

3    her report?

4          MS. BERRY:  Objection, mischaracterizes

5    earlier testimony.

6          MR. ALDERMAN:  Actually, it's perfectly

7    consistent.

8      Q    You agreed that there were no factual

9    findings that supported any of her conclusions,

10   correct?

11         MS. BERRY:  Same objection.

12     Q    Do we have to go through that again,

13   Mr. Braddock?

14         MS. BERRY:  We do.

15     A    So, when we discussed this earlier you

16   were asking me did I see certain things in the

17   report relative to lines you were pointing out, and

18   I said I did not.

19     Q    Correct.

20     A    And then farther in my testimony, I spoke

21   to the fact that Francine is always incredibly

22   thorough, I didn't expect to need to see those

1    direct ties because of my experiences with her.

2         Q    And because you assumed that she had

3    reviewed the documents that we've been discussing,

4    correct?

5              MS. BERRY:  Objection, mischaracterizes

6    earlier testimony.

7         A    Based on my experiences with her, I

8    believed that she had done so, correct.

9         Q    Even though in the very first paragraph

10   she listed the things that she reviewed and the

11   people to whom she spoke?

12             MS. BERRY:  Objection, mischaracterizes

13   the evidence.

14        A    That's not how I read that.  I read that

15   to be that's what she got on that day and went over

16   with them on that day.

17        Q    Because no other day's mentioned, right?

18   Because no other day's mentioned in the report?

19        A    No.  It doesn't speak to the day she

20   wrote the report, either.

21        Q    And you had no discussions with her about

22   the report or about her findings, correct?

1       A    No.  I've never had to follow up behind

2    Francine.

3       Q    So, you don't know if she visited on any

4    other day besides November 6th, the one day that

5    she wrote in her report, correct?

6       A    I have no knowledge, no.

7       Q    That would a total guess, a guess, if you

8    were to say that you think that she went out there

9    on another day, correct?

10           MS. BERRY:  Objection, calls for

11   speculation.

12      Q    Exactly, it would call for speculation,

13   correct?

14      A    Yes.

15           MS. BERRY:  Objection, calls for a legal

16   conclusion.  Okay, what is this?

17      Q    And you would be speculating?

18      A    What happened between that time and the

19   time she wrote the report?  I don't know what she

20   was doing each of the days.

21      Q    Okay.  So, based on what you know, her

22   report is limited to the date that she mentioned in

1    the report, right?

2        A    That's the day that's specifically

3    referenced.

4        Q    Correct.  There's no other reference to

5    any other date?

6        A    Again, that -- I would have to draw a

7    conclusion as to what she was doing from that date

8    to the date she did the report with her workload.

9        Q    Mr. Braddock, this should be easy, okay?

10       A    Do I see another date?  No.

11       Q    Do you see any other date that she did

12   anything to gather information other than the date

13   that she mentions in her report?

14            MS. BERRY:  Objection, asked and

15   answered.

16       A    There's no other date referenced.

17       Q    And on the day that she references that

18   she was conducting her factual inquiry in the first

19   paragraph of the report, she lists exactly what she

20   reviewed and who she talked to, correct?

21            MS. BERRY:  Objection, mischaracterizes

22   the exhibit.

1      A     She referenced in that paragraph what she

2   went over with them on that date, that is correct.

3      Q     Okay.  So, any assumption that she looked

4   at anything else would be based on a guess,

5   correct?

6           MS. BERRY:  Objection.

7      A     It is based on my informed opinion as a

8   supervisor that has supervised her before on

9   projects that she did.

10     Q     But it's not based on anything that she

11  wrote in the report, correct?

12     A     Correct, she did not detail any of that

13  in the report, correct.

14     Q     And Chief Sund had not worked with Ms.

15  Benko directly before, had he?

16          MS. BERRY:  Objection, calls for

17  speculation.

18     A     I don't know what he worked with her on

19  or did not.

20     Q     And this memo was to inform Chief Sund,

21  not you, correct?

22     A     It was to inform Chief Sund, correct.

1      Q     And you approved of this report and you

2   forwarded it on to Chief Sund, correct?

3      A     That's correct.

4            MR. ALDERMAN:  Okay.  That's all I've got

5   for you now.

6            THE WITNESS:  Let me clarify.  I read it,

7   I was -- I approved of it.  My deputy sent it on my

8   behalf.  I don't believe I was in the office.

9            MR. ALDERMAN:  Okay.

10           MS. BERRY:  Okay, nothing further here.

11           (Off the record at 1:02 p.m.)

12

13

14

15

16

17

18

19

20

21

22

1          CERTIFICATE OF REPORTER - NOTARY PUBLIC

2               I, Jacquelyn C. Jarboe, Registered

3     Professional Reporter, the officer before whom the

4     foregoing deposition was taken, do hereby certify

5     that the foregoing transcript is a true and correct

6     record of the testimony given; that said testimony

7     was taken by me stenographically and thereafter

8     reduced to typewriting by me; that reading and

9     signing was not requested; and that I am neither

10    counsel for, related to, nor employed by any of the

11    parties to this case and have no interest,

12    financial or otherwise, in its outcome.

13               IN WITNESS WHEREOF, I have hereunto set

14    my hand and affixed my notarial seal this 6th day

15    of July, 2021.

16

17    My commission expires: August 21, 2018

18

19    _Jacquelyn C. Jarboe_

20    _____

21    NOTARY PUBLIC IN AND FOR THE

22    STATE OF MARYLAND